## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NORMA J. FIORENTINO, *et al.*, | : | 3:09-CV-2284 |
| | : | |
| Plaintiffs | : | Hon. John E. Jones III |
| | : | |
| v. | : | Special Master |
| | : | Jennifer Walsh Clark |
| CABOT OIL & GAS CORPORATION | : | |
| and GAS SEARCH DRILLING | : | |
| SERVICES CORPORATION, | : | |
| | : | |
| Defendants. | : | |

### MEMORANDUM AND ORDER

Before the Special Master for disposition is a motion filed on behalf of thirty-eight Plaintiffs ("Moving Plaintiffs") in this case for a Protective Order (Doc. 124) pursuant to Federal Rule of Civil Procedure 26(c).  More specifically, Moving Plaintiffs' filed a motion to preclude Defendants from "obtaining HIPAA-compliant medical authorizations and/or obtaining documents and discovery from medical care providers on behalf of plaintiffs who have not asserted personal injury claims in this matter."  Doc. 124, p.1 (filed March 31, 2011).   Upon consideration of Moving Plaintiffs' motion, the Memorandum of Law in support of

the motion (Doc. 125, March 31, 2011), Defendants' Brief in Opposition to Moving Plaintiffs' motion (Doc. 133, April 14, 2011), and Moving Plaintiffs' Memorandum of Law in Reply to Defendants' Opposition Brief (Doc. 144, May 2, 2011), Moving Plaintiffs' motion will be denied.

Although this case commenced in November of 2009, the controlling pleading is the Second Amended Complaint, filed on May 17, 2010 (Doc. 25). In the Second Amended Complaint, sixty-two plaintiffs seek damages by way of various causes of action relating to Defendants' operation of natural gas wells in Dimock, Pennsylvania. Of those sixty-two plaintiffs, twenty-four allege personal injury claims, and all sixty-two allege a claim for medical monitoring.[1]

At present, the question for resolution is whether the medical records of the thirty-eight plaintiffs who have asserted medical monitoring claims - but who have not asserted personal injury claims - are discoverable or entitled to protection from production under federal discovery rules and applicable law. Since there exists no dispute as to the confidential nature of Moving Plaintiffs' medical records outside

---

[1] The Second Amended Complaint, oddly, does not specifically identify which plaintiffs allege which causes of action (i.e., personal injury, medical monitoring, etc). Plaintiffs have nonetheless clarified in their pending motion that twenty-four of the sixty-two plaintiffs – identified by name or designation - have alleged a cause of action for personal injury, and that the remaining thirty-eight have not alleged a personal injury claim. See Doc. 124, p.3 & n.1. Moreover, throughout the discovery process, several plaintiffs may have clarified their asserted causes of action.

the confines of this case, there is no need to address whether that information is entitled to protection outside the context of the asserted medical monitoring claims.

Federal Rule of Civil Procedure 26(b) governs, in general terms, discovery parameters in federal court civil actions. Pursuant to that rule, "[u]nless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense--including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(C)."

As the Advisory Committee notes related to the 2000 amendments of the Federal Rules of Civil Procedure indicate, Rule 26(b) takes a two-tiered approach to determining the appropriate scope of discovery: the first as between the parties, i.e., the "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to *any party's claim or defense*"; and the second as ordered by the Court, i.e., "the court may order discovery of any matter relevant *to the subject matter involved in the action*." Under this rule, the Court has the ability to order - for

good cause - discovery on a matter that is relevant to the subject matter involved in the case, even in the instance where that discovery may not be relevant to a party's claim or defense.

In the instant motion and briefs, the parties in this case have focused their respective arguments on the relevance of the moving Plaintiffs' medical records as they relate to the medical monitoring claim - i.e., relevance as it relates to a party's claim or defense. Moving Plaintiffs posit that "plaintiffs' past and current health is irrelevant to whether they are entitled to medical monitoring" (Doc. 125, p.9), while Defendants' counter that "[w]ithout medical records, it will not be possible for Defendants to form a defense to claims for medical monitoring . . . ." (Doc. 133, p.6). In order to resolve the parties' contrasting positions in the motion, an analysis of Pennsylvania law as to the elements and defenses of a medical monitoring claim is required.

Medical monitoring is a comparatively young tort in the history of Pennsylvania jurisprudence. One of the earliest reported cases of such a claim in the Commonwealth was reported in 1982 out of Montgomery County, Peterman v. Techalloy Co., Inc., 29 Pa. D. & C. 3d 104, where Plaintiff sought a medical monitoring trust fund due to his alleged exposure to water contaminated with a hazardous substance, which he claimed increased his risk of serious illness or death at some point in the future. The court dismissed Peterman's claim, which it

4

determined was premised upon the speculative nature of a possible future injury in derogation of Pennsylvania's requirement of present actual injury to merit recovery of damages.

In 1984, outside the boundaries of Pennsylvania, the United States Court of Appeals for the District of Columbia Circuit was ostensibly the first court to retool the medical monitoring legal analysis as it relates to "current" versus "future" harm, anchoring its reasoning firmly in the definition of "injury" found in Section 7 of the Restatement (Second) of Torts. Friends for All Children, Inc. v. Lockheed Aircraft Corp., 746 F.2d 816 (D.C. Cir. 1984).[2]  According to the Friends Court, having to subject oneself to expensive diagnostic testing as the result of exposure to hazardous substances due to the negligence of another amounted to "the invasion of a legally protected interest" – or "injury" - of the plaintiffs such that compensation for such examinations and testing was warranted under the circumstances.

Back in Pennsylvania just two years after the Friends decision, a York County Court reached the same conclusion, holding that even absent a claim for present physical injury, the plaintiffs could maintain a common law claim in equity

---

[2] The Defendant's airplane crashed during an evacuation of Vietnamese orphans. The Plaintiff, the entity that organized the evacuation, filed suit on behalf of the 149 orphans that survived the crash, alleging that while they displayed no physical symptoms, the children suffered from Minimal Brain Dysfunction. Plaintiff sought to compel Lockheed to create a fund to pay for the costs of diagnostic examinations and tests.

for a medical monitoring trust fund due to the alleged leakage of toxic substances from a landfill which put them at risk for developing a serious latent disease. Habitants Against Landfill Toxicants v. City of York, No. 84-S-3820 (York County, May 20, 1985), 15 Envtl. L. Rep. 20937.

Over the next few years, the question of the very viability of medical monitoring claims under Pennsylvania law came before the federal courts in Pennsylvania before having reached the Pennsylvania Supreme Court. In 1990, the Third Circuit Court of Appeals concluded that the Pennsylvania Supreme Court would recognize a claim for medical monitoring, and predicted that a plaintiff asserting such a claim would be expected to meet a four-part test in order to succeed on the claim. In re Paoli Railroad Yard PCB Litigation, 916 F.2d 829 (3d Cir. 1990) ("Paoli I"). That same court then refined the test in 1994 in the In re Paoli Railroad Yard PCB Litigation decision. 35 F.3d 717 (3d. Cir. 1994) ("Paoli II").

The Supreme Court of Pennsylvania finally had the opportunity to confront the issue directly in Simmons v. Pacor, Inc., 543 Pa. 664 (1996), where it confirmed the Third Circuit's Paoli I prediction. In Simmons, the Pennsylvania Supreme Court formally recognized a medical monitoring claim as a viable cause of action in Pennsylvania (Simmons specifically involved pleural thickening resulting from occupational exposure to asbestos). Finally, in Redland Soccer

Club, Inc. v. Dept. of the Army, 548 Pa. 178 (Pa. 1997)[3], the Supreme Court

clarified that medical monitoring claims were not limited to asbestos-related

exposures as in Simmons, and further refined the elements of a medical monitoring

claim, which test remains the controlling one for such claims in Pennsylvania

today.

According to Redland Soccer, a plaintiff must establish the following seven

elements in order to succeed on a medical monitoring claim:

1. Exposure greater than normal background levels;

2. To a proven hazardous substance;

3. Caused by the Defendant's negligence;

4. As a proximate result of the exposure, plaintiff has a significantly increased

   risk of contracting a serious latent disease;

5. A monitoring procedure exists that makes early detection of the disease

   possible;

---

[3] The Redland Soccer complaint alleged violations of the Pennsylvania Hazardous Sites Cleanup Act, asserting that a landfill once used by the U.S. Department of the Army ("Army") to dispose of various kinds of "waste" contained toxic substances. The Army utilized the landfill between 1917 to sometime in the 1950s, at which time it closed the landfill and covered it over with soil and ashes. In 1976, the Army transferred property, including the landfill acreage, to Fairview Township, which transformed the area into a local park where the Redland Soccer Club held practices and games from 1982 to approximately 1987.

7

6. The prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and

7. The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

Redland Soccer, 548 Pa. at 195-96. Here, the crux of the disagreement between the parties as to the relevance of Moving Plaintiffs' medical records lies in the sixth element, i.e., the nature of the monitoring regime.

More specifically, moving Plaintiffs' interpretation of the sixth Redland element would read as follows: "the prescribed monitoring regime is different from that normally recommended [*for the general public*] in the absence of the exposure." Moving Plaintiffs' theory, therefore, is that the individual medical health or health conditions of each moving Plaintiff is completely irrelevant to establishing that, due to the alleged exposure, the Plaintiff requires a monitoring regime different than that normally prescribed for the general public.

Alternatively, Defendants' interpretation of the sixth element would read: "the prescribed monitoring regime is different from that normally recommended [*for that particular plaintiff*] in the absence of the exposure." Under Defendants' approach, individual plaintiffs with individualized medical conditions would be required to establish that the prescribed monitoring regime for that plaintiff would be different than one normally recommended *for that plaintiff* absent the exposure,

8

taking into account his or her medical history, genetic risk factors, occupational exposure to chemicals or other hazardous substances, etc.

Research reveals that the Pennsylvania Supreme Court has not expressly addressed this particular point, nor have other Pennsylvania state or federal courts (the vast majority of cases cited by the parties either involved class certification analyses or hailed from other jurisdictions[4]). Therefore, a review of the parties' respective positions and an interpretation and prediction as to how the Pennsylvania Supreme Court would rule on this particular issue is required.

Plaintiffs first offer that "several decisions have held that a plaintiff's physical condition is irrelevant to a claim for medical monitoring," citing to Redland Soccer Club, Inc. v. Dep't of the Army of the U.S., 55 F.3d 827 (3d Cir. 1995) for support.  A review of that decision, and other Pennsylvania state and federal court decisions cited by the parties, does not reveal the express proposition for which Plaintiffs cite the case, nor could any other binding decisions be located that so hold.

---

[4] Medical monitoring does not occupy one stable role in jurisprudence from state to state, making an adoption of any one state's rule of thumb unwise.  More particularly, some states recognize medical monitoring as an independent cause of action, some states recognize it only as an element of damages, and others do not recognize medical monitoring in any form.

However, some cases cited by Plaintiffs contain language that could arguably be interpreted as implying the premise Plaintiffs propose.[5]  However, a more global review of tort law married with the impetus for and genesis of the medical monitoring claim in Pennsylvania persuasively counsels against assigning the weight of an express holding to the otherwise descriptive language quoted and relied upon by Plaintiffs.

The federal <u>Redland Soccer Club</u> opinion (predating the Pennsylvania Supreme Court case of the same name decided in 1997) addressed the issue of whether Plaintiffs were entitled to "response costs" under CERCLA and HSCA, including a health risk assessment (or medical monitoring).  <u>Id.</u>  Ultimately, because the majority of Plaintiffs could not demonstrate that "their exposure required a different medical monitoring regimen than that which would normally be recommended *for them* absent exposure," the Third Circuit affirmed the district court's order granting summary judgment to the United States on Plaintiffs'

---

[5]  For example, Moving Plaintiffs refer to the Pennsylvania Supreme Court's decision in <u>Redland Soccer</u> (quoting from <u>Paoli II</u>) when justifying the requirement that the recommended monitoring regime in element six be more expansive than the monitoring regime "which is recommended *for everyone*."  While at first blush it appears as though this passage provides direction on the immediate question, the context of that quoted passage is illustrative of how, in the Third Circuit's view, the requirement that the monitoring regime be different, broader or more involved than that recommended "for everyone" supports the model of justice and comports with traditional notions of tort law by characterizing the 'special' monitoring regime recommended for the exposed plaintiff as an injury for which defendant may be held accountable.  The Court, it appears, intended to convey its support for the notion that the special monitoring regime requirement is one that could ostensibly protect a defendant from liability for medical monitoring that would otherwise be recommended absent an exposure to hazardous substances.

medical monitoring claims. Id. at 848 (emphasis added). That is not the end of Redland Soccer, however, and the Pennsylvania Supreme Court decision in 1997 will be explored *infra*.

Plaintiffs also refer to Merry v Westinghouse, which likewise does not address the issue at hand and, moreover, was decided prior to the Pennsylvania Supreme Court decisions in both Simmons in 1996 and Redland Soccer Club in 1997, and therefore does not offer much by way of support. In Simmons v. Pacor, Inc., the Commonwealth's highest Court affirmed the viability of a common law claim for medical monitoring, writing: "[a]lthough we hold that awarding damages for the increased risk and fear of cancer is contrary to the established jurisprudence of this Commonwealth, we find that recovery for medical monitoring is appropriate and just." 543 Pa. 664, 679-80 (1996).

In so holding, the Pennsylvania Supreme Court found both "interesting and appropriate the rationale and findings" by the Court of Appeals of Arizona in Burns v. Jaquays Mining Corp., 156 Ariz. 375, 380 (Ariz. Ct. App. 1987). The Burns court concluded that "when the evidence shows 'through reliable expert testimony predicated on the significance and extent of exposure . . . the toxicity of [the contaminant], the seriousness of the diseases for which the individuals are at risk, the relative increase in the chance of onset of the disease in those exposed and the value of early diagnosis, . . . surveillance to monitor the effects of exposure to

toxic chemicals is reasonable and necessary,' *and its cost is a compensable item of damages.*" Id. (further citations omitted).

Next, in Plaintiffs' reply brief (Doc. 144), they maintain that evidence supporting the sixth element monitoring regime "does not inquire into any plaintiff's individual medical history or condition but, rather, the risk to each member of the group as a whole that was exposed to toxic chemicals and the need for that group to receive tests not generally required in the general non-exposed population." In support of this proposition, Plaintiffs assert that the Court in Paoli II "expressly examined and rejected the arguments" proffered by Defendants.

A careful review of the Paoli II passage relied upon by moving Plaintiffs reveals that the Court was addressing the first and fourth elements of the Redland Soccer test relating to the levels of exposure and relative increase in risk for contracting a latent disease – not the sixth element monitoring regime at issue here – and was doing so in the context of class certification.

More particularly, the Court in Paoli II was addressing defendants' argument that each medical monitoring plaintiff should be individually required to meet certain thresholds to show that a chemical has significantly increased his or her risk of disease in order to state a medical monitoring claim. The Paoli II Court rejected that argument, stating that "where experts individualize their testimony to a group of individuals *with a common characteristic* (*i.e.*, levels of exposure to chemical X

above Y amount), we do not think there is a need for greater individualization so long as they testify that the risk to each member of the group is significant. We fail to see the purpose in requiring greater individualization." The collective, as referred to in this passage from Paoli II, can be evaluated for *risk* as a group for class certification purposes, but only to the extent that the group shares common characteristics that make sense to the analysis, such as common levels of exposure to the same hazardous substance.

Finally, Plaintiffs point to Foust v. Southeastern Pennsylvania Transp. Auth., 756 A.2d 112, 120-122 (Pa. Cmwlth. Ct. 2000), and parenthetically note that "[w]hile individual issues may arise, including length and extent of exposure, age, gender, medical history, family history, lifestyle, preexisting conditions, intervening factors and the like, these items will be addressed when and if a medical monitoring program is created."  Plaintiffs' parenthetical appears to support the notion that individualized characteristics, including the preexisting medical conditions of the plaintiffs, are relevant factors in fashioning the medical monitoring regime for a plaintiff, but are not relevant to establishing the medical monitoring claim itself.[6]

---

[6]  In Foust, *Plaintiffs* argued that the extent, type and frequency of the medical monitoring regimes "will depend upon the factors set forth above by Defendants (i.e., each plaintiff's health, the tests to be employed, the diseases to be screened and the available treatments for these conditions as appropriately integrated into each particular plaintiff's medical care program) and will therefore be relevant at that time" – but maintained that those characteristics were not relevant for purposes of a class certification analysis. Foust v. Southeastern Pennsylvania Transp. Auth., 756 A.2d 112, 120-122 (Pa. Cmwlth. Ct. 2000).

In opposition, Defendants argue that individual factors, such as the individual plaintiff's pre-existing medical history, exposures to the same or other potentially toxic substances, genetics, etc… are relevant to determining whether the monitoring regime recommended to track any adverse health effects resulting from exposure is different from the monitoring regime recommended for that plaintiff absent exposure. That, according to Defendants, is the appropriate standard for the sixth Redland Soccer element.

At this juncture, given the lack of binding precedent upon which to rely in applying Pennsylvania law to the pending discovery issue, a prediction of how the Pennsylvania Supreme Court would decide this substantive issue of law appears necessary. The fundamental principles of tort law and the evolution of the medical monitoring claim throughout Pennsylvania Supreme Court decisions leads to the prediction that the Supreme Court would require each plaintiff to demonstrate that the monitoring regime recommended for her is different from the monitoring regime recommended *for her* absent the alleged exposure. In other words, each plaintiff's individual medical condition/history is relevant to establishing the medical monitoring claim; medical records of plaintiffs bringing such a claim are

therefore relevant to determining the sixth element[7] of the <u>Redland Soccer</u> test, and are therefore discoverable under Rule 26(b).

According to fundamental principles of negligence under Pennsylvania law, which has adopted the Restatement (Second) of Torts, establishing a cause of action for negligence requires a showing of injury.   As Comment a. in the Restatement (Second) of Torts reminds us, *"the law of torts attempts primarily to put an injured person in a position as nearly as possible equivalent to his position prior to the tort.* The law is able to do this only in varying degrees dependent upon the nature of the harm . . . . This first purpose of tort law leads to compensatory damages." (See §§ 903-906).  Restatement (Second) of <u>Torts, § 901</u>, comment a.

While the "injury" to a person in any claim for negligence can take different forms, the Pennsylvania Supreme Court has indicated, albeit indirectly, that for medical monitoring claims, the injury at issue is the cost to an individual of the additional/different medical monitoring resulting from the alleged exposure over and above the cost that individual would have incurred for medical monitoring absent exposure.  Such an interpretation: (1) comports with the tort law ideal that aims to place a plaintiff in the position he occupied prior to the occurrence of the tort, as described above; and (2) has roots wound subtly throughout the few Pennsylvania Supreme Court decisions addressing medical monitoring claims.

---

[7] Although not raised by the parties, plaintiffs' medical records would seemingly be relevant to factors other than the sixth element of the <u>Redland Soccer</u> test, including the causation element.

More specifically, a close reading of the <u>Redland Soccer</u> decision reveals that the Supreme Court recapitulated and summarized prior Pennsylvania state and federal court holdings related to medical monitoring claims.  The Court took note of the 1990 Third Circuit decision in <u>In re Paoli Railroad Yard PCB Litigation, 916 F.2d 829</u> (3d Cir. 1990) (Paoli I), predicting that the Pennsylvania Supreme Court would recognize a cause of action for medical monitoring, specifically restating the following passage from the Third Circuit decision: "Pennsylvania courts traditionally have been reluctant to permit remedies in tort actions absent actual injury, particularly where the plaintiff sought damages for increased risk of future harm.  However, the court *persuasively explained why a claim for medical monitoring was different from a claim for increased risk of future harm*: an action for medical monitoring seeks to recover *only the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm*, whereas an enhanced risk claim seeks compensation for the anticipated harm itself, proportionately reduced to reflect the chance that it will not occur. . . ."  <u>Redland Soccer Club v. Dep't of the Army, 548 Pa. 178, 191-192 (Pa. 1997)</u>(emphasis added).

The Court continued, "*[t]he injury in a medical monitoring claim is the cost of the medical care that will, one hopes, detect [any] injury [resulting from exposure]*."  <u>Redland Soccer Club v. Dep't of the Army, 548 Pa. 178, 191-192 (Pa.</u>

1997)(citing Paoli I, 916 F.2d at 850-51 (footnote omitted))(emphasis added).  In sum thus far, the injury (as it relates to element six of the Redland Soccer test) in a medical monitoring case is the quantifiable cost of periodic medical examinations necessary to detect the onset of physical harm – but costs as compared to what?

The Supreme Court continued, restating the reasoning of the Third Circuit Court of Appeals in a different, yet related opinion, that "special medical monitoring was a necessary element of the claim 'because under this cause of action, a plaintiff may recover only if the defendant's wrongful acts increased the plaintiff's incremental risk of incurring the harm produced by the toxic substance enough *to warrant a change in the medical monitoring that otherwise would be prescribed for that plaintiff.*'"   Redland Soccer Club v. Dep't of the Army, 548 Pa. 178, 191-192 (Pa. 1997)(quoting In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 788 (3d Cir. 1994) (Paoli II) (further citations omitted))(emphasis added).  It stands to reason then, that establishing a medical monitoring claim requires each plaintiff to demonstrate that the medical monitoring regimen he had been or would have been prescribed, taking into account individualized and personal factors such as genetics, medical history, etc..., has changed due to the exposure.  The costs associated with those changes collectively represent the injury in a medical monitoring claim.

This conclusion harmonizes magnificently with the fundamental concept that tort law is designed to restore the plaintiff to the position he occupied prior to the advent of the tort.  In the federal Redland Soccer decision, the Third Circuit harkens back to the fundamentals principles of tort law when it stated: "Paoli II's requirement of 'special' medical monitoring implicitly recognizes the longstanding requirement in all tort cases other than those based on the old 'intentional' common law torts for various forms of trespass that a plaintiff must prove an injury before he may recover anything from a defendant."  Redland Soccer Club v. Dep't of the Army, 548 Pa. 178, 193 (Pa. 1997) (Redland, 55 F.3d at 846 n.8 (citations omitted)).

Finally, the Supreme Court stated that, while a verbatim adoption of the Paoli I medical monitoring test was impractical given case-specific nuances of Paoli I, Paoli II, and the federal Redland Soccer case, those decisions nonetheless "provide[d] a persuasive approach to defining the elements of a cause of action for medical monitoring. " Redland Soccer Club v. Dep't of the Army, 548 Pa. 178, 195 (Pa. 1997).

Parenthetically, or perhaps alternatively, the analysis employed above arises under the first tier of "relevance" found in Rule 26(b) as described *supra*. However, the medical records of those Plaintiffs alleging medical monitoring claims are also discoverable under Rule 26(b)'s second tier: "the court may order

18

discovery of any matter relevant *to the subject matter involved in the action.*"
Under this rule, the Court has the ability to order - for good cause - discovery on a
matter that is relevant to the subject matter involved in the case, even in the
instance where that discovery may not be relevant to a party's claim or defense.

Here, even if Plaintiffs' medical records were held *not* to be relevant to the
sixth element of the Redland Soccer test as predicted herein, they would
nonetheless be relevant to the medical monitoring regimes themselves (a subject
matter involved in the litigation) as Plaintiffs readily acknowledge: "defendants
emphasize that their experts opined that in order to determine whether a medical
monitoring program is reasonably necessary, a physician must analyze each
plaintiff's health . . . While individual issues may arise, including length and extent
of exposure, age, gender, medical history, family history, lifestyle, preexisting
conditions, intervening factors and the like, these items will be addressed when and
if a medical monitoring program is created."

Therefore, the medical records at issue are discoverable under either
approach to the Rule 26(b) analysis, for the foregoing reasons. For the foregoing
reasons, the medical records of those Plaintiffs who asserted claims for medical
monitoring are relevant to Plaintiffs' claims as well as Defendants' defense, and
are therefore discoverable pursuant to Rule 26(b).  Plaintiffs must comply with

Defendants' discovery requests in this regard for the execution of HIPAA authorizations/releases.

An appropriate Order will follow.

Date: October 31, 2011

Jennifer Walsh Clark, Special Master

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NORMA J. FIORENTINO, *et al.*, | : | 3:09-CV-2284 |
| | : | |
| Plaintiffs | : | Hon. John E. Jones III |
| | : | |
| v. | : | Special Master |
| | : | Jennifer Walsh Clark |
| CABOT OIL & GAS CORPORATION | : | |
| and GAS SEARCH DRILLING | : | |
| SERVICES CORPORATION, | : | |
| | : | |
| Defendants. | : | |

## ORDER

AND NOW, this 31st day of October, 2011, for the reasons in the foregoing Memorandum, Plaintiffs' Motion for a Protective Order is hereby DENIED. Plaintiffs must promptly provide Defendants with HIPAA-compliant medical authorizations and provide to Defendants all responsive documents and information sought regarding their medical conditions, histories and providers as requested.

As a result, case scheduling deadlines will be extended to the following:

1. Fact discovery on these issues only is extended through and including January 16, 2012;

2. Plaintiffs' expert reports are due February 13, 2012;

3. Defendants' expert reports are due March 12, 2012;

4. Expert supplements due March 26, 2012; and

5. Dispositive motions are due on or before April 9, 2012.

Date:  October 31, 2011

Jennifer Walsh Clark, Special Master