# EXHIBIT A

**Exhibit A**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NORMA FIORENTINO, *et al.*, | ) | CASE NO.  3:09-cv-02284-JEJ |
| | ) | |
| Plaintiffs, | ) | *Complaint date:*  November 19, 2009 |
| | ) | |
| v. | ) | *Originally assigned to:* |
| | ) | District Judge Thomas I. Vanaskie |
| | ) | |
| CABOT OIL & GAS | ) | |
| CORPORATION, *et al.*, | ) | *Transferred to:* |
| | ) | District Judge John E. Jones III |
| Defendants. | ) | |

### DECLARATION OF JEFFREY KEIM

My name is Jeffrey Keim.  I am over 18 years of age and have personal knowledge of the statements herein.  I am currently employed by Defendant Cabot Oil & Gas Corporation ( "Cabot") as Cabot's North Region Land Manager.

1.     I have worked for Cabot for approximately twenty-three (23) years.  I was promoted to land manager, my current position, on October 1, 1997, and therefore held that position with Cabot during the time period relevant to this Declaration.

2.     In my position as North Region Land Manager, I serve as the custodian responsible for maintaining the lease files and other land-related documents associated with each well drilled and currently operated by Cabot in Pennsylvania, including those files related to the lease and addendum Cabot signed with James Costello and Julie Costello (the "Costello Lease").

1

3.     The Costello Lease was signed on October 9, 2006 by James Costello and Julie Costello.  A true and correct copy of the Costello Lease, as maintained in Cabot's lease files, is attached hereto as Exhibit A.

4.     The final page of the Costello Lease is an addendum which was signed contemporaneously with the Costello Lease.  *See* Exhibit A.

5.     The addendum gave to James Costello and Julie Costello the right to consent to the location of, among other things, the Costello #2 well pad.  Specifically, the addendum provides that: "The location of any well, pipeline, access road or related facility constructed by the Lessee upon the leased premises shall be chosen by mutual consent between the Lessor and Lessee."  *See* Exhibit A.

6.     Also included in the Costello well files are two well site and access plans signed by James Costello and Julie Costello.  These well site and access plans are the mutual consent agreements required by the addendum contained in the Costello Lease.  True and correct copies of the well site and access plans, as maintained in Cabot's lease files, are attached hereto as Exhibit B and Exhibit C.

7.     Exhibit B is a well site and access plan signed by James Costello and Julie Costello.  Exhibit B specifically states that "Well site and access for Costello Wells #1 and #2 approved this 9[th] day of January, 2008."

8.     Exhibit C is a well site and access plan signed by James Costello and Julie Costello.  Exhibit C specifically states that "Well site and access for Costello Wells #1 and #2 approved this 31[st] day of March, 2008."

9.     To the best of my knowledge, Exhibit A, Exhibit B, and Exhibit C were made at or near the dates indicated thereon.

10.     Exhibit A, Exhibit B, and Exhibit C were kept in the course of Cabot's regularly conducted activities related to the preparation for and drilling of natural gas wells.

11.     Cabot's making of Exhibit A was a regularly conducted practice of the activities described in Paragraph 10.

12.     Cabot's making of Exhibit B and Exhibit C was a regularly conducted practice of the activities described in Paragraph 10, when obtaining lessor consent was required by the terms of a lease.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September *28*, 2012.  *See* 28 U.S.C. § 1746

By: _____
      Jeffrey Keim

3

# EXHIBIT A

# Oil and Gas Lease

COGC-08-PAPD

THIS AGREEMENT, shall be made this ___9th___ day of ___October___ 2008 ___ between ___

James B. Costello and Julie Hill, now known as Julie Costello, his wife

RR 6 Box 6178C, Dimock, PA 18801

hereinafter called Lessor, (whether one or more) and CABOT OIL & GAS CORPORATION • 900 Lee Street East, Suite 500 Huntington Square, Charleston, West Virginia  25301, hereinafter called Lessee.

WITNESSETH:

1. Lessor in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, and of the royalties herein provided and of the agreements of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of exploring by geophysical and other methods, drilling, and operating for and producing oil, gas (the term "gas" as used herein includes but is not limited to, helium, carbon dioxide, and all other commercial gas, as well as all hydrocarbon gases such as natural gas, methane gas, casinghead gas, hydrogen sulfide gas, coalbed methane gas, gob gas, and all natural gas originating, produced, or emitted from coal formations or seams, and any related, associated, or adjacent rock material), liquid hydrocarbons, all gases, and the respective constituents thereof, injecting gas, waters, other fluids and air into subsurface strata, injecting, storing, and withdrawing stored gas regardless of source, laying pipelines, storing oil, building roads, tanks, power stations, telephone lines and other structures and things thereon as necessary, useful, or convenient to produce, save, take care of, treat, process, store and transport said oil, liquid hydrocarbons, all gases and other products manufactured therefrom, the following described land in Dimock Township, County of Susquehanna, Commonwealth of Pennsylvania, and bounded substantially by lands now and/or formerly owned as follows:

On the North by: Mark & Petrina Gregory, Emerson & Nancy Sands, William & Sheila Ely

On the East by: Raymond Kemblo & Lorna Schopperth, Richard & Wendy Seymour

On the South by: Harold & Jennefer Lewis

On the West by: Stanley & Valeri Stankavage

Including but not limited to Tax Map or Assessment Number (now or formerly) 200-1-38 (35.0 ac.), 200-1-37 (34.38 ac.).

hereinafter called "premises" and for reference purposes only being the same land conveyed in whole or in part to Lessor by deed dated 7-22-05/8-4-03, and recorded in said county records in Book No. 200506918/583 Page 204 it being the purpose and intent of Lessor to lease, and Lessor does hereby lease all strips or parcels of land owned by Lessor, which adjoins the lands above, described. For all purposes of this lease, the premises shall be deemed to contain 69.38 acres, whether more or less.

2. This lease shall remain in force for a term of five (5) years from this date (called "primary term") and as long thereafter as oil or gas is produced, or considered produced under the terms of this lease, in paying quantities from the premises or from lands pooled therewith, or the premises are used for gas storage purposes as provided in paragraph 6 hereof, or this lease is maintained in force under any subsequent provisions hereof.

3. Lessee shall deliver to the credit of Lessor, free of cost, into Lessor's tanks on the premises or in the pipeline thereon which Lessor may designate, the equal one-eighth (1/8th) part of all oil or liquid hydrocarbons produced and saved from the premises, and shall pay the Lessor on gas, including casinghead gas and other gaseous substances, produced and sold from the premises one-eighth (1/8th) of the amount realized from the sale of gas at the well (meaning the amount realized less all costs of gathering, transportation, compression, fuel, line loss and other post-production expenses incurred downstream of the wellhead).  Payment for royalties in accordance herewith shall constitute full compensation for the gas and all of its components.  No royalty shall be due on stored gas produced from the premises or on gas produced from a storage formation or formations hereunder.

4. If at any time either during or after the primary term hereof there is a well capable of producing gas (with or without condensate) in paying quantities (other than stored gas) located upon the premises or on lands pooled therewith but such well is shut-in (whether before or after production) and this lease is not maintained in force by operations or production at any well, by gas storage, or by other activity or event, nevertheless it shall be considered that gas is being produced in paying quantities within the meaning of this lease.  On or before the end of the initial year during which this lease is maintained in force for the entire annual period under this paragraph 4, Lessee shall pay or tender to Lessor hereunder, or to those entitled to the royalties provided in this lease (as shown by Lessee's records) at the addresses shown by Lessee's records, a shut-in royalty equal to $1.00 per acre for the acreage held under this lease (as shown by Lessee's records) at the time such payment or tender is made.  Each subsequent payment or tender shall be made thereafter in like manner and amount on or before the end of each annual period while the lease was maintained in force for the entire annual period under the first sentence of this paragraph 4.  Lessee's failure to timely or correctly pay or tender the shut-in royalty for any year shall not operate to terminate this lease or serve as a basis for its cancellation, but Lessee shall correct any erroneous payment or tender, when notified thereof, and if late then Lessee shall make the correcting payment or tender with interest at the rate of eight (8%) percent per annum to those to whom such shut-in royalty was not timely or correctly paid or tendered.  As long as any well is shut-in, it shall be considered for the purposes of maintaining this lease in force that gas is being produced in paying quantities and this lease shall continue in effect both before and after the primary term.

5. Lessee is granted the right and option at any time or times while this lease is in force to pool or combine as it sees fit all or any part or parts of the premises, or formation, depth or depths thereunder, with any other land, lease, leases, parts thereof, or formation, depth, or depths thereunder, in the vicinity of the premises covered hereby, into one or more units for the production of oil and/or gas through vertical, horizontal, or slant hole well completions, primary or secondary recovery methods, (including by water flooding, gas injections, or injections of other substances) or combinations of any recovery techniques.  No unit may exceed 640 acres in size unless prescribed or permitted by applicable law or administrative order, rule or regulation.  Each unit formed hereunder may be reduced or enlarged in size at anytime, before or after the completion of any well or the commencement of production, by not more than fifteen (15%) percent, when in Lessee's judgment it is necessary or advisable to do so in order properly to explore or develop and operate the premises, in order to promote the conservation of oil or gas in Lessee's judgment, in order to include an omitted lease or area within a unit, in order to comply with well location or distance rules or regulations, and in order to make adjustments to the acreage (after adequate showings) in tracts included within a unit area, but each such reduction or enlargement shall only be effective prospectively.  The effective time of forming, reducing, or enlarging a unit, shall be when Lessee files a written designation of record in the county or counties in which the pooled or combined premises are located.  Operations or production on any part of any unit formed, reduced, or enlarged hereunder shall be treated as if the operations were upon or the production was from the premises covered hereby, whether the well or wells are located on the premises or not.  The entire acreage pooled into a unit shall be treated for all purposes except for the computation and payment of royalties on production from the unit, as if it were included in this lease.  In lieu of the royalties on production elsewhere provided in this lease, Lessor shall receive on production from each pooled or combined unit only such portion of the royalty stipulated in this lease as the amount on an acreage basis, that each owner's interest in the acreage placed in the unit bears to the interests in all the acreage pooled or combined into a unit.

S9485

1

39 - 10349

CABOT_OIL_0022082

6. Lessee is hereby granted the right to use any formation(s) underlying the premises for the injection and/or storage therein of any quantity of gas regardless of its source, and for the withdrawal of stored gas therefrom, and shall have all rights, rights of way, and privileges necessary, useful, or convenient for such purposes, including but not limited to the right to drill or convert any well or wells on the premises for use as storage wells. Injection of gas for underground storage, and withdrawal thereof, may be performed by storage well or wells located on other lands or leases in the vicinity of the premises. Lessee's good faith determination of when or whether the premises are being used for gas storage purposes shall be conclusive. Lessee shall give Lessor written notice of the use of the premises for gas storage purposes and shall calculate and pay Lessor for Lessor's royalty ownership in all economically recoverable gas reserves in the formation(s) to be utilized for storage purposes, using methods of calculating such reserves as are generally accepted in the natural gas industry. Lessor shall be entitled to the same royalty on such recoverable reserves as though the gas were produced and sold or used off the premises. In addition, Lessee shall pay Lessor a storage rental at the rate of Two Dollars ($2.00) per acre per year, payable annually while the premises are used for storage purposes beginning ninety (90) days after written notice of such use is given Lessor in accordance with the foregoing provisions.

7. If Lessor owns a lesser interest in the oil and gas in and under the premises than the entire undivided interest therein, then the royalties, rentals and other payments herein provided shall be paid the Lessor only in the proportion which his interest bears to the whole and undivided interest therein.

8. No well may be drilled nearer than 200 feet to any dwelling house now on said premises without the written consent of Lessor. Lessee shall have the right to use free of cost, gas, oil and water produced from the premises for its operations thereon, except water from wells of Lessor. Lessee shall also have the right at any time to remove all or any part of the machinery, fixtures, or structures placed on said premises, including the right to draw and remove casing. Lessee shall pay for damages caused by its operations to growing crops, trees, and fences located on the premises. In exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized therewith, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises as may be reasonably necessary for such purposes, including but not limited to geophysical operations, the drilling of wells, and the construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations and other facilities to discover, produce, store, treat and/or transport production.

9. The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors, and assigns, but no change of division in ownership of the premises, rentals or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee. No such change or division in the ownership of the premises, rentals, or royalties shall be binding upon Lessee for any purpose until thirty (30) days after the person acquiring any interest has furnished Lessee with the instrument or instruments, or certified copies thereof, constituting his chain of title from the original Lessor. In case of assignment of this lease as to any part or parts (whether divided or undivided) of the premises, all rental payable hereunder shall be apportionable as between the several leasehold owners ratably according to the surface area (using the acreage content set forth in good faith in such assignment) or undivided interest of each and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. No owner of an interest in this lease in whole or in part shall be liable for the failure of any prior, subsequent or concurrent owner to perform the terms, conditions, and obligations of this lease, express or implied.

10. Lessee, its successors or assigns, shall have the right to surrender this lease or any part thereof for cancellation after which all payments and liabilities hereunder shall cease and determine as to the part surrendered and if the whole is surrendered then this lease shall become absolutely null and void.

11. Lessor hereby warrants and agrees to defend the title to the premises against all persons whomsoever and agrees that the Lessee at its option may pay, discharge, or redeem any taxes, mortgages, or other liens existing, levied or assessed on or against the premises, and in the event it exercises such option, it shall be subrogated to the rights of any holder or holders thereof and may reimburse itself by applying any royalty or rentals accruing hereunder to the discharge of any such taxes, mortgages, or other liens. In case of any controversy or dispute regarding title to the premises or any part thereof, or regarding the ownership of any sums payable hereunder, Lessee shall have the right to withhold and retain without accrual of interest all sums payable hereunder which are subject to such controversy or dispute until the final determination of said controversy or dispute and then to distribute the same among those lawfully entitled thereto.

12. If during the last ninety (90) days of the primary term hereof or at any time after the expiration of the primary term, production of oil and gas in paying quantities from the premises, or lands pooled therewith, should cease for any reason, or if during or after such ninety (90) day period and prior to discovery of oil or gas on the premises or lands pooled therewith, Lessee should complete a dry hole thereon, this lease shall not terminate if Lessee commences or resumes additional operations on the premises or lands pooled therewith, within ninety (90) days after production ceased or the well was completed as a dry hole, whichever is applicable. If, at the expiration of the primary term, oil or gas is not being produced in paying quantities from the premises, or lands pooled therewith, but Lessee is then engaged in operations thereon, this lease shall remain in force so long as operations are prosecuted (whether on the same or different wells) with no cessation of more than ninety (90) consecutive days, and if they result in production, so long thereafter as oil or gas is produced in paying quantities from the premises or lands pooled therewith. The term "operations" as used in this Lease shall include but not be limited to the drilling, testing, completing, (including by horizontal and slant hole well completion techniques) reworking, recompleting, deepening, plugging back, or repairing of a well (and all work preparatory, incident or related to any such operation) in search for or in an endeavor to obtain, restore, maintain, or to increase production of oil, liquid hydrocarbons, or gas, or any of them.

13. Lessor (whether one or more) hereby further grants, leases, lets, and demises exclusively to Lessee the lands then covered by the lease under the provisions of this first right and option to extend the primary term of the lease for an additional five (5) years from the expiration of the original primary term by paying or tendering the sum of twenty-five dollars per acre (for the acreage estimated to be comprised by the lease) to the parties entitled to payments for leasing rights according to Lessee's records. This payment shall be based upon the number of acres then covered by this lease, and all the provisions of this lease relating to payments shall apply equally to this payment including, but not limited to, the provisions regarding changes in ownership, reduction for lessor interest, reduction for partial release, naming a depository bank, and for joint deposit to all owners. If, at the time this payment is made, various parties are entitled to specific payments according to Lessee's records, this payment may be divided between said parties and paid or tendered in the same proportion. Should this option be exercised as herein provided, it shall be considered for all purposes as though this paid up lease originally provided for a primary term of ten (10) years. Lessee shall execute and file for record within four (4) weeks following the exercise of this option has been exercised and showing the expiration date of the primary term as extended.

14. All express or implied covenants of this lease shall be subject to all Federal and state laws, executive orders, rules and regulations and this lease shall not be terminated in whole or in part, nor Lessee held liable for damages, for failure to comply herewith if compliance is prevented by, or if such failure is a result of, any such law, order, rule or regulation, or if prevented by an act of God, the public enemy, labor disputes, inability to obtain materials, failure of transportation or other cause beyond the control of the Lessee.

2

CABOT_OIL_0022083

15. This lease embodies the entire agreement between the parties and no representation or promise on behalf of either party shall be binding unless contained herein or mutually agreed to in writing by all parties hereto. This agreement shall be binding upon each Lessor who shall execute the same and upon Lessee from and after the date of delivery to Lessee or its representative by the executing Lessor.

16. All monies coming due hereunder shall be paid or tendered to Lessor at the address set forth above and no default shall be declared against the Lessee by the Lessor for failure of the Lessee to make any payments that may become due and payable hereunder unless the Lessee shall refuse or neglect to pay the same for sixty (60) days after having received written notice by registered mail from the Lessor of his intention to declare such default.

17. If during any time while this lease is in force and effect Lessor receives a bona fide offer from any party (other than Lessee) to purchase a new lease or an option to purchase a new lease covering all or any part of the lands or substances covered hereby, and if Lessor is willing to accept such offer, ("third party offer," hereunder) then Lessor shall promptly notify Lessee in writing of the name and address of the offeror, and all of the terms and conditions of such third party offer, including any lease or option bonus offered. Lessee shall have a period of thirty (30) days after receipt of all such notice data in which to exercise the herein granted preferential right to purchase a new lease or option for a new lease from Lessor on a form comparable to the third party offer, or absent a specific form with the third party offer then on this lease form adjusted by Lessee to include the terms and conditions in the third party offer, by giving Lessor written notice of the exercise of such preferential right. Promptly thereafter, Lessee shall furnish to Lessor the new lease for execution, along with a time draft for any lease bonus included as a part of the third party offer, conditioned upon execution and delivery of the lease by Lessor and approval of title by Lessee, all in accordance with the terms of the draft. Whether or not Lessee exercises the preferential right granted hereunder, during the time this lease remains in effect, by new lease executed by Lessor pursuant to any third party offer shall be subordinate to this lease and shall not be construed as replacing or adding to Lessee's obligations hereunder. The preferential right to purchase a new lease granted to Lessee by this paragraph 17, shall terminate unless exercised prior to one week before the expiration of the period allowed for the absolute suspension of the power of alienation by the rule against perpetuities.

18. Lessee will not drill, lay pipeline or conduct operations of any kind upon the surface of the leased premises without the express written consent of the Lessor.

**See Addendum attached hereto and made a part hereof**

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

Lessor

_James B. Costello_ (Seal)
James B. Costello

_Julie Costello_ (Seal)
Julie Costello

_____ (Seal)

_____ (Seal)

**ACKNOWLEDGMENT**

State of ___Pennsylvania___

County of ___Susquehanna___

On this the ___9th___ day of _October_, 2006, before me a Notary Public, the undersigned officer, personally appeared _James B. Costello and Julie Costello_, now known as, known to me to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that __they__ executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

SEAL.
My commission expires: may 9, 2009

_Shirley A. Lockhart_
(Notary Public)

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Shirley A. Lockhart, Notary Public
Bridgewater Twp., Susquehanna County
My Commission Expires May 9, 2009
Member, Pennsylvania Association of Notaries

3

CABOT_OIL_0022084

# ADDENDUM

Attached to and made a part of that certain Oil and Gas Lease dated the 9th day of October 2006 by and between James B. Costello and Julie Costello, Lessor, and Cabot Oil & Gas Corporation, Lessee, covering land situated in Dimock Township County of Susquehanna, Commonwealth of Pennsylvania, to wit:

Anything contained in said Oil and Gas Lease to the contrary notwithstanding it is agreed that:

> The location of any well, pipeline, access road or related facility constructed by the Lessee upon the leased premises shall be chosen by mutual consent between the Lessor and Lessee.

Signed here for purposes of identification.

_____          _____
James B. Costello

_____          _____
Julie Costello

CABOT_OIL_0022085

# EXHIBIT B

CONFIDENTIAL



Cabot_Oil_0069340

# EXHIBIT C

Well Site accesss for Costello Wells #1 and #.
approved this _3/2ᵗ_ day of _March_ , 20_08_ ,
it being understood that within ten months after drilling and
completion the wellsites will be regraded to smaller service
areas not to exceed 100' X 100'.

_James B. Costello_
James B. Costello

_Julie Costotlo_
Julie Costello



**Site Plan**
1" = 400'

N

NOTE: Proposed wellsite #1 is east-sloping, brushy field bounded on the east by small, marshy pond.
NOTE: Proposed wellsite #2 is fairly steep, north-sloping woods.

Carter Road

Emerson Sands

Mark & Patrina Gregory

Corey & Phyllis Cohen

William & Sheila Ely

Proposed Access 100' x 35'± ( 3500 sf ± )

haybale or sed. fence

18 ± %

PROPOSED WELLSITE 225 x 300'± ( 81,000 sf ± )

30± %

Costello

woods

Proposed Access 1300' x 30'± ( 39,000 sf ± )

open field

15 ± %

topsoil

brush

PROPOSED WELLSITE 250' x 350'± ( 87,500 sf ± )

James & Julie Costello

SR 3023

NOTE: Shape of sites may be adjusted to fit terrain; final location of drilling pit and positions of equipment on site will be determined by drilling contractor

**Cabot Oil & Gas Corp**
Access / Site Plan
"Costello" - Wells #1 & #2

Dimock Twp. - Susquehanna Co. - Pennsylvania

HERITAGE SURVEYS
Gregory C. Bell

SEE ALSO ORIGINAL CONSENT (SAME PLAN) DOCUMENT
DATED 1-9-08 Transmitted WITH THE CURATIVE
RESPONSE DATED 6-5-08 FOR THE

27-10349

Cabot_Oil_0069078