# EXHIBIT B

Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

NORMA FIORENTINO,      :   CIVIL ACTION
et al.,                :
    Plaintiffs     :
                :
    V.             :
                :
CABOT OIL & GAS        :
CORPORATION, et al.  :   NO.
    Defendants    :   309-CV-02284-JEJ

- - -

May 3, 2011

- - -

Videotaped deposition of JULIE COSTELLO, held at the Hampton Inn, Schechter Road, Wilkes-Barre, Pennsylvania, commencing at 9:26 a.m. on the above date, before Teresa M. Beaver, a Federally-Approved Registered Professional Reporter and a Notary Public in the Commonwealth of Pennsylvania.

- - -

ESQUIRE DEPOSITION SERVICES
Four Penn Center
1600 JFK Boulevard
12th Floor
Philadelphia, Pennsylvania 19103
(215) 988-9191

2

1  A P P E A R A N C E S  :

2

         NAPOLI BERN RIPKA, LLP
3        BY:  W. STEVEN BERMAN, ESQUIRE
         One Greentree Center
4        Marlton, New Jersey  08053
         (888)  529-4669
5        Counsel for the Plaintiffs

6

         FULBRIGHT & JAWORSKI LLP
7        BY:  AMY L. BARRETTE, ESQUIRE
                  and
8            JEREMY A. MERCER, ESQUIRE
         Southpointe Energy Complex
9        370 Southpointe Boulevard
         Suite 100
10       Canonsburg, Pennsylvania  15317
         (724)  470-3467
11       amy.barrette @klgates.com
         jeremy.mercer@klgates.com
12       Counsel for the Defendants

13                -  -  -

14  A L S O   P R E S E N T  :

15       DONNA BELK, VIDEOGRAPHER

16                -  -  -

17

18

19

20

21

22

23

24

21

1   two.

2            That whole mountain area

3   back there is blue stone.  There's a

4   quarry on the other side of our property

5   and everything of value that Cabot took

6   from a person's property, whether it be

7   timber or crop damage, Cabot has always

8   reimbursed the landowners for.

9            We attempted to get paid and

10  we never received any payment.  They

11  never asked our permission to take that

12  stone and they used it for their own use.

13            That's actually a crime,

14  taking something of value and not

15  reimbursing a person for.

16            Anyway, there were several

17  attempts made on contacting different

18  people and we never got reimbursed for

19  that stone.

20            And finally, we gave up and

21  joined the -- we had another attorney

22  write a letter and then we joined the

23  lawsuit.

24            Q.    Okay.  At the time -- and

1   this is all -- the blue stone issue, all

2   involves the Costello-two well pad as

3   opposed to the Costello-one; correct?

4           A.      That's correct.

5           Q.      At the time the Costello-two

6   well pad was being constructed, there was

7   no quarry operating on your property;

8   correct?

9           A.      There was not an established

10  quarry.

11          Q.      Had you or your husband

12  informed Cabot prior to the development

13  of the Costello-two well pad that there

14  was blue stone on your property?

15          A.      The appearance of where the

16  well site was going to be was down at the

17  bottom of a hill where it did not look as

18  if they would be chipping away at the

19  blue stone.

20                  So, they were not contacted

21  at that time.

22          Q.      At any point in time prior

23  to the construction of the Costello-two

24  well pad, did you or your husband mention

1    in any way to Cabot that there was blue

2    stone on your property that you were

3    concerned about?

4              A.      No.

5              Q.      You mentioned something

6    about Costello-two well pad being further

7    down the hill.  What do you mean by that?

8              A.      Prior to the establishment

9    of the pads, they would put a stake in

10   where they had planned to put the well

11   site.

12              And it was -- it appeared to

13   be at the bottom of our hill.

14              So, we -- we thought that

15   that's where the well site would be.

16             Q.      Did anyone tell you that

17   that stake was actually where the well

18   pad was going to be constructed?

19             A.      That's -- not me personally.

20             Q.      Did your husband tell you

21   that anyone told him that that stake was

22   the location of the well pad?

23             A.      I believe so.

24             Q.      Do you recall who it was

Julie Costello                                    May 3, 2011

24

1    that your husband said told him that?

2           A.    No.

3           Q.    I'm sorry.

4           A.    No.

5           Q.    Prior to the construction of

6    the Costello-two well pad, did you

7    receive any notice from Cabot regarding

8    the development of the Costello-two well

9    site?

10          A.    Could you rephrase your

11   question?

12          Q.    Sure.  Before Cabot started

13   developing the Costello-two well pad and

14   drilling the Costello-two well, did you

15   receive notice from Cabot that it was

16   going to be constructing that pad and

17   drilling that well?

18          A.    Yes.

19          Q.    Did you receive that, along

20   with a platt, showing the proposed

21   location?

22          A.    Yes.

23          Q.    Do you still have that platt

24   and that notice from Cabot?

26

1        Q.     Do you know where that platt
2    map and notice are currently?
3        A.     I am unsure.
4        Q.     Would you be able to, if
5    during a break, Mr. Berman and I discuss
6    it, and he provides the direction, would
7    you be able to look for that information
8    when you return home and if you do find
9    it, pass it to Mr. Berman for production
10   to us in this case?
11            MR. BERMAN:  And by
12       counsel's reference to Mr. Berman,
13       he includes anyone in our
14       attorney's office.
15            THE WITNESS:  I can.
16   BY MR. MERCER:
17       Q.     Okay.  After you received
18   notice from Cabot regarding the
19   development of the Costello-two well pad
20   and drilling of the Costello-two well,
21   did you log any formal objection through
22   that objection process?
23       A.     Rephrase the question.
24       Q.     Sure.  When you got the

27

1   notice from Cabot that came to you with

2   the platt map saying here's the

3   Costello-two well pad and the

4   Costello-two well; along with those is a

5   notice of your right to object to the

6   DEP.

7              Do you recall that being

8   included in the packet?

9        A.    I do not.

10       Q.    Okay.  When you received the

11  platt map, showing where the well pad was

12  going to go and where the well was going

13  to be drilled, did you object at all to

14  anyone?

15       A.    No.

16       Q.    Had you and your husband

17  explored the possibility of establishing

18  a quarry on your property at any time

19  prior to Cabot developing the

20  Costello-two well pad?

21              MR. BERMAN:  Object to the

22       form.  You may answer.

23              THE WITNESS:  We talked of

24       it.

Julie Costello                                    May 3, 2011

29

1        Q.     Let me back up then because
2   the question is at any time prior to
3   Cabot developing the Costello-two well
4   pad, so, before you were involved in this
5   lawsuit, did you or your husband have any
6   discussions about actually establishing a
7   quarry on your property?
8        A.     Me and my husband.
9        Q.     Did you have any discussions
10  with your husband or with anyone else?
11       A.     Yes.
12       Q.     Who did you have discussions
13  with about establishing a quarry?
14       A.     My husband and -- I don't
15  remember his name.  Oh, I do now.  Carl
16  Johnson.
17       Q.     Who is Carl Johnson?
18       A.     He is the man that has
19  Harold's Quarry.
20       Q.     By Harold, you mean Harold
21  Lewis?
22       A.     Yes.
23       Q.     What were your
24  discussions -- discussion or

30

1   discussions -- with Carl Johnson?

2          A.    Well, he initiated the

3   discussion.

4                He is backed up to our

5   property line on Harold's Quarry and he

6   wants to come over to our side of the

7   property.

8          Q.    What response did you or

9   your husband provide to Mr. Johnson in

10  response to his initiation of that

11  conversation?

12         A.    That we did not want a

13  quarry.

14         Q.    Okay.  Did you or your

15  husband have any other discussions about

16  establishing a quarry at any other time

17  prior to the development of the

18  Costello-two well pad?

19         A.    He and I had a discussion,

20  as I told -- previously told you.

21         Q.    Okay.  Any other discussions

22  besides that -- the discussion you had

23  with your husband and the discussion you

24  and your husband had with Mr. Johnson?

1          A.    We discussed that we did not

2     want a quarry on our property at this

3     time.

4          Q.    Okay.  Any other

5     discussions?

6          A.    Not that I recall.

7          Q.    Were you living in the house

8     on -- between the Costello-one well pad

9     and the Costello-two well pad at the time

10    the Costello-two well pad was being

11    constructed?

12         A.    Yes.

13         Q.    You were aware that Cabot

14    was actually developing the well pad for

15    Costello-two?

16         A.    Yes.

17         Q.    Did you ever go up, when

18    they were developing the Costello-two

19    well pad, and say to anyone anything

20    about the blue stone?

21         A.    I've had numerous

22    conversations with landmen, Mr. Tonkins

23    and Jeff Keim.

24         Q.    Were those discussions while

Julie Costello                                    May 3, 2011

38

1       Q.     What information do you
2   remember providing to Mr. Tonkins while
3   the well pad was being developed,
4   regarding the blue stone issue?
5       A.     Well, I gave him the same
6   information that I gave the other
7   landmen.
8       Q.     The other landman being Dan?
9       A.     Dan and Phil.  And there
10  might have been -- like as I mentioned,
11  there might have been others.
12           Whoever came up to the house
13  and we had the opportunity to tell, we
14  did tell.
15       Q.     Did anyone ever tell you,
16  yes, you will be reimbursed for the blue
17  stone?
18       A.     No.
19       Q.     Now, I believe you
20  indicated, at a certain point in your
21  testimony up till now, that Cabot had
22  always reimbursed people for damage done
23  during the development of well pads.
24           And I believe you referenced

40

1        Q.     What was it that you
2  received payment for from Cabot?
3        A.     Trees.
4        Q.     Do you know why Cabot
5  reimbursed you for the trees?
6        A.     No.
7        Q.     Do you know if there's any
8  requirement in your lease for Cabot to
9  reimburse for trees or timber?
10        A.     I believe that there is a
11  paragraph that refers to that.
12        Q.     Do you know if there's any
13  requirement in your lease for Cabot to
14  reimburse for blue stone?
15        A.     No.
16        Q.     No, you do not know, or no,
17  there is not?
18        A.     There is not.
19             MR. BERMAN:  Note my belated
20        objection to the question.  That
21        seeks a legal conclusion.
22  BY MR. MERCER:
23        Q.     Did you ever have anyone
24  provide any type of estimate of the value

68

1  reimbursed -- that was verified by his

2  verbal comment that they would not drill

3  and that, you know, there were 640 acres.

4          Q.    The lease actually says that

5  the units would not exceed 640 acres;

6  correct?

7                MR. BERMAN:  Object to the

8          form.

9                THE WITNESS:  May I see the

10         lease?

11  BY MR. MERCER:

12         Q.    Do you recall the language?

13         A.    No.

14                   -   -   -

15                (Deposition Exhibit No.

16         Julie Costello-3, Oil and Gas

17         Lease, was marked for

18         identification.)

19                   -   -   -

20  BY MR. MERCER:

21         Q.    Mr. Costello, the court

22  reporter has handed you a document that

23  we've marked as Julie Costello Exhibit 3.

24                First of all, I'd like to

69

1   ask you, does this appear to be a

2   photocopy of the oil and gas lease that

3   you and your husband signed with Cabot?

4              MR. BERMAN:  Take your time

5        to look through it.

6              THE WITNESS:  Yes.

7   BY MR. MERCER:

8        Q.    If you look at the page that

9   has the page number in the middle of the

10  bottom as three, but the Bates number is

11  22084, it's two pages back from that.

12  Does that appear to be a photo copy of

13  your signature above the line where it's

14  typed Julie Costello?

15       A.    Yes.

16       Q.    Does that appear to be a

17  photocopy of your husband's signature,

18  the next line up?

19       A.    Yes.

20       Q.    And then the next page of

21  the document that has the caption

22  addendum at the top, does that also

23  appear to be a photocopy of your

24  signature on the line that says Julie

                                                                    70

1    Costello?

2         A.    Yes.

3         Q.    And does that appear to be a

4    photocopy of your husband's signature on

5    the next line up?

6         A.    Yes.

7         Q.    Now, you were talking about

8    acreage for pooled units.

9              I direct your attention to

10   Paragraph 5 of the lease.  And the fifth

11   line down towards the end of that line,

12   the sentence starts out "No unit may

13   exceed 640 acres in size unless

14   prescribed or permitted by applicable law

15   or administrative order, rule or

16   regulation."  Correct?

17              MR. BERMAN:  Are you asking

18         if that was a correct reading of

19         what it says or --

20              MR. MERCER:  Yes.

21              THE WITNESS:  Yes.

22   BY MR. MERCER:

23         Q.    Is there anywhere in the

24   lease that says that the units would be

Julie Costello                                        May 3, 2011

312

 1               C E R T I F I C A T E

 2

 3          I hereby certify that the

 4  proceedings and evidence noted are

 5  contained fully and accurately in the

 6  notes taken by me on the deposition of

 7  the above matter, and that this is a

 8  correct transcript of the same.

 9

10

11

12

13

14  

15          Teresa M. Beaver, RPR

16

17

18          (The foregoing certification of

19  this transcript does not apply to any

20  reproduction of the same by any means,

21  unless under the direct control and/or

22  supervision of the certifying shorthand

23  reporter.)

24

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.345.4940
Facsimile: 215.988.1843

Suite 1210
1600 John F. Kennedy Blvd
Philadelphia, PA 19103
www.esquiresolutions.com

313

1              DEPOSITION ERRATA SHEET

2

3   Our Assignment No.:  218233

4   Case Caption:  FIORENTINO V. CABOT

5

6    DECLARATION UNDER PENALTY OF PERJURY

7                I declare under penalty of

8   perjury that I have read the entire

9   transcript of my Deposition taken in the

10  captioned matter or the same has been

11  read to me, and the same is true and

12  accurate, save and except for changes

13  and/or corrections, if any, as indicated

14  by me on the DEPOSITION ERRATA SHEET

15  hereof, with the understanding that I

16  offer these changes as if still under

17  oath.

18

19       Signed on the _____ day of

20  _____, 20__.

21  _____

22             JULIE COSTELLO

23

24

314

1                    DEPOSITION ERRATA SHEET

2

3    Page No.____Line No.____Change to:_____

4    _____

5    Reason for change:_____

6

7    Page No.____Line No.____Change to:_____

8    _____

9    Reason for change:_____

10

11   Page No.____Line No.____Change to:_____

12   _____

13   Reason for change:_____

14

15   Page No.____Line No.____Change to:_____

16   _____

17   Reason for change:_____

18

19   Page No.____Line No.____Change to:_____

20   _____

21   Reason for change:_____

22

23   SIGNATURE:_____DATE:_____

24               JULIE COSTELLO

315

1              DEPOSITION ERRATA SHEET

2

3    Page No.____Line No.____Change to:_____

4    _____

5    Reason for change:_____

6

7    Page No.____Line No.____Change to:_____

8    _____

9    Reason for change:_____

10

11   Page No.____Line No.____Change to:_____

12   _____

13   Reason for change:_____

14

15   Page No.____Line No.____Change to:_____

16   _____

17   Reason for change:_____

18

19   Page No.____Line No.____Change to:_____

20   _____

21   Reason for change:_____

22

23   SIGNATURE:_____DATE:_____

24            JULIE COSTELLO

Julie Costello                                    May 3, 2011

316

# LAWYER'S NOTES

PAGE        LINE

1

2

3

4   _____    _____    _____

5   _____    _____    _____

6   _____    _____    _____

7   _____    _____    _____

8   _____    _____    _____

9   _____    _____    _____

10  _____    _____    _____

11  _____    _____    _____

12  _____    _____    _____

13  _____    _____    _____

14  _____    _____    _____

15  _____    _____    _____

16  _____    _____    _____

17  _____    _____    _____

18  _____    _____    _____

19  _____    _____    _____

20  _____    _____    _____

21  _____    _____    _____

22  _____    _____    _____

23  _____    _____    _____

24  _____    _____    _____



**SUSQUEHANNA COUNTY COURT HOUSE**
**MONTROSE, PENNSYLVANIA**

## MARY F. EVANS
Register of Wills - Recorder of Deeds
Clerk of Orphans' Court Division
Court of Common Pleas of Susquehanna County
**PO BOX 218**
**MONTROSE, PA  18801-0218**

(570) 278-4600

Instrument Number - 200611302
Recorded On 10/30/2006 At 10:34:06 AM

\* Total Pages - 2

\* Instrument Type - MEMORANDUM OF LEASE
Invoice Number - 32885
\* Grantor - COSTELLO, JAMES B
\* Grantee - CABOT OIL & GAS CORPORATION
\* Customer - CABOT OIL & GAS CORP
\* **FEES**

| | |
|---|---|
| STATE WRIT TAX | $0.50 |
| RECORDING FEES - RECORDER OF DEEDS | $13.00 |
| COUNTY IMPROVEMENT FEE | $2.00 |
| RECORDER IMPROVEMENT FEE | $3.00 |
| TOTAL PAID | $18.50 |

---

**This is a certification page**

# DO NOT DETACH

**This page is now part
of this legal document.**

---

**RETURN DOCUMENT TO:**
CABOT OIL & GAS CORP
900 LEE STREET EAST
SUITE 1500 HUNTINGTON SQUARE
CHARLESTON, WV 25301
ATTN: CATHY EWALD

I hereby CERTIFY that this document is recorded in the
Recorder's Office of Susquehanna County, Pennsylvania.



*Mary F. Evans*
**MARY F. EVANS**
**RECORDER OF DEEDS**

\* - Information denoted by an asterisk may change during
the verification process and may not be reflected on this page.


000K9X


EXHIBIT
Julie
Costello -3
B 5-3-4

CABOT_OIL_0022080

# MEMORANDUM OF OIL AND GAS LEASE

State (situs of land):      Pennsylvania

County (situs of land):      Susquehanna

Township:      Dimock

Lessor:      James B. Costello and Julie Hill, now known as Julie Costello, his wife

Lessor's Address:      RR 6 Box 6176C, Dimock, PA 18801

Lessee:      Cabot Oil & Gas Corporation, with offices at 900 Lee St., Suite 1500, Charleston, WV 25301

Date Executed:      10-9-06

Effective Date of Lease:      10-9-06

Primary Term of Lease:      5 Years

Option to Extend Primary Term of Lease:      5 Years

As of the Effective Date stated above, Lessor, named above, executed and delivered to Lessee, named above, an Oil and Gas Lease (the "Lease") in which Lessor granted, leased, and let to Lessee lands ("the lands") containing __69.38__ acres, more or less located in the above named Township, County and State, bounded substantially by lands now or formerly owned as follows:

On the North by: Mark & Petrina Gregory, Emerson & Nancy Sands, William & Sheila Ely

On the East by: Raymond Kemble & Lorna Schopperth, Richard & Wendy Seymour

On the South by: Harold & Jennefer Lewis

On the West by: Stanley & Valeri Stankavage

Including but not limited to Tax Map or Assessment Number (now or formerly) 200-1-36 (35.0 ac.), 200-1-37 (34.38 ac.)

The Lease grants Lessee the exclusive right to explore for, drill for, produce and market oil, gas and other hydrocarbons from the lands during the term of the Lease (see paragraph 18). This Memorandum is executed and placed of record in the County in which the lands are located for the purpose of placing all persons on notice of the existence of the Lease.

LESSOR:

_James B. Costello_
James B. Costello

_Julie Costello_
Julie Costello

**ACKNOWLEDGMENT**

State of      Pennsylvania

County of      Susquehanna

On this the __9th__ day of __October__, 2006, before me a Notary Public, the undersigned officer, personally appeared James B. Costello and Julie Costello, known to me to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that __they__ executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

SEAL.
My commission expires: MAY 9, 2009

_Shirley A. Lockhart_

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Shirley A. Lockhart, Notary Public
Bridgewater Twp., Susquehanna County
My Commission Expires May 9, 2009
Member, Pennsylvania Association of Notaries

39 - 10349

## Oil and Gas Lease

COGC-06-PAPD

THIS AGREEMENT, shall be made this ___9th___ day of ___October___ ___2006___ between _____
James B. Costello and Julie Hill, now known as Julie Costello, his wife
RR 6 Box 6176C, Dimock, PA 18801
hereinafter called Lessor, (whether one or more) and CABOT OIL & GAS CORPORATION • 900 Lee Street East, Suite 500
Huntington Square, Charleston, West Virginia 25301, hereinafter called Lessee.

WITNESSETH:

1. Lessor in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, and of the royalties herein provided and of the agreements of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of exploring by geophysical and other methods, drilling, and operating for and producing oil, gas (the term "gas" as used herein includes but is not limited to, helium, carbon dioxide, and all other commercial gas, as well as all hydrocarbon gases such as natural gas, methane gas, casinghead gas, hydrogen sulfide gas, coalbed methane gas, gob gas, and all natural gas originating, produced, or emitted from coal formations or seams, and any related, associated, or adjacent rock material), liquid hydrocarbons, all gases, and the respective constituents thereof, injecting gas, waters, other fluids and air into subsurface strata, injecting, storing, and withdrawing stored gas regardless of source, laying pipelines, storing oil, building roads, tanks, power stations, telephone lines and other structures and things thereon as necessary, useful, or convenient to produce, save, take care of, treat, process, store and transport said oil, liquid hydrocarbons, all gases and other products manufactured therefrom, the following described land in Dimock Township, County of Susquehanna, Commonwealth of Pennsylvania, and bounded substantially by lands now and/or formerly owned as follows:

On the North by: Mark & Petrina Gregory, Emerson & Nancy Sands, William & Sheila Ely

On the East by: Raymond Kemble & Lorna Schopperth, Richard & Wendy Seymour

On the South by: Harold & Jennefer Lewis

On the West by: Stanley & Valeri Stankavage

Including but not limited to Tax Map or Assessment Number (now or formerly) 200-1-36 (35.0 ac.), 200-1-37 (34.38 ac.)

hereinafter called "premises" and for reference purposes only being the same land conveyed in whole or in part to Lessor by deed dated 7-22-05/6-4-03, and recorded in said county records in Book No. 200506918/583 Page 204 it being the purpose and intent of Lessor to lease, and Lessor does hereby lease all strips or parcels of land owned by Lessor, which adjoins the lands above, described. For all purposes of this lease, the premises shall be deemed to contain 69.38 acres, whether more or less.

2. This lease shall remain in force for a term of five (5) years from this date (called "primary term") and as long thereafter as oil or gas is produced, or considered produced under the terms of this lease, in paying quantities from the premises or from lands pooled therewith, or the premises are used for gas storage purposes as provided in paragraph 6 hereof, or this lease is maintained in force under any subsequent provisions hereof.

3. Lessee shall deliver to the credit of Lessor, free of cost, into Lessor's tanks on the premises or in the pipeline thereon which Lessor may designate, the equal one-eighth (1/8th) part of all oil or liquid hydrocarbons produced and saved from the premises, and shall pay the Lessor on gas, including casinghead gas and other gaseous substances, produced and sold from the premises one-eighth (1/8th) of the amount realized from the sale of gas at the well (meaning the amount realized less all costs of gathering, transportation, compression, fuel, line loss and other post-production expenses incurred downstream of the wellhead).  Payment for royalties in accordance herewith shall constitute full compensation for the gas and all of its components.  No royalty shall be due on stored gas produced from the premises or on gas produced from a storage formation or formations hereunder.

4. If at any time either during or after the primary term hereof there is a well capable of producing gas (with or without condensate) in paying quantities (other than stored gas) located upon the premises or on lands pooled therewith but such well is shut-in (whether before or after production) and this lease is not maintained in force by operations or production at any well, by gas storage, or by other activity or event, nevertheless it shall be considered that gas is being produced in paying quantities within the meaning of this lease.  On or before the end of the initial year during which this lease is maintained in force for the entire annual period under this paragraph 4, Lessee shall pay or tender to Lessor hereunder, or to those entitled to the royalties provided in this lease (as shown by Lessee's records) at the addresses shown by Lessee's records, a shut-in royalty equal to $1.00 per acre for the acreage held under this lease (as shown by Lessee's records) at the time such payment or tender is made.  Each subsequent payment or tender shall be made thereafter in like manner and amount on or before the end of each annual period while the lease was maintained in force for the entire annual period under the first sentence of this paragraph 4.  Lessee's failure to timely or correctly pay or tender the shut-in royalty for any year shall not operate to terminate this lease or serve as a basis for its cancellation, but Lessee shall correct any erroneous payment or tender, when notified thereof, and if late than Lessee shall make the correcting payment or tender with interest at the rate of eight (8%) percent per annum to those to whom such shut-in royalty was not timely or correctly paid or tendered.  As long as any well is shut-in, it shall be considered for the purposes of maintaining this lease in force that gas is being produced in paying quantities and this lease shall continue in effect both before and after the primary term.

5. Lessee is granted the right and option at any time or times while this lease is in force to pool or combine as it sees fit all or any part or parts of the premises, or formation, depth or depths thereunder, with any other land, lease, leases, parts thereof, or formation, depth, or depths thereunder, in the vicinity of the premises, in the vicinity of the premises covered hereby, into one or more units for the production of oil and/or gas through vertical, horizontal, or slant hole well completions, primary or secondary recovery methods, (including by water flooding, gas injections, or injections of other substances) or combinations of any recovery techniques.  No unit may exceed 640 acres in size unless prescribed or permitted by applicable law or administrative order, rule or regulation.  Each unit formed hereunder may be reduced or enlarged in size at anytime, before or after the completion of any well or the commencement of production, by not more than fifteen (15%) percent, when in Lessee's judgment it is necessary or advisable to do so in order properly to explore or develop and operate the premises, in order to promote the conservation of oil or gas in Lessee's judgment, in order to include an omitted lease or area within a unit, in order to comply with well location or distance rules or regulations, and in order to make adjustments to the acreage (after adequate showings) in tracts included within a unit area, but each such reduction or enlargement shall only be effective prospectively.  The effective time of forming, reducing, or enlarging a unit, shall be when Lessee files a written designation of record in the county or counties in which the pooled or combined premises are located.  Operations or production on any part of any unit formed, reduced, or enlarged hereunder shall be treated as if the operations were upon or the production was from the premises covered hereby, whether the well or wells are located on the premises or not.  The entire acreage pooled into a unit shall be treated for all purposes except for the computation and payment of royalties on production from the unit, as if it were included in this lease.  In lieu of the royalties on production elsewhere provided in this lease, Lessor shall receive on production from each pooled or combined unit only such portion of the royalty stipulated in this lease as the amount on an acreage basis, that each owner's interest in the acreage placed in the unit bears to the interests in all the acreage pooled or combined into a unit.

CABOT_OIL_0022082

6.  Lessee is hereby granted the right to use any formation(s) underlying the premises for the injection and/or storage therein of any quantity of gas regardless of its source, and for the withdrawal of stored gas therefrom, and shall have all rights, rights of way, and privileges necessary, useful, or convenient for such purposes, including but not limited to the right to drill or convert any well or wells on the premises for use as storage wells. Injection of gas for underground storage, and withdrawal thereof, may be performed by storage well or wells located on other lands or leases in the vicinity of the premises. Lessee's good faith determination of when or whether the premises are being used for gas storage purposes shall be conclusive. Lessee shall give Lessor written notice of the use of the premises for gas storage purposes and shall calculate and pay Lessor for Lessor's royalty ownership in all economically recoverable gas reserves in the formation(s) to be utilized for storage purposes, using methods of calculating such reserves as are generally accepted in the natural gas industry. Lessor shall be entitled to the same royalty on such recoverable reserves as though the gas were produced and sold or used off the premises. In addition, Lessee shall pay Lessor a storage rental at the rate of Two Dollars ($2.00) per acre per year, payable annually while the premises are used for storage purposes beginning ninety (90) days after written notice of such use is given Lessor in accordance with the foregoing provisions.

7.  If Lessor owns a lesser interest in the oil and gas in and under the premises than the entire undivided interest therein, then the royalties, rentals and other payments herein provided shall be paid the Lessor only in the proportion which his interest bears to the whole and undivided interest therein.

8.  No well may be drilled nearer than 200 feet to any dwelling house now on said premises without the written consent of Lessor. Lessee shall have the right to use free of cost, gas, oil and water produced from the premises for its operations thereon, except water from wells of Lessor. Lessee shall also have the right at any time to remove all or any part of the machinery, fixtures, or structures placed on said premises, including the right to draw and remove casing. Lessee shall pay for damages caused by its operations to growing crops, trees, and fences located on the premises. In exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized therewith, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises as may be reasonably necessary for such purposes, including but not limited to geophysical operations, the drilling of wells, and the construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations and other facilities to discover, produce, store, treat
and/or transport production.

9.  The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors, and assigns, but no change of division in ownership of the premises, rentals or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee. No such change or division in the ownership of the premises, rentals, or royalties shall be binding upon Lessee for any purpose until thirty (30) days after the person acquiring any interest has furnished Lessee with the instrument or instruments, or certified copies thereof, constituting his chain of title from the original Lessor. In case of assignment of this lease as to any part or parts (whether divided or undivided) of the premises, all rental payable hereunder shall be apportionable as between the several leasehold owners ratably according to the surface area (using the acreage content set forth in good faith in such assignment) or undivided interest of each and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. No owner of an interest in this lease in whole or in part shall be liable for the failure of any prior, subsequent or concurrent owner to perform the terms, conditions, and obligations of this lease, express or implied.

10.  Lessee, its successors or assigns, shall have the right to surrender this lease or any part thereof for cancellation after which all payments and liabilities hereunder shall cease and determine as to the part surrendered and if the whole is surrendered then this lease shall become absolutely null and void.

11.  Lessor hereby warrants and agrees to defend the title to the premises against all persons whomsoever and agrees that the Lessee at its option may pay, discharge, or redeem any taxes, mortgages, or other liens existing, levied or assessed on or against the premises, and in the event it exercises such option, it shall be subrogated to the rights of any holder or holders thereof and may reimburse itself by applying any royalty or rentals accruing hereunder to the discharge of such taxes, mortgages, or other liens. In case of any controversy or dispute regarding title to the premises or any part thereof, or regarding the ownership of any sums payable hereunder, Lessee shall have the right to withhold and retain without accrual of interest all sums payable hereunder which are subject to such controversy or dispute until the final determination of said controversy or dispute and then to distribute the same among those lawfully entitled thereto.

12.  If during the last ninety (90) days of the primary term hereof or at any time after the expiration of the primary term, production of oil and gas in paying quantities from the premises, or lands pooled therewith, should cease for any reason, or if during or after such ninety (90) day period and prior to discovery of oil or gas on the premises or lands pooled therewith, Lessee should complete a dry hole thereon, this lease shall not terminate if Lessee commences or resumes additional operations on the premises or lands pooled therewith, within ninety (90) days after production ceased or the well was completed as a dry hole, whichever is applicable. If, at the expiration of the primary term, oil or gas is not being produced in paying quantities from the premises, or lands pooled therewith, but Lessee is then engaged in operations thereon, this lease shall remain in force so long as operations are prosecuted (whether on the same or different wells) with no cessation of more than ninety (90) consecutive days, and if they result in production, so long thereafter as oil or gas is produced in paying quantities from the premises or lands pooled therewith. The term "operations" as used in this Lease shall include but not be limited to the drilling, testing, completing, (including by horizontal and slant hole well completion techniques) reworking, recompleting, deepening, plugging back, or repairing of a well (and all work preparatory, incident or related to any such operation) in search for or in an endeavor to obtain, restore, maintain, or to increase production of oil, liquid hydrocarbons, or gas, or any of them.

13.  Lessor (whether one or more) hereby further grants, leases, lets, and demises exclusively to Lessee the lands then covered by the lease under the provisions of this first right and option to extend the primary term of the lease for an additional five (5) years from the expiration of the original primary term by paying or tendering the sum of twenty-five dollars per acre (for the acreage estimated to be comprised by the lease) to the parties entitled to payments for leasing rights according to Lessee's records. This payment shall be based upon the number of acres then covered by this lease, and all the provisions of this lease relating to payments shall apply equally to this payment including, but not limited to, the provisions regarding changes in ownership, reduction for lessor interest, reduction for partial release, naming a depository bank, and for joint deposit to all owners. If, at the time this payment is made, various parties are entitled to specific payments according to Lessee's records, this payment may be divided between said parties and paid or tendered in the same proportion. Should this option be exercised as herein provided, it shall be considered for all purposes as though this paid up lease originally provided for a primary term of ten (10) years. Lessee shall execute and file for record within four (4) weeks following the exercise of this option has been exercised and showing the expiration date of the primary term as extended.

14.  All express or implied covenants of this lease shall be subject to all Federal and state laws, executive orders, rules and regulations and this lease shall not be terminated in whole or in part, nor Lessee held liable for damages, for failure to comply herewith if compliance is prevented by, or if such failure is a result of, any such law, order, rule or regulation, or if prevented by an act of God, the public enemy, labor disputes, inability to obtain materials, failure of transportation or other cause beyond the control of the Lessee.

2

CABOT_OIL_0022083

15. This lease embodies the entire agreement between the parties and no representation or promise on behalf of either party shall be binding unless contained herein or mutually agreed to in writing by all parties hereto. This agreement shall be binding upon each Lessor who shall execute the same and upon Lessee from and after the date of delivery to Lessee or its representative by the executing Lessor.

16. All monies coming due hereunder shall be paid or tendered to Lessor at the address set forth above and no default shall be declared against the Lessee by the Lessor for failure of the Lessee to make any payments that may become due and payable hereunder unless the Lessee shall refuse or neglect to pay the same for sixty (60) days after having received written notice by registered mail from the Lessor of his intention to declare such default.

17. If during any time while this lease is in force and effect Lessor receives a bona fide offer from any party (other than Lessee) to purchase a new lease or an option to purchase a new lease covering all or any part of the lands or substances covered hereby, and if Lessor is willing to accept such offer, ("third party offer," hereunder) then Lessor shall promptly notify Lessee in writing of the name and address of the offeror, and all of the terms and conditions of such third party offer, including any lease or option bonus offered. Lessee shall have a period of thirty (30) days after receipt of all such notice data in which to exercise the herein granted preferential right to purchase a new lease or option for a new lease from Lessor on a form comparable to the third party offer, or absent a specific form with the third party offer then on this lease form adjusted by Lessee to include the terms and conditions in the third party offer, by giving Lessor written notice of the exercise of such preferential right. Promptly thereafter, Lessee shall furnish to Lessor the new lease for execution, along with a time draft for any lease bonus included as a part of the third party offer, conditioned upon execution and delivery of the lease by Lessor and approval of title by Lessee, all in accordance with the terms of the draft. Whether or not Lessee exercises the preferential right granted hereunder, during the time this lease remains in effect, by new lease executed by Lessor pursuant to any third party offer shall be subordinate to this lease and shall not be construed as replacing or adding to Lessee's obligations hereunder. The preferential right to purchase a new lease granted to Lessee by this paragraph 17, shall terminate unless exercised prior to one week before the expiration of the period allowed for the absolute suspension of the power of alienation by the rule against perpetuities.

18. Lessee will not drill, lay pipeline or conduct operations of any kind upon the surface of the leased premises without the express written consent of the Lessor.

**See Addendum attached hereto and made a part hereof**

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

**Lessor**

_James B. Costello_ (Seal)
James B. Costello

_Julie Costello_ (Seal)
Julie Costello

_____ (Seal)

_____ (Seal)

**ACKNOWLEDGMENT**

State of _____Pennsylvania_____

County of _____Susquehanna_____

On this the ____9th____ day of _October_, _2006_, before me a Notary Public, the undersigned officer, personally appeared James B. Costello and Julie Costello, now known as, known to me to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that __they__ executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

SEAL
My commission expires: May 9, 2009

_Shirley A. Lockhart_
(Notary Public)

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Shirley A. Lockhart, Notary Public
Bridgewater Twp., Susquehanna County
My Commission Expires May 9, 2009
Member, Pennsylvania Association of Notaries

3

CABOT_OIL_0022084

# ADDENDUM

Attached to and made a part of that certain Oil and Gas Lease dated the 9th day of October 2006 by and between James B. Costello and Julie Costello, Lessor, and Cabot Oil & Gas Corporation, Lessee, covering land situated in Dimock Township County of Susquehanna, Commonwealth of Pennsylvania, to wit:

Anything contained in said Oil and Gas Lease to the contrary notwithstanding it is agreed that:

The location of any well, pipeline, access road or related facility constructed by the Lessee upon the leased premises shall be chosen by mutual consent between the Lessor and Lessee.

**Signed here for purposes of identification.**

_____ _James B. Costello_ _____          _____
James B. Costello

_Julie Costello_ _____                        _____
Julie Costello

CABOT_OIL_0022085