Seconded Amended complaint

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

-------------------------------------------------------------------------

NORMA J. FIORENTINO, CRAIG SAUTNER and JULIA
SAUTNER, Individually, and as the Parents and Natural Guardians
of ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮, MICHAEL ELY
and ANDREA ELY, Individually, and as the Parents and Natural
Guardians of ▮▮▮▮▮▮ and ▮▮▮▮▮▮▮, RAY HUBERT
and VICTORIA HUBERT, Individually, and as the Parents and
Natural Guardians of ▮▮▮▮▮▮ and ▮▮▮▮▮▮,
RONALD CARTER, SR. and JEAN CARTER, WILLIAM T.
ELY and SHEILA A. ELY, SAMANTHA SEBJAN, Individually,
and as the Parents and Natural Guardians of ▮▮▮▮▮▮▮
▮▮, JIMMY LEE SWITZER and VICTORIA SWITZER,
NOLEN SCOTT ELY and MONICA LAURA MARTA-ELY,
Individually, and as the Parents and Natural Guardians of ▮▮▮▮▮
▮▮, ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮, NOLEN SCOTT ELY as
the Executor of the Estate of KENNETH RAY ELY, RICHARD
SEYMOUR and WENDY SEYMOUR, TODD CARTER and
JEANNETTE CARTER, PATRICIA FARNELLI, Individually,
and as Parent and Natural Guardian of ▮▮▮▮▮▮▮▮▮,
▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮, ▮
and ▮▮▮▮▮▮, ERIK B.J. ROOS and
SUSAN M. ROOS, FRANK NOBLE and KAREN NOBLE,
Individually, and as the Parents and Natural Guardians of ▮▮▮
▮▮, RAYMOND KEMBLE, EMMAGENE E. SAMOY-
ELY, KENNETH ELY and DEBORAH ELY, GREGGORY
NEWELL, COLLEEN NEWELL, JUSTIN NEWELL and
JENNIFER NEWELL, RONALD CARTER, JR. and CHRISTINA
CARTER, TAMARA CARTER, Individually and as the Mother
and Natural Guardian of ▮▮▮▮▮▮▮, SHELLEY WEAVER,
Individually and as the Mother and Natural Guardian of
▮▮▮▮▮▮▮▮▮▮▮, JAMES COSTELLO and JULIE
COSTELLO, DOUGLAS R. HEITSMAN and JOANN
HEITSMAN, Individually and as the Parents and Natural
Guardians of ▮▮▮▮▮▮▮▮▮▮▮, and ANNE M.
HEITSMAN,

|                          |
|--------------------------|
| Hon. Thomas I. Vanaskie  |
|                          |
| Civil Action No. 3:09-cv-02284-TIV |
|                          |
| **Second Amended Complaint** |

Plaintiffs,

-against-

CABOT OIL & GAS CORPORATION and GAS SEARCH
DRILLING SERVICES CORPORATION,

Defendants.

-------------------------------------------------------------------------

Plaintiffs, through their undersigned attorneys, for their Complaint allege the following:

## INTRODUCTION

1.      Plaintiffs complain, *inter alia*, of environmental contamination and polluting events caused by the conduct and activities of the Defendants herein, who caused the releases, spills, and discharges of combustible gases, hazardous chemicals, and industrial wastes from its various oil and gas drilling facilities. These releases, spills and discharges caused the Plaintiffs and their property to be exposed to such hazardous gases, chemicals, and industrial wastes and caused damage to the natural resources of the environment in and around the Plaintiffs' properties, causing Plaintiffs to incur health injuries, loss of use and enjoyment of their property, loss of quality of life, emotional distress, and other damages. Moreover, the Defendants failed to fulfill their contractual obligations with the Plaintiffs and engaged in fraudulent conduct, as more fully set forth herein.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Jurisdiction is proper in that the amount in controversy with respect to each Plaintiff individually exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

3.      Venue in this District is proper under 28 U.S.C. §1391.

## PARTIES

4.      At all times mentioned herein, Plaintiff, NORMA J. FIORENTINO, was and is a citizen of the State of Pennsylvania, residing at RR 6, Box 6212, Montrose, PA 18801.

5.     At all times mentioned herein, Plaintiffs, CRAIG SAUTNER and JULIA SAUTNER, were and are citizens of the State of Pennsylvania, residing at RR 6, Box 6147, Montrose, PA 18801. These Plaintiffs reside with their minor children, ███████████ and ███████████, and bring this action individually and on their behalf as parents and natural guardians.

6.     At all times mentioned herein, Plaintiffs, MICHAEL ELY and ANDREA ELY, were and are citizens of the State of Pennsylvania, residing at RR, 6 Box 3176, Montrose, PA 18801. These Plaintiffs reside with their minor children, ███████████ and ███████████, and bring this action individually and on their behalf as parents and natural guardians.

7.     At all times mentioned herein, Plaintiffs, RAY HUBERT and VICTORIA HUBERT, were and are citizens of the State of Pennsylvania, residing at P.O. Box 111, Carter Road, Dimock, PA 18816. These Plaintiffs reside with their minor children, ███████████ and ███████████, and bring this action individually and on their behalf as parents and natural guardians.

8.     At all times mentioned herein, Plaintiffs, RONALD CARTER, SR. and JEAN CARTER, were and are citizens of the State of Pennsylvania, residing at P.O. Box 82, Dimock, PA 18816.

9.     At all times mentioned herein, Plaintiffs, WILLIAM T. ELY and SHEILA A. ELY, were and are citizens of the State of Pennsylvania, residing at RR 6, Box 6176, Montrose, PA 18801.

10.     At all times mentioned herein, Plaintiff, SAMANTHA SEBJAN, was and is a citizen of the State of Pennsylvania, residing at RR 6, Box 6176, Montrose, PA 18801. This

Plaintiff resides with her minor child, ███████████, and brings this action individually and on his behalf as parent and natural guardian.

11.     At all times mentioned herein, Plaintiffs, JIMMY LEE SWITZER and VICTORIA SWITZER, were and are citizens of the State of Pennsylvania, residing at P.O. Box 113, Dimock, PA 18801.

12.     At all times mentioned herein, Plaintiffs, NOLEN SCOTT ELY and MONICA LAURA MARTA-ELY, were and are citizens of the State of Pennsylvania, residing at P.O. Box 39, Carter Road, Dimock, PA 18816. These Plaintiffs reside with their minor children, ████ ███, ██████████ and ████████████, and bring this action individually and on their behalf as parents and natural guardians.

13.     At all times mentioned herein, Plaintiff, KENNETH RAY ELY, was a citizen of the State of Pennsylvania, residing at P.O. Box 23, Meshoppen Creek Road, Dimock, PA 18816. KENNETH RAY ELY died on May 20, 2009. On May 29, 2009, his son, NOLEN SCOTT ELY, was appointed the Executor of KENNETH RAY ELY's estate, for which Plaintiff NOLEN SCOTT ELY brings this action, including heirs and next of kin deriving rights therefrom.

14.     At all times mentioned herein, Plaintiffs, RICHARD SEYMOUR and WENDY SEYMOUR, were and are citizens of the State of Pennsylvania, residing at RR 6, Box 6177-A, Montrose, PA 18801.

15.     At all times mentioned herein, Plaintiffs, TODD CARTER and JEANNETTE CARTER, were and are citizens of the State of Pennsylvania, residing at P.O. Box 185, Dimock, PA 18816.

16.     At all times mentioned herein, Plaintiff, PATRICIA FARNELLI, was and is a citizen of the State of Pennsylvania, residing at RR 6, Box 6151, Montrose, PA 18801. This

Plaintiff resides with her minor children,  , ,

, and , and brings this

action individually and on their behalf as parent and natural guardian.

17.     At all times mentioned herein, Plaintiffs, ERIC B.J. ROOS and SUSAN M.

ROOS, were and are citizens of the State of Pennsylvania, residing at RR 6, Pox 6194, Montrose,

PA 18801.

18.     At all times mentioned herein, Plaintiffs, FRANK NOBLE and KAREN NOBLE,

were and are citizens of the State of Pennsylvania, residing at RR1 Box 489, Hop Bottom, PA

18824. These Plaintiffs reside with their minor child, ▮▮▮▮▮▮▮, and bring this action

individually and on her behalf as parents and natural guardians.

19.     At all times mentioned herein, Plaintiff, RAYMOND KEMBLE, was and is a

citizen of the State of Pennsylvania, residing at RR 6, Box 6177, Montrose, PA 18801.

20.     At all times mentioned herein, Plaintiff, EMMAGENE E. SAMOY-ELY, was and

is a citizen of the State of Pennsylvania, residing at P.O. Box 23, Meshoppen Creek Road,

Dimock, PA 18816.

21.     At all times mentioned herein, Plaintiffs, KENNETH ELY and DEBORAH ELY,

were and are citizens of the State of Pennsylvania, residing at P.O. Box 95, Brooklyn, PA 18813,

owning certain undeveloped property, upon which a water well is located, on SR 3023 in

Dimock, PA 18816.

22.     At all times mentioned herein, Plaintiffs, GREGGORY NEWELL, COLLEEN

NEWELL, JUSTIN NEWELL and JENNIFER NEWELL, were and are citizens of the State of

Pennsylvania, residing at 11545 SR 3004, Springville, PA 18844.

5

23.   At all times mentioned herein, Plaintiffs, RONALD CARTER, JR. and CHRISTINA CARTER, were and are citizens of the State of Pennsylvania, residing at P.O. Box 13, Carter Road, Dimock, PA 18816.

24.   At all times mentioned herein, Plaintiff, TAMARA CARTER, was and is a citizen of the State of Pennsylvania, residing at P.O. Box 13, Carter Road, Dimock, PA 18816. This Plaintiff resides with her minor child, ███████████, and brings this action individually and on his behalf as mother and natural guardian.

25.   At all times mentioned herein, Plaintiff, SHELLEY WEAVER, was and is a citizen of the State of Pennsylvania, residing at RD6 Box 6212, Montrose, PA 18801. This Plaintiff resides with her minor child, ██████████████, and brings this action individually and on his behalf as mother and natural guardian.

26.   At all times mentioned herein, Plaintiffs, JAMES COSTELLO and JULIE COSTELLO, were and are citizens of the State of Pennsylvania, residing at RR6 Box 6176-C, Montrose, PA 18801.

27.   At all times mentioned herein, Plaintiffs, DOUGLAS R. HEITSMAN and JOANN HEITSMAN, were and are citizens of the State of Pennsylvania, residing at 6788 State Route 29, Springville, PA 18844. These Plaintiffs reside with their minor child, ██████████ ███████, and bring this action individually and on his behalf as parents and natural guardians.

28.   At all times mentioned herein, Plaintiff, ANNE M. HEITSMAN, was and is a citizen of the State of Pennsylvania, residing at 6792 State Route 29, Springville, PA 18844.

29.   At all times mentioned herein, Plaintiffs, DOUGLAS R. HEITSMAN, JOANN HEITSMAN, and ANNE M. HEITSMAN, were and are citizens of the State of Pennsylvania,

6

residing at the aforementioned addresses, owning two undeveloped properties, one being comprised of 18 acres and located in Dimock, PA, and the other being comprised of 25 acres and located in Springville, PA.

30. The aforementioned Plaintiffs are hereinafter collectively referred to as "Plaintiffs".

31. At all times mentioned herein, Defendant, CABOT OIL & GAS CORPORATION ("Cabot"), was and is a Delaware Corporation, with its headquarters and principal place of business located at 1200 Enclave Parkway, Houston, TX. This Defendant engages in various oil and gas exploration and production activities in the State of Pennsylvania.

32. At all times mentioned herein, Defendant, GAS SEARCH DRILLING SERVICES CORPORATION ("Gas Search"), was and is a wholly owned, operated, and controlled subsidiary of Defendant, CABOT OIL & GAS CORPORATION. Defendant, GAS SEARCH DRILLING SERVICES CORPORATION, engages in the drilling and servicing of oil and gas wells, and has a mailing address at 466 Airport Industrial Park, Parkersburg, WV. Defendants, Cabot and Gas Search, are hereinafter collectively referred to as "Defendants".

## GENERAL ALLEGATIONS

33. At all times mentioned herein, Defendants engaged in drilling activities, and owned and operated gas wells, at least sixty-two (62) such gas wells at the present time, within a nine-square mile tract (the "Dimock Gas Well Area") in Dimock Township, Susquehanna County, Pennsylvania wherein Plaintiffs own property and/or reside.

34. In order to obtain the legal right to drill on Plaintiffs' property, and extract natural gas from Plaintiffs' property, Cabot obtained from each of the Plaintiffs an executed oil and gas lease agreement and addendum thereto (hereinafter referred to as "gas lease").

7

35. Each gas lease was solicited by a representative of Cabot who came to each of the Plaintiffs' homes, unannounced, commencing in 2006.

36. The gas leases were not negotiated at "arm's length".

37. In the process of obtaining the gas leases, Cabot expressly warranted to each of the Plaintiffs the following, upon which Plaintiffs relied, to their detriment, as the basis for the bargain:

a. That Cabot would reasonably and thoroughly test Plaintiffs' domestic water supply prior to and following commencement of drilling operations in order to ensure that the water supply will not be adversely affected by said operations;

b. That Cabot would timely and fully disclose in all instances the results of such reasonable and thorough water tests to Plaintiffs;

c. That Plaintiffs' person, property, and land resources would remain for themselves and future generations substantially preserved and undisturbed in the face of said operations;

d. That Plaintiffs' quality of life, and use and enjoyment of their properties would not be disrupted or adversely affected for themselves and future generations by said operations;

e. That in the unlikely event that it was determined that Cabot's operations had adversely affected Plaintiffs' water supply, Cabot would immediately disclose that information and, at its expense, take all steps necessary to return the Plaintiffs' water supply to pre-drilling conditions;

8

f.    That Cabot would remain at all times in substantial compliance with all state and federal laws and regulations governing safe oil and gas drilling practices; and

g.    That Plaintiffs would receive from Cabot timely and regular payments of monetary compensation commensurate with the amount of natural gas extracted from Plaintiffs' property, which payments would be calculated according to a transparent formula with verifying data.

38.    At all times mentioned herein, the gas wells drilled, owned and operated by Defendants in the Dimock Gas Well Area did and do include the following (collectively referred to hereinafter as "Defendants' Gas Wells"):

a.    Baker 1 Well

b.    Gesford 2, 3, 7-H, and 9 Wells

c.    Costello 1 and 2 Wells

d.    Lewis 2 Well

e.    Ratzel 1H and 3V Wells

f.    Ely 2, 4 and 6 Wells

g.    Black 2H Well

h.    Heitsman A-1, 1H, 2V and 4H Wells

i.    Hibbard 2H and 4H Wells.

39.    At all times mentioned herein, in order to extract natural gas from the Defendants' Gas Wells, Defendants used a drilling process known as hydraulic fracturing. Hydraulic fracturing requires the discharge of enormous volumes of hydraulic fracturing fluids

otherwise known as "fracking fluid" into the ground under extreme pressure in order to dislodge and discharge the gas contained under the ground.

40.    The composition of fracking fluid includes hazardous chemicals that are carcinogenic and toxic.

41.    Other materials, including but not limited to, diesel fuel, lubricating agents and surfactant and defoaming agents, also consisting of hazardous chemicals, are utilized during drilling, and well operations and servicing.

42.    In addition, gas, oil and brine present in formations within the earth, themselves contaminants, are dislodged and migrate during drilling and well operations.

43.    Defendants located Defendants' Gas Wells within the following proximities to Plaintiffs' property, home and water supply wells:

  a.    Plaintiff NORMA FIORENTINO's property, home and water supply are located within 1300 feet of Baker 1 Well.

  b.    Plaintiffs CRAIG SAUTNER and JULIA SAUTNER's property, home and water supply are located within 1000 feet of Baker 1 Well.

  c.    Plaintiffs MICHAEL ELY and ANDREA ELY's property, home and water supply are located within 1300 feet of Gesford 3 Well, Costello 1 Well, and Gesford 9 Well.

  d.    Plaintiffs RAY HUBERT and VICTORIA HUBERT's property, home and water supply are located within 1000 feet of Gesford 3 Well and Gesford 9 Well.

e.      Plaintiffs RONALD CARTER, SR. and JEAN CARTER's property, home and water supply are located within 1000 feet of Gesford 2 and Gesford 7-H Wells.

f.      Plaintiffs WILLIAM ELY and SHEILA ELY's property, home and water supply are located within 1000 feet of Costello 1 Well.

g.      Plaintiff SAMANTHA SEBJAN's residence and water supply are located within 1000 feet of Costello 1 Well.

h.      Plaintiffs JIMMY LEE SWITZER and VICTORIA SWITZER's property, home and water supply are located within 1000 feet of Lewis 2 Well.

i.      Plaintiffs NOLEN SCOTT ELY and MONICA LAURA MARTA-ELY's property, home and water supply are located within 1000 feet of Gesford 3 Well and Gesford 9 Well.

j.      Plaintiff-decedent KENNETH RAY ELY's property has upon it Ely 2, 4, and 6 Wells are located within 1000 feet of the Plaintiff-decedent's home, spring water supply and rock quarry.

k.      Plaintiffs RICHARD SEYMOUR and WENDY SEYMOUR's property, home, agricultural business and water supply are located within 1000 feet of Costello 1 Well.

l.      Plaintiffs ERIC ROOS and SUSAN ROOS's property, home and water supply are located within 1000 feet of Ratzel 3V Well, and Ratzel 1H Well.

m.      Plaintiffs TODD CARTER and JEANNETTE CARTER's residence and water supply are located within 1000 feet of Gesford 2 and Gesford 7-H Wells.

11

n.      Plaintiff PATRICIA FARNELLI's property, home and water supply are located within 1000 feet of Gesford 2 and 3 Wells.

o.      Plaintiffs FRANK NOBLE and KAREN NOBLE's property, home and water supply are located within 1000 feet of Black 2H Well.

p.      Plaintiff RAYMOND KEMBLE's property, home and water supply are located within 1000 feet of Costello 2 Well.

q.      Plaintiff EMMAGENE E. SAMOY-ELY's residence and spring water supply are located within 1000 feet of Ely 2 Well.

r.      Plaintiffs KENNETH ELY and DEBORAH ELY's property and water supply are located within 1000 feet of Lewis 2 Well.

s.      Plaintiffs GREGGORY NEWELL and COLLEEN NEWELL's property, home and water supply are located within 400 feet of Heitsman A-1 Well.

t.      Plaintiffs RONALD CARTER, JR. and CHRISTINA CARTER's property, home and water supply are located within 1000 feet of Gesford 2 and Gesford 7-H Wells.

u.      Plaintiff TAMARA CARTER's residence and water supply are located within 1000 feet of Gesford 2 and Gesford 7-H Wells.

v.      Plaintiff SHELLEY WEAVER's residence and water supply are located within 1000 feet of Baker 1 Well.

w.      Plaintiffs JAMES COSTELLO and JULIE COSTELLO's property, home and water supply are located within 1000 feet of Costello 1 and Costello 2 Wells.

12

x. Plaintiffs DOUGLAS R. HEITZMAN and JOANN HEITZMAN's property, home and water supply are located within 1000 feet of Hibbard 2H and Hibbard 4H Wells.

y. Plaintiff ANNE M. HEITSMAN's property, home and water supply are located within 1000 feet of Heitsman 1H, Heitsman 2V, and Heitsman 4H Wells.

z. Plaintiffs DOUGLAS R. HEITSMAN, JOANN HEITSMAN, and ANNE M. HEITSMAN's undeveloped property in Dimock, PA is located 1000 feet of Hibbard 2H and Hibbard 4H Wells.

aa. Plaintiffs DOUGLAS R. HEITSMAN, JOANN HEITSMAN, and ANNE M. HEITSMAN's undeveloped property in Springville, PA is located 1500 feet of Heitsman A-1 Well.

44. At all times mentioned herein, Plaintiffs rely on ground water wells for drinking, bathing, cooking, washing and other daily residential and business uses.

45. At all times mentioned herein, and upon information and belief, Defendants were otherwise negligent and/or grossly negligent in their drilling, construction and operation of Defendants' Gas Wells such that:

a. Combustible gas was caused to be released into the headspaces of the water wells that provide water to Plaintiffs;

b. Elevated levels of dissolved methane were caused to be present in wells that provide water to Plaintiffs;

c. Natural gas was caused to be discharged into and caused to enter Plaintiffs' fresh groundwater;

d.    Excessive pressures were caused to be present within the gas wells near Plaintiffs' homes and water wells;

e.    Pollutants and industrial and/or residual waste was caused to be discharged into the ground or into the waters near Plaintiffs' homes and water wells;

f.    Diesel fuel was caused to be spilled onto the ground near Plaintiffs' homes and water wells;

g.    Drilling mud was caused or allowed to be discharged into diversion ditches near Plaintiffs' homes and water wells;

h.    An explosion was caused to occur in an outside, below-grade water well pit on or about January 1, 2009 on the property of Plaintiff, NORMA FIORENTINO, causally related to accumulation of evaporated methane gas in her wellhead; and

i.    A fire in the well vent was caused to occur on the property of Plaintiffs, MICHAEL ELY and ANDREA ELY, which was causally related to the accumulation and re-accumulation of evaporated methane gas in their wellhead.

j.    Three significant spills of pollutants were caused to occur within the Dimock Gas Well Area within a ten day period.

k.    On September 24, 2009, the Pennsylvania Department of Environmental Protection issued an Order to Cabot requiring that Cabot cease all fracturing/well stimulation activities within Susquehanna County, Pennsylvania, and near the Dimock Gas Well Area, which prohibition lasted for approximately three weeks.

l.   Following many of the aforementioned spills, discharges, releases and other activities, Defendants failed to inform Plaintiffs, other nearby residents, emergency response personnel, and public officials, or take other reasonable measures to protect Plaintiffs, the public, and the environment.

46.   Upon information and belief, at all times mentioned herein the release and discharges of gas, presence of excessive well pressures as well, explosion and fire were the result of improper or insufficient cement casing of Defendants' Gas Wells located near Plaintiffs' homes, and discharges and spills of industrial and/or residual waste, diesel fuel and other pollutants and hazardous substances were the result of Defendants' negligence, including its negligent planning, training and supervision of staff, employees and/or agents.

47.   Upon information and belief, these aforementioned spills, discharges, releases and other activities include, but are not limited to, various hazardous chemicals, including 1,2,4-trimethylbenzen exceeding state wide health standards for saturated soil, the discharge into surface water of aluminum in amounts exceeding the Pennsylvania Department of Environmental Protection's Water Quality Criteria, the discharge of iron exceeding the Pennsylvania State Department of Environmental Protection's Water Quality Criteria, and the discharge of N-propylbenzene, and P-isopropyl toluene.

48.   Upon information and belief, Defendants have maintained their activities in such a negligent and improper manner as to violate various Pennsylvania state laws and the Rules and Regulations promulgated there under, including but not limited to the Pennsylvania Clean Streams Law, 35 P.S. §§691.1, et seq., the Pennsylvania Solid Waste Management Act, 35 P.S. §§ 6018.101, et seq., the Pennsylvania Oil and Gas Act, 58 P.S. §§ 601.101, et seq., the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), 35 P.S. §§ 6020.101, et seq.; the Federal

15

Solid Waste Disposal Act, 42 USC §§ 6901, *et seq.*; the Federal Comprehensive Environmental Response, Compensation, and Liability Act, 42 USC §§ 9601, *et seq.*; and the Federal Water Pollution Control Act, 33 USC §§ 1251, *et seq.*

49.    Despite the language of the gas leases that requires Cabot to test Plaintiffs' domestic water supplies prior to and following commencement of drilling operations in order to ensure that the water supplies have not be adversely affected by said operations, Cabot failed to fully engage in such testing activities in violation of the gas leases.

50.    Cabot has failed to fulfill its responsibility under the gas leases to take all steps necessary to return the Plaintiffs' water supplies to pre-drilling condition.

51.    As a result of the aforementioned releases, spills, discharges, and non-performance attributed to and caused solely by Defendants' negligent and/or grossly negligent drilling and production activities and fraudulent solicitation of the gas leases, Plaintiffs and their properties have been seriously harmed, to wit:

a.    Plaintiffs' water supplies are contaminated.

b.    Plaintiffs have been and continue to be exposed to combustible gases, hazardous chemicals, threats of explosions and fires.

c.    Plaintiffs' property has been harmed and diminished in value.

d.    Plaintiffs have lost the use and enjoyment of their property, and the quality of life they otherwise enjoyed.

e.    Plaintiffs have been caused to become physically sick and ill, manifesting neurological, gastrointestinal and dermatological symptoms, as well demonstrating blood study results consistent with toxic exposure to, for example, heavy metals.

16

f.      Plaintiffs live in constant fear of future physical illness, particularly with respect to the health of their minor children and grandchildren.

g.      Plaintiffs live in a constant state of severe emotional distress consistent with post traumatic stress syndrome.

52.     As a result of the foregoing and following allegations and Causes of Action, Plaintiffs seek, *inter alia*, a preliminary and permanent injunction barring Defendants from engaging in the acts complained of and requiring Defendants to abate the nuisances, unlawful conduct, violations and damages created by them, and an order requiring Defendants to pay compensatory damages, punitive damages, the cost of future health monitoring, litigation fees and costs, and to provide any further relief that the Court may find appropriate.

## CAUSES OF ACTION

### First Cause of Action: Hazardous Sites Cleanup Act

53.     Plaintiffs repeat and reallege the allegations of paragraph "1" through "52" of this Complaint, as though set forth in this paragraph at length.

54.     The locations of the releases of hazardous substances as set forth above constitute "sites" as defined by the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), 35 P.S. §§ 6020.101, *et. seq.*

55.     The spills, releases, and discharges set forth above constitute "releases" of hazardous substances and contaminants under HSCA.

56.     At all relevant times, Defendants owned and/or operated the sites, and/or Defendants owned or possessed and arranged for the disposal, treatment or transport for disposal or treatment of the hazardous substances, under the HSCA.

17

57. Defendants are "responsible persons" responsible for the release or threatened release of hazardous substances, under HSCA.

58. As set forth above, Defendants have caused, and continue to cause, releases or substantial threats of releases, of hazardous substances or contaminants which present a substantial danger to the public health or safety or the environment, under HSCA.

59. Pursuant to Section 507, 702 and 1101 of HSCA, 35 P.S. §§ 6020.507, 6020.507 and 6020.1101, Defendants are strictly liable for costs incurred by Plaintiffs to respond to Defendants' releases or threatened releases of hazardous substances and contaminants, including but not limited to the cost of a health assessment or health effects study, medical monitoring, and interest.

60. The above releases and threats of releases of hazardous substances and contaminants by Defendants constitute public nuisances under Section 1101 of HSCA, 35 P.S. § 6020.1101.

61. The above releases and threats of releases of hazardous substances by Defendants constitute unlawful conduct under Section 1108 of HSCA, 35 P.S. §6020.1108.

62. The above releases and threats of releases of hazardous substances and contaminants by Defendants have caused and threaten to cause personal injury and property damage to Plaintiffs.

63. Defendants, by reason of these releases and threats of releases, are liable for all the damages and injuries to Plaintiffs proximately caused by the releases and threats of releases, and to remediate the releases, threats of releases, and resultant contamination.

18

## Second Cause of Action: Negligence

64. Plaintiffs repeat and reallege the allegations of paragraph "1" through "63" of this Complaint, as though set forth in this paragraph at length.

65. Defendants, by violating the various laws indicated herein, engaged in a negligence *per se.*

66. Defendants owed a duty of care to Plaintiffs to responsibly drill, own and operate Defendants' Gas Wells, respond to spills and releases of hazardous chemicals, and prevent such releases and spills, and take all measures reasonably necessary to inform and protect the public, including Plaintiffs, from the contamination of their water supply and exposure to hazardous chemicals and combustible gases.

67. Defendants, including their officers, agents, and/or employees, knew or in the exercise of reasonable care should have known, their operations would result in the release or the threat of release of combustible gases and hazardous chemicals.

68. Defendants, including their officers, agents, and/or employees, knew or in the exercise of reasonable care should have known, of the dangerous, offensive, hazardous or toxic nature of their operations.

69. Defendants, including their officers, agents, and/or employees, knew or in the exercise of reasonable care should have known, of the dangerous, offensive, hazardous or toxic nature of the combustible gases and hazardous chemicals released by Defendants, and that they were capable of causing serious personal injury to persons coming into contact with them, polluting the water supplies of the Plaintiffs, damaging property and causing natural resource damage.

19

70.     Defendants, including their officers, agents, and/or employees, should have taken reasonable precautions and measures to prevent or mitigate the releases and spills, including the design and operation of process systems so that such releases and spills did not occur, as well as adequate planning for such spills or releases or other emergencies.

71.     Defendants, including their officers, agents, and/or employees, knew or in the exercise of reasonable care should have known, that once a spill or release occurred, they should take reasonable measures to protect the public, including by issuing immediate and adequate warnings to nearby residents, including Plaintiffs, to emergency personnel and to public officials.

72.     Defendants, including their officers, agents, and/or employees, knew or in the exercise of reasonable care should have known, that the spills and releases caused by Defendants' negligent conduct, and the resultant harm to Plaintiffs and their property, were foreseeable and inevitable consequences of Defendants' acts and/or omissions in the manner in which they engaged in their gas drilling and production activities.

73.     Defendants, including their officers, agents, and/or employees, acted unreasonably and negligently in causing the releases and spills and the contamination of Plaintiffs' water supplies and property, and failed to take reasonable measures and precautions necessary to avoid and/or respond to the spills and releases of hazardous chemicals, and to protect the public, including the Plaintiffs, from exposure to these combustible gases and hazardous chemicals.

74.     Defendants' acts and/or omissions mentioned herein were the direct and proximate cause of the damages and injuries to Plaintiffs alleged herein.

75.     Contamination resulting from the Defendants' negligence continues to this day, and is likely to continue into the future, unless injunctive relief is awarded by this Court abating

the nuisances and enjoining Defendants from engaging in their drilling and production activities in the Dimock gas well area.

76.     Some or all of the acts and/or omissions of Defendants were grossly, recklessly and wantonly negligent, and were done with utter disregard for the consequences to Plaintiffs and other persons, and therefore, Plaintiffs are entitled to an award of punitive damages.

77.     Plaintiffs in no way contributed to the damages and injuries they have sustained.

78.     Defendants, by reason of their negligence, are liable for all the damages and injuries to Plaintiffs proximately caused by the spills and releases of hazardous chemicals indicated herein, and to remediate the contamination caused by such spills and releases.

### Third Cause of Action: Private Nuisance

79.     Plaintiffs repeat and reallege the allegations of paragraph "1" through "78" of this Complaint, as though set forth in this paragraph at length.

80.     Defendants, by their acts and/or omissions, including those of their officers, agents, and/or employees, have caused an unreasonable and substantial interference with Plaintiffs' right to use and enjoy Plaintiffs' property.

81.     Defendants, including their officers, agents and/or employees, have created and maintained a continuing nuisance in the Dimock gas well area, by allowing the gas wells to exist and operate in a dangerous and hazardous condition, allowing the spills and releases, and/or the threats of spills and releases, of hazardous chemicals, and allowing the spills and releases to continue to spread to surrounding areas, including Plaintiffs' properties and drinking water supplies, resulting in injuries to Plaintiffs' health, well being and property.

82.     This nuisance continues to this day, and is likely to continue into the future.

83.     Defendants, by reason of this private nuisance, are liable for all the damages and injuries to Plaintiffs proximately caused by the spills, releases and contamination, and to remediate the contamination.

### Fourth Cause of Action: Strict Liability

84.     Plaintiffs repeat and reallege the allegations of paragraph "1" through "83" of this Complaint, as though set forth in this paragraph at length.

85.     The hazardous chemicals and combustible gases used, processed, and stored by Defendants are of a toxic and hazardous nature capable of causing severe personal injuries and damages to persons and property coming in contact with them, and therefore are ultra hazardous and abnormally dangerous.

86.     The use, processing, storage, and activity of hydro-fracturing at Defendants' Gas Wells, adjacent to or on residential properties, was and continues to be an abnormally dangerous and ultra hazardous activity, subjecting persons coming into contact with the hazardous chemicals and combustible gases with severe personal injuries, regardless of degree of caution Defendants might have exercised.

87.     Defendants, by engaging in abnormally dangerous and ultra hazardous activities, is strictly liable with regard to fault for all the damages and injuries to Plaintiffs proximately caused by the spills, releases and contamination caused by Defendants, and to remediate the contamination.

### Fifth Cause of Action: Breach of Contract

88.     Plaintiffs repeat and reallege the allegations of paragraph "1" through "87" of this Complaint, as though set forth in this paragraph at length.

89. As previously indicated, the gas leases required Cabot to test the Plaintiffs' water supply following commencement of drilling operations on the premises in order to ensure that the water supplies would not be adversely affected by Cabot's operations.

90. Under the gas leases, in the event is determined that said operations adversely affected Plaintiffs' water supply, then Cabot is required to immediately, at its own expense, take all steps necessary to return the water supply to pre-drilling conditions.

91. Cabot has failed to perform its obligations as required by the gas leases, in that Cabot has not fully tested Plaintiffs' water supplies for various substances including but not limited to combustible gases, methane gas, and hazardous chemicals used in the hydro-fracturing process, once it was determined that such drilling operations had caused spills or leaks into Plaintiffs' domestic water supplies.

92. Furthermore, Cabot has failed to perform as required by the gas leases by immediately, at its own expense, taking all steps necessary to return Plaintiffs' water supplies to pre-drilling conditions.

93. In addition, as previously indicated, Cabot expressly warranted to Plaintiffs that they would receive timely, certain and regular compensation in the form of royalty checks, in exchange for a certain percentage of the value of natural gas extracted from Plaintiffs' property.

94. Cabot' payments to Plaintiffs have been untimely, irregular and declining, without opportunity or mechanism to verify their correctness and accuracy.

95. Finally, as previously indicated, Cabot expressly warranted to Plaintiffs that their land, person and environs would remain safe and undisturbed despite its drilling activities.

23

96.     Cabot proximately caused spills and releases onto Plaintiffs' property, has contaminated Plaintiffs' water, cause physical harm to Plaintiffs and reduced Plaintiffs' quality of life.

97.     As such, Cabot is in breach of the gas leases.

98.     Cabot, by reason of this breach of contract, is liable for all damages and injuries to Plaintiffs caused by such breaches of contract, and is required to make Plaintiffs whole, put Plaintiffs back into the same condition they would have been if the contract was not breached, and remediate the contamination.

### Sixth Cause of Action: Fraudulent Misrepresentation

99.     Plaintiffs repeat and reallege the allegations of paragraph "1" through "98" of this Complaint, as though set forth in this paragraph at length.

100.    In addition to the General Allegations, affirmative statements and misrepresentations contained herein at Paragraph 30 (a-g), Plaintiffs recount the following particular statements and omissions as additional bases for their claims of fraudulent misrepresentation.

101.    As specifically detailed below, in order to gain Plaintiffs' reliance and induce them to lease their natural gas rights, Cabot, through its below identified officers, agents and/or employees, with intent to mislead made certain material representations to the Plaintiffs, which were either made despite their known falsity and/or made with reckless disregard for their truthfulness. In the alternative, Cabot omitted and/or purposely concealed certain material facts from Plaintiffs in order to gain their reliance, which is tantamount to an overt misrepresentation. The misrepresentations and/or omissions, upon which Plaintiffs justifiably relied, were the proximate cause of certain injuries Plaintiffs suffered to their person and property. These

24

misrepresentations and/or omissions, specifically recalled by Plaintiffs for purposes of the Complaint, include but are not limited to the following:

102.    Plaintiff NORMA FIORENTINO claims fraudulent misrepresentation as follows:

a.    This Plaintiff was approached on or about January 15, 2008 by Pete Mellick, who introduced himself as a Cabot employee, at the home of her grandson. Upon information and belief, Mr. Mellick arrived at this Plaintiff's grandson's home unannounced at approximately 7:00 p.m. and urged this Plaintiff to sign the lease that night.

b.    This Plaintiff specifically expressed her concerns over the lease's potential impact on her land and water. This Plaintiff was assured by Mr. Mellick that any disturbances caused to her land and/or water during the drilling process would be remedied by Cabot and returned to their pre-drilling condition.

c.    This Plaintiff was told by Mr. Mellick that she had to sign the lease that night, as he had other appointments later that night, despite having approached her grandson's house that evening unannounced and without an appointment. Mr. Mellick told this Plaintiff that he was notary, but because he had forgotten his notary kit that evening, she should sign the lease and he would notarize it at a later date and mail her a copy. Mr. Mellick also informed this Plaintiff that royalty payments for gas drilling had reached "unprecedented heights" and that she had to sign that evening if she wanted to get a good deal, and the royalties never even remotely approached the level represented.

d.    All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with

25

regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

e.      All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of entering the lease agreement and the subsequent conduct by Cabot, have been to the detriment of this Plaintiff's health, property and welfare.

103.    Plaintiffs CRAIG SAUTNER and JULIA SAUTNER claim fraudulent misrepresentation as follows:

a.      These Plaintiffs were first contacted by Frank Fletcher, who identified himself as a Cabot employee, via telephone in or about May 2008. An appointment was then made for Mr. Fletcher to meet these Plaintiffs at a notary in South Montrose, PA for the purpose of providing these Plaintiffs with a copy of the lease, which they were urged to sign at that time despite never having seen it before.

b.      These Plaintiffs specifically telephoned Mr. Fletcher a few days prior to their meeting to sign the lease to express their concerns over the impact Cabot's drilling could potentially have on their property and community. Mr. Fletcher assured them that the drilling would have no impact whatsoever on their land and that the most they could expect to see on their property as a result of the drilling would be a small pipe no bigger than a fire hydrant. Mr. Fletcher also informed these Plaintiffs that because their property was so small, Cabot would never place a well on it. These Plaintiffs also expressed concern over signing the lease at the

26

designated meeting, as they had not been provided a copy of the lease beforehand. Mr. Fletcher told these Plaintiffs that it was a "standard lease" that had already been signed by all of their neighbors.

c.     These Plaintiffs were told by Mr. Fletcher that they should sign the lease because all of their neighbors had already signed. No mention was made of the fact that an attorney should review the lease prior to their signing. Despite having been informed by Mr. Fletcher that they could expect to start receiving royalty payments after they signed the lease, these Plaintiffs did not receive their first royalty check until on or about June 2, 2008, nearly a year after they signed.

d.     All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

e.     All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of entering the lease agreement and the subsequent conduct by Cabot, have been to the detriment of this Plaintiff's health, property and welfare.

104.   Plaintiffs   MICHAEL   ELY   and   ANDREA   ELY   claim   fraudulent misrepresentation as follows:

a.     These Plaintiffs were first approached by Frank Fletcher, who identified himself as a Cabot employee, on or about Spring 2008. This visit was unannounced, as were the subsequent 6 or 7 visits. Mr. Fletcher also placed

approximately 10 phone calls to these Plaintiffs. On the final unannounced visit, these Plaintiffs signed the lease at the notary's office in South Montrose, PA.

b.      These Plaintiffs specifically asked Mr. Fletcher what they should expect to see on their property as a result of Cabot's drilling. Mr. Fletcher informed these Plaintiffs that the most they could expect to see would be "a little well head sticking out of the ground." Mr. Fletcher also specifically promised these Plaintiffs that they would "never know Cabot was even there."

c.      These Plaintiffs expressed to Mr. Fletcher their desire to have their lawyer review the lease before signing it. Mr. Fletcher specifically informed these Plaintiffs that all of their neighbors had already signed and they were holding things up for everyone. Mr. Fletcher also informed these Plaintiffs that it was a "standard lease" and that "they should not waste time or money having an attorney review it." Mr. Fletcher also informed these Plaintiffs that royalty payments would be consistent and that they could expect monthly checks. Mr. Fletcher also specifically informed these Plaintiffs that Cabot would take the gas from their land whether they signed the lease or not, so they should sign so that they could start receiving royalties.

d.      All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

e.     All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of entering the lease agreement and the subsequent conduct by Cabot, have been to the detriment of this Plaintiff's health, property and welfare.

105.   Plaintiffs RAY HUBERT and VICTORIA HUBERT claim fraudulent misrepresentation as follows:

a.     These Plaintiffs were first approached by Bill Pershern, who identified himself as a Cabot employee, on or about June 9, 2007. This visit was unannounced. These Plaintiffs were then visited by Mr. Pershern on or about June 16, 2007, at which time they signed the lease.

b.     Mr. Pershern informed these Plaintiffs that there was a possibility Cabot would be drilling on or about their property and that the impact and effect on their lives and property would be minimal.

c.     These Plaintiffs were never informed by Mr. Underwood that Cabot's drilling could potentially harm their property, health or daily activities in any way. Mr. Underwood also neglected to explain the pre and post water testing that was required under the lease and what these Plaintiffs should expect in the event that the integrity of their water was harmed in any way.

d.     These Plaintiffs were told by Mr. Pershern that they should sign the lease because all of their neighbors had already signed. No mention was made of the fact that an attorney should review the lease prior to their signing. Despite having been informed by Mr. Pershern that they could expect to start receiving royalty payments after they signed the lease, these Plaintiffs did not receive their first

29

royalty check until on or about January 23, 2009, nearly a year and a half after they signed.

e.　All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

f.　All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of entering the lease agreement and the subsequent conduct by Cabot, have been to the detriment of this Plaintiff's health, property and welfare.

106.　Plaintiffs RONALD CARTER, SR. and JEAN CARTER claim fraudulent misrepresentation as follows:

a.　These Plaintiffs were first contacted by Jim Underwood, who identified himself as a Cabot employee, via telephone in or about the spring of 2006. Approximately a day or two following this telephone call, Mr. Underwood and his wife arrived unannounced at these Plaintiffs' home with the lease for their signature. The following day, Plaintiff RONALD CARTER, SR. met Mr. Underwood at a notary's office in South Montrose, PA to execute the lease.

b.　Mr. Underwood told these Plaintiffs that if Cabot drilled at all on or about their property, they would be there only for short a period of time, it would not negatively affect their lives, and they would not even know Cabot was there.

30

c.    These Plaintiffs were never informed by Mr. Underwood that Cabot's

drilling could potentially harm their property, health or daily activities in any way.

Mr. Underwood also neglected to explain the pre and post water testing that was

required under the lease and what these Plaintiffs should expect in the event that

the integrity of their water was harmed in any way.

d.    These Plaintiffs were told by Mr. Underwood that Cabot would drill

underneath their land regardless of whether they signed the lease because all of

their neighbors had already executed leases. To that end, Mr. Underwood showed

these Plaintiffs other leases that had been signed by their neighbors and informed

them that they "may as well get some financial compensation" out of Cabot's

drilling, thus inducing these Plaintiffs to sign. Additionally, plaintiff RONALD

CARTER, SR. expressed confusion over the lease and told Mr. Underwood that

he did not understand its terms. Mr. Underwood informed him that the sum and

substance of the lease was that Cabot was investigating test drilling in the area

and that in the event that these Plaintiffs signed, they would begin receiving

monthly royalty payments. Despite having been informed by Mr. Underwood that

they could expect to start receiving royalty payments after they signed the lease,

these Plaintiffs did not receive their first royalty check until in or about December

2009, which was more than two years after they signed.

e.    These Plaintiffs suffered injuries in addition to those shared by all other

Plaintiffs as follows: the well that provides water to their home became

contaminated with hazardous chemicals compounds, and/or substances, as

confirmed by water tests, causing them to become sick and suffer from stomach

and/or digestive problems as well as skin and scalp irritations and/or rashes. These Plaintiffs have had to expend monies on bottled water, tap filters, and a water purification system because their repeated complaints to Cabot regarding the condition of their water went unanswered. Additionally, these plaintiffs have had multiple drilling pads installed very close to their home, resulting in disturbingly loud noises throughout the day and night for continuous periods of time.

f. All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

g. All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of entering the lease agreement and the subsequent conduct by Cabot, have been to the detriment of this Plaintiff's health, property and welfare.

107. Plaintiffs WILLIAM ELY and SHEILA ELY claim fraudulent misrepresentation as follows:

a. These Plaintiffs were first approached by Frank Fletcher, who identified himself as a Cabot employee, in or about July 2006. This visit was unannounced, as were the four subsequent visits, one of which was at 9:30 p.m. These Plaintiffs signed the lease on or about September 29, 2006 at a notary's office in South Montrose, PA.

b.      These Plaintiffs were specifically informed by Mr. Fletcher that the gas well sites were "no big deal" and that at most, these Plaintiffs would see a "few pads and one little pipe sticking out of the ground." Mr. Fletcher informed these Plaintiffs that the well sites would "look just like a golf course" and that they would never notice Cabot on their property. Mr. Fletcher also told these Plaintiffs that it was a "standard lease" that had already been signed by all of their neighbors.

c.      These Plaintiffs were told by Mr. Pershern that they should sign the lease because all of their neighbors had already signed. No mention was made of the fact that an attorney should review the lease prior to their signing. Mr. Fletcher also specifically informed these Plaintiffs Cabot would take the gas from their land whether they signed the lease or not, so they should sign in so that they could receive royalties. Despite having been informed by Mr. Fletcher that they could expect to start receiving royalty payments after they signed the lease, these Plaintiffs did not receive their first royalty check until in or about January 2009, which was more than two years after they signed.

d.      All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

e.      All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of

entering the lease agreement and the subsequent conduct by Cabot, have been to the detriment of this Plaintiff's health, property and welfare.

108.    Plaintiffs JIMMY LEE SWITZER and VICTORIA SWITZER claim fraudulent misrepresentation as follows:

a.     These Plaintiffs were first approached by Bill (last name unknown), who identified himself as a Cabot employee, in or about September 2006. This visit was unannounced, as was the subsequent visit. During the second visit, Bill told these Plaintiffs that they had to sign the deadline by October 2006 or they would be precluded from doing so. These Plaintiffs signed the lease at a notary's office in South Montrose. Frank Fletcher, who identified himself as a Cabot employee, was present for the signing.

b.     These Plaintiffs asked and were specifically told by Bill that the drilling was "exploratory" and that there was "nothing to worry about." Bill also promised these Plaintiffs that there would not be any damage done to their land by Cabot's drilling. These Plaintiffs specifically asked whether the drilling would affect their way of life and use of their property and Bill told them that it would not.

c.     These Plaintiffs were promised that after signing the lease, they should expect approximately $14.00 per day in royalty payments. Despite having been informed by Bill that they could expect to start receiving royalty payments after they signed the lease, these Plaintiffs did not receive their first royalty check until in or about January 2009, which was nearly three years after they signed.

d.     All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with

regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

c.  All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of entering the lease agreement and the subsequent conduct by Cabot, have been to the detriment of this Plaintiff's health, property and welfare.

109.  Plaintiffs NOLEN SCOTT ELY and MONICA LAURA MARTA-ELY claim fraudulent misrepresentation as follows:

a.  These Plaintiffs were first approached by Bill (last name unknown), who identified himself as a Cabot employee, in or about the summer of 2006. This visit was unannounced, as were two subsequent visits. On the third visit, these Plaintiffs signed the lease at a table in their front lawn before Bill and Bill's assistant. These Plaintiffs were later approached by Ryan Swanson, who identified himself as a Cabot employee, for the purpose of gaining their signature on a "lease addendum." Mr. Swanson continuously and persistently called these Plaintiffs, despite their refusal to sign anything further.

b.  These Plaintiffs specifically asked Bill whether Cabot's drilling could be harmful and Bill assured these Plaintiffs that there was absolutely "no risk" of property damage.

c.  These Plaintiffs were specifically told by Bill that Cabot would take the gas from their land whether they signed the lease or not, and that their refusal to sign the lease on his first two unannounced visits was causing monetary damage

to their neighbors who had already signed. On the third and final visit, these Plaintiffs specifically questioned the contents of the lease and informed Bill that they wanted their attorney to review it. Bill responded by stating that it was a "standard lease that did not need to be reviewed by an attorney" and that all of their neighbors had already signed identical leases, thus inducing these Plaintiffs to sign. Bill also stated that these Plaintiffs could expect to receive monthly royalty payments of "$25 to $100 dollars per acre / per month," despite the fact that these Plaintiffs were ultimately paid only $2.50 per acre / per month.

d.       All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

e.       All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of entering the lease agreement and the subsequent conduct by Cabot, have been to the detriment of this Plaintiff's health, property and welfare.

110.   Plaintiff-decedent KENNETH RAY ELY who is the deceased husband of EMMAGENE E. SAMOY-ELY, claims fraudulent misrepresentation as follows:

a.       This Plaintiff was approached by Phil McNamara, who identified himself as a Cabot employee, in the summer of 2006 via telephone. This Plaintiff then received five or six telephone calls from Mr. McNamara and Frank Fletcher, who

36

also identified himself as a Cabot employee, prior to signing the lease in or about September 2006.

b.      This Plaintiff specifically asked Frank Fletcher what would happen in the event that the drilling done by Cabot damaged his property in any way. Mr. Fletcher assured this Plaintiff that if the drilling had any negative impact on his property that Cabot would "immediately" repair the property to its pre-drilling condition.

c.      All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

d.      All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of entering the lease agreement and the subsequent conduct by Cabot, have been to the detriment of this Plaintiff's health, property and welfare.

e.      All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

f.      All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of

37

entering the lease agreement and the subsequent conduct by Cabot, have been to

the detriment of this Plaintiff's health, property and welfare.

111.    Plaintiffs RICHARD SEYMOUR and WENDY SEYMOUR claim fraudulent

misrepresentation as follows:

a.      These Plaintiffs were approached by Frank Fletcher, who identified

himself as a Cabot employee, in or about September 2006. The visit was

unannounced. On the last Friday of the month of September, 2006 these Plaintiffs

met Mr. Fletcher at the office of the local Notary Public at Mr. Fletcher's

suggestion in order to sign the lease.

b.      These Plaintiffs describe the experience a "high pressure." They were

never informed by Mr. Fletcher that Cabot's drilling could potentially harm their

property, health, water, business or daily activities in any way. Mr. Fletcher did

not explain the pre and post drilling testing that was required under the lease, nor

what to expect if their water supply became contaminated. Mr. Fletcher told these

Plaintiffs that there was only a possibility that Cabot would even commence

drilling, that Cabot did not even know for sure whether there was even gas in

Dimock earth, that even if they did start drilling they would not even notice

Cabot's presence, that they did not need a lawyer to review the lease and that it

was a standard lease.

c.      These Plaintiffs were specifically informed by Mr. Fletcher that the

$25/acre signing bonus and 12-1/2% signing royalty offer was a limited time

offer, as high as it would get, and if the Plaintiffs did not sign the lease

immediately, that the offer was revoked and they would not have a later

opportunity to change their minds. These Plaintiffs were told that in the remote event that Cabot struck gas in Dimock near their property they would be richly rewarded.

d.      All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

e.      All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of entering the lease agreement and the subsequent conduct by Cabot, have been to the detriment of this Plaintiff's health, property and welfare.

112.    Plaintiffs ERIC ROOS and SUSAN ROOS claim fraudulent misrepresentation as follows:

a.      These Plaintiffs were first approached by an older gentleman, who identified himself as a Cabot employee, in or about the summer of 2007. This employee arrived at their home unannounced. This employee visited their home on three subsequent occasions, the first two visits being unannounced, until these Plaintiffs agreed to sign the lease in or about October of 2007.

b.      These Plaintiffs were specifically informed by the above described Cabot employee that their property would never be affected by the drilling because it was "too small." He went on to state that there was no risk of property damage in the event that any drilling did affect their property.

39

c.    These Plaintiffs were specifically told by the above described Cabot employee that Cabot would take gas from underneath their land whether the signed the lease or not, and that he would "hate to see them miss out" on being compensated monetarily for what Cabot intended on doing with or without them signing a lease. Additionally, they were not provided with a copy of the lease prior to the day when they were coerced into signing it. Despite having been informed by the above described Cabot employee that they could expect to start receiving royalty payments after they signed the lease, these Plaintiffs did not receive their first royalty check until in or about September 2009, which was two years from the date that they signed.

d.    All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

e.    All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of entering the lease agreement and the subsequent conduct by Cabot, have been to the detriment of this Plaintiff's health, property and welfare.

113.    Plaintiff PATRICIA FARNELLI claims fraudulent misrepresentation as follows:

a.    This Plaintiff was approached by an older gentleman, who identified himself as a Cabot employee, in or about the spring of 2006. This employee went to her home unannounced and alone. This unannounced visit took place in the

40

afternoon. This Plaintiff was then approached on two later occasions, also unannounced, by the same Cabot employee, at which point she agreed to sign the lease. After the lease was signed, this Plaintiff was approached by Phil McIntire, who introduced himself as a Cabot employee, with forms he identified as "lease ratifications," that required this Plaintiff's signature.

b.      This Plaintiff was specifically told by the above described Cabot employee that in all likelihood, Cabot would never drill on her property, and in the event that they did, the disruption caused by Cabot employees and/or any machinery on her property would be limited to a maximum of two weeks. This plaintiff asked and was informed that the integrity of her property would not change with the exception of a small patch of concrete that may be put down on the ground. This Plaintiff was also promised that the drilling process would not harm or otherwise negatively impact her land in any way, including the well that provides water used for all purposes in the home. This Plaintiff was assured that if any damage was done to her property and/or water, that Cabot would take all necessary steps to return her property and/or water to its pre-drilling condition, as Cabot would test her water prior to drilling, and periodically thereafter, to ensure that her water quality was unchanged.

c.      This Plaintiff was specifically told by the above described Cabot employee that the neighbors who owned all of the property adjacent to her had already signed the lease and that as a result of a horizontal drilling process, Cabot would be capable of drilling underneath her home and property whether she signed the lease or not. This Plaintiff was also told that it was a limited offer and that she

would never receive a better offer than that being offered by Cabot, which was $25/acre as a signing bonus. When she attempted to negotiate the price offered per acre, she was told by this Cabot employee that the price terms of the lease were non-negotiable. This Plaintiff was notified that she would receive monthly royalty payments, but the meter on her property is locked thus precluding her from knowing whether the royalty payments are accurate.

d.      This Plaintiff suffered injuries in addition to those shared by all other Plaintiffs as follows: several trees were cut from her property; portions of the fields on her property were destroyed due to the heavy traffic of Cabot trucks, machinery and/or employees; the well that provides water to her home became contaminated with hazardous chemicals compounds, and/or substances, as confirmed by water tests, causing herself and her children to become sick and suffer from stomach and/or digestive problems as well as skin and scalp irritations and/or rashes. This Plaintiff has had to expend monies on bottled water because her repeated complaints to Cabot regarding the condition of her water have gone unaddressed. Additionally, this Plaintiff's requests that Cabot provide water have similarly gone unanswered.

e.      All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

     f.     All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of entering the lease agreement and the subsequent conduct by Cabot, have been to the detriment of this Plaintiff's health, property and welfare.

114.   Plaintiffs FRANK NOBLE and KAREN NOBLE claim fraudulent misrepresentation as follows:

     a.     These Plaintiffs were first approached by Bill Pershern, who identified himself as a Cabot employee, on or about January 1, 2008. This visit was unannounced. These Plaintiffs signed the lease that day and Mr. Pershern took the lease to have it notarized, informing these Plaintiffs that he would mail it back to them at some later time.

     b.     These Plaintiffs specifically asked Mr. Pershern what would happen if their property or water was damaged as a result of Cabot's drilling and Mr. Pershern informed them that Cabot would "take care of it."

     c.     These Plaintiffs were specifically informed by Bill Pershern that they had to sign the lease because they were the only people in the neighborhood who had not yet signed. Despite having been informed by Bill and Mr. Swanson that they could expect to start receiving royalty payments immediately after signing the lease, these Plaintiffs did not receive his first royalty check until in or about January 2009, a year after they signed.

115.   Plaintiff RAYMOND KEMBLE claims fraudulent misrepresentation as follows:

     a.     This Plaintiff was approached by an older gentleman, who introduced himself as Bill and identified himself as a Cabot employee, in or about November

or December of 2005. This visit was unannounced, as were the subsequent visits, totaling more than twenty visits, some of which were three times per week. This Plaintiff was also approached by Ryan Swanson, who identified himself as a Cabot employee, on several, unannounced occasions. These two Cabot employees also made numerous telephone calls to this Plaintiff until this Plaintiff signed the lease in or about October of 2006.

b.      This Plaintiff was never informed by Bill or Mr. Swanson that Cabot's drilling could potentially harm their property, health or daily activities in any way. These Cabot employees also neglected to explain the pre and post water testing that would be done and what this Plaintiff should expect in the event that the integrity of their water was harmed in any way.

c.      This Plaintiff was specifically informed by Bill and Mr. Swanson that he was one of the last members of the community to sign the lease, and that his late signature was holding the drilling up for everyone. This Plaintiff was also specifically told that Cabot planned on taking gas from his land whether he signed the lease or not, so "he might as well sign." Bill or Mr. Swanson told this Plaintiff that he should sign the lease and that a copy would be mailed to him after they got it notarized at a later time, despite never having provided him with a copy of the lease in advance of this Plaintiff's signing. Despite having been informed by Bill and Mr. Swanson that he could expect to start receiving royalty payments immediately after he signed the lease, this Plaintiff did not receive his first royalty check until on or about June 25, 2009, nearly three years after he signed.

d.     All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

e.     All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of entering the lease agreement and the subsequent conduct by Cabot, have been to the detriment of this Plaintiff's health, property and welfare.

116.    Plaintiff EMMAGENE E. SAMOY-ELY claims fraudulent misrepresentation as follows:

a.     This Plaintiff was approached by Phil McNamara, who identified himself as a Cabot employee, in the summer of 2006 via telephone. This Plaintiff then received five or six telephone calls from Mr. McNamara and Frank Fletcher, who also identified himself as a Cabot employee, prior to signing the lease in or about September 2006.

b.     This Plaintiff specifically asked Frank Fletcher what would happen in the event that the drilling done by Cabot damaged her property in any way. Mr. Fletcher assured this Plaintiff that if the drilling had any negative impact on her property that Cabot would "immediately" repair the property to its pre-drilling condition.

c.     All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with

regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

d.　　All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of entering the lease agreement and the subsequent conduct by Cabot, have been to the detriment of this Plaintiff's health, property and welfare.

117.　Plaintiffs　KENNETH　ELY　and　DEBORAH　ELY　claim　fraudulent misrepresentation as follows:

a.　　These Plaintiffs were approached by Frank Fletcher, who identified himself as a Cabot employee, in or about August or September 2006. This first visit was unannounced and took place in the afternoon. Subsequently, Mr. Fletcher visited these Plaintiffs' residence on two other occasions prior to their agreement to sign the lease.

b.　　These Plaintiffs were never informed by Mr. Fletcher that Cabot's drilling could potentially harm their property, health or daily activities in any way. Mr. Fletcher also neglected to explain the pre and post water testing that was required under the lease and what these Plaintiffs should expect in the event that the integrity of their water was harmed in any way.

c.　　These Plaintiffs were specifically informed by Mr. Fletcher that the $25/acre signing bonus was nonnegotiable, as was the percentage at which the royalty payments would be calculated, upon attempting to negotiate the price terms of the lease. Mr. Fletcher also told these Plaintiffs that they had to sign the

lease immediately because once drilling commenced, their opportunity to sign and collect any monetary compensation from Cabot would be revoked. These Plaintiffs were also told that once drilling started, they could expect to receive "handsome royalty payments" in the amount of "thousands of dollars per month," thus inducing them to sign.

d.      All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

e.      All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of entering the lease agreement and the subsequent conduct by Cabot, have been to the detriment of this Plaintiff's health, property and welfare.

118.    Additionally, Plaintiffs MICHAEL ELY, ANDREA ELY, NOLEN SCOTT ELY, and MONICA LAURA MARTA-ELY were assured by the above described Cabot employees that there would only be 27 wells per every 640 acres of land.

119.    Plaintiffs JAMES COSTELLO and JULIE COSTELLO claim fraudulent misrepresentation as follows:

a.      These Plaintiffs met with Frank Fletcher, who identified himself as a Cabot employee, in or about October 2006.

b.      These Plaintiffs were never informed by Mr. Fletcher that Cabot's drilling could potentially harm their property, health or daily activities in any way. Mr.

47

Fletcher also neglected to explain the pre and post water testing that was required under the lease and what these Plaintiffs should expect in the event that the integrity of their property and/or water was harmed in any way. These Plaintiffs expressed concern over any disturbance that Cabot's drilling would have on their land and Mr. Fletcher informed them that Cabot would "never drill on their land because it was not conducive to drilling." These Plaintiffs specifically asked and were told that no seismic testing (i.e. "bull shots" or "vibe truck activity") would be conducted on their property. These Plaintiffs were told that at most, they could expect to see a pipe no bigger than "a small Christmas tree" on their property.

c.      These Plaintiffs were specifically informed by Mr. Fletcher that they had to sign the lease immediately because once drilling commenced, their opportunity to sign and collect any monetary compensation from Cabot would expire. Mr. Fletcher also informed these Plaintiffs that Cabot would take the natural gas whether they signed or not "due to Pennsylvania's capture laws," and showed them a map of their neighbors indicating that all residents surrounding these Plaintiffs had already signed gas leases. Mr. Fletcher informed these Plaintiffs that he was going to Texas for a wedding and that they had to sign before he left, which was only days after meeting with him for the first time. These Plaintiffs expressed their desire to have their lawyer review the lease prior to their signing, but Mr. Fletcher informed them that there was not enough time for them to do so. These Plaintiffs were also told that once drilling started, they could expect to receive royalty payments in an amount that would be enough to "buy a new car every week," thus inducing them to sign.

d.  These Plaintiffs suffered injuries in addition to those shared by all other Plaintiffs as follows: portions of their property were destroyed due to the heavy traffic of Cabot trucks, machinery and/or employees, including creation of a dirt road and ditches that did not previously exist; portions of the valuable bluestone rock quarry on their property, which Plaintiffs had discussed and explored marketing as a source of income in the future, have been destroyed; their driveway has sustained damage despite representations made by Phil McIntire, who identified himself to these Plaintiffs as a Cabot employee, that Cabot would maintain their driveway for the lifetime of the wells; the landscape of these Plaintiffs' property has changed in that two wells have been placed on their property, despite Mr. Fletcher's assurances that no drilling would take place on their property; seismic testing occurred on their property, despite assurances that no such testing and/or activity would take place; and trespassers have continuously been discovered near the wells on these Plaintiffs' property. These Plaintiffs' persistent requests that Cabot address damage to their driveway have gone substantially unanswered in that multiple requests have had to be made in order for Cabot to "fix" the damage, which attempts have failed as the driveway still has not been returned to its previous condition. These Plaintiffs' persistent requests that Cabot address the trespassers on their land were met with the erection of a fence by Cabot on their property, which has failed to keep trespassers from entering their land.

e.  All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with

regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

f.    All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of entering the lease agreement and the subsequent conduct by Cabot have been to the detriment of these Plaintiffs' property and welfare.

120.    Plaintiffs DOUGLAS R. HEITZMAN, JOANN HEITZMAN, and ANNE M. HEITSMAN claim fraudulent misrepresentation as follows:

a.    These Plaintiffs were first contacted by telephone by James Underwood, who identified himself as a Cabot employee, in April 2006. Subsequently, Mr. Underwood contacted these Plaintiffs again by telephone to set up a meeting at their home. Following this meeting, Mr. Underwood approached these Plaintiffs' residence unannounced on two occasions prior to their signing the lease.

b.    These Plaintiffs asked and were specifically informed by Mr. Underwood that Cabot's drilling would never harm their property, health or daily activities in any way. Mr. Underwood neglected to explain the pre and post water testing that was required under the lease and what these Plaintiffs should expect in the event that the integrity of their property and/or water was harmed in any way. These Plaintiffs expressed concern over any disturbance that Cabot's drilling would have on their land, and specifically any disturbance to the integrity of the aquifer and numerous ponds located on their property, as these Plaintiffs had heard that a great deal of water was needed to implement the fracking process. In response,

Mr. Underwood informed these Plaintiffs that their property would not be disturbed in any way, that they "would never know Cabot was there," and that at most, they could expect to see a pipe no bigger than "a small Christmas tree" on their property, with the rest of the property "landscaped and beautiful."

c.      These Plaintiffs were specifically informed by Mr. Underwood that Cabot would take the natural gas whether they signed the gas lease or not and these Plaintiffs were shown a map of surrounding landowners that indicated they had all signed gas leases. These Plaintiffs expressed their desire to have their lawyer review the lease prior to their signing, but Mr. Underwood informed them that there was nothing "tricky or wrong" with the lease and that "there was no need for a lawyer to review it." These Plaintiffs were never informed of the possible risks and interferences associated with drilling, including spills, discharges, noise, water and/or soil contamination, traffic, or the use of chemicals and/or potentially toxic agents that could be used in the drilling and fracturing process.

d.      These Plaintiffs suffered injuries in addition to those shared by all other Plaintiffs as follows: the landscape of these Plaintiffs' property has changed in that five wells have been placed on their property, despite Mr. Underwood's assurances that the most disturbance to their land would be "one small pipe no bigger than a small Christmas tree," and several ditches have been dug into their property for the placement of well heads, gas purifiers, and tanks; the undeveloped properties have sustained damage, resulting in overall lower crop yield; at least five (5) spills and/or discharges have taken place during the fracking process on these Plaintiffs' properties.

e.      All of these actions, representations, statements and omissions were intended to and did limit detailed discussion, full disclosure and inquiry with regard to the truth of the statements and representations, the potential risks to the health, property and welfare of the Plaintiff, the substance of the lease contract offered by Cabot and the extent of Cabot's obligations under the lease.

f.      All of these statements and representations proved to be false. The omissions turned out to be relevant and material. The actual consequences of entering the lease agreement and the subsequent conduct by Cabot have been to the detriment of these Plaintiffs' property and welfare.

121.    Furthermore, the royalty payments for all the Plaintiffs herein, were delayed and sporadic, and did not even approach the amounts promised by Cabot.   Moreover, the basis for determining the amount of each individual royalty payment was not transparent nor were Plaintiffs, in any instance, provided a mechanism by which to determine the proper payment, as was represented to all Plaintiffs.

122.    These statements and omissions were made for the purpose of inducing reliance on the part of Plaintiffs, and did induce such reliance on the part of Plaintiffs.

123.    These statements and omissions were material to the transaction, *to wit*, obtaining Plaintiffs' agreement to lease their gas rights.

124.    Plaintiffs were justified in relying upon the above misrepresentations and/or omissions, as Plaintiffs have no specialized knowledge with respect to drilling for natural gas, a fact that Cabot knew or should reasonably have known based on its interactions with the Plaintiffs, including the questions posed by Plaintiffs during the above-described meetings. More specifically, Plaintiffs do not possess specialized scientific knowledge with respect to drilling for

52

natural gas and its potentially negative impact on land, health and/or water, the chemicals and/or machinery used in the process, or its market value, among several other things.

125.    Cabot, by reason of fraudulent misrepresentation, is liable for all damages and injuries to Plaintiffs caused by their justifiable reliance, as well as punitive damages.

### Seventh Cause of Action: Medical Monitoring Trust Funds

126.    Plaintiffs repeat and reallege the allegations of paragraph "1" through "125" of this Complaint, as though set forth in this paragraph at length.

127.    As set forth above, as a result of Defendants' negligent acts and/or omissions, plaintiffs have been exposed to hazardous substances.

128.    The levels of hazardous substances to which plaintiffs have been exposed are greater than normal background levels.

129.    As a proximate result of their exposure to such hazardous substances, Plaintiffs have a significantly increased risk of contracting a serious latent disease.

130.    A monitoring procedure exists that makes the early detection of the disease possible.

131.    Such early detection will help to ameliorate the severity of the disease. The prescribed monitoring regime is different from that normally recommended in the absence of the exposure.

132.    The prescribed monitoring regime is reasonably necessary according to contemporary medical opinion.

### Eighth Cause of Action: Gross Negligence

133.    Plaintiffs repeat and reallege the allegations of paragraph "1" through "132" of this Complaint, as though set forth in this paragraph at length.

134. The actions of Defendants, including their officers, agents and/or employees, were grossly, recklessly and wantonly negligent, and were done with utter disregard for the consequences to Plaintiffs and other persons.

135. Defendants, by reason of their gross negligence, are liable for all the damages and injuries to Plaintiffs proximately caused by the spills, releases and contamination, to remediate the contamination, and is liable for punitive damages.

**WHEREFORE, upon the aforesaid Causes of Action, Plaintiffs seek the following relief:**

i. The reasonable and necessary costs of remediation of the hazardous substances and contaminants;

ii. A preliminary and permanent injunction barring Defendants from engaging in the acts complained of and requiring Defendants to abate the aforesaid nuisances, wrongful acts, violations and damages created by them within the Dimock Gas Well Area;

iii. The cost of future health monitoring;

iv. Compensatory damages for the loss of property value, damage to the natural resources of the environment in and around the Plaintiffs' properties, medical costs, loss of use and enjoyment of their property, loss of quality of life, emotional distress, personal injury and such other reasonable damages incidental to the claims.

v. Punitive damages for Defendants' for fraudulent misrepresentation and gross negligence;

vi. Plaintiffs' litigation costs and fees; and

vii. any further relief that the Court may find appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that the trial of all issues be heard by a Judge sitting with jury in

accordance with the Federal Rules of Civil Procedure.

RESPECTFULLY SUBMITTED,

THE JACOB D. FUCHSBERG LAW FIRM, LLP
500 Fifth Avenue, 45th Floor
New York, New York 10110-0393
212 869 3500

BY LESLIE L. LEWIS, ESQ.
ALAN. L. FUCHSBERG, ESQ.

ZARWIN BAUM DEVITO KAPLAN SCHAER
TODDY, P.C.
1818 Market Street, 13th Floor
Philadelphia, Pennsylvania 19103
215 569 2800
PAUL M. SCHMIDT, ESQ.

RICHARD J. LIPPES AND ASSOCIATES
11089 Delaware Avenue
Buffalo, New York 14209
716 884 4800

DATED: May 17, 2010

55