Aff. N.S. Ely
**EXHIBIT 2**

NORMA FIORENTINO, et al.,    )    3:09-cv-02284
        )
            Plaintiffs,   )    Hon. John E. Jones III
     v.         )
        )    Magistrate Paul C. Carlson
CABOT OIL & GAS     )
CORPORATION and GAS SEARCH )
DRILLING SERVICES CORP.,  )
        )
       Defendants.   )

## AFFIDAVIT FOR PURPOSES OF RULE 56(d) OF THE FEDERAL RULES OF CIVIL PROCEDURE AND IN OPPOSITION

I, Nolen Scott Ely, certify pursuant to the penalty of perjury under 28 U.S.C. 1746, that:

1. My name is Nolen Scott Ely.  I submit this affidavit in opposition to defendants' motion for summary judgment on all of the claims we have alleged in the above matter.

2. I am appearing pro se together with the only other remaining plaintiffs in this case: my wife Monica Marta-Ely, our three minor children, ███, ███ and ███, Ray Hubert and Victoria Hubert, their minor daughter, ███, and Angel Hubert.[1]

3. I represent no one but myself.  Because I am the one with the ECF for filings, documents appear filed under my name only.  When I make statements here and I utilize the words "we" or "our," I am referring to the group of 10 pro se plaintiffs, but not speaking for them or on their behalf.

4. I and the others are appearing pro se, because we have no alternative at this time.  We have been unable to find a law firm willing to assume representation of this case on

---

[1]The fact that defendants repeatedly assert in filed documents that there are twelve (12) remaining plaintiffs rather the actual 10 is baffling to me; Todd Carter and Jeannette Carter have, sadly, been dead for years, a fact well known by defendants and our former attorneys since the time of their separate passing.

the record following the representation of Napoli Bern, since discovery has closed and because there are these type of motions pending.  From what I have been told, I believe that if we survive all or any of these motions we will to be able to obtain counsel willing to appear on our behalf, and will be able to obtain financing of our cases to completion.

### Rule 56(b)

5.  We received the Court's order dated June 12, 2013, issued in part as a response to our letter dated June 7, 2013.  My wife and I wish to assure your Honor that our letter was not intended to be a request for an extension of time.  Your Honor made it perfectly clear in his previous ruling that June 17, 2013 was the final deadline.  That is why we sent an emergency letter to the Court on Friday, June 7th, upon hearing from Mr. Kuntz, whom I now see works for Esquire Deposition Solutions, LLC of Dallas, TX, defendants' stenography company, that counsel for defendants were not responding to his inquiries, so he did not have an answer for me about when I could expect to the depositions I was asking for and on what terms. If I had received the depositions, or had a known date as to when I would get them, there would have been no need for the letter I and the others sent to the Court on Friday, June 7th.

6.  We selected the mechanism of a letter to contact the Court because we were previously allowed to do so, and told that we could do so at the conclusion of our original and only conference with the Court.  We certainly did not mean to abuse or misuse that opportunity.

7.  As a point of information, it was not until 4:41 p.m. on Thursday, June 13th that I received an email from Mr. Kuntz, attached here together with our email exchange

described below where he advised me that he would send out the depositions for a grand total of $3,138.10. This is what I believe an inflated expense on an emailed, condensed version of a product that has already been paid for.[2]

8.  That is an expense that none of us can incur. Therefore, we have completed our opposition without the benefit of *any* party deposition other than mine, in favor of paying for the transcript of the deposition of Daniel Farnham, of Farnham & Associates, Inc., pre and post drilling water tester, once a Cabot contractor, who found constituents in our water (ethylene glyocol, polypropylene glycol, toluene and xylene) that are associated with the gas drilling operations of Cabot. (Please see the full transcript of Mr. Farnham's deposition attached with our papers as well as the gentleman's affidavit in support.)

9.  I do not believe it fair or helpful for defendants to dwell on the length of time during which we have been in possession of what Napoli Bern Ripka sent to us of our files. To us it has been almost overwhelming. We are not attorneys, and have expended inordinate time away from our work, our families and our lives in order to get attorneys to represent us and enter this case, rather than attempt to make sense of what is upon us and do what needs to be done. Eventually we were left no choice but to dive in.

10. Taking our cues from the Court we have plowed along. We raised the issue of questionable completeness of the file, and depositions a long time ago. Napoli Bern will not respond to inquiries. I won't even talk about the Fulbright attorneys. I guess they are just doing their job, but they sure go for the jugular.

---

[2] Please see email string between myself and Mr. Kuntz and Esquire's bill attached here.

11. We worked around the depositions as best we could, while revisiting and revisiting the CDs and external hard drives for the missing depositions, certain that we must be missing something big because how could dozens be missing. We thought it must be us, that surely all the fundamental depositions, like that of my wife, a party, and Ray, Victoria and Angel Hubert, parties, must have been returned to us with the file. We did want to be premature or act more ignorant than we already have before Cabot attorneys and the Court.

12. Again, and this is only my opinion, but it is odd to me that the Napoli firm has remained silent on all this, fully aware of our confusion and dilemma, not pointing us in the direction of the missing depositions if they are on the external hard drives and/or CDs they sent to me, or, with a few strokes of the keys, forwarding electronic copies to us, and be done with it.

13. At any rate, pursuant to FRCP 56(b) we request that your Honor exercise one of the options available to him in favor of plaintiffs upon consideration of the fact that potentially 30, 40 or more depositions are not in plaintiffs' possession, and those depositions undoubtedly contain and provide highly relevant testimony regarding elements of our claims, for better or worse. (Please see a accounting of our deposition list attached)

14. I hope that the court does not view it as farfetched that this content is essential to the full and complete justification of our opposition, regardless of what predispositions may exist with respect to how we came to be without counsel, or what we have been doing for the last six months (like dealing with acquiring potable and drinking water for myself and my family).

15. Finally, about the stenography company. To be clear, and absolutely fair, there was nothing in our letter to the Court on June 7th that suggested or intended to suggest that the stenography company was intentionally "working in concert" with defendants and/or our former attorneys, for at the time that simply was not the case.

16. However, I am inclined otherwise upon reviewing the fiction contained in Mr. Kuntz' supposed sworn statement, executed on behalf of a law firm, defendants' law firm which would have had to have supplied his company at least six figures worth of business in 2011 alone, given the number of depositions that were conducted by defendants in this case alone, and the charge Mr. Kuntz intends to leverage against me to merely acquire my wife's and that of Dan Farnham's depositions, $1,932.30, which I personally feel borders on the criminal given the depositions have had to have been paid for in full at least once, probably twice.

17. I attach here for your assessment a string of emails between myself and Mr. Kuntz for factual content as well as the bill we eventually received before we could get some of the depositions. There were also phone conversations where: i) I told Mr. Kuntz that I was a pro se plaintiff in the case; ii) I told him Dan Farnham would be providing him a release if he needed it; iii) I was told that all the attorneys had copies of the transcripts, why didn't I get them from the attorneys; and iv) I was told that defendants' attorneys were not responding to his requests to release the transcripts. Why would I ever hide the fact that I was a party, plaintiff, or pro se? These were essential parts of getting to first base with getting these depositions, that I needed in a hurry.

**Statements in Opposition**

18. I and my wife and three children reside at 44 Carter Rd. Dimock Pa

19. We reside on 8.23 acres in a home that I began building in 2005, that I built myself with the assistance of subcontractors, that has 26 rooms and occupies over 7000 square feet.

20. It is the dream house that I promised my wife.

21. We have spent $700,000 just in labor cost to help with our home.

22. The Huberts live on property formerly belonging to my father and now owned by me. Victoria Hubert was in fact my deceased father's former step daughter. While title of the property upon which the Huberts reside has never officially been transferred, after living openly and with my approval on the property for approximately 20 years.

23. My family has lived in Dimock for over 100 years. There was a time in history when my family owned so much of the land that constituted the township. (By way of example, my family previously owned the property that is residence for former plaintiffs Ray Kemble, Michael Johnson, and Richard Seymour. Some of Carter Road, all with contaminated water after Cabot commenced gas drilling operations.)

24. During my life I have had many jobs, two of them were in the gas and oil industry. Building and maintaining a commercial facility (fueling gas stations), and after Cabot came to town, in 2007, I took a job with GasSearch Drilling Corp (GDS).

25. I became very familiar with the management of that company and its conduct. What I saw was concerning, and gave me the first suspicion that Cabot and its' subsidiary GDS were a seat of the pants operation, and people were going to get hurt.[3]

---

[3] In the two years that I worked at GDS, I observed on the job during well pad construction rampant drinking, drug use, inattentiveness, negligent spills and discharges and cover ups, after dark dumping into streams, leaks, spraying dusty roads with

26. I had never been adverse to mineral extraction as long as it is done right. The concept of natural gas using high volume hydrofracking also sounded fine to me, as described to me by Cabot landman back in 2007.

27. In the summer of 2006, together with my wife were approached on my property, without announcement, by a gentleman we now know to be Bill Pershem. Prior to this visit I had

28. Mr. Pershem identified himself as a landman working for Cabot Oil & Gas Corporation.  I proceeded to have a talk with Mr. Pershem.

29. At the time, Mr. Pershem told me during the visit that there was a lot of natural gas below the surface and would it posed a wonderful opportunity for me and  that all of our neighbors had already signed leases.

30.  Mr. Pershem paid me another unannounced visit shortly thereafter and increased the pressure.  He told me that by not signing I was essentially holding up the other people getting gas money.  He also said even if I didn't sign a lease with Cabot they would take my money anyway.  He mention something about "domain."  I now believe it to be a reference to eminent domain I did not sign the lease during the second visit but the idea of them taking the gas anyway was starting to bother me.

---

produced water. I also observed a thorough lack of oversight by GDS management, and their owners Cabot.  In late 2009, I walked around the Dimock-Springville in the company of with representatives of DEP and Cabot, as well as one of my attorneys at the time, Paul Schmidt of Zarwin Baum, to point sites of unreported surface "accidents" and contamination due to Cabot and GDS activities, most if not all of which had been plowed over or otherwise "remedied" with DEP's prior knowledge, oversight or involvement. (See Exhibit 3 for notes of the survey and meeting.) I subsequently lost my job.

31. Cabot determined that there was gas under their property, the company would be able to take the gas anyway with all my neighbors signed. By the third visit with Pershem again asserting they would take my gas anyway, I became determined that wasn't going to happen, so I signed the lease.

32. I was not show the lease until Mr. Pershem's third visit, shortly before I was asked to sign the lease.

33. During no conversation with me prior to my signing the lease did Mr. Pershem inform the me of the risks involved in gas drilling operations of the nature Cabot intended to embark on, nor their rights or the gas companies' obligations or limitation of rights under state law governing natural gas and oil extraction.

34. Thereafter, Mr. Pershem contacted me on a number of occasions, including by undated letter, requesting that I sign something like and amendment or a ratification form.  I decided not to sign another agreement with Cabot.

35. I never did receive royalties in the amount promised.  I never did receive royalties that amounted to more than pretty much $2.50 per acre per month. Now we receive $25 twice a year. And I have never been able determine exactly how to decipher what are or should be getting paid for, especially since we do not know the exact volume of gas coming off the well heads. Nobody lessor is privy to the actual meter readings. One time out of the blue Cabot decided to pay me out of Cabot Ely 2 well production. There is no rhyme or reason as to how or what they pay.

36. I ceased receiving any royalties of any kind after Cabot was ordered to shut down and supposedly plug and take off line the Gesford 3 and Gesford 9. I know there were

a lot of violations issued by the DEP regarding those wells and a number of consent orders between DEP and Cabot that followed in 2009 and 2010.

37. On September 28, 2010, Secretary John Hanger announced to the world that he was directing that Cabot pay for a water line to assure us of a permanent supply of clean water, because he deemed that would be the only solution to our water contamination problem. This was after at least two meetings with me other plaintiffs legally-deemed to have had their water supplies contaminated by methane secondary to the negligent construction of its gas wells in the much written of Carter Road or "9 mile affected area" in Dimock-Springville townships.

38. Secretary Hanger in ordering the pipeline had specifically decided that permanent delivery of external water was not a permanent solution, drilling another well on the affected property was not a solution, because there could not be a guarantee that water would ever be restored to pre-drilling condition due to the contamination of the aquifer.

39. As explained to us, and I heard it in disbelief with my own ears during a hastily-designed phone conference between all of us and Secretary Hanger on the evening of December 14, 2010, he was pulling the pipeline, and arranged another deal for us, because realistically, the new Governor, entering office in a few weeks, "would not, for political reasons, let the pipeline go through."

40. My family's water well supply is each located less than 700 feet of the Gesford 3 and Gesford 9 wells and within 7 or more wells **within 2500 or so feet**of gesford, Ely 1, Ely 2, Ely 5H, Ely 7, Costello 1&2,

41. Prior to commencement of gas operations by or at the direction of Cabot in the vicinity of my domestic water well supply, we had absolutely no issue with the appearance, palatability, condition, drinkability or potability of our well water supplies.

42. Prior to commencement of gas operations by or at the direction of Cabot in the vicinity of my well, I neither conducted nor allowed to be conducted any type of industrial activity on or about my property. Nor were we exposed to any type of industrial activity in the vicinity of our property.

43. Prior to commencement of gas operations by or at the direction of Cabot in the vicinity of my property, and never in the recorded history of ownership of my property had there been any reported industrial accident, spill, contamination of water or air or interference of any kind with their peaceful and healthy use and enjoyment of their property and its natural beauty and resources.

44. Prior to commencement of gas operations by or at the direction of Cabot in the vicinity of the my property, and never in the recorded history of ownership or that of my family that dates back over 100 year, had I ever heard of or observed any person in Dimock township lighting their water on fire.

45. Prior to commencement of gas operation by or at the direction of Cabot in the vicinity of my property, I never had any difficulties with the physical integrity of their domestic water wells. My water well was installed in 2003 its depth is 300ft. and it is encased in 60 ft of well casing and grouted.

46. Prior to commencement of activity by or at the direction of Cabot in the vicinity of their well water I never had upon my property what I would describe as a "burn pit."

I do have a barbeque pit with a rack that I use all the time in the summer to make hamburgers and barbeque chicken for my family.

47. Prior to commencement of activity by or at the direction of Cabot in the vicinity of my water well, there was never any evidence of stray methane on or around my property or entering or exiting my water well.

48. Prior to commencement of activity by or at the direction of Cabot in the vicinity of my water well my water was sampled, tested and analyzed and found to be free of heavy metals, dissolved solids, methane, propane and ethane.

49. Prior to commencement of gas operations by or at the direction of Cabot on and about my property, these water quality studies I believe were conducted for Cabot by Daniel Farnham.

50. Those water quality results demonstrated clean, drinkable, potable water from my water well.

51. Prior to commencement of activity by or at the direction of Cabot in the vicinity of my water well neither Cabot nor any agent of Cabot undertook to check my property or water for what you might call "background levels" of any of the chemicals and additives that Cabot uses by or at the direction of Cabot in its gas drilling operations.

52. Subsequent to gas operations commencing by or at the direction of Cabot in the Dimock-Springville township area, sampling of my well water, conducted at the direction of the PADEP, revealed the acute and continuing presence of explosive levels of free methane in the wells heads and elevated concentrations of dissolved methane in the my water.

53. I learned later that the DEP, isotopically tagged the gas had ended up in my water well to the Marcellus Shale gas extracted by or at the direction of Cabot as a result of its gas operations at, among others, the Gesford 3 and Gesford 9 gas wells.

54. In January 2009, at the direction of the PADEP my water well was shut off in my home. My regular well water supply was replaced by the installation of an external system that involved hooking up the house plumbing to a 320 gallon plastic container, sometimes referred to as a "water buffalo" which was placed in an out-building on each of their respective properties and adjacent to their homes.

55. From that time to June 12, 2013, Cabot, or I have trucked potable water to fill the water buffalos for non-consumption, home water use, usually 3 a week, but sometimes daily.[4] Between the spring of 2012 and June 12, 2013 I obtained water household use, not for consumption purposes, from a hydrant on the property which my wife, Monica owns and where she runs a dental practice.

56. Cabot has offered to connect a treatment system to my water well system. It sounds innocuous, but in fact is a science lab, an ongoing experiment, requiring an electricity source and house of its own. It is heated in winter so the pipes don't freeze.

57. This is like water treatment systems provided to others in Dimock, and two in my immediate vicinity on Carter Road. Neither work.

58. Furthermore, since Cabot resumed drilling and fracking in the "9 mile affected area" around November 2012 one previously settled client from this litigation, has

---

[4] Between the spring of 2012, when Cabot discontinued delivery of bottled drinking water and potable water to the Ely-Hubert homes for external use, the Elys and Huberts had obtained at by their own methods and at their own expense potable water via a hydrant placed on the property of Monica Marta-Ely, which hydrant was forced to be removed, by order of a Montrose court on a questionably legal basis. At present the Elys and Huberts are without any potable water source and continue to purchase drinking water at their own expense.WHAT ABOUT THE $153k FROM CABOT?

complaints of contaminated water. The water treatment systems do not work. A number of the residents who have decided to allow Cabot to place a treatment system on their property and attach the water treatment system to their plumbing, continue to receive water deliveries to their buffalo water as well as deliveries of bottled water, at Cabot's expense. (Dep of Deborah Maye, Aff of Bill Ely)

59. At a "town hall-type meeting" at the Elk Lake High School in Dimock township on Marh 9, 2009, Mr. Komorski, former spokesperson for Cabot and present managing partner at defendants' law firm made the following statements as to Dimock as to Cabot's position and responsibilities as to its activities in the community:

> "There is the potential during drilling, during site construction,during trucks moving in and out, I mean, there have been diesel spills. We don't have to use things like petroleum distillates. If you spill those additives on the surface, yes it can affect the water supply, if there were a problem with the several series of casings, steel casings and cementing at the surface, yes it can. The contents of that flows back, it's heavily, heavily salt-laden. There I, in addition, whatever additives that we've put in...that never enters the water supply, unless we spill it on the surface. We've had diesel spills, we've had spills of hydraulic fracturing fluid. And we have to avoid those when possible. The reality is it is going to happen. If proper practices are used in drilling the well, there is a very, very rare occasion that anyone's water supply is affected, and in most of those situations, the vast majority of those situations, it's temporary. There are those rare few where it's longer term and more serious. We have continued to evaluate the presence of methane in the water supply. It is possible that methane in the water supply came from one well where there was a problem, where a well was being drilled and the rock collapsed around the equipment while it was being drilled. We were unable to recover the equipment while it was being drilled. We were unable to recover the equipment immediately. It is at least a theoretical possibility that that allowed migration of gas from 2000 feet to 500 feet and allowed it a pathway to get to the water supply. There are measures in place to insure that that cannot ever happen again, whether or not that was the cause. It's possible that wasn't the cause, but if it was caused by Cabot that's our most likely culprit. So we're continuing to focus on efforts there, continuing to work with the Department, and making sure, as best we can, to do the right thing."
>
> "[Landmen] were doing their jobs. Their job is not to fully explain the entirety of the drilling process. It wasn't intended to mislead anyone, but we can tell from what's happened her in Dimock and Susquehanna County that there was not as

*much information shared as we could have and as we should have.*[5]

60. I was told by G.L. Parrish a local vendor who delivers bulk potable water and bottled drinking to Bill Ely and other prior plaintiffs and non plaintiffs in the Dimock area told me when I inquired as to whether he could continue to deliver water to me after stopped last year.  He said yes, and that it would cost me $125 a day. <u>But it would be a conflict of interest and would have to get permission from Cabot.</u>

61. I have received phone calls from Richard, Robert, and Jennifer on or about June of 2012 stating my water is not safe to drink, I was told by EPA, ATSDR and CDC not to use or drink the water and that they knew what was reported by there was other information that was alarming. (don't use the water)

62. During that period when were using our well water after Cabot commence drilling we my wife and I experienced headaches, dizziness, and unusual visual issues.  They persisted even after we stopped using the water. We discovered that the well was bleeding by its valve inside the house and the potable system was being contaminated by the well water. We had Cabot, well there contractor totally disconnect the well pipe. There was a period also where I was really worried about my little kids.  They looked pale were getting sick a lot and started to complain of weird issues, like my son, ███ started to have pains in his sides.  He has been to many doctors.

63. Monica, who has a lot of chemistry training and is a trained and licensed dentist, and I are extremely concerned about ongoing contamination issues and the exposure of your children to hazardous materials.  Our local doctors candidly seem unwilling to

---

[5] Transcription of exactly what Ken Komoroski had to say in Q&A session at a public meeting, advertised and open to all, held at The Elk Lake School in Dimock on March 9, 2010 and at  which Nolen Scott Ely was in attendance. Soon after making these statements, and others described verbatim below, Mr. Komoroski was replaced as spokesman for Cabot by George Stark, who has remained in that position to present.

even order tests or entertain the possibility of exposure issues. And our former

attorneys, despite the promise to do so did not arrange for toxicological assessment

for members of my household or any other plaintiffs. Our health examinations in

connection with this litigation stopped with the defendant's doctor, Dr. Greenberg's

"independent" medical examination.

### History of present home and value

64. In or about summer 2004, Monica and I broke earth in a sense for the home I had

always promised her. We rented the appropriate equipment which we used to fell and

clear approximately 100 mature trees in contemplation of creating a space for

building a new home.

65. In or about November 2005, Monica and I started excavating the land with use of a

rented tractor to make room for the foundation of our new home.

66. During 2006, Monica and I continued to excavate the land. In addition, we looked for

and selected the house plans we used to build the house we live in today.

67. In 2008, Monica and I started the block work involved in building the foundation

work for our home.

68. Throughout 2009, Monica and I finished the basement and started the building

process of our home.

69. Throughout 2010, Monica and I both experienced many mixed feelings as to whether

or not to continue constructing a new home due to the water contamination of our

water well by Cabot Oil and Gas. Monica in particular wanted to invest no more

money due to threats to our health and wellbeing and property value resulting from

the water well contamination caused by or at the direction of Cabot and GDS. I prevailed.

70. During 2011, Monica and I completed framing the house, installed sheet rock, painted and started finishing the rooms one-by-one of our new house.

71. During 2012, Monica and I continued to work on the completion of the house.

72. During 2013, Monica and I have been putting the finishing touches on the house now that the construction and interior work is largely completed.

73. Over all these years, from 2004 through the present time, Monica and I spent close to one million dollars, out of pocket, in connection with building our house.

74. To conserve money, I performed most of the work myself which allowed Monica and I to spend money on contractors when we needed them the most.

75. I completed 90% of the house framing, all of the electrical work, and plumbing, with some help. In addition, with respect to the heating system, I ran all the radiant heat pipes and a plumber hooked together all the pipes and installed the boiler. All of the insulation was installed by Monica and me. The interior painting, molding, doors, and the rest of the interior details were done by me. The fees paid for the plumber and outside contractor we hired were more than $700,000. Monica and I spent, combined, more than 5000 hours. If we had paid a contractor to perform the work we completed, it would have cost us at least $1,755,750

76. This house has been a big investment for Monica and me. It is our dream home but on the other hand, in Monica's mind, it is a big mistake. We have had many arguments, because of the water and what are we being exposed to with our permanently contaminated water well, which we eventually plugged. If we ever wanted to sell the

house now, we don't know if we could get a buyer to pay anything near the fair

market value of our house because is in the 9 mile affected zone and has no potable

water. Even if someone wanted to buy our house we don't know if a buyer could even

get a mortgage. We don't want to move but the current damage we experienced to our

water supply has us trapped in our dream house without the most basic thing in life, a

safe, reliable water source.

77. Finally, I want to recapitulate that I have personally observed in the past month of

June 2013two families in the 9 mile affected zone whose water was contaminated by

Cabot and who agreed to accept a water filtration system in their settlement, who are

now back on bulk water potable through water buffaloes and bottled water because as

gas operations continues, so does contamination and the treatment systems, so called,

do not work. As these systems appear not to effectively or safely filter or treat the

water or otherwise do not work, this is a persistent cause of concern regarding the

safety of resuming use of my original well and aquifer and the value of our home and

property.

78. Upon reviewing the reports' of defendants real estate experts, who claim that

Susquehanna real estate and Dimock are better off for Cabot, I can only say that in

my first hand observation Cabot is propping up the market by either buying properties

directly, or through second parties as they did with former plaintiffs, the Sautners, or

providing opportunities for rich people to invest in water contaminated real estate

with a gas lease who would never live the house themselves but have the

discretionary pick it up as an investment. Such was the case of former Fiorentino

plaintiffs, Richard and Wendy Seymour, who settled with Cabot and whose was sold to an out of state physician.

Date: June 17, 2013

Respectfully submitted,

Nolen Scott Ely

*Scott Ely Tour*

Violations in Dimock, PA area at Cabot well sites

These are violations reported by me, Nolen Scott Ely, to Cabot at a meeting on November 24, 2009.  I marked the wells on the attached map.

1.   TEEL-5

   a.   This location is off Button Road. This was a diesel fuel spill in to the creek from a rig hose malfunction. The spill was reported with amounts of 800-900 gallons, but was more. If the delivery records were to be retrieved you would find the 3000 gallon tank was filled very recently, and after the spill the tank was empty. Denny came to the site.  The pad location was contaminated, but no contaminated soil was removed. The efforts of clean up consisted of putting some dirt in a pile and spreading lime and a form of a bacteria eating bug. Rain water was a factor in washing away the diesel fuel, but it went to the creek. The dirt should have been removed to a land fill.

   DEP was testing an area in the vicinity of the spill where a hay bale was on the bank of this location.  DEP used this as an indicator of the spill area. Paul Harton had the hay bale moved down the location bank 50' so that DEP would test in the wrong location and get a clean test. If you were to dig up the correct location you would find diesel fuel still laying in heavy concentrations.

   b.   The pit contains heavy metals, soaps, and other contaminates. The pit was back-filled but not solidified, with no concern for the environment or future repercussions. The pit was pumping all the way up like Jell-O. Co-workers were concerned of this and spoke with Mike Johnson about how bad it really was. They were directed to continue and get it buried quickly.  It was covered with dirt while still oozing.

2.   TEEL-7

   a.   This location is further down Button Road. This is another concern of the pit condition, which of course was back filled improperly. The pit was oozing and pumping its contaminant upward. Here there was another order to complete the job. Flow back was noticed to be laying all over in puddles, but no one in management was ever concerned.

3.   ELY-2

   a.   Several things took place here. The land owner which was my father had concerns of valves leaking onto the ground. The time was winter. Valves were frozen and splitting apart. Cabot was notified with no response. Paul Harton was aware of the problem. DEP was notified. My father called the local paper to get some exposure.  Tanks were to be removed from property immediately as per my father. It was early spring before they were removed.

b.     Because my father had gone to the media Paul took it personally. Paul ordered a co-worker to throw stones at the pit liner to create holes for the pit to leak. Paul and I were on location and I had spotted a major leak in the pit liner. Paul directed me to stay quiet because we did not need the exposure. It took a week before they drained the pit. I had asked my father if he was drinking the water. No, he replied with the amount of spills on the property. My father has a spring located several hundred feet from this location. Ground water can enter. The pit has holes in it and was back-filled!

Paul planned action against a worker over this. I said I'd tell Houston HR if he did. Paul threatened to fire anyone reporting to Houston.

4.    ELY-5

a.     This location is on top of the hill and had several diesel spills, one of which, when employees on the rig spotted DEP pulling onto location, they attempted to covering up with plastic.

b.     The pit is another disaster in the making. A co-worker was attempting to stir concrete into the pit when Paul Harton arrived and took over the machine. He had pushed the Portland cement into one end and said it was good enough to back-fill the hole! The co-worker had questioned him on his decision of why. He was ordered to do as he was told.

5.    LEWIS-2

a.     A diesel fuel spill in winter time late 2008 was noticed all over the pad area, but was never addressed. The material laid there all winter, until it was mixed into the bank during reclamation. It will leach into Brodick Creek.

b.     This location is another with a problem with the pit, pumping its material up. How can you stir frozen blocks of ice into a concrete mix? The blocks of ice were over 2' thick! The liner was clearly damaged. The pit was never solidified. The location was back-filled and reclaimed under 30-50' of material, without cleanup.

6.    COSTELLO-1

a.     This location had several issues, some I'm unaware of at this time. But what I do know is that the pit had major holes in the liner. The liner was ripped open with a back hoe. The pit was continued to be used through many phases thereafter. The pit that contains the well was filled with a liquid. It looked like antifreeze. Methane was bubbling around the well like Alka-Seltzer. No one was concerned. All of this is leaking into the ground now.

b. There was much complication with the well, and service rigs were used to stop the well from leaking outside of its casing.

7. GESFORD-3

a. The problem child that spurred all the attention. As we all know this location had many problems. Let's start with the spills. There were several diesel fuel spills one of which was attempted to be covered up. Mike Johnson ordered co-workers to cover up the major spill with fresh gravel. It was not reported to DEP by GDS. An employee reported it to DEP, and got in trouble. This location had many spills from drilling mud, fuel oil, oils, etc…

b. After the rig was removed this spring, GDS used heavy equipment to scrape the pad area into a big dirt pile on the creek side of a pit. This dirt pile was several dumptruck loads of dirt, and remained all summer long in the rain until fall time and was hauled away. The reason the dirt pile was removed was that DEP tested the dirt and found it to be hazardous. At DEP's request to have it removed it was finally removed in the fall of 2009! Note that during this time the rain fall we had was extremely high; therefore, runoff from the pile of dirt had leached into the ground which of course is 300-500' from home. My property consists of a creek and 2 ponds. My children played in this creek all summer long. The small ponds which I have animals drinking from I assume is contaminated. I requested DEP to test the water in the ponds and to test the creek. The whole area is contaminated around the pad! Paul started to keep Scott away from the area, and from other spills.

c. The site has 4 pits, all had holes in the liner and were not solidified.

d. Management all knows the biggest lose of methane into our ground water is from this well. The problem was ignored until January of 2009 when our water was unable to be consumed any more. This summer Cabot went on a man hunt to rectify many leaking wells to stop the amount of methane into our water table.

8. GESFORD-7

a. The issue here occurred when the well was drilled. It was rather close to the neighbor's septic leach field. The fecal matter or sewer water was now draining down the well to our water table contaminating it further. Management called this a "natural event."

b. In early October 2009, it was witnessed by myself and the management (Paul and Mike) that a black liquid material was all over the ground - this liquid is very concentrated flow back. The flow back was discharged from filtration tanks onto the ground. Paul had directed me to cover it with the dozer. Of course I did not. I left it exposed. I have a picture for evidence.

3

c. During a diesel spill clean up, it was discovered that under less than 6" of gravel the whole area is covered in drilling mud. Another cover up! They were not going to report one diesel spill, but a person from Shlaumberger said he would, so they reported it as "soap."

9. BROOKS-1 and 2

a. There was more spills on location 2 Fridays in a row! All of these locations are heavily contaminated. They are just being covered up with fresh gravel. You do not need to look hard to find contamination - dig about 6".

10. BROOKS-2

a. This location a change of events had taken place. We were in the process of fracing. There was an amount of water pushed down the well by this process – about 2 million gallons of soap, sand, etc. An accident had occurred. There was a failure in the piping to the well head which released onto the ground. We had no way of controlling the failure - the valves had failed. The truth of the whole matter is after 45 minutes I personally walked around location to find a 3' river of soapy water running off location. It was so intense of the severity; I took a dozer through a farmer's field and fence to stop the flow of water from continuing its flow into the creek. We took a walk through the woods to the creek to find 6' walls of soap suds all over. What a nightmare. Paul came up, and what was reported to DEP was far from the truth on the amount of discharged water. You do the math. About 16,000 gal. came out.

11. BLACK-1

a. We call this the black hill side. It is by Gilbert and Pat Sickel. A night mare that continues to run endlessly. A pit liner had a major leak which allowed pit water to leach into the ground. There was a 500' hill side with black stinking water extruding from the ground and into a nearby pond, drainage pipe, a spring of a resident and into the creek down below. Fish died in the pond. Our management team decided to spread lime around this problem hoping it would go away. To this day they continue to drain water from a trapping tank and haul it to unknown places. To remedy this problem someone will have to dig up the pit area and all of its contaminated soil and have it properly disposed. They can't do that easily, because they reclaimed the location with a 40' high wall of dirt.

12. GENERAL

a. If the proper people were to investigate all locations they would be surprised to the severity of contamination on all location well sites.

b.   Excavators always hit liners in all pits at all wells, when trying to stir in concrete. They liners always ripped and the pits keep leaking.  Paul is aware of all pit conditions.

c.   Workers were told there was nothing wrong with the pit liquid.  Cabot should educate employees on how to treat, handle liquid, and how critical it is.  No employees are properly trained or certified.

d.   Paul Harton has repeatedly tried to convince his workers including myself that the pits do not contain anything harmful other than drillings. The pits were sometimes unbearable to smell. But not harmful right! Don't trust your nose. My father had 2 pits tested to confirm is own intuitions and found it to be very scary. He had educated me on the truth of the results. Everyone thought Paul had been truthful with his employees and the land owners. Far from the truth, the pits contain very high concentrations of cancer causing materials.

e.   Make note that Paul Harton and Mike Johnson frequently visited all locations daily. Denny allows violations.

f.   This not an accusation but the absolute truth that Paul Harton a Cabot/GDS supervisor was moving employees around when the safety officer was drug testing GDS employees. Paul, knowing when the arrival of the safety officer's arrival would be, would personally contact drug-using employees and tell them not to come to work.  The fellows that were using drugs on the rigs were moved to night shift to avoid being tested for drugs. This stuff happened all the time. I personally viewed an employee of GDS smoking pot on the job site. Many co-workers can confirm the use of drugs. Paul was aware of drug use on site. He said a pot smoker was better to have than a drinker. Drugs were also used in company vehicles.  Cases of beer are kept on ice in company vehicles under sodas, and employees drink in the company vehicles on the way home.

g.   Paul tested one worker and later told him to bury the sample because it was "hot." Paul tore up the sample paperwork.

h.   A co-worker said that Paul once went out to a rig and dug up a barrel drum, put it into his truck, and took it away because it was hot.

i.   On Mike's birthday, on Baker at the end of Carter Road, Mike drove up in a company vehicle and came out too drunk to walk.  Paul and Don were there, and other co-workers.  Paul only said to leave Mike alone because "everyone is entitled to their one day."

j.   Mike hires his good friends with no experience. He treats other workers very badly, and fires good employees

k.  I advised Paul about problems with Mike. Mike took retaliatory action once by using an excavator to hit me with a log, and hit other workers with an excavator.

l.  There are mud, diesel, and frac fluid spills every week at the well sites. All but 1 or 2 frac jobs had spills, without any containment. The areas were reclaimed without any cleanup.

m.  Paul asks workers to work 15 hour at a time, even 24 straight, and adds their time to later timesheets so only 15 hours how on a day.

n.  Cabot and GDS vehicles were often taken to drinking establishments by supervisors and drilling workers who were over-indulging, but not the production workers.

o.  In mid-October, Denny threatened firing me because of "pending lawsuit." Paul used me to be diplomatic; neighbors wanted my help. After that, I went from being the "outside guy" watching the work areas to just an operator, and being left alone on rigs. Also, they denied my work expenses even though they had paid them all before.

p.  On about November 11, 2009, Paul had a rampage and told office staff I was off of work without permission, when I had actually advised Paul I would be out, which was standard procedure.

q.  I am so disgusted with the decisions of the management - something has to change. My co-workers come to me with a lot of these problems. The know more than I am telling.

13.  My name is Nolen Scott Ely a Cabot/GDS employee

6



CABOT OIL & GAS CORPORATION
PO BOX 4544
HOUSTON, TX 77210-4544

If you have questions call 1099 Helpline
(281) 589-4666
See back of form for add'l info/state breakdown

TEP166250_9161_18321 1 of 2

NOLEN SCOTT ELY
PO BOX 39
DIMOCK, PA 18816-0039

**Instructions for Recipients**

**Recipient's identification number.** For your protection, this form may show only the last four digits of your social security number (SSN), individual taxpayer identification number (ITIN), or adoption identification number (ATIN). However, the issuer has reported your complete identification number to the IRS and, where applicable, to state and/or local governments.

**Account number.** May show an account or other unique number the payer assigned to distinguish your account.

**Amounts shown may be subject to self-employment (SE) tax.** If your net income from self-employment is $400 or more, you must file a return and compute your SE tax on Schedule SE (Form 1040). See Pub. 334 for more information. If no income or social security and Medicare taxes were withheld and you are still receiving these payments, see Form 1040-ES (or Form 1040-ES(NR)). Individuals must report these amounts as explained in the box 7 instructions on this page. Corporations, fiduciaries, or partnerships must report the amounts on the proper line of their tax returns.

**Form 1099-MISC incorrect?** If this form is incorrect or has been issued in error, contact the payer. If you cannot get this form corrected, attach an explanation to your tax return and report your income correctly.

**Box 1.** Report rents from real estate on Schedule E (Form 1040). However, report rents on Schedule C (Form 1040) if you provided significant services to the tenant, sold real estate as a business, or rented personal property as a business.

**Box 2.** Report royalties from oil, gas, or mineral properties on Schedule E (Form 1040). However, report payments for a working interest as explained in the box 7 instructions. For royalties on timber, coal, and iron ore, see Pub. 544.

**Box 3.** Generally, report this amount on the "Other income" line of Form 1040 (or Form 1040NR) and identify the payment. The amount shown may be payments received as the beneficiary of a deceased employee, prizes, awards, taxable damages, Indian gaming profits, or other taxable income. See Pub. 525. If it is trade or business income, report this amount on Schedule C or F (Form 1040).

**Box 4.** Shows backup withholding or withholding on Indian gaming profits. Generally, a payer must backup withhold if you did not furnish your taxpayer identification number. See Form W-9 and Pub. 505 for more information. Report this amount on your income tax return as tax withheld.

**Box 5.** An amount in this box means the fishing boat operator considers you self-employed. Report this amount on Schedule C (Form 1040). See Pub. 334.

**Box 6.** For individuals, report on Schedule C (Form 1040).

**Box 7.** Shows nonemployee compensation. If you are in the trade or business of catching fish, box 7 may show cash you received for the sale of fish. If the amount in this box is SE income, report it on Schedule C or F (Form 1040), and complete Schedule SE (Form 1040). You received this form instead of Form W-2 because the payer did not consider you an employee and did not withhold income tax or social security and Medicare tax. If you believe you are an employee and cannot get the payer to correct this form, report the amount from box 7 on Form 1040, line 7 (or Form 1040NR, line 8). You must also complete Form 8919 and attach it to your return. If you are not an employee but the amount in this box is not SE income (for example, it is income from a sporadic activity or a hobby), report it on Form 1040, line 21 (or Form 1040NR, line 21).

**Box 8.** Shows substitute payments in lieu of dividends or tax-exempt interest received by your broker on your behalf as a result of a loan of your securities. Report on the "Other income" line of Form 1040 (or Form 1040NR).

**Box 9.** If checked, $5,000 or more of sales of consumer products was paid to you on a buy-sell, deposit-commission, or other basis. A dollar amount does not have to be shown. Generally, report any income from your sale of these products on Schedule C (Form 1040).

**Box 10.** Report this amount on Schedule F (Form 1040).

**Box 13.** Shows your total compensation of excess golden parachute payments subject to a 20% excise tax. See the Form 1040 (or Form 1040NR) instructions for where to report.

**Box 14.** Shows gross proceeds paid to an attorney in connection with legal services. Report only the taxable part as income on your return.

**Box 15a.** May show current year deferrals as a nonemployee under a nonqualified deferred compensation (NQDC) plan that is subject to the requirements of section 409A, plus any earnings on current and prior year deferrals.

**Box 15b.** Shows income as a nonemployee under a NQDC plan that does not meet the requirements of section 409A. This amount is also included in box 7 as nonemployee compensation. Any amount included in box 15a that is currently taxable is also included in this box. This income is also subject to a substantial additional tax to be reported on Form 1040. See "Total Tax" in the Form 1040 (or Form 1040NR) instructions.

**Boxes 16-18.** Shows state or local income tax withheld from the payments.

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | CORRECTED (if checked) | | |
|---|---|---|---|
| CABOT OIL & GAS CORPORATION<br>PO BOX 4544<br>HOUSTON, TX 77210-4544 | 1 Rents<br>$ | OMB No. 1545-0115<br><br>20**12**<br>Form **1099-MISC** | **Miscellaneous Income** |
| | 2 Royalties<br>$ 64.80 | | |
| | 3 Other income<br>$ | 4 Federal income tax withheld<br>$ | **Copy B**<br>**For Recipient** |
| PAYER'S federal identification number<br>04-3072771 | RECIPIENT'S identification number<br>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 | 5 Fishing boat proceeds<br>$ | 6 Medical and health care payments<br>$ | |
| RECIPIENT'S name, street address (including apt. no.), city, state, and ZIP code<br><br>NOLEN SCOTT ELY<br>PO BOX 39<br>DIMOCK, PA 18816-0039 | 7 Nonemployee compensation<br><br>$ | 8 Substitute payments in lieu of dividends or interest<br>$ | This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ | 10 Crop insurance proceeds<br>$ | |
| | 11 | 12 | |
| Account number (see instructions)    476856<br><br>   Tracking #:    59693T4 | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ | |
| 15a Section 409A deferrals<br>$ | 15b Section 409A income<br>$ | 16 State tax withheld<br>$ | 17 State/Payer's state no.<br>PA / | 18 State income<br>$ |

Form **1099-MISC**                                    (keep for your records)                            Department of the Treasury - Internal Revenue Service

2H8021 3.000




Aff. Monica Ely

# EXHIBIT 3

NORMA FIORENTINO, et al.,    )    3:09-cv-02284
                    )
          Plaintiffs,   )    Hon. John E. Jones III
      v.            )
                    )    Magistrate Paul C. Carlson
CABOT OIL & GAS       )
CORPORATION and GAS SEARCH )
DRILLING SERVICES CORP.,  )
                    )
         Defendants.  )

## AFFIDAVIT FOR PURPOSES OF RULE 56(d) OF
## THE FEDERAL RULES OF CIVIL PROCEDURE AND IN OPPOSITION

I, Monica Marta-Ely, certify pursuant to the penalty of perjury under 28U.S.C. 1746, that:

1.  My name is Monica Marta-Ely. I submit this affidavit in opposition to defendants'
    motion for summary judgment on all of the claims we have alleged in the above matter
    and for FRCP Rule 56(b) purposes.

2.  I am married to Nolen Scott Ely ("Scott"). I am a mother of three minor children ███,
    ███ and ███, and a dentist.

3.  I am appearing pro se together with the only other remaining plaintiffs in this case: my
    husband, our children, Ray Hubert and Victoria Hubert, their minor daughter, ███, and
    Angel Hubert.[1]

4.  I represent no one but myself. Scott does the filings with the Court because he obtained
    an ECF account. When I make statements here and I utilize the words "we" or "our," I
    am referring to the group of 10 pro se plaintiffs but am not speaking for them or on their
    behalf.

---

[1] The fact that defendants repeatedly assert in filed documents that there are twelve (12) remaining plaintiffs rather the actual 10 is baffling to me; Todd Carter and Jeannette Carter have, sadly, been dead for years, a fact well known by defendants and our former attorneys since the time of their separate passing.

5.  I and the others are appearing pro se, because we have no alternative at this time.  We have been unable to find a law firm willing to assume representation of this case on the record following the representation of Napoli Bern, since discovery has closed and because there are these types of motions pending.  From what I have been told, I believe that if we survive all or any of these motions we will to be able to obtain counsel willing to appear on our behalf, and will be able to obtain financing of our cases to completion.[2]

### Rule 56(b)

6.  We received the Court's order dated June 12, 2013, issued in part as a response to our letter dated June 7, 2013.  My husband and I wish to assure your Honor that our letter was not intended to be a request for an extension of time.  Your Honor made it perfectly clear in his previous ruling that June 17, 2013 was the final deadline.  That is why we sent an emergency letter to the Court on Friday, June 7th.

7.  I will leave the recounting of events that led up to our sending your Honor the letter to my husband in his affidavit.  What I can tell you is that Scott is an honest man, and has been very badly treated by the filing by Jeremy Mercer of the slanderous and dishonest statements supposedly coming from Mr. Kuntz. The fact is, my husband, all of us, had and have been attempting to obtain, accumulate and understand all of the important evidence for our case in the form of documents, data and sworn deposition testimony of parties against curious obstruction from all sides.

8.  We selected the mechanism of a letter to contact the Court because we were previously allowed to do so, and told that we could do so at the conclusion of our original and only conference with the Court.  We certainly did not mean to abuse or misuse that opportunity.

9.  As a point of information, I do know it was not until shortly before close of business on Thursday, June 13, 2013 that Scott received an email from Mr. Kuntz where he told Scott that he would send only some of the depositions for the sum of $3,138.10. I believe this to be exorbitant for a the electronic transfer of selected condensed documents that had to have already been paid for, at least once.

10. That is an expense that none of us can incur.  Therefore, we have completed our opposition without the benefit of any remaining party deposition other than Scott's (which Napoli Bern elected to disclose), in favor of paying for the transcript of the deposition of Daniel Farnham, of Farnham & Associates, Inc., pre and post drilling water tester, once a Cabot contractor, who found constituents in our water (ethylene glyocol, polypropylene glycol, toluene and xylene) that may have been very well associated with the gas drilling operations of Cabot.

11. I do not believe it is fair or helpful for defendants to dwell on the length of time during which we have been in possession of what Napoli Bern Ripka sent to us of our files.  To us, it is confusing and monolithic.  We are not attorneys and have expended inordinate time away from our work, our families and our lives in order to obtain attorneys to represent us and appear on this case, rather than attempt to make sense of what is upon us and do what needs to be done.

12. I also personally do not think it is fair to make assertions that somehow I or other remaining plaintiffs are somehow willfully without representation. In reality we were represented by in the past two sets of attorneys, and unfortunately neither relationship worked out.  The first we left because our lead attorney left the Fuchsberg firm and we followed her to Napoli Bern.  In the end, and a long time after that lead attorney left Napoli Bern, our faith and trust in that firm had eroded to such an extent that a continued relationship was untenable. I will leave it at that.

13. Taking our cues from the Court we have plowed along.  We raised the issue of questionable completeness of the file, and depositions a long time ago.  Napoli Bern will not respond to inquiries.  I will not even talk about the Fulbright attorneys, except to say that I now understand sadly the kind of "gamesmanship" Judge Jones once referred to in one of his orders in this case.

14. We worked around the depositions as best we could, while revisiting and reviewing the CDs and external hard drives for the missing depositions, certain that we must be missing something big because how could dozens be missing.  We thought it must be us, that surely all the fundamental depositions, mine, a party, and Ray, Victoria and Angel Hubert, parties, must have been returned to us with the file.  We did not want to be premature or act more ignorant than we already have before Cabot attorneys and the Court.

15. Again, and this is only my opinion, it is odd to me that the Napoli firm, fully apprised and noticed on all events, has remained silent on all this, not pointing us in the direction of the missing depositions if they were in the hard drives and CDs sent to me, or, with a few clicks of a few computer keys, forwarding electronic copies to us, and be done with it.

16. At any rate, pursuant to FRCP 56(b) we request that your Honor exercise one of the options available to him in favor of plaintiffs upon consideration of the fact that potentially 30, 40 or more depositions are not in plaintiffs' possession, and those depositions undoubtedly contain and provide highly relevant testimony regarding elements of our claims, for better or worse.

17. I hope that the Court does not view it as farfetched that this content is essential to the full and complete justification of our opposition, regardless of what predispositions may exist with respect to how we came to be without counsel, or what we have been doing for the

last six months (pattern and practice, fraud, water contamination, past and ongoing, effectiveness of treatment systems, water delivery issues, damages).

18. Finally, about the stenography company. To be clear, and absolutely fair, there was nothing in our letter to the Court on June 7th that suggested or intentioned to suggest that the stenography company was intentionally "working in concert" with defendants and/or our former attorneys, for at the time that simply was not the case.

19. However, in keeping with my statements above, I, like Scott, am inclined otherwise upon reviewing the untruths in Mr. Kuntz' supposed sworn statement, executed on behalf of Texas stenography firm, on behalf a Texas gas and oil company, by the law firm for the Texas gas and oil company with enormous business leverage over the reporting company.

## Opposition

20. I also submit this affidavit to explain the impact of Cabot's negligence and GDS' negligence on the spacing unit into which our property was incorporated by the gas lease, and the impact from owning property, a residence and relying on a water source in the nine mile affected zone in Dimock, PA.

21. Scott and I divide the labor in our home. Scott takes care of things relating to our home.

22. In or about 2004, Scott and I started the process of building the home where we currently live. This land has been in the Ely family for generations. It is more than just a location to my husband; it is his lifeblood, his history and his legacy for our children and their children.

23. I had nothing to do with Scott signing the gas lease but I was in the background. Scott was concerned that Cabot would take our gas without our permission. I was concerned from the outset about avoiding anything that outsiders might do that would threaten the health or safety of our children or our home.

24. Our worst nightmare came true when Cabot's wells failed and our water contaminated with toxic levels of methane gas. Throughout 2010, Scott and I both experienced many mixed feelings as to whether or not to continue constructing our new home due to the water contamination of our water well by Cabot and GSD. I did not want to invest any more hard earned money into the house construction due to threats from the methane toxicity to our health and safety and property value unleashed by Cabot and GSD. Given the importance of this Ely family land to Scott, we continued to complete the construction of our dream house. On the one hand, it seemed to make no sense to live in a home without potable water. On the other hand, we were here first and it seemed totally unacceptable that Cabot and GSD would impose itself across our community without using one shred of respect for the people who live here, or exercise responsible care for their operations. Why should we have to run because of Cabot's bad practices?

25. Since first planning for our home through the current time, we have spent almost one million dollars, out of pocket, to build our house. This does not include the sweat equity we, especially Scott, have put into it which would add up to hundreds of thousands of dollars if otherwise paid to a third-party contractor. Now, of course, we live in limbo, in a beautiful home without on-site potable water. Every week we have one struggle or another to get our family water, just to survive.

26. As a health care professional, I am acutely aware of environmental impacts to human health. Cabot has insisted that the water has improved and we must try a water filtration system to mitigate the contaminated water supply we have. Cabot insists upon this, even though there apparently is no water filtration system available that can make our water safe. We have neighbors who agreed to allow Cabot to install a water filtration system as a part of their settlement in <u>Fiorentino</u> but their systems repeatedly fail. Education teaches intelligent people not to make the mistakes of others. Scott and I have three small

children. I, along with Scott refuse to let Cabot or anyone use or abuse them or us as if they or we were objects in an experiment. I want our water returned to the condition that existed before the drilling began.

Date: June 17, 2013

Respectfully submitted,

Monica Marta-Ely

Aff. Ray Hubert
# EXHIBIT 4

NORMA FIORENTINO, et al.,    )       3:09-cv-02284
                          )
             Plaintiffs,   )       Hon. John E. Jones III
      v.               )
                          )       Magistrate Paul C. Carlson
CABOT OIL & GAS        )
CORPORATION and GAS SEARCH )
DRILLING SERVICES CORP.,   )
                          )
          Defendants.   )

## AFFIDAVIT FOR PURPOSES OF RULE 56(d) OF
## THE FEDERAL RULES OF CIVIL PROCEDURE
## <u>AND IN OPPOSITION</u>

I, Ray Hubert, certify pursuant to the penalty of perjury under 28 U.S.C. 1746, that:

1. My name is Ray Hubert and I submit this affidavit in opposition to defendants' motion for summary judgment on all of the claims I have alleged on behalf of myself and my family in the above matter.

2. I reside with my family at 120 Carter Road, Dimock, PA where we have lived for over 20 years. My wife and I also own about 3 acres of undeveloped property across the road. Nolen Ely and I consider that my wife and I own this property after so many years of habitation and according to the wishes of Ken Ely, deceased, mother wife, Victoria's step father and owner prior transferring title to Scott. The damages with respect to loss of water, devaluation of property, and other derive from use of the property at 120 Carter Road.

3.   I am appearing pro se together with the only other remaining plaintiffs in this case: my wife, Victoria Hubert, minor daughter, ██, Angel Hubert, Nolen Scott Ely, Monica Marta-Ely, and their three minor children, ██, ██ and ██.[1]

4.   I represent myself, as does my wife, and older daughter.  Because Nolen is the one with the ECF account, he has performed the filings with the

5.   Court for all of us.  When I make statements here and I utilize the words "we" or "our," I am referring to the group of ten pro se plaintiffs, but not speaking for them or on behalf of them.

6.   I and the others are appearing without an attorney, because we have been unable to find a law firm willing to take on the case and appear officially in court after the representation of Napoli Bern and the closing of discovery while defendants' motions are still open.  I, like the other plaintiffs, my wife Victoria, Nolen, Monica, and my older daughter, Angel are hopeful that once these motions are decided in our favor we will have greater leverage, so to speak, to find counsel willing to appear and finance our cases through trial.

**Rule 56(b)**

7.   We received the Court's order dated June 12, 2013, issued in part as a response to our letter dated June 7, 2013.  To be clear, our letter was not intended as a request for an extension of time.  Your Honor made it very clear in his previous ruling that June 17th was a last possible deadline.

---

[1]The fact that defendants repeatedly assert in filed documents that there are twelve (12) remaining plaintiffs rather the actual 10 is baffling to me; Todd Carter and Jeannette Carter have, sadly, been dead for years, a fact well known by defendants and our former attorneys since the time of their separate passing.

8. I request that the Court refer to Mr. Ely's affidavit for details on what transpired with respect to obtaining depositions for this opposition, and take note that surprisingly I determined after searching and searching the external hard drive and CD that I received from Tate Kunkle at Napoli Bern, that my deposition was not included. Nor was my wife's or my daughter's.

9. I received word just last Thursday evening, June 13th, that Reporting Depositions, LLC, of Dallas, Texas was attempting to charge us $1,803.80 to obtain my deposition transcript, and that of my wife and daughter, Angel, which had already been obtained by Cabot and Napoli Bern. I do not have that kind of money, and have been unable to purchase the transcripts. Mr. Ely was unable to foot the bill for my family in this instance, as he has his own expenses and has been covering all of the costs of hauling potable water from Montrose to the water buffaloes at my home and his, at least until recently.

10. I do not think it is fair that defendants keep writing about the amount of time that we had our record from Napoli Bern. It has been overwhelming. We have put a lot of time into trying to get attorneys to represent us and appear on our case. It has really not been that long since we resigned ourselves that no one was ready to fully step in for us, and to turn our full attention personally to the "file" we had received, and how we were going to deal with the immediate task at hand, in other words, answering all of these motions. (For example, we were on the hook with one law firm in Philadelphia for three weeks, who at the last minute told us that they would appear and put some warm bodies behind the cases, but they would not expend a dime unless and until the motions were "survived." )

11. At any rate, we all have worked around the depositions as best we could, and at this time look at FRCP 56(b) and ask the Court to exercise one of the options available to him in favor of plaintiffs upon consideration of the fact that potentially 30, 40 or more depositions are not in plaintiffs' possession, and those depositions undoubtedly contain and provide highly relevant testimony regarding elements of our claims, for better or worse.

12. I hope that your Honor does not view it as farfetched that this content is essential to the full and complete justification of our opposition, regardless of what impressions as to how we came to be without counsel, or what we have been doing for the last six months.

**Opposition**

13. I also submit this sworn statement in opposition to defendants' motion to for summary judgment on all of remaining plaintiffs' claims in this case.

14. I would like to describe here the circumstances leading up to my signing the gas lease with Cabot Oil and Gas ("Cabot"), the impact of defendants' negligence on the spacing unit into which my property was incorporated by the gas lease, and the impact of having to rely on an external water source to meet my family's needs as a result of living in the nine mile affected zone in Dimock, PA.

15. At approximately the end of May, beginning of June 2007, a gentleman by the name of William J. Pershem who identified himself as an employee of Cabot Oil & Gas Corporation visited my home to get my wife Victoria and me to sign a gas lease with

the gas company. Before he left, Mr. Pershem gave me his business card with Cabot's name and logo on it.

16. My wife Victoria and I did not know much about what Mr. Persham was talking about, and were mostly concerned that the gas drilling would not harm our property and quality of life. Mr. Pershem said the three acres was too small, and that Cabot would not drill on our property. He never said anything about whether Cabot would drill under our property.

17. Mr. Pershem told Victoria and me that most of the people in the area had already signed a gas lease. He also specifically said that if we didn't sign a gas lease, we would not get a signing bonus and that Cabot would get the gas anyway. Mr. Pershem never explained anything to Victoria or me about the kind of hydraulic fracturing Cabot ended up doing next to our property at the Gesford Wells which is maybe 100 yards further than if Cabot had drilled across the road.

18. Mr. Pershem came back about a week later which must have been June 8 which is the date on the lease Victoria and I signed with Cabot. At no time prior to signing leases with Cabot were plaintiffs alerted by Pershern of the fact that Cabot's proposed gas drilling operations carried risks of well site blowouts, equipment failures, uncontrolled flows of gas, oil or well fluids, fires, formations with abnormal pressure, and pollution and other environmental risks, such as water contamination.

19. At no time prior to signing leases with Cabot were plaintiffs informed of their rights or the Cabot's obligations under state law governing natural gas and oil extraction.

20. A Cabot person came back in October 2008 to have Victoria and me sign a ratification to the lease which we did not fully understand but we signed.

21. Our well water was the first one to go after Cabot or Gas Search Drilling or both started to drill on the Gesford wells. After 22 years with a Jet pump and no problems, the water table fell to such a level that we couldn't get our water. Cabot put us on a water buffalo. We were told that everything would be okay. One day after they took us off the the buffalo, I went into the house to turn on the water and it started spurting. I called Cabot and a Cabot representative came to my house with someone from Quantum Laboratories who waved a wand inside my house and also checked outside. He said, "I am not supposed to tell you this, but if you are a smoker, I would not smoke in your house." I asked him if I could drink the water. I have a wife and two children.

22. The representative checking my water from Quantum said we should not drink the water. I did not want to get him in trouble for telling me, so I also asked the Cabot representative if it was okay for us to drink the water, and he told me the test results would be coming, but it was perfectly safe for us to drink the water. We took the word of the Quantum representative, the water tester who waved the wand, and did not drink the water.

23. In terms of the hydraulic fracturing, there are hundreds of trucks that came through. We have a small road so a truck going one way and a car going the other way won't fit. They ended up tearing up the roadside. We ended up with road damage and pipe

damage from the heavy trucks which still isn't fixed. Also, Guy Parrish, who delivered water to me from Cabot broke a pipe under the driveway which helps with the runoff.

24. Now there is a dip in the driveway and when it rains the gravel runs onto the grass. Guy Parish said it would be fixed, but it never was. The unbearably loud noise from the burn off of the gas which is like a giant candlestick with a 20 foot flame went on for days. All of this inconvenience along with having to pay attention almost every day to get clean water for our family has been overwhelming for all of us.

25. I have seen the truck from Guy Parrish, Cabot's handyman, water servicing and repair going to Bill Ely's house every day for approximately the last four months. His water filtration system doesn't work and he is back on a buffalo for water.

26. Our water is in the vicinity of Scott Ely's property and remains contaminated.  Please see the expert report of our hydrogeologist for opinions and details.

27. Since our water went bad we have been on bottled water. Victoria and I are raising our two girls. All three of them got red blotches on their skin when we first lost our water. We worry that with the drilling and fracking activity starting up again and our neighbor is on a buffalo because his filtration system doesn't work, we want to be safe and have our drinking water returned back to the way it was, when it was clean and safe to drink, before all this drilling in the affected area began.

Date: June 17, 2013

Respectfully submitted,

Ray Hubert

Aff. Victoria Hubert

# EXHIBIT 5

NORMA FIORENTINO, et al.,   )    3:09-cv-02284
                          )
            Plaintiffs,   )    Hon. John E. Jones III
      v.              )
                          )    Magistrate Paul C. Carlson
CABOT OIL & GAS        )
CORPORATION and GAS SEARCH )
DRILLING SERVICES CORP.,   )
                          )
        Defendants.   )

## AFFIDAVIT FOR PURPOSES OF RULE 56(d)
## OF THE FEDERAL RULES OF CIVIL PROCEDURE
## AND IN OPPOSITION

I, Victoria Hubert, certify pursuant to the penalty of perjury under 28 U.S.C. 1746, that:

1. My name is Victoria Hubert and I submit this affidavit in opposition to defendants' motion for summary judgment on all of the claims I have alleged on behalf of myself and my family in the above matter.

2. I am appearing pro se together with the only other remaining plaintiffs in this case: my husband, Ray Hubert, minor daughter, ███, Angel Hubert, Nolen Scott Ely, Monica Marta-Ely, and their three minor children, ███, ███ and ███.[1]

3. I represent myself, as does my husband, and older daughter. Because Nolen is the one with the ECF account, he has performed the filings with the Court for all of us. When I make statements here and I utilize the words "we" or "our," I am referring to the group of ten pro se plaintiffs, but not speaking for them or on behalf of them.

---

[1] The fact that defendants repeatedly assert in filed documents that there are twelve (12) remaining plaintiffs rather the actual 10 is baffling to me; Todd Carter and Jeannette Carter have, sadly, been dead for years, a fact well known by defendants and our former attorneys since the time of their separate passing.

4.  I and the others are appearing without an attorney, because we have been unable to find a law firm willing to take on the case and appear officially in court after the representation of Napoli Bern and the closing of discovery while defendants' motions are still open.  I, like the other plaintiffs, my husband Ray, Nolen, Monica, and my older daughter, Angel are hopeful that once these motions are decided in our favor we will have greater leverage, so to speak, to find counsel willing to appear and finance our cases through trial.

### Rule 56(b)

5.  We received the Court's order dated June 12, 2013, issued in part as a response to our letter dated June 7, 2013.  To be clear, our letter was not intended as a request for an extension of time.  Your Honor made it very clear in his previous ruling that June 17th was a last possible deadline.

6.  I request that the Court refer to Mr. Ely's affidavit for details on what transpired with respect to obtaining depositions for this opposition, and take note that surprisingly I determined after searching and searching the external hard drive and CD that I received from Tate Kunkle at Napoli Bern, that my deposition was not included.  Nor was my  husband's or my daughter's.

7.  I received word just last Thursday evening, June 13th, that Reporting Depositions, LLC, of Dallas, Texas was attempting to charge us $1,803.80 to obtain my deposition transcript, and that of my husband and daughter, Angel, which had already been obtained by Cabot and Napoli Bern. I do not have that kind of money, and have been unable to purchase the transcripts. Mr. Ely was unable to foot the bill for my family in this instance, as he has his own expenses and has been covering all of the costs of

hauling potable water from Montrose to the water buffaloes at my home and his, at least until recently.

8. I do not think it is fair that defendants keep writing about the amount of time that we had our record from Napoli Bern. It has been overwhelming. We have put a lot of time into trying to get attorneys to represent us and appear on our case. It has really not been that long since we resigned ourselves that no one was ready to fully step in for us, and to turn our full attention personally to the "file" we had received, and how we were going to deal with the immediate task at hand, in other words, answering all of these motions. (For example, we were on the hook with one law firm in Philadelphia for three weeks, who at the last minute told us that they would appear and put some warm bodies behind the cases, but they would not expend a dime unless and until the motions "survived.")

9. At any rate, we all have worked around the depositions as best we could, and at this time look at FRCP 56(b) and ask the Court to exercise one of the options available to him in favor of plaintiffs upon consideration of the fact that potentially 30, 40 or more depositions are not in plaintiffs' possession, and those depositions undoubtedly contain and provide highly relevant testimony regarding elements of our claims, for better or worse. (Please see Exhibit 2 for partial list.)

10. I hope that your Honor does not view it as farfetched that this content is essential to the full and complete justification of our opposition, regardless of what impressions as to how we came to be without counsel, or what we have been doing for the last six months.

**Opposition**

11. I also submit this sworn statement in opposition to defendants' motion to for
    summary judgment on all of remaining plaintiffs' claims in this case.

12. I would like to describe here the circumstances leading up to my signing the gas lease
    with Cabot Oil and Gas ("Cabot"), the impact of defendants' negligence on the
    spacing unit into which my property was incorporated by the gas lease, and the
    impact of having to rely on an external water source to meet my family's needs as a
    result of living in the nine mile affected zone in Dimock, PA.

13. At approximately the end of May, beginning of June 2007, a gentleman by the name
    of William J. Pershem who identified himself as an employee of Cabot Oil & Gas
    Corporation visited my home to get my  husband  Ray and me to sign a gas lease with
    the gas company. Before he left, Mr. Pershem gave me his business card with Cabot's
    name and logo on it.

14. My husband, Ray and I did not know much about what Mr. Pershem was talking
    about, and were mostly concerned that the gas drilling would not harm our property
    and quality of life. Mr. Pershem said the three acres was too small, and that Cabot
    would not drill on our property. He never said anything about whether Cabot would
    drill under our property.

15. Mr. Pershem told me and Ray that most of the people in the area had already signed a
    gas lease. He also specifically said that if we didn't sign a gas lease, we would not get
    a signing bonus and that Cabot would get the gas anyway. He promised us lots of
    money and said things would be good. He didn't say anything about the water. Ray
    did most of the talking for us.

16. Mr. Pershem never explained anything to me or Ray about the kind of hydraulic fracturing Cabot ended up doing next to our property at the Gesford Wells which is maybe 100 yards further than if Cabot had drilled across the road.

17. Mr. Pershem came back about a week later which must have been June 8th, which is the date on the lease Ray and I signed with Cabot.

18. A Cabot person came back in October 2008 to have Ray and me sign another paper which we signed.

19. After the drilling started, at first we lost all of the water. We called Kenneth Ely, Nolen's dad, who has since died. He told us to call Cabot, so we did. Cabot sent a water buffalo that they put in front of the house and they hooked it into the house through where the hose was outside.

20. We were the first people to have one. We used it to shower, for the toilet and to wash our dishes. Cabot gave us bottled water from Endless Mountain. When the water level came back we went back on our well water, it was bubbly like Alka-Seltzer and it had a sulphur smell. After a few minutes it cleared. We figured there was air in the water.

21. Then the girls and I started to get red skin blotches on our arms and legs after our evening shower and they would go away by morning.

22. Sometime when we drank the water we got headaches. I had a fish tank with gold fish and when I put the tap water into the fish tank, the fish died. I had always used tap water before and never had a problem with the fish.

23. About the same time we started to hear that neighbors were having water problems. Their water was dirty.

24. After about two weeks we called Cabot. Someone from Cabot came with someone from Quantum. The man from Quantum waived a wand over our sink water and also outside by the well. Then he went over to talk to the Cabot representative by his truck for about 10-15 minutes.

25. The man from Cabot made a phone call and the man from Quantum who wabed the wand came back over to Ray and me in the yard and said he was not supposed to tell us this but if he was us he would not smoke in the house or use the stove. We have propane.

26. Then the man from Cabot came back and said he would be in touch. Ray asked if everything was going to be fine and he said everything would be fine. Then we got back on bottled water and a buffalo.

27. Deliveries went on until Cabot stopped bringing the water last summer. Around holiday time water delivery would sometimes stop and then go back on. After Cabot stopped delivering water, the people from New York sent water. Then someone, not Cabot, bought a truck with a tank that we fill to take showers.

28. I have concerns about our health, about cancer. I wish this was over and we had clean water. Cabot wants us to take a water filtration system as if that is going to make everything okay. I think that is a waste of time and Cabot's money. Bill Ely is having trouble with his system.

29. People say, it's only water. I say, until you don't have it, you don't know.

Date: June 17, 2013

Respectfully submitted,

Victoria Hubert

NORMA FIORENTINO, et al.,    )    3:09-cv-02284
    )
            Plaintiffs,    )    Hon. John E. Jones III
       v.    )
    )    Magistrate Paul C. Carlson
CABOT OIL & GAS    )
CORPORATION and GAS SEARCH )
DRILLING SERVICES CORP.,    )
    )
           Defendants.    )

## AFFIDAVIT FOR PURPOSES OF RULE 56(d)
## OF THE FEDERAL RULES OF CIVIL PROCEDURE
## AND IN OPPOSITION

I, Angel Hubert, certify pursuant to the penalty of perjury under 28 U.S.C. 1746, that:

1. My name is Angel Hubert and I submit this affidavit in opposition to defendants' motion for summary judgment on all of the claims I have alleged on behalf of myself and my family in the above matter.

2. I am 24 years old, until August of 2009, I resided with my parents, Ray and Victoria Hubert, and my younger sister, ▮▮▮ at 120 Carter Road (formerly P.O. Box 111) Dimock, PA 18816.

3. I recall in late 2008 observing changes to our drinking water, in that I saw the water spurting out of the faucet.  Then it turned a brownish color, which in all the years that I lived with my parent (since childhood).

4. During the time up until our water system was disconnect by Cabot, I would use the damaged water and experience headaches and dry, itchy skin.  My mother and sister had similar experiences including blotches.

5. I wish to adapt the contents of my parents affidavits and request the same help from the Court that they do.

Date: June 17, 2013

Respectfully submitted,

Angel Hubert