Congdon - Damages Appraiser

**EXHIBIT 8**

| | |
|---|---|
| NORMA FIORENTINO, et al.,           ) | 3:09-cv-02284 |
|                                                      ) | |
|        Plaintiffs,           ) | Hon. John E. Jones III |
| v.                                                 ) | |
|                                                      ) | Magistrate Paul C. Carlson |
| CABOT OIL & GAS                         ) | |
| CORPORATION and GAS SEARCH) | |
| DRILLING SERVICES CORP.,         ) | |
|                                                      ) | |
|       Defendants.           ) | |

### AFFIDAVIT IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND PARTIAL SUPPLEMENTAL EXPERT REPORT

I, Robert D. Congdon, Jr., certify pursuant to the penalty of perjury under 28 U.S.C. 1746, that:

1. My name is Robert D. Congdon, Jr. I am the Owner and President of Congdon & Company, Inc., a full-service real estate appraisal and mineral rights appraisal firm that has been serving Upstate New York, and Northern Pennsylvania commercial, industrial and residential customers for the last forty years.

2. I hold dual, SRA and MAI,[1] designations from the Appraisal institute, am Certified as a General Appraiser in New York State and the Commonwealth of Pennsylvania, and am an Affiliate Member of the American Institute of Mineral Appraisers.

3. I have completed literally hundreds of Mineral Valuations in Northern Pa for uses including matrimonial action, condemnations, pipelines, estates, and mostly for IRS submissions within Financial Planning scenarios. Clients include multiple attorneys and Financial Planners in the region. I have made multiple presentations to regional groups about Mineral Valuations, the most recent of which was for Half Moon Seminars for CE credit for Attorneys and Engineers. I work with an Appraiser/Petroleum Engineer and most recently have hired a Staff Geologist.

---

[1] **The MAI designation** is held by individuals who are experienced in the valuation and evaluation of commercial, industrial, residential and other types of properties, and who advise clients on real estate investment decisions. **The SRA designation** is held by individuals who are experienced in the analysis and valuation of residential real property. Obtaining such designations requires education and experience, and demonstrated professional knowledge, understanding and ability beyond that needed for state certification. Designated members make a commitment to advanced education, defined ethical requirements and higher expectations for the appraisal profession as a whole. MAI and SRA are collective membership marks.

**4.** For a more detailed accounting of my professional experience and background, please see a current curriculum vita attached hereto.

**5.** I submit this affidavit in support of the continued prosecution by *pro se* plaintiffs of their litigation claims against Cabot Oil & Gas Corporation and its drilling subsidiary company, GasSearch Drilling Operations Corp. (Cabot); in opposition to defendants' motions for summary judgment; in partial supplementation of my original expert report in this matter; and in rebuttal of defendants' expert reports with respect to Cabot's denials of lost property value and royalties revenue by plaintiffs due to Cabot's conduct.

**6.** I have reviewed in preparation for rendering my present analysis and opinions pertinent pleadings, defendants' motions and attachments, reports of their experts, and the affidavits of *pro se* plaintiffs. I have spoken with the plaintiffs and received from Nolen Scott Ely deeds of sale of properties located in and about Dimock Township that he retrieved from the County Courthouse, which deeds are reflective of some, if not all properties sold in the area between approximately 2009 and present, including sales of the Carter Road properties of Harold

Lewis and Greg Sautner, highlighted by defendants' expert Hedden in his report.

**7.** At their request, on **01/11/2011**, I provided plaintiffs' Napoli Bern Ripka Scholnick, plaintiffs' former attorneys, with an expert opinion in the form of a report generally directed toward litigation involving of multiple households.

**8.** I learned from pro se plaintiffs that this Court had ordered that supplemental expert reports were to have been filed by June 3th. My understanding is that Mr. Ely received defendants' expert reports sometime during the week of April 29th.

**9.** I received them from Mr. Ely within the following week, whereupon I alerted Mr. Ely that as much as I wished to meet that deadline, and that I would do the best I could to do so, my other assignments would probably not allow me to do the thorough job that another month would allow me given the voluminous paper inundation from Cabot and their experts and the need to conduct a final appraisal of his property. I know that pro se plaintiffs were to have made a request of the Court for me in that regard.

**10.**     A copy of my original general report, and supplemental reports are annexed hereto, and are incorporated by reference.

**11.** Separately or in combination, these reports are neither comprehensive nor my last word on the issues of plaintiffs' lost property value and royalties in this case, as the situation is dynamic.

**12.** Accordingly, and for the reasons stated above, I request that I be able to amend my reports and findings, ideally at any time up to and at the time of trial, but in any case not earlier than July 31, 2013, and preferably 8/30/2013.

13. However, to be clear, based on my professional experience and the relevant information I have culled and reviewed in connection with preparing the attached reports, it is my opinion to a reasonable degree of professional mineral rights appraisal and property valuation certainty that it is more likely than not that: i) the value of the homes and properties of the Nolen Scott Ely family, the Estate of Kenneth R. Ely, and the Ray Hubert family have been significantly diminished due to the absence of potable water, and the stigma attached to Dimock and the infamous nine-by-nine mile "affected" Carter Road area;[2] ii) but for the apparent propping up of

---

[2] So designated by the Pennsylvania Department of Environmental Protection (PADEP) in a series of Consent Orders and Agreements entered between the Department and Cabot in 2009 and 2010, which designation has subsequently been widely publicized.

the real estate market by Cabot directly or through intermediaries, or third-party investors, a conventional real estate market would not exist in Dimock; and, iii) due to findings and directives of the PADEP that required Cabot to take off line and plug certain of their gas wells, generally identified as Gesford 3 and Gesford 9 because of faulty construction which lead to the contamination of plaintiffs' water source/aquifer, the plaintiffs have suffered a calculable loss of royalties revenue from the time of "plugging" of the wells to present in the amounts as noted below.

| Name | Acres | Per acre Lost Royalties (Past) * | Per acre Lost Royalties (Future) | Total *** |
|---|---|---|---|---|
| Scott Ely | 8.28 | $8,557-$17,059 | $5,161-$10,288 | $113-226,000 |
| Ely Estate | 183 | $8,557-$17,059 | $5,161-$10,288 | $2,500,000 – $3,566,000 |
| Ely Estate | 260 ** | $8,557-$17,059 | $5,161-$10,288 | $5,004,000 – $7,110,000 |
| Hubert | 2.93 | $8,557-$17,059 | $5,161-$10,288 | $40,200 - $80,100 |

\* see attached documentation

\*\* serious dispute as to actual acreage

\*\*\* Total range, past and future

_____

Dated: June 17, 2013

                                                Respectfully submitted,

                                                _____

                                                Robert A. Congdon, Jr., SRA, MAI

# Congdon & Company Inc. *Real Estate Appraisals and Consulting*

## DIMOCK – PART A

1. Appraisal Review – Robert D. Congdon, MAI, SRA
2. Technical Report Review – Zackery E. Smith, Staff Geologist and Robert D. Congdon
3. Royalties Lost Estimates – Zackery E. Smith and Robert D. Congdon

### 1. Appraisal Review

Three Appraisal reports have been submitted to me for initial review within the time constraints provided. Please note that, unlike many other MAIs in the country, I also have the SRA Designation from the Appraisal Institute. My Appraisal roots are in residential, having complicated and reviewed literally thousands of 1-4 family reports in the region.

After this initial review, it is my conclusion that the reports need deeper examination, since they collectively contain significant errors which can result in erroneous conclusions and results which are not credible. At this writing, I will make no judgments as to USPAP violations concerning State and Federal law.

As a sample, for the Court's consideration, here are some notable issues observed in the valuation grid and which should be further questioned or corrected.

In noting these issues, I make no conclusions as to the credibility of the final value without further investigations.

### 44 Carter Road Report

4694 Sq ft home, 5 bedroom, 3.5 baths, 8.28 acres, 3-car garage

a) Acreage differences should be adjusted consistently. Sale 1 – adjusted at $9,505/acre, Sale 2 – at $2,465/acre and Sale 3 – at $9,491/acre.
b) (+) or (-) sign adjustments should be correctly applied. The rule, CBS, is "comp better subtract", has been reversed in Sale 2. The sale has 25.5 acres versus 8.28 for the subject, and the report shows a (+) 42,500, the opposite of convention, and resulting in doubling the error and resulting in a value indicator which is at least $85,000 off.
c) The "Quality of Construction" of the subject is rated as "Good". All sales are also rated as "Good", but the appraiser still makes a significant adjustment of $47,000. Either the adjustment or ratings are wrong.
d) Sale 2 – the seller apparently returned 50% of the mineral rights, but no adjustment was made in the grid. For 25.5 acres, 50% of Mineral Rights is a significant number and will affect the value conclusion. Also, a brief call to the Realtor confirmed that the property was <u>not</u> under lease, therefore making it much more appealing to purchasers. These issues need to have more review.
e) The 3 resulting value indicators are widely divergent, to the point that any reviewer has to seriously question the content and treatment of the information. These indicators are supposed to provide the appraiser with a logical range within which the final value is reconciled.

1

**Congdon & Company Inc.** *Real Estate Appraisals and Consulting*

| Sale 1 | Sale 2 | Sale 3 |
|---|---|---|
| $280,700 | $665,900 | $397,000 |

The above range is generally unacceptable in Appraisal practice.

f) The signatures provide the reader with a vague idea of who actually did the report and is responsible for the content. Note that the report could have been co-authored by an MAI. My concern is that this colleague may or may not have any residential experience, especially in northern PA, and that many errors as noted above apparently escaped his attention.

g) The Interest appraised is curiously named "Leased Fee", contrary to acceptable definitions. In my multiple contacts and appraisals for area Attorneys primarily for the Intended Use of IRS applications, the proper interest is named Fee Simple As Encumbered (by a gas lease).

## Conclusion

All of the above observations beg for further scrutiny of all the Appraisal reports.

# Congdon & Company Inc. *Real Estate Appraisals and Consulting*

**2. Technical Report Review**
A Response to Payne's Petroleum Engineering Study

*Zackery E. Smith, Geologist, Congdon & Company Appraisers and Consultants*

Note: This document does not necessarily constitute a final draft until reviewed by Don Warnken, Petroleum Engineer, and Certified Mineral Appraiser.

**2. Technical Report Review**

**Foreword**

The document by Robert Congdon that is referred to by Payne is a Restricted Use Consulting Report. As such it is neither a Self-Contained Report nor intended for use in final Litigation. It was designed to give the Client a summary of a variety of potential damages with the future prospect of more detailed analysis if necessary. Therefore, the methodology and data sources of that report are not addressed herein. Comments will be limited to the methodology and soundness of data contained in the Petroleum Engineering Study.

**Analysis of Report**

The report repeatedly refers to actual production records from the subject parcels as a basis upon which to value losses, however, it is the production and activity on these parcels that is the subject of the litigation. The unknown quantity is not what actually happened, but what should have happened had normal production been in effect since the beginning of these actions. Therefore the use of these numbers by Payne is <u>invalid</u>.

XXX??? It has been observed in the Marcellus Play in the Northern Tier of Pennsylvania that litigation inhibits leasing, production, etc. In some instances, parcels that have been leased, but subject to litigation are left undeveloped and the leases allowed to expire in areas that are otherwise actively developed and producing. Therefore, the chilling effect of litigation renders the use the subject as a basis for assessing the value in the current market is <u>Invalid. xxx???</u>

Exhibit #3 references the wells of interest and identifies whether they are vertical or horizontal. Ten wells are identified as vertical and five as horizontal. Vertical wells are inferior and not economically viable in tight shale reservoirs such as the Marcellus Shale, and cannot be used to predict natural gas reserves for the subject especially when the unknown once again is what should have happened had proper horizontal drilling been in effect.

Exhibit #7 references a "Normalized Daily Production Rate". The data used to develop this graph is from the wells referenced in Exhibit #3. Again, this is based upon the use of ten inferior vertical wells. This use of this technique to estimate value of natural gas reserves and production potential is <u>Invalid.</u>

Exhibit #8 uses the "Normalized Daily Production Rate" to compare to a decline curve model. The primary value required for decline curve development is the Initial Production Rate.

**Congdon & Company Inc.** *Real Estate Appraisals and Consulting*

"Normalized Daily Production Rate" IS NOT equivalent to Initial Production Rate and CANNOT be used for the development of a decline curve for the subject. The comparison made in this exhibit is again predicated upon the use primarily of inferior vertical wells and as a technique for estimating production potential is scientifically <u>Invalid.</u>

Exhibit #9 presents production records from the Pennsylvania Department of Environmental Protection for all wells in Susquehanna County, PA reporting 30 or fewer days of production. This data is then used to calculate the volume of gas produced per day, which in the text if the report is referred to as "initial production rate". This is not an accurate method of calculating the initial production rate. The first few days or weeks of production tend to be biased downward due to the process of finishing the well and the pressure in the reservoir/system removing impediments to fluid flow. The author's technique for developing the Initial Production Rate is <u>Invalid.</u>

In the section "Findings and Conclusions", #4, the author states that using a decline curve "derived from wells drilled many miles away… has led to an unreliable calculation". However, it is impossible to estimate future production without relying upon a decline curve. The standard methodology for the prediction of future production of oil and gas is to take extant production records and fit the data to a decline curve model. Models vary, but the universal input to the equations is the Initial Production Rate. At this writing, we have the benefit of hindsight and can use real and accurate numbers from area production to build the scenario of what should have happened.

It is true that the geology of the Marcellus can change significantly over relatively short distances, thus, using data in the region local to the subject is most appropriate. Using Pennsylvania Department of Environmental Protection data for natural gas production in <u>Dimock Township Only</u>, the resultant Initial Production Rate is roughly twice the average for Susquehanna County as a whole.

<u>Conclusion</u>

The criticisms in the Payne report are not valid and all assumptions need to be updated to a more current venue.

# Congdon & Company Inc. *Real Estate Appraisals and Consulting*

## DIMOCK CONSULTING REPORT C

Valuation of Income Stream from an Average Horizontal Well in Dimock Township, PA

**Developing the IP Rate**

The value central to the prediction of natural gas production over time is the Initial Production rate (IP). When a well begins production, the first few weeks or even months of tend to be biased downward due to the process of finishing the well and the pressure in the reservoir/system removing impediments to fluid flow. Therefore, a "stabilized" IP rate must be set forth. This concept is similar to all other Income Approaches to value in the practice of valuation.

Pennsylvania Department of Environmental Protection data is used to extract the IP rate. All records for wells in Dimock Township, Susquehanna County, PA that report 1-46 days of production are used for this analysis. As stated above, early production is not representative of potential. Consequently, for the purpose of this exercise, wells are separated into two groups: wells with 1-15 production days and 16-36 Production days.

*Wells: 1-15 days in production*

| Unit | Well | Mcf | Days | Mcf/day |
|---|---|---|---|---|
| A & M HIBBARD 2H | 2H | 11207.18 | 13 | 862.0908 |
| C LARUE | 2 | 7973 | 15 | 531.5333 |
| C LARUE | 3H-SE | 21200 | 14 | 1514.286 |
| C LARUE | 6 | 123267 | 14 | 8804.786 |
| C ROSE 3 | 3 | 40900 | 5 | 8180 |
| GESFORD | | 16460 | 13 | 1266.154 |
| GREENWOOD | | 22203 | 15 | 1480.2 |
| HUBBARD | | 2244 | 1 | 2244 |
| R WARRINER 4 | 4 | 69180 | 13 | 5321.538 |
| R WARRINER 8 | 8 | 67401 | 13 | 5184.692 |

For the group of 1-15 days, the daily volume is calculated to be 3,539 Mcf/day. That number is then multiplied by 15 days to estimate the volume produced by an average well in the first 15 days of production, or 53,084 Mcf.

# Congdon & Company Inc. *Real Estate Appraisals and Consulting*

*Wells: 16-46 days in production*

| Unit | Well | Mcf | Days | Mcf/day | Mcf days 16-46 | Days | Mcf/day |
|---|---|---|---|---|---|---|---|
| A & M HIBBARD 4 | 4 | 162539.8 | 21 | 7739.991 | 109455.8998 | 6 | 18242.65 |
| BAKER | | 39833 | 29 | 1373.552 | -13250.92022 | 14 | -946.494 |
| G SHIELDS | 2 | 75475 | 46 | 1640.761 | 22391.07978 | 31 | 722.2929 |
| G SHIELDS | 2H | 216069 | 45 | 4801.533 | 162985.0798 | 30 | 5432.836 |
| G SHIELDS | 4H-SE | 55962 | 19 | 2945.368 | 2878.07978 | 4 | 719.5199 |
| GESFORD | | 241712 | 36 | 6714.222 | 241712 | 21 | 11510.1 |
| GESFORD 4R | 4R | 16018.51 | 28 | 572.0896 | -37065.41022 | 13 | -2851.19 |
| KING 2 | 2 | 898772.5 | 40 | 22469.31 | 845688.6198 | 25 | 33827.54 |
| KING 3 | 3 | 909050.8 | 40 | 22726.27 | 855966.8598 | 25 | 34238.67 |
| R WARRINER 2 | 2 | 244599.9 | 28 | 8735.709 | 191515.9398 | 13 | 14732 |
| | | | | | | Average | 11562.79 |

For wells with 16-46 days of production, the value of 53,084 Mcf is subtracted from the total produced volume in order to estimate the volume from only days 16-46. Finally, the resultant volume is divided by the number of days of production beyond 15 days and averaged to arrive at an IP rate of approximately 11,563 Mcf/Day for Dimock Township.

Also, drawing from our extensive files, production records reported by companies for 2008 and 2009 typically indicated an IP rate of approximately 5,800 Mcf/day for all of Susquehanna County.

This analysis provides loss estimates based upon both the 5,800 Mcf/day and 11,563 Mcf/day IP Rate. The loss value derived from the 5,800 Mcf/day IP rate could be considered a minimum estimate and the 11,563 Mcf/day value could be considered as the more likely reality.

### Summary Of Assumptions

| | |
|---|---|
| Start date: | July 1, 2009 |
| Lease Royalty: | 12.5% |
| Expenses: | None at this time |
| Total Period: | 25 years |
| Discount Rate: | 16% applied to production from 7/1/2013 onward, 0% applied to losses for 7/1/2009-6/30/2013 |
| Capture Zone: | 100 acres |
| Gas Price: | Historical wellhead prices as reported by the US Energy Information Administration (EIA) used for the period July 2009 to December 2012. January 2013-June 2013 prices are derived from the average quarterly prices reported in the EIA June 2013 Short-term Energy Outlook. Rate of price increase is also derived from the EIA. |
| IP Rate: | 5800 Mcf/day and 11563 Mcf/day |
| Decline Curve: | Hyperbolic with curve derived by Penn State University Marcellus Center for Outreach and Research. |

**Congdon & Company Inc.** *Real Estate Appraisals and Consulting*

*Loss Estimates as of 7/1/2013*

| IP rate | 07/2009-06/2013 $/acre | 07/2013 On - NPV $/acre |
|---|---|---|
| 5800 Mcf/day | $8,557 | $5,161 |
| 11563 Mcf/day | $17,059 | $10,288 |

*Example*

*Cumulative Royalties Lost on a 200 acre Parcel*
200 acre parcel with 5,800 Mcf/day IP rate
200 acres x $8,557/acre = $1,711,400 Past Loss from 7/1/2009-6/30/2013
200 acres x $5,161/acre = $1,032,200 Future Loss from 7/1/2013 onward

200 acre parcel with 11,563 Mcf/day IP rate
200 acres x $17,059/acre = $3,411,800 Past Loss from 7/1/2009-6/30/2013
200 acres x $5,161/acre = $2,057,600 Future Loss from 7/1/2013 onward