**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NOLEN SCOTT ELY, et al.,** | : | **Civil No. 3:09-CV-2284** |
| | : | |
| **Plaintiffs** | : | **(Judge Jones)** |
| | : | |
| **CABOT OIL & GAS** | : | **(Magistrate Judge Carlson)** |
| **CORPORATION, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

This lawsuit was initiated on November 19, 2009, by a group of 44 Plaintiffs who collectively filed suit to recover damages for injuries and property damage allegedly suffered as the result of the Defendants' natural gas drilling operations in Dimock Township, Susquehanna County, Pennsylvania.  Subsequent to this case being filed, a number of the Plaintiffs reached settlement agreements with the Defendants, and at this juncture only 10 Plaintiffs remain in the case.  Those Plaintiffs include Nolen Scott Ely and Monica L. Marta-Ely, individually, and as parents and natural guardians of their three minor children (the "Elys" or "Ely Family"); Nolen Scott Ely, as Executor for the Estate of Kenneth R. Ely ("Estate"); and Ray and Victoria Hubert, individually, and as the parents and natural guardians of one minor child, and a child who has since reached the age of majority, Angel Hubert ("Huberts") (collectively, "Plaintiffs").

The claims of the Plaintiffs are now subject to multiple pending dispositive motions filed by Defendants Cabot Oil & Gas Corporation ("Cabot") and GasSearch Drilling Services Corporation ("GDS") (collectively, "Defendants").  In the motion currently before the Court, the Defendants have moved for summary judgment on the Claims of the Ely Family.  Included among the Ely Family's claims set forth in the second amended complaint that are subject to the motion are claims for breach of contract, fraudulent inducement, private nuisance, negligence and negligence *per se*, claims for medical monitoring, and alleged violations of a variety of Pennsylvania environmental laws.[1]  Notwithstanding the variety of claims that the Elys allege in this case, a careful analysis of the allegations in the Second Amended Complaint, and

---

[1]  In addition, the Plaintiffs brought claims alleging that the Defendants natural gas drilling activities, including hydraulic fracturing, constituted abnormally dangerous activities subject to strict liability under Pennsylvania law. The Defendants moved separately for summary judgment on that particular claim, and review of the Plaintiffs' collective brief in opposition to the pending motions for summary judgment reflects that the Plaintiffs had placed the greatest emphasis in this litigation on obtaining a ruling that natural gas drilling, and hydraulic fracturing, should be deemed abnormally dangerous or ultra-hazardous activities subject to strict liability under Pennsylvania law – something that no court in Pennsylvania has ever held to be the law.  Finding that the Plaintiffs failed to come forward with sufficient evidence to show that these activities are ultra-hazardous, and concluding that the Pennsylvania courts would not deem natural gas drilling activities to be subject to strict liability as a matter of law, the undersigned has issued a report and recommendation that the motion for summary judgment on the Plaintiffs' strict liability claims be granted.  (Doc. 489.)  That report and recommendation remains pending.

of the voluminous documents that the parties have submitted in support of and opposition to the motion, makes it clear that the primary thrust of the Elys' claims is that the Defendants' oil and gas drilling activities have caused injury to the Elys' access to safe water from a well on the property where they live.  Although this appears to be the central theme in the Elys' allegations, the Defendants have addressed each of the asserted claims in the motion for summary judgment, and we consider these claims separately below.

The Defendants initially argue that under any legal theory, the Elys have failed to prove damages to property, or for medical claims, or for lost royalties that allegedly could have been earned under oil and gas leases.  Next, the Defendants maintain that the Ely's own testimony negates their claims for breach of contract, fraudulent inducement, medical monitoring and their claims for violations of Pennsylvania environmental laws.  The Defendants contend that the Elys' negligence claims fail because they have not produced expert evidence that the Defendants suggest is necessary to demonstrate the applicable standard of care relevant to the negligence claim.

Finally, the Defendants move for summary judgment on the Ely's claims for private nuisance, in which they aver that the Defendants' drilling activities have contaminated the family's water supply, and, therefore, unreasonably interfered with

the family's use and enjoyment of their property.  With respect to this claim, the Defendants first argue that the Elys have no evidence of an intentional and unreasonable invasion of property necessary to support a claim for nuisance, and they also contend that the Elys have not shown that the Defendants acted negligently, or that the Elys suffered significant harm, and thus they argue that the claims for nuisance should fail as a matter of law.

Upon consideration, we agree with the Defendants that many of the Ely's claims fail for lack of evidentiary or legal support, and thus we will recommend that the Defendants' motion be granted in most respects.[2]  However, we find that the

---

[2] We also do not agree with the Plaintiffs' suggestion that summary judgment should be denied or delayed in order to permit the Plaintiffs to undertake more discovery in a case that is now approximately four and one-half years old, where the Plaintiffs were, for a considerable period of time, represented by counsel and nevertheless failed to adduce facts in support of most of their claims during that time.  We have endeavored to be lenient with the Plaintiffs as they have undertaken representation on their own behalf, without the benefit of counsel.  To that end, we have entertained, and granted, multiple requests for extensions of time to permit the Plaintiffs an opportunity to contest the Defendants' motions.  However, the Plaintiffs have merely suggested that other evidence contained within deposition transcripts or other materials that the Plaintiffs have never obtained or reviewed *might* be relevant to the claims in this case.  This showing is, frankly, insufficient at this late stage of the litigation.  We have, over the Defendants' well-argued motion to strike these materials, permitted the Plaintiffs' belated submission of affidavits and supplemental reports from their experts in this case, and in some narrow respects these late-filed materials have provided additional support for the Ely Family's and the remaining Plaintiffs' negligence claims.  Although the admission of these late-filed materials has to some degree prejudiced the Defendants, we nonetheless found that the interests of

record contains sufficient evidence that would allow the Ely Family to pursue claims for negligence and private nuisance under Pennsylvania law.

The Elys have provided evidence indicating that Cabot's negligently conducted drilling activities may have negatively impacted the Ely's water supply, may have caused injury to the property and caused the Elys to suffer damages, and may further have caused the Elys to resort to obtaining potable and usable water from outside vendors and sources at their own expense. Although these claims are far narrower than those the Elys have attempted to prosecute in this case, and although the evidence offered in support of these claims is somewhat limited, we conclude that there are sufficient disputed issues of fact regarding alleged pollution of the Elys' water supply and invasion of the family's right to the enjoyment of their land to

---

justice favored allowing consideration of these materials. However, we do not reach the same conclusion with respect to the Plaintiffs' Rule 56(d) request, as we do not believe that the Plaintiffs have shown that they are entitled to undertake still more discovery in a case that has stretched on for years, where the Plaintiffs are impermissibly vague about what such further discovery might reveal. The Plaintiffs have failed to come up with evidence in support of the majority of their claims, and it is submitted that the Defendants are entitled to have judgment entered in their favor on these claims. We do find, however, that the evidence in the record taken in the light most favorable to the Elys compels denial of the Defendants' motion with respect only to the Plaintiffs' negligence and nuisance claims, which relate principally to the Defendants' alleged pollution of their water supply.

withstand the Defendants' motion for summary judgment with respect to the claims for negligence and nuisance.

## II.   BACKGROUND

The Elys reside on an 8.28 parcel of real property located in Dimock Township, in Susquehanna County, Pennsylvania.  Nolen Scott Ely and his wife, Monica, have spent a number of years constructing what Nolen Ely described as a 7,000 square foot "dream home" for their family on a portion of the property, which is part of land that has been owned by Nolen Ely's family for multiple generations.  Nolen Ely has testified that the property has extraordinary value to him, and indeed that he would not part with the property for any amount of money.

The Ely property is the subject of an oil and gas lease granted to Cabot by "Nolen Scott Ely, a married man dealing in his sole and separate property," dated June 4, 2007 ("Lease").  (Def. SMF ¶ 10; Doc. 391, Ex. C, Declaration of Jeffrey Keim ("Keim Decl."), Ex. B.)  Defendant GDS is not a party to the Lease.  (Def. SMF ¶ 11.)  Neither Marta Ely nor the minor children are parties to the Lease, and the Property leased is identified as Nolen Ely's sole and separate property.  (Id. ¶ 13.)  Although Nolen Ely added his wife as a co-owner of the Property in 2010, he has never assigned any interest in the Lease to her and she has never become a party thereto.  (Id. ¶ 14.)

6

The purpose of the Lease is "exploring by geophysical and other methods, drilling, and operating for and producing" oil and gas on the Property.  (Keim Decl. and Lease, Ex. B thereto.)  The Lease grants Cabot the right to pool or combine all or any part of the leased premises with any other land in the vicinity of the leased premises into one or more units for production of oil and gas, as provided in Paragraph 5 of the Lease.  (Id.)

Paragraph 1 of the Lease provides that the rights granted to Cabot include "laying pipelines, storing oil, building roads, tanks, power stations . . . and things thereon as necessary, useful or convenient to produce, save, take care of, treat, process, store and transport" such oil and gas.  (Id.)  Paragraph 8 of the Lease grants to Cabot the right of "ingress and egress" along with the right to conduct operations as may be reasonably necessary, such as "geophysical operations, the drilling of wells, and the construction and use of roads, canals, pipelines, tanks, water wells, injections wells, pits . . . and other facilities to discovery, produce, store, treat and/or transport production."  (Lease, ¶ 8.)

In an addendum to the Lease, Cabot is obligated to "test Lessor's domestic water supply (as to quality and quantity) prior to commencement of, and following, drilling operations on said land in order to ensure that said water supply is not adversely affected by said operations.  In the event it is determined that said

operations have adversely affected said water supply, then immediately Lessee, at it's [sic] own expense, shall take all steps necessary to return said water supply to pre-drilling conditions." (Keim Decl., Ex. C, Lease, Addendum ¶ 3.)

An addendum to the Lease provides, among other things, that Lessee shall: (1) construct or install all well sites, access roads and pipeline right-of-ways in a manner which would minimize any related soil erosion; and (2) plan surface operations in a manner that will reduce or minimize the intrusion to crop fields. (Keim Decl., Ex. C, Lease, Addendum ¶¶ 5, 7.)

The Lease contains an integration clause, which provides: "This lease embodies the entire agreement between the parties and no representation or promise on behalf of either party shall be binding unless contained herein or mutually agreed to in writing by all parties hereto. This agreement shall be binding upon each Lessor who shall execute the same and upon Lessee from and after the date of delivery to Lessee or its representative by the executing Lessor." (Keim Decl., Ex. C, Lease, ¶ 15.)

Cabot did not make any express warranties in the Lease, and the Lease does not contain a promise by Cabot that royalties under the Lease would not decline. (Keim Decl., Ex. C, Lease.) Instead, the Lease requires Cabot to pay Nolen Ely a percentage of the amount realized from the sale of gas at the well ("Royalty"), but the Lease does

not contain any provision that warrants either the timeliness or regularity of Royalty payments.  (Keim Decl., Ex. C, Lease, ¶ 3.)

No provision in the Lease expressly addresses safety, and there is no provision in the Lease warranting that persons or property will be "safe and undisturbed." (Keim Decl., Ex. C, Lease.)

Cabot has not conducted drilling operations on the Property, and there are no horizontal well bores underlying any portion of the Property.  (Declaration of John Papso, App. Ex. D at ¶¶ 4-5; Deposition of Nolen Scott Ely ("NS.Ely Dep."), App. Ex. B at 111:5-14.)  There is no pipeline constructed on or under the Property. (NS.Ely Dep. at 111:5-14.)  Nolen Ely testified that he receives royalty statements and payments from Cabot.  (NS Ely Dep. at 110:15-23.)  There is no evidence that the royalty payments have been inaccurate, irregular or untimely, although Nolen Ely has since submitted an affidavit in which he attested that royalties never amounted to much more than $2.50 per acre, and that he believes "[t]here is no rhyme or reason as to how or what they pay."  (Doc. 426-2, Affidavit of Nolen Scott Ely at ¶ 35.)

Nolen Ely testified that prior to signing the Lease, Cabot represented that it: (1) would not drill on the Property; (2) would not put a pipeline through the Property; (3) would not build a pad in front of his house; and (4) would not "mess with" his water.  (NS.Ely Dep. at 89:20-90:14.)  Ely also testified that prior to signing the

Lease, Cabot told him that if he declined to enter into the Lease, Cabot could drill a well on other property and "take" or drain gas reserves from under his Property. (NS.Ely Dep. at 89:1-4; 102:10-18; 103:9-23.)  In the complaint, Nolen Ely alleges that Cabot told him that he did not need to have the Lease reviewed by a lawyer, (Compl., ¶ 109(c)), and Ely testified that he "never even [gave] a thought" to having a lawyer look at the Lease because he "didn't think it was a big deal."  (NS.Ely Dep. at 106:24-107:6.)[3]

Nolen Ely has alleged that someone from Cabot told him that he could expect to receive monthly royalty payments of $25 to $100 per acre, but he testified that the amount of money he expected to receive did not induce him to enter into the Lease. (NS.Ely Dep. at 99:20-24; 100:1-4.)  Instead, Nolen Ely testified that he was induced to sign the Lease only by one alleged representation – that Cabot would drain his gas regardless of whether he signed the Lease.  (NS.Ely Dep. at 88:21-89:7; 99:10-24; 103:24-104:12.)  For her part, Monica Ely cannot recall being present for any pre-Lease conversations between her husband and Cabot, and she does not recall seeing any Cabot representative having pre-Lease discussions with Nolen Ely.  (Doc. 393,

---

[3] During his deposition, rather than testifying that Cabot affirmatively told him he did not need the assistance of a lawyer to review the Lease, Nolen Ely testified that Cabot did not suggest that he seek legal counsel.  (NS.Ely Dep. at 107:7-11.)

Ex. A, Deposition of Monica Ely ("M.Ely Dep."), at 223:17-21; 224:6-225:12; 228:22-229:11.)  Monica Ely never had any pre-Lease communications with any Cabot representative.  (Id.)

Despite claiming that Cabot damaged their property, the Elys testified that they have not expended any money to repair or remediate the Property.  (M.Ely Dep. at 403:12-16; NS.Ely Dep. at 303:21-304:2.)  The record does not contain evidence that the Elys expect to incur any response costs or other cost in the future.  There is also no evidence in the record that the Elys have incurred costs for a health assessment or health effects study.

The primary thrust of the Elys' claims against the Defendants is that drilling operations at the so-called Gesford 3 and Gesford 9 wells, which are within 700 feet of the Elys' water supply, have contaminated their well water with methane and other shallow gas sources, and drilling mud and other drilling materials.  In his Affidavit in Opposition to Defendants' Motions for Summary Judgment and Partial Supplemental Expert Report, Paul Rubin, a hydrologist, has attested that the aquifer supplying the Elys' water well has been compromised and contaminated by Cabot's drilling activities, leading to "highly variable methane concentrations in the Scott Ely and Hubert wells" from gas drilling activities, and that such contamination can be expected to last for decades, or even a century or more.  (Doc. 426-4, Affidavit of

Paul A. Rubin ("Rubin Aff.") at ¶ 11.)  Another of the Plaintiffs' expert witnesses, Anthony Ingraffea, a professor of engineering at Cornell University, has opined that the contamination of this water supply is the direct result of the Defendants' negligently conducted drilling operations in the vicinity of the Elys' home.  (Doc. 426-4, Affidavit of Anthony Ingraffea ("Ingraffea Aff.") at ¶¶ 12, 14.)

In an affidavit, Nolen Ely attested that prior to the commencement of drilling operations in the area, his family had never had any issue with the "appearance, palatability, condition, drinkability or potability" of their well water.  (Doc. 426-2, Affidavit of Nolen Scott Ely ("NS.Ely Aff.") at ¶ 41.)  Likewise, Nolen Ely attested that prior to the commencement of drilling operations the Property had never been exposed to any kind of industrial accident, spill, or contamination of any kind.  (Id. ¶ 43.)  Nolen Ely installed the well on the Property in 2003 to a depth of 300 feet, and it is encased in 60 feet of well casing and is grouted.  (Id. ¶ 45.)  Prior to Cabot's drilling operations, there was no stray methane on or around the Property or its well, and the Elys' well water was sampled, tested and analyzed and was found to be free of heavy metals, dissolved solids, methane, propane and ethane.  (Id. ¶ 48.)

However, subsequent to gas operations in the area, Nolen Ely attested that his water was sampled pursuant to the direction of the Pennsylvania Department of Environmental Protection, and revealed the "acute and continuing presence of

12

explosive levels of free methane in the wells heads and elevated concentrations of dissolved methane" in the water.  (Id. ¶ 52.)

In January 2009, pursuant to direction from the Department of Environmental Protection, the Elys' water well was shut off and their water supply was replaced by the installation of an external system that involved hooking up the house plumbing to a 320-gallon plastic container known as a "water buffalo," which was placed in an out-building on the Property.  (Id. ¶ 54.)  Until June 12, 2013, either Cabot or Nolen Ely brought in potable water to fill the water buffaloes for non-consumption, home water use, typically three times a week but sometimes as often as daily.  (Id. ¶ 55.) It appears that for a time Cabot was supplying the family with drinking water, but this stopped sometime in 2012, and since then the Elys have had to obtain water "by their own methods and at their own expense."  (Id. ¶ 55 n.4.)  According to Nolen Ely, Cabot had offered to connect a treatment system to his well water system, but he has apparently refused because he believes that this is "in fact [a] science lab, an ongoing experiment, requiring an electricity source and house of its own."  (Id. ¶ 56.) Moreover, Nolen Ely testified that other treatment systems that have been installed at nearby properties have failed and are not an adequate solution to the problem.  (Id. ¶¶ 57-58.)

Nolen Ely testified that in 2012 he was told by numerous individuals, including representatives of the Environmental Protection Agency, the Centers for Disease Control and elsewhere that he and his family should not use or drink the water from the well. (Id. ¶ 61.)

In 2004, the Elys began clearing a space on the Property where Nolen Ely set about building "the home [he] had always promised" to construct for his wife. (Id. ¶ 64.) The family continued to build the home for years, even after growing concerned about well-water contamination in the area, and after initiating this lawsuit. The Elys have spent close to $1,000,000 in connection with building the home, and they have conserved the resources needed for this effort by having Nolen Ely complete a substantial amount of the work himself. (Id. ¶¶ 65-75.) Nolen Ely represents that the house has been a significant investment for the family, and although the house is their "dream home," Monica Ely now believes that the house has been "a big mistake" because of the contamination in the area. (Id. ¶ 76.) Nolen Ely testified that the well on the Property is "permanently contaminated," and has been plugged. (Id.)

Nolen Ely testified that in 2007 the Property was worth $180,000, but the 7,000 square foot home he has constructed on the Property is alone worth at least $750,000. (NS.Ely Dep. at 245:5-247:19.) Despite the size of their investment, the Elys now

14

"don't know if [they] could get a buyer to pay anything near the fair market value of [the] house because it is in the 9 mile affected zone and has no potable water." (Id.) Likewise, Nolen Ely believes it would be difficult for a buyer to obtain a mortgage for the Property. (Id.)  Consequently, the Elys claim to feel stuck:  "We don't want to move but the current damage we experienced to our water supply has us trapped in our dream house without the most basic thing in life, a safe, reliable water source." (Id.)

## III.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Kreschollek v. S. Stevedoring Co., 223 F.3d 202, 204 (3d Cir.2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to th/e nonmoving party.  See Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir.1998) (citing Peters v. Delaware River Port Auth. of Pa. & N.J., 16 F.3d 1346, 1349 (3d Cir.1994)).  The moving party bears the burden of establishing that no genuine issue of material fact remains.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  "[W]ith respect to an issue on which the

15

nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'-that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> Fed.R.Civ.P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." <u>Schoch v. First Fid. Bancorporation</u>, 912 F.2d 654, 657 (3d Cir.1990); <u>see also</u> <u>Gleason v. Norwest Mortg., Inc.</u>, 243 F.3d 130, 138 (3d Cir.2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial .... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial." Katz v. Aetna Cos. & Sur. Co., 972 F.2d 53, 55 (3d Cir.1992) (quoting Celotex, 477 U.S. at 322–23).

Where a party fails to address the other party's properly supported assertion of fact, the court may consider "grant[ing] summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it...." Fed. R. Civ. P. 56(e). Local Civil Rule 56.1(a) deems a movant's statement of material facts undisputed where a party does not respond or file a counterstatement.  L.R. 56(a).  A failure to dispute a party's statement of material facts, however, "is not alone a sufficient basis for the entry of a summary judgment." See Anchorage Assocs. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir.1990) (holding that even where a local rule deeming unopposed motions to be conceded, the court was still required to analyze the movant's summary judgment motion under the standard prescribed by Fed.R.Civ.P. 56(e)); see also Muskett v. Certegy Check Servs., Inc., Civ. No. 08–3975, 2010 WL 2710555 (D.N.J. July 6, 2010) ("In order to grant Defendant's unopposed motion for summary judgment, where, as here, 'the moving party does not have the burden of proof on the relevant issues, ... the [Court] must determine that the deficiencies in [Plaintiff's] evidence

designated in or in connection with the motion entitle the [Defendants] to judgment

as a matter of law.' " (quoting <u>Anchorage Assocs.</u>, 922 F.2d at 175)).

## IV.   <u>DISCUSSION</u>

### A.   **The Elys' Breach of Contract Claims Fail Because There is No Factual or Legal Support for the Claims**

#### 1.   **Governing Law and Overview of the Elys' Claims**

In order to prevail on a claim for breach of contract under Pennsylvania law,

a plaintiff must prove:  (1) the existence of a contract, including the essential terms

of the contract; (2) breach of a duty imposed by that contract; and (3) resulting

damages.  <u>CoreStates Bank, Nat'l Ass'n v. Cutillo</u>, 723 A.2d 1053, 1058 (Pa. Super.

Ct. 1999); <u>T.W. Phillips Gas & Oil Co. v. Jedlicka</u>, 42 A.3d 261, 267 (Pa. 2012) (oil

and gas leases are contracts).  It is undisputed that the Nolen Ely and Cabot are

parties to the Lease; Defendant GDS is not a party to the Lease and thus it is entirely

unclear how the Nolen Ely could maintain a breach-of-contract claim against GDS

predicated on the Lease between him and Cabot.  In this case, Nolen Ely alleges that

Cabot breached its contractual obligations in the Lease by failing to:  (1) test and/or

restore the Ely's water supply; (b) provide timely royalty checks; and (c) keep the

Property and persons "safe and undisturbed."  (Second Am. Compl., ¶¶ 90-92, 93,

95.)

## 2.   Cabot Did Not Breach an Obligation to Test or Restore the Ely's Domestic Water Supply

Nolen Ely first claims that Cabot breached the terms of the Lease by failing to test or restore the water supply on the Property.  Although the Lease does contain a provision requiring Cabot to test and restore the domestic water supply on the Property subject to the Lease at such time that drilling operations are conducted on the Property, the undisputed facts show that this provision has not been triggered and has not been violated.

Thus, this initial breach-of-contract claim fails for straightforward, largely factual, reasons since the provision in the Lease that requires Cabot to test or restore the domestic water supply on the Property is only applicable at such time as drilling operations are conducted on the Property.  (Def. SMF ¶ 19) ("Lessee shall test Lessors' domestic water supply prior to commencement of, and following, *drilling operations on said land*.") (emphasis added).  There is no dispute in this case that there have been no drilling operations on the leased premises, and indeed there is no dispute that there are no horizontal well bores underlying any portion of the Property that is subject to the Lease.  Furthermore, we agree with Cabot that even if Nolen Ely were to argue that drilling operations "on said land" means "on or under" the Property, it is undisputed that there are no horizontal well bore underlying any portion

19

of the Property.  Accordingly, the provision in the Lease requiring the testing or restoration of the domestic water supply on the Property was never triggered, and Cabot thus did not breach any alleged obligation to test Nolen Ely's water supply.

Second, because Cabot did not conduct any drilling operations on the Property, Cabot had no contractual obligation to "return said water supply to pre-drilling conditions." (Def. SMF ¶ 29.)  Since Cabot's contractual obligation to restore the Ely's water supply was only triggered by the commencement of drilling operations, and because Cabot has conducted no such drilling operations on or under the Property, Cabot had no contractual obligation to return the water supply to "pre-drilling conditions".

### 3.    Cabot Did Not Breach An Obligation to Pay Royalties

The Second Amended Complaint also avers that Cabot breached a royalties "warranty" provision in the Lease by because the payments made "have been untimely, irregular and declining, without opportunity or mechanism to verify their correctness and accuracy." (Second Am. Compl. ¶¶ 93-94.)  However, the evidence in the record shows not only that Cabot complied with its obligation to make royalty payments under the Lease, but also that Nolen Ely has no evidence that Cabot breached its royalty payment obligations.

Contrary to any suggestion in the Second Amended Complaint, the Lease does not require Cabot to make "timely, certain or regular" payments. Instead, the Lease requires Cabot to pay a percentage of the amounts that are realized from sale of gas at the well, and does not provide for the timing or regularity of this payment. (Def. SMF ¶¶ 23-25.) The Lease does not contain any provision that warrants the timeliness, regularity, or amount of royalty payments. (Id.) Even if a warranty to pay royalties existed, it would appear that there was no breach of such obligation since it is undisputed that Nolen Ely received royalty statements and checks from Cabot. (Id. ¶ 32.)

Lastly, Nolen Ely has not come forward with any evidence to show that he has suffered damages as a proximate result of any breach of Cabot's obligation to pay royalties. The expert report and opinion that the Elys rely upon is inadequate to support the claim, since the expert, Robert Congdon, does not relate his opinions to the Property, the Lease, or to any alleged breach. Thus, as a factual and legal matter, the Ely's contract claim relating to royalty payments fails and summary judgment is appropriate.

**4.      Cabot Did Not Breach the Lease By Failing to Keep the Property Safe and Undisturbed**

Nolen Ely also alleges that Cabot breached the Lease by failing to ensure that the "land, persons and environs would remain safe and undisturbed." (Second Am. Compl., ¶ 95.)  Review of the Lease, however, makes clear that there was no such contractual warranty embedded in the Lease.

First, the Lease does not contain any express warranties. (Lease; Keim Decl.) There is no provision anywhere in the Lease that addresses safety, or that warrants that persons and property will be "safe and undisturbed." (Id.)  Indeed, rather than warranting against harm to property, the Lease expressly authorizes Cabot to utilize the Property to engage in drilling operations, including "drilling of wells, and the construction and use of roads, canals, pipelines, tanks, water wells, injection wells, pits . . . and other facilities to discover produce, store, treat and/or transport production." (Def. SMF ¶ 18.)  The Lease contemplates that the land and environs will be disturbed to permit Cabot to engage in drilling activity; in contrast, the Lease says nothing at all about keeping persons and property "safe and undisturbed." Moreover, not only does the Lease not require that Cabot keep the land and environs "undisturbed," it authorizes Cabot to make significant changes to the Property – that is, in fact, one of the core purposes of the Lease agreement.

For the foregoing reasons, the Defendants are entitled to summary judgment on Nolen Ely's claims for breach of contract.

## B.     The Ely' Fraud Claims Fail

The Elys next claim that the Defendants fraudulently induced them to enter into the Lease.   (Second Am. Compl. ¶¶ 101, 109(a)-(e).)   The claim, however, is foreclosed as a matter of both fact and law.

As an initial matter, neither Monica Ely nor any of the Ely children are party to the Lease, and there is no apparent basis for any of these Plaintiffs to maintain claims for fraudulent inducement to enter into a contract to which none are a party. Additionally, GDS is not a party to the Lease, and, therefore, we do not perceive how Nolen Ely could maintain a claim for fraudulent inducement against GDS, to say nothing of the fact that there is no evidence to show that any employee of GDS engaged in fraud to induce Nolen Ely to enter into the contract with Cabot.  Thus, the fraudulent inducement claim is limited to Nolen Ely and Cabot.

In order to prove a claim for fraudulent misrepresentation under Pennsylvania law, Nolen Ely has the burden of proving the following elements:   (1) a representation; (2) which is material to the transaction; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the

misrepresentation; and (6) resulting injury that is proximately caused by the reliance. Kostryckyj v. Pentron Laboratory Technology, LLC, 52 A.3d 333, 338 (Pa. Super. Ct. 2012) (quoting Hart v. Arnold, 884 A.2d 316, 339 n.7 (Pa. Super. Ct. 2005)). "Unsupported assertions and conclusory accusations cannot create genuine issues of material fact as to the existence of fraud." Hart, 884 A.2d at 339 n.7.  Moreover, it is well-established that the party asserting a claim of fraud has a "very high standard" of proof, Kostryckyj, 52 A.3d at 338, and must come forward with evidence that is "clear, precise and convincing", Yoo Hoo Bottling Co. of Pennsylvania, Inc. v. Leibowitz, 247 A.2d 469, 469 (Pa. 1968) (per curiam).

In this case, Nolen Ely's claim that Cabot fraudulently induced him to enter into the Lease by: (1) misrepresenting that there would be no risk of property damage from drilling activities; (2) asserting that "Cabot would take gas from their land whether they signed the lease or not"; (3) failing to explain the pre- and post-drilling water testing that was required under the Lease and what could be expected if the integrity of their water was harmed in any way; (4) failing to mention that an attorney should review the Lease; (5) misrepresenting that all of their neighbors had already signed oil and gas leases with Cabot; and (6) misrepresenting when they would receive royalty checks.  (Compl. ¶ 109(b), (c).)  These claims fail for a number reasons, among them:  Nolen Ely negated these claims through his own testimony that

the statements were never made; there is no evidence to show that Cabot knowingly made a false representation that was intended to induce Nolen Ely to sign the Lease; there is no evidence of reliance and, in any event, the Lease contains an integration clause that negates Ely's alleged reliance. Additionally, Ely has not come forward with evidence of damages caused by the alleged misrepresentations. We begin first with the Lease's integration clause.

The parol evidence rule bars evidence of "previous oral or written negotiations or agreements involving the same subject matter as the contract . . . to explain or vary the terms of the contract." Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436-37 (Pa. 2004). The reason for this rule is to uphold the integrity of a written contract, which Pennsylvania law deems to be the best embodiment of the parties' true agreement. Rose v. Food Fair Stores, Inc., 262 A.2d 851, 853 (Pa. 1970).

The issue of whether a writing constitutes an integrated contract is a matter of law. See Haywood v. Univ. of Pittsburgh, No. 11-1200, 2013 WL 5466958, at *25, – F. Supp. 2d – , (W.D. Pa. Sept. 30, 2013). A written contract is "integrated" where it represents the final and complete expression of the parties' agreement. Kehr Packages Inc. v. Fidelity Bank, N.A., 710 A.2d 1169, 1173 (Pa. Super. Ct. 1998). In order to determine whether a writing is the parties' complete expression of their agreement, the court must examine the writing and "if it appears to be a contract

complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the [parties'] engagement, it is conclusively presumed that [the writing represents] the whole engagement of the parties." Haywood, *supra*, 2013 WL 5466958, at *25 (quoting Gianni v. R. Russel & Co., 126 A. 791, 792 (Pa. 1924).

An integration clause which states that a writing is intended to present the parties' entire agreement is "a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution." Yocca, 854 A.2d at 436.  The effect of an integration clause "is to make the parol evidence rule particularly applicable." Haywood, *supra*, 2013 WL 5466958, at *26 (citing Hart v. Arnold, 884 A.2d 316, 341 (Pa. Super. Ct. 2005).

In this case, the Lease contains an integration clause in paragraph 15, which states as follows:

> This lease embodies the entire agreement between the parties and no representation or promise on behalf of either party shall be binding unless contained herein or mutually agreed to in writing by all parties hereto.  This agreement shall be binding upon each Lessor who shall execute the same and upon Lessee from and after the date of delivery to Lessee or its representative by the executing Lessor.

(Def. SMF ¶ 21; see also Lease ¶ 15.)  Another court in this district considering identical language in another Cabot lease found that the integration clause was "a

clear sign that the agreement is integrated." Kropa v. Cabot Oil & Gas Corp., 609 F. Supp. 2d 372, 376 (M.D. Pa. 2009) (Munley, J.)

The parol evidence rule bars the admission of evidence that is contrary to the express terms of the written agreement "unless it is admitted [by the contracting party asserting the parol evidence rule] that the whole agreement is not set forth in the writing." Domino's Pizza LLC v. Deak, 383 F. App'x 155, 159 (3d Cir. 2010) (quoting Scott v. Bryn Mawr Arms, Inc., 312 A.2d 592, 595 (Pa. 1973)). The party seeking to introduce parol evidence bears the burden of establishing that the agreement between the parties, as written, is incomplete. Id. Moreover, the party seeking to introduce parol evidence must demonstrate through clear, precise and convincing evidence that the contract is incomplete and not integrated. Id.

Furthermore, even if we were to disregard the integration clause in the Lease, we would still find that Cabot would be entitled to summary judgment because Nolen Ely failed to present evidence to show that Cabot representatives actually made false statements with knowledge that the statements were false, and with the intent to induce him to enter into the Lease. See In re Allegheny Int'l, Inc., 954 F.2d 167, 178 (3d Cir. 1992) (fraudulent inducement requires proof that the alleged misrepresentation was made with intent to induce another to enter into the contract); Ira G. Steffy & Son, Inc. v. Citizens Bank of Pennsylvania, 7 A.3d 278, 290 (Pa.

Super. Ct. 2010) (defendant's knowledge of the untrue nature of the representation is a necessary element in a fraudulent inducement claim).   In this case, Ely has not offered any evidence to show that Cabot, through its representatives, knowingly made false statements with the intent to induce him to enter into the Lease that they now claim they did not understand.

In addition, even if we were to consider the alleged misrepresentations to support a bare showing of fraud in this case, it appears that a number of the statements complained of are actually true statements.  Although the Plaintiffs alleged that Cabot represented that there would be "no risk" of damage from drilling, (Compl., ¶ 109(b)), during Nolen Ely's deposition he testified that Cabot actually represented to him that there would be no drilling on his property, no pipeline would be run through his property, and "they weren't going to mess with" the family's water.  (Def. SMF ¶ 33.)  The evidence shows that these were not false statements, since Cabot has not, in fact, conducted drilling operations on the Property, and no horizontal well bores run through the Property.  Furthermore, to the extent that Ely argues that the rule of capture does not apply to oil and gas embedded in shale formations, he has provided insufficient legal support for this claim, and the United States Court of Appeals for the Third Circuit has seemingly observed to the contrary that "[u]nder Pennsylvania law, oil and gas resources are subject to the 'rule of

capture,' which permits an owner to extract oil and gas even when extraction depletes a single oil or gas reservoir lying beneath adjoining lands.  The adjoining owner's only remedy against such drainage is to 'go and do likewise.'"  <u>Minard Run Oil Co. v. U.S. Forest Serv.</u>, 670 F.3d 236, 256 (3d Cir. 2011).

Finally, there is no evidence to show that Ely suffered any damages as a result of these asserted false statements.  This is another critical shortcoming in this case, since a party seeking to recover damages for fraudulent inducement must show that the alleged fraud caused economic harm.  <u>Solarchick v. Metro. Life Ins. Co.</u>, 430 F. Supp. 2d 511, 514 (W.D. Pa. 2006) ("In fraud actions, compensatory damages are defined by the Plaintiffs' actual loss.") (internal quotations omitted) (citing <u>B & P Holdings I, LLC v. Grand Sasso Inc.</u>, 114 F. App'x 461, 467 (3d Cir. 2004)).  In the absence of actual damages, "causation effected by the deceit is of no legal consequence." <u>Neuman v. Corn Exch. Nat'l Bank & Trust Co.</u>, 51 A.2d 759, 766 (Pa. 1947) ("In an action for deceit of fraud in Pennsylvania, the plaintiff can recover only 'his actual loss' and not 'the value of his bargain'.")  Without evidence to show economic injury from the fraud, the claim fails.

For all of the foregoing reasons, it is recommended that the Court enter summary judgment in Cabot's favor with respect to the Plaintiffs' claim of fraudulent inducement.

### C.     The Ely's Claims Under the HSCA Fail as a Matter of Law and for Lack of Proof

To the extent the Elys are continuing to pursue a claim under the HSCA based upon an actual or threatened release of a hazardous substance on the Property, (Second Am. Compl. ¶¶ 53-63), the claim fails because there is no evidence of an actual or threatened release of a hazardous substance on the Property, and because the Elys have not incurred and apparently will not incur any response costs.

In order to prevail on a claim under the HSCA, the Elys bear the burden of proving:  (1) that Defendants are responsible parties under the Act; (2) there has been an actual or threatened release of hazardous substances on the Property; (3) responses costs were or will be incurred; and (4) the response costs were reasonable and necessary or appropriate.  In re Joshua Hill, Inc., 294 F.3d 482, 485 (3d Cir. 2002).

It is undisputed that the Elys have no evidence of any actual or threatened release of a "hazardous substance" on the Property.  (Def. SMF ¶ 67, 71, 80.)  It is also undisputed that the Defendants have not conducted any operations on the Property.  (Id. ¶ 30.)  Although the Plaintiff's expert, Anthony Ingraffea, attested that it was "highly likely" that contamination of the Ely's water supply with "drilling mud and other well drilling materials could have occurred," neither the Elys nor their

Igraffea have identified the release of any "hazardous substances" on the Property, as defined by the HSCA.

To the extent that the Elys were endeavoring to bring a claim under the HSCA for alleged release of methane or petroleum products into the water supply on the property where they live, it appears that these substances would be excluded from coverage under the HSCA in any event.  The HSCA expressly excludes from the definition of "hazardous substances" "petroleum or petroleum products, including crude oil or any fraction thereof, which are not otherwise specifically listed or designated as a hazardous substance under paragraph (1); natural gas, natural gas liquids, liquefied natural gas or synthetic gas usable for fuel or mixtures of natural gas and synthetic gas usable for fuel . . . ."  35 Pa. Cons. Stat. Ann. § 6020.103; United States Steel Co. v. Hoge, 468 A.2d 1380, 1382 (Pa. 1983) (including "mixtures of various hydrocarbons" and "methane" within the definition of "natural gas").  Since it appears the Elys may be complaining about an alleged spill of petroleum products or "natural gas", and because these substances do not fall within the definition of "hazardous substances" covered by the HSCA, this aspect of the claim plainly fails as a matter of law.

Moreover, even if the Elys had come forward with evidence of a spill of hazardous substances on the Property, the claim would still fail because the Elys have

31

not incurred, and apparently will not incur, any response costs to clean up such an alleged spill on the Property.   In order for a private party to recover damages under the HSCA, the party must demonstrate either (1) reasonable and necessary or appropriate response costs incurred by any other person or (2) the cost of a health assessment or health effects study.   35 Pa. Cons. Stat. Ann. § 6020.702(a)(3), (5). Reasonable and necessary or appropriate response costs exclude compensatory damages, lost property damage, or attorney's fees.   F.P. Woll & Co. v. Fifth & Mitchell St., Corp., No. 96-5973, 2005 WL 1592948, at *3 (E.D. Pa. July 1, 2005); see also Black v. Metso Paper USA, Inc., 240 F.R.D. 155, 161-62 (M.D. Pa. 2006).

The record shows that the Elys have not incurred any response costs, and they have not presented any evidence of costs incurred as part of a health assessment or health effects study, and we do not find any evidence to show that the Elys will incur response costs in the future.   (Def. SMF ¶ 48.)   In the absence of evidence of a spill of hazardous substances and the costs of responding to such an alleged spill, the Defendants are entitled to summary judgment on the Elys' HSCA claim.

For the foregoing reasons, the Defendants are entitled to summary judgment on the Huberts' claims under the HSCA.

### D.     The Elys' Negligence Claims Should Be Permitted to Proceed to Trial.[4]

---

[4] Our recommendation in this regard is limited to the Plaintiffs' traditional negligence claim, and does not extend to the Plaintiffs' claim for negligence *per se*. We agree with the Defendants that the Plaintiffs have failed to create a triable issue of fact with respect to their negligence *per se* claim. Negligence *per se* is defined as "[c]onduct, whether of action or omission, which may be declared and treated as negligence without any argument or proof as to the particular surrounding circumstances." Wagner v. Anzon, Inc., 684 A.2d 570, 574 (Pa. Super. Ct. 1996) (quoting White by Stevens v. SEPTA, 518 A.2d 810, 816 (Pa. 1987)). Pennsylvania law recognizes that a violation of a statute may serve as the basis for negligence per se, id., but a court will not use a statute as a basis for finding negligence per se where the purpose of the statute is to "secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public." Centolanza v. Lehigh Valley Dairies, 635 A.2d 143, 150 (Pa. Super. Ct. 1993). In order to prove a claim based on negligence *per se*, the following four elements must be satisfied: (1) the purpose of the statute must be, at least in part, to protect the interest of a group of individuals, as opposed to the public generally; (2) the statute or regulation must clearly apply to the conduct of the Defendants; (3) the Defendants must violate the statute or regulation; and (4) the violation of the statute or regulation must be the proximate cause of the Plaintiff's injuries. Kaplan v. Philadelphia Transp. Co., 171 A.2d 166 (Pa. 1961).

In this case, the Plaintiffs purported to bring a claim for negligence *per se* based upon the Defendants' alleged violations of seven statutes, including: the Pennsylvania Clean Streams Law, 35 Pa. Cons. Stat. Ann. §§ 691.1 et seq.; the Pennsylvania Solid Waste Management Act, 35 Pa. Cons. Stat. Ann. §§ 6018.101 et seq.; the HSCA; the Pennsylvania Oil & Gas Act, 58 Pa. Cons. Stat. Ann. §§ 2301 et seq., the Federal Solid Waste Disposal Act, 42 U.S.C. §§ 6901 et seq., the Federal Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 et seq.; and the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. However, aside from asserting these statutes as the bases for their negligence *per se* claim, the Plaintiffs have entirely failed to show with competent evidence that the Defendants actually violated these statutes. The Plaintiffs' mere allegation that the Defendants violated the statutes in some way is insufficient to show the existence of a genuine issue of fact, and the absence of evidence that the Defendants violated any of the statutes warrants granting

The Elys have also brought claims alleging either negligence or negligence *per se* under Pennsylvania law, based upon claimed spills or releases on the Property. Under Pennsylvania law, a negligence claim requires proof of (1) a duty of obligation recognized by law, obligating the Defendants to conform to a certain standard of conduct, (2) a breach of that standard of conduct, (3) a causal connection between the Defendants's conduct and the resulting injury, and (4) actual loss or damage. Kleinknecht v. Gettysburg College, 989 F.2d 1360, 1366 (3d Cir. 1993). A Plaintiff may bring a claim alleging negligence *per se*, which allows courts to adopt certain statutory requirements as the "standard of conduct" imposed upon the Defendant. But even assuming all other aspects of a negligence *per se* claim are satisfied – including showing that the statute in question was for the protection of a group of individuals rather than the public at large, that the statute applies to the Defendant, and that the Defendant violated the statute – the Plaintiff still must show that the alleged statutory violation caused the Plaintiff injury. Wagner v. Anzon, Inc., 684 A.2d 570, 574 (Pa. Super. Ct. 1996).

The Defendants have moved for summary judgment on the Plaintiffs' negligence claims on the grounds that the Plaintiffs have failed to come forward with evidence that the Defendants breached an applicable standard of care, and maintain

summary judgment in the Defendants' favor on the negligence *per se* claim.

that the Plaintiffs are unable to rely upon the numerous consent orders and settlement agreements that Cabot and the Pennsylvania Department of Environmental Protection entered into with respect to the Department's investigation into Cabot's drilling activities in Dimock Township. Those consent orders would appear to include information showing the Cabot's wells in the area near the Elys' property were negligently constructed, and that the domestic water wells used by the Elys and numerous others had been contaminated by methane gas as a result of Cabot's negligence. Notwithstanding the possible probative value of this evidence, Cabot cites to numerous decisions in which courts have held that consent decrees and settlement agreements may not be introduced as evidence to prove liability, in accordance with Rule 408 of the Federal Rules of Evidence. As Cabot avers that the Plaintiffs rely exclusively, and improperly, on the various consent decrees that the drilling company entered into with the DEP to prove liability, Cabot argues that the Plaintiffs have no competent evidence to show that Cabot breached an applicable standard of care. Secondly, Cabot argues that the Elys have come forward with no evidence of damages to property caused by Cabot's allegedly negligent drilling operations, and that they have no evidence to support claims for personal injury.

Upon consideration, we disagree that summary judgment is appropriate with respect to the Plaintiffs' negligence claim.

### 1.    There is Sufficient Evidence in the Record to Create a Triable Issue as to Whether the Defendants Breached an Applicable Standard of Care

As an initial matter, we are not persuaded that the Plaintiffs' asserted failure to identify the standard of care applicable to entities engaged in oil and gas operations compels summary judgment in this case.  As the presiding judge in this action observed in a related case, also brought against Cabot,

> The laws and regulations of the Commonwealth of Pennsylvania establish that entities engaging in gas drilling operations ***must do so in a manner that would not jeopardize the health, safety, and well-being of the citizens of the Commonwealth***.  See, e.g., 25 Pa. Code § 78.54 (requiring well operators such as the Defendants to "control and dispose of fluids . . . in a manner that prevents pollution of the waters of this Commonwealth"); 25 Pa. Code § 78.86 (requiring well operator to promptly remedy any defective, insufficient, or improperly cemented casing so as to prevent pollution); see also 58 Pa. Cons. Stat. § 3217(b) (establishing casing requirements so as to "prevent migration of gas or fluids into sources of fresh groundwater"); 58 Pa. Cons. Stat. § 3218(a) (requiring well operator who pollutes public water supply to restore the affected supply with alternative potable water source.

Roth v. Cabot Oil & Gas Corp., 919 F. Supp. 2d 476, 486 (M.D. Pa. 2013) (emphasis added).  Having identified numerous instances where oil and gas operators have been subjected by law to standards of care applicable to their drilling activities, and finding that a standard of care governing those operating in the oil and gas industry was

readily ascertainable, the district court found it "indisputable then that the Defendants, as owners and operators or drilling wells, are subject to a certain and articulable standard of conduct," thereby satisfying the first element of a common-law negligence claim in Pennsylvania. Thus, to the extent the Defendants are arguing that the Plaintiffs should be absolutely foreclosed from pursuing their negligence claims because they failed to identify an applicable standard of care, we disagree.

The Defendants argue, however, that even if there is a recognized standard of care, the Plaintiffs have failed to identify evidence to show a breach of that standard. In making this argument, the Defendants urge the Court to disregard the evidence of consent decrees entered that Cabot and the DEP entered into, and the Defendants argue that without the consent decrees, the Plaintiffs have no other competent evidence to prove breach. In making this argument, the Defendants argue that the Court should decline to consider evidence from the Plaintiff's engineering expert, Anthony Ingraffea, a professor at Cornell University, either because the evidence that Ingraffea offered should be stricken as untimely and otherwise improperly submitted, or because Ingraffea's opinions amount to nothing more than legal conclusions without factual support.

We agree with the Defendants that the Plaintiffs may not rely upon evidence contained within the consent decrees that Cabot and the DEP entered into during the

course of certain investigations in order to establish evidence of negligence.  Federal

Rule of Evidence 408 precludes the introduction of evidence of a party "furnishing

. . . a valuable consideration in compromising or attempting to compromise a claim"

and "conduct or statements made in compromise negotiations regarding the claim"

when "offered to prove liability for, invalidity of, or amount of a claim that was

disputed as to validity or amount, or to impeach through a prior inconsistent statement

or contradiction . . . ."  Fed. R. Evid. 408(a).  The policy behind the rule "is to

encourage freedom of discussion with regard to compromise," Affiliated

Manufacturers, Inc. v. Aluminum Company of America, 56 F.3d 521, 526 (3d Cir.

1995), and "the promotion of settlement of disputes, which would be discouraged if

offers of compromise were admitted."  2 McCormick on Evid. § 266 (6th ed.)

   Courts generally have found that Rule 408 applies to consent decrees.  See,

e.g., Wilson v. Parisi, No. 3:04-CV-1737, 2009 WL 151666, at *1 (M.D. Pa. Jan. 21,

2009);  Bowers v. Nat'l Collegiate Athletic Ass'n, 563 F. Supp. 2d 508, 536 (D.N.J.

2008);  N.J. Turnpike Auth. v. PPG Indus., Inc., 16 F. Supp. 2d 460, 473 (D.N.J.

1998) (collecting cases).  Rule 408 will permit the introduction of a settlement

agreement or compromise related evidence, but only when it is offered for purposes

not prohibited by subsection (a), such as "proving a witness's bias or prejudice;

negating a contention of undue delay; and providing an effort to obstruct a criminal

investigation or prosecution." Fed. R. Evid. 408(b). However, consent orders and related agreements will be deemed inadmissible when offered to provide liability, which is precisely what the Plaintiffs seek to do by relying in part on this evidence to show breach. We agree with the Defendants that it would be error to rely on evidence of the consent orders between Cabot and the DEP in order to find an issue of fact on negligence.

However, the Plaintiffs have not relied solely on the consent decrees, but have additionally submitted evidence from expert witnesses, including a hydrologist and an engineering professor, to bolster their claims that the Defendants breached a duty to the Plaintiffs and damaged the Plaintiffs' property and their domestic water supply as a result. We have already considered and denied the Defendants' motion to strike Ingraffea's supplemental affidavit and report, as well as the supplemental affidavits and reports from other experts. (Doc. 496.) In so doing, we recognized that the Defendants were somewhat prejudiced by the Plaintiffs' belated submission of these reports, but on balance we concluded that the interests of justice militated in favor of allowing the opinions to be considered so that the Plaintiffs' claims could be assessed on their merits. Having now considered these reports, including the opinion of the Plaintiffs' hydrologist, Paul Rubin, and that of Professor Ingraffea, we find that these opinions at the very least give rise to a disputed issue of fact regarding whether the

Defendants' drilling operations breached an applicable standard of care and caused injury to the Elys' property and their water supply.  We also do not agree with the Defendants that Ingraffea's report is merely a string of legal opinions masquerading as a competent expert opinion.

The Elys' negligence claims is predicated chiefly on the assertion that the Defendants' drilling activity in the area has caused their water supply to become polluted, and that the pollution and its effects may be expected to continue for years. The Plaintiffs have offered testimony from a hydrologist stating that the aquifer feeding the Elys' water supply "has been compromised and contaminated by Cabot gas drilling and waste disposal operations in the area" and that "such contamination will last for decades, a century or more," and that the cause of this contamination is the Defendants' drilling operations in the close vicinity of the Plaintiffs' home.  (Doc. 426-4, Rubin Aff.)  Another of the Plaintiffs' experts, Anthony Ingraffea, a professor engineering at Cornell University, has submitted an affidavit in which he attests that "[t]he evidence of negligence and causation on the part of the gas company and its drilling operators is, frankly, overwhelming and irrefutable."  (Ingraffea Aff. ¶ 12.) This expert has also opined that the Defendants negligence in the drilling operations have directly permitted "methane gas together with other unwelcome constituents and fluids [to] migrate, as they naturally will, into the aquifer that supplies the well water

40

to the Nolen Scott Ely and Ray Hubert households." (Id. ¶ 14.)  The Defendants

dismiss these opinions as mere legal conclusions that are bereft of factual support, but

we do not agree, and find that it would be inappropriate to enter summary judgment

in favor of the Defendants in the face of these opinions, which we find give rise to

disputed issues of fact with respect to the Plaintiffs' negligence claims.

### 2. The Plaintiffs Have Presented Sufficient Evidence of Damages to Withstand Summary Judgment, and Any Doubts About the Plaintiffs' Ability to Prove Damages Resulting from the Defendants' Negligence Should Be Resolved at Trial

The other basis that the Defendants offer in support of their motion for

summary judgment on the Plaintiffs' negligence claims is that the Plaintiffs have

failed to present sufficient evidence of damages.  The Defendants discount the

significance of the Plaintiffs' purported valuation expert, Robert Congdon, because

his initial report did not express a sufficiently definite opinion about the current, "as

is", value of the Ely property, and it did not express a sufficient opinion about the

decrease in the property's value as a result of the Defendants's alleged contamination

of it.  The Defendants also argue that Congdon's report is impermissibly speculative,

and should be discounted for its lack of specifics.

Although we agree with the Defendants that the Elys' evidence regarding

damages is somewhat spare, and although we share the view that Congdon's report

is in and of itself inadequate to prove damages with respect to the Property, we do not believe that summary judgment should be entered at this time, particularly having found disputed issues of fact with respect to whether the Defendants breached an applicable standard of care in the conducting drilling operations in the area of the Elys' property, and whether this allegedly negligent conduct caused injury to the property. In addition to the anticipated testimony of Robert Congdon, the record contains evidence from Nolen Ely himself, who would appear to have substantial relevant knowledge regarding the value of the property, the value of the improvements made to the property, and the impact on the value of the property as a result of the Defendants' drilling operations and its effect on the domestic water supply.

In general, a property owner is competent to testify about his opinion regarding the value of his property, and in this case given Ely's long history in the area and knowledge of his property, we believe that his testimony may be relevant to an assessment of damages. Moreover, in Pennsylvania courts have found that owners of real property may be competent to testify as to the value of their property. See, e.g., Sgarlat Estate v. Commonwealth, 158 A.2d 541, 545 (Pa. 1960); Richards v. Sun Pipe Line Co., 636 A.2d 1162, 1165 (Pa. Super. Ct. 1994); Watsontown Brick Co. v. Hercules Powder Co., 265 F. Supp. 268, 275 (M.D. Pa. 1967). Although there may

be limitations on the damages that the Plaintiffs can recover, and although we have some doubts about the probative value of Congdon's expert opinion in this case, particularly as it relates to alleged lost royalties, we cannot find at this stage that the Defendants have carried their burden of establishing a total absence of material fact with regard to damages that the Plaintiffs claim to have suffered, particularly since we believe that Nolen Ely may in particular be able to offer competent evidence to support a damages claim.  Summary judgment on this basis should be denied, and the Plaintiffs should be permitted to prove their negligence claim and support their claim for damages at trial.

### F.   The Defendants are Not Entitled to Summary Judgment on the Plaintiffs' Claims for Private Nuisance

Finally, the Defendants argue that summary judgment is warranted with respect to the Elys' claim for private nuisance, which relates chiefly to the Plaintiffs' allegation that the Defendants' drilling operations have caused their domestic water supply to become contaminated, and, therefore, to have interfered significantly with the Plaintiffs' use and enjoyment of the property that they own and use for their home.  We find that there is sufficient evidence in the record to permit this claim to go forward.

Pennsylvania recognizes a claim for private nuisance liability, but only if the Defendants's conduct "is a legal cause of an invasion of another's interest in the private use and enjoyment of land." Waschak v. Moffat, 109 A.2d 310, 314 (Pa. 1954) (recognizing that Pennsylvania has adopted the Restatement (Second) of Torts § 822); see also Kembel v. Schlegel, 478 A.2d 11, 14-15 (Pa. 1984). The Defendants's invasion of the Plaintiff's private use and enjoyment of land must be either "intentional and unreasonable" or "intentional or otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities." Restatement (Second) of Torts § 822 (1977).

The Pennsylvania Supreme Court has noted that in order for a Plaintiff to prevail on a claim for private nuisance, the Plaintiff must have suffered "significant harm, of a kind that would be suffered by a normal person in the community or by property in normal condition and used for a normal purpose." Kembel, 478 A.2d at 14-15 (citing Restatement (Second) of Torts § 821F (1977)). Commentary to the Restatement makes clear that a "significant harm" is a "harm of importance" and one that must cause a "real and appreciable interference with the Plaintiff's use or enjoyment of his land." Restatement (Second) of Torts § 821F cmt. c. In this case, the Elys' nuisance claim rests on their assertion that the Defendants' drilling activity in the area has caused their water supply to become polluted, and indeed unusable,

44

and that the pollution and its effects may be expected to continue for years. The Plaintiffs have offered testimony from a hydrologist stating that the aquifer feeding the Elys' water supply "has been compromised and contaminated by Cabot gas drilling and waste disposal operations in the area" and that "such contamination will last for decades, a century or more," and that the cause of this contamination is the Defendants' drilling operations in the close vicinity of the Plaintiffs' home. (Doc. 426-4, Rubin Aff.) Another of the Plaintiffs' experts, a professor engineering at Cornell University, has submitted an affidavit in which he attests that "[t]he evidence of negligence and causation on the part of the gas company and its drilling operators is, frankly, overwhelming and irrefutable." (Ingraffea Aff. ¶ 12.) This expert has also opined that the Defendants negligence in the drilling operations have directly permitted "methane gas together with other unwelcome constituents and fluids [to] migrate, as they naturally will, into the aquifer that supples the well water to the Nolen Scott Ely and Ray Hubert households." (Id. ¶ 14.)

Upon consideration, we do not find that the Defendants have carried their burden for entry of summary judgment on the Plaintiffs' private nuisance claims. The Plaintiffs have alleged a serious invasion of their possessory interest in their property, in that they have alleged that the Defendants' drilling activities has caused contamination of their domestic water supply, and has caused them to resort to the use

45

of bottled water for their family's needs.  The Plaintiffs have also offered expert testimony to support their claims of pollution and that the pollution is the direct result of the Defendants' negligent drilling operations.  The Defendants urge the Court nevertheless to foreclose this claim on summary judgment because the Plaintiffs have come forward with no evidence to show that the Defendants' alleged invasion of their property interest was intentional and unreasonable, but we have already found that the Plaintiffs have come forward with some evidence to show that the Defendants breached an applicable standard of care, and under the law in this field that is sufficient to support a claim for nuisance.  See Restatement (Second) of Torts § 822.  Upon review of the record, there are sufficient facts in dispute that make summary judgment on the Plaintiffs' nuisance claims inappropriate.

### G.    The Defendants are Entitled to Summary Judgment on the Plaintiffs' Medical Monitoring Claims

Lastly, the Defendants move for summary judgment on the Plaintiffs' claims for medical monitoring.  Because the Plaintiffs have entirely failed to produce evidence to support these claims, summary judgment is warranted.

Under Pennsylvania law, a Plaintiff bringing a claim for medical monitoring has a significant burden, and must prove: (1) exposure greater than normal background levels (2) to a proven hazardous substance (3) caused by the

46

Defendants's negligence; (4) as a proximate result of the exposure, the Plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles. Redland Soccer Club, Inc. v. Dep't of the Army and Dep't of Defense, 696 A.2d 137, 195-96 (Pa. 1997). Proving these elements requires expert testimony. Id.

The Elys have never been told that they are at increased risk of disease, (Def. SMF ¶ 57), and more importantly they have no expert testimony relevant to a claim for medical monitoring. The Plaintiffs weakly attempt to save this claim by relying on the testimony of their expert hydrologist, but the Plaintiffs' argument in this regard is no more than speculative and conclusory, and the record simply does not contain the requisite evidence necessary to support this particular type of tort claim. Summary judgment on the Plaintiffs' medical monitoring claims is appropriate.

## V.   **RECOMMENDATION**

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED THAT the Defendants' Motion for Summary Judgment on the Ely Family's claims (Doc. 390.)

be granted with respect to all claims **except** for the Elys' claims for negligence and

for private nuisance, which should be permitted to proceed in this action.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 21st day of April, 2014.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge