IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NOLEN SCOTT ELY, et al., | : | Civil No. 3:09-CV-2284 |
| | : | |
| Plaintiffs | : | (Magistrate Judge Carlson) |
| | : | |
| v. | : | |
| | : | |
| CABOT OIL & GAS CORP., | : | |
| | : | |
| Defendant | : | |
| | : | |
| | : | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

In this memorandum opinion we begin to write the final chapter in this longstanding legal saga, a saga which has consumed the parties for the past eight years.   This lawsuit was initiated on November 19, 2009, by a group of 44 plaintiffs who collectively filed suit to recover damages for injuries and property damage allegedly suffered as the result of the defendant's natural gas drilling operations in Dimock Township, Susquehanna County, Pennsylvania.   Subsequent to this case being filed, a number of the plaintiffs reached settlement agreements with the defendants, and at this juncture a handful of plaintiffs remain in the case. Those plaintiffs include Nolen Scott Ely and Monica L. Marta-Ely, individually, and as parents and natural guardians of their three minor children (the "Elys" or

"Ely Family"); and Ray and Victoria Hubert, individually, and as the parents and natural guardians of one minor child, and a child who has since reached the age of majority, Angel Hubert ("Huberts") (collectively, "Plaintiffs"). Beyond this protracted civil litigation, the dispute between the parties has been the subject of administrative environmental proceedings conducted by the Pennsylvania Department of Environmental Protection. Those administrative proceedings also concluded through a settlement and the entry of a consent decree. Much of this litigative past now forms the prologue for the trial of this final case, and provides the basis for the parties' competing motions *in limine* which are now before the court.

This longstanding civil action, relating to alleged groundwater contamination at certain property in Dimock, Pennsylvania, is now scheduled for trial on February 22, 2016. In advance of trial, the parties have endeavored to limit and shape the presentation of evidence to the jury by filing motions *in limine* that are ripe for resolution.

For its part, in its motion *in limine,* (Doc. 633.), the defendant, Cabot, invites us to rule, prior to trial and before any evidence has been presented, that presentation of 28 broad categories of testimony is precluded at trial, mostly on the

grounds that the anticipated evidence is irrelevant or unduly prejudicial.[1]   The

plaintiffs respond to this wide-ranging motion by urging the court to refrain from

prejudging the admissibility of much of this testimony; representing that counsel

will exercise caution in eliciting testimony in some areas; and otherwise suggesting

that the court can take steps at trial to limit the presentation of evidence if

necessary or warranted at trial, and may further provide limiting or cautionary

instructions, as needed at trial.   In other areas, the plaintiffs concede that the

motion may be granted because they do not intend in any event to present the

evidence that the defendant seeks to exclude.

Having carefully considered this multi-faceted motion, as described below,

the defendant's motion will be GRANTED in part and DENIED in part.

The plaintiff has filed a less expansive, though largely unsupported, motion

*in limine*, (Doc. 638.), seeking to restrain the defendant's ability to present

evidence regarding the alleged number and efficacy of the water treatment systems

that have been implemented in some households in the Dimock and Springville

Townships, or about households that may have used such water systems.   The

plaintiff also seeks to prevent one of the defendant's experts, Brent Brelje, from

---

[1]   The defendant has also moved for a motion *in limine* to prevent the testimony of
one of the plaintiff's experts, Paul Rubin, pursuant to *Daubert v. Merrell Dow
Pharmaceuticals*, 509 U.S. 579 (1993).  (Doc. 636.)  That motion was the subject
of a hearing with the parties on February 1, 2016, and will be resolved by a
separate opinion.

testifying that the opinions set forth in his written reports were made to a reasonable degree of scientific or engineering certainty.  Additionally, the plaintiff generally seeks entry of an order that would "limit[] cumulative and redundant presentation of purported water data results obtained by Cabot . . . ." (Doc. 638, p. 3.)   In making these requests, the plaintiffs have in many instances failed to identify for the court exactly what evidence they would have the court exclude, have provided little by way of legal support for their request, and sometimes simply overlooked evidence in the record that undermines their motion, which will be DENIED in its entirety at this time, without prejudice to the plaintiff raising timely objections to evidence at trial if warranted.

## II.   <u>DISCUSSION</u>

### A.   <u>Legal Standards–Motions in Limine</u>

The court is vested with broad inherent authority to manage its cases, which carries with it the discretion and authority to rule on motions *in limine* prior to trial. *See Luce v. United States*, 469 U.S. 38, 41 n.4 (1984); *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 260 (3d Cir. 1983), *rev'd on other grounds sub nom.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (the court exercises its discretion to rule *in limine* on evidentiary issues "in appropriate cases").   Courts may exercise this discretion in order to ensure that juries are not

exposed to unfairly prejudicial, confusing or irrelevant evidence. *United States v. Romano*, 849 F.2d 812, 815 (3d Cir. 1988). Courts may also do so in order to "narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990) (citation omitted). However, courts should exercise caution when ruling on such motions.

In considering motions *in limine* which call upon the court to engage in preliminary evidentiary rulings under Rule 403 of the Federal Rules of Evidence, we begin by recognizing that these "evidentiary rulings [on motions *in limine* ] are subject to the trial judge's discretion and are therefore reviewed only for abuse of discretion ... Additionally, application of the balancing test under Federal Rule of Evidence 403 will not be disturbed unless it is 'arbitrary and irrational.' " *Abrams v. Lightolier Inc.* 50 F.3d 1204, 1213 (3d Cir.1995) (citations omitted); *see Bernardsville Bd. of Educ. v. J.H.,* 42 F.3d 149, 161 (3d Cir.1994) (reviewing *in limine* rulings for abuse of discretion). Yet, while these decisions regarding the exclusion of evidence rest in the sound discretion of the district court, and will not be disturbed absent an abuse of that discretion, the exercise of that discretion is guided by certain basic principles.

One of the key guiding principles is reflected in the philosophy which shapes the rules of evidence. The Federal Rules of Evidence can aptly be

characterized as evidentiary rules of inclusion, which are designed to broadly permit fact-finders to consider pertinent factual information while searching for the truth.  The inclusive quality of the rules, and their permissive attitude towards the admission of evidence, is embodied in three cardinal concepts.  The first of these concepts is Rule 401's definition of relevant evidence.  Rule 401 defines what is relevant in an expansive fashion, stating:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable *197 or less probable than it would be without the evidence.

Fed. R. Evid. 401.

Adopting this broad view of relevance it has been held that:  "Under [Rule] 401, evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'   [Therefore] 'It follows that evidence is irrelevant only when it has no tendency to prove the fact.  Thus the rule, while giving judges great freedom to admit evidence, diminishes substantially their authority to exclude evidence as irrelevant.' "  *Frank v. County of Hudson,* 924 F. Supp. 620, 626 (D.N.J.1996) *citing Spain v. Gallegos,* 26 F.3d 439, 452 (3d Cir.1994) (quotations omitted).

This quality of inclusion embraced by the Federal Rules of Evidence, favoring the admission of potentially probative proof in all of its forms, is further buttressed by Rule 402, which generally defines the admissibility of relevant evidence in sweeping terms, providing that:

> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

Fed. R. Evid. 402.

Thus, Rule 402 expressly provides that all "[r]elevant evidence will be admissible unless the rules of evidence provide to the contrary." *United States v. Sriyuth,* 98 F.3d 739, 745 (3d Cir.1996) (citations omitted). While these principles favoring inclusion of evidence are subject to some reasonable limitations, even those limitations are cast in terms that clearly favor admission of relevant evidence over preclusion of proof in federal proceedings. Thus, Rule 403, which provides grounds for exclusion of some evidence, describes these grounds for exclusion as an exception to the general rule favoring admission of relevant evidence, stating that:

> Although relevant, evidence may be excluded if its probative value **is substantially outweighed** by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403 (emphasis added).

By permitting the exclusion of relevant evidence only when its probative value is "substantially outweighed" by other prejudicial factors, Rule 403 underscores the principle that, while evidentiary rulings rest in the sound discretion of the court, that discretion should consistently be exercised in a fashion which resolves all doubts in favor of the admission of relevant proof in a proceeding, unless the relevance of that proof is substantially outweighed by some other factors which caution against admission.

These broad principles favoring the admission of relevant evidence also shape and define the scope of this court's discretion in addressing motions *in limine* like those filed by the parties here, which seek a pre-trial ruling excluding a considerable range of evidence largely on relevance and prejudice grounds.  In the past the United States Court of Appeals for the Third Circuit has cautioned against such preliminary and wholesale exclusion of evidence, noting that it has "made clear that rulings excluding evidence on Rule 403 grounds should rarely be made *in limine.*"  *Walden v. Georgia–Pacific Corp.,* 126 F.3d 506, 518 n. 10 (3d Cir.1997).  The reason for this caution is evident:  oftentimes a court "cannot fairly ascertain the potential relevance of evidence for Rule 403 purposes until it has a full record relevant to the putatively objectionable evidence." *Id.; see also In re*

*Diet Drugs Products Liability Litigation,* 369 F.3d 293, 314 (3d Cir.2004). As the Court of Appeals has observed when advising against excessive reliance on motions *in limine* to exclude evidence under Rule 403:

> [M]otions *in limine* often present issues for which final decision is best reserved for a specific trial situation. *American Home,* 753 F.2d at 324; *cf. Luce v. United States,* 469 U.S. 38, 41–42, 105 S.Ct. 460, 463–64, 83 L.Ed.2d 443 (1984) (holding that criminal defendant must testify to preserve claim of improper impeachment with prior conviction) ("The [*in limine* ] ruling is subject *198 to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling."). This is particularly true when the evidence is challenged as irrelevant or prejudicial; the considerations weighed by the court will likely change as the trial progresses. *See Rosenfeld v. Basquiat,* 78 F.3d 84, 91 (2d Cir.1996) ("Unlike rulings that involve balancing potential prejudice against probative value, the ruling in the present case was not fact-bound and no real purpose other than form would have been served by a later objection."). We have also made clear that rulings excluding evidence on Rule 403 grounds should rarely be made *in limine.* "[A ] court cannot fairly ascertain the potential relevance of evidence for Rule 403 purposes until it has a full record relevant to the putatively objectionable evidence. We believe that Rule 403 is a trial-oriented rule. Precipitous Rule 403 determinations, before the challenging party has had an opportunity to develop the record, are therefore unfair and improper." *Paoli I,* 916 F.2d at 859; *see also In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 747 (3d Cir.1994) ( "*Paoli II*" ). Under these and similar circumstances, if a district court makes a tentative pre-trial ruling, it has the opportunity to "reconsider [its] in limine ruling with the benefit of

>    having been witness to the unfolding events at trial."
>    *United States v. Graves,* 5 F.3d 1546, 1552 (5th
>    Cir.1993).

*Walden,* 126 F.3d at 518 n. 10.

The Third Circuit has thus cautioned that "pretrial Rule 403 exclusions should rarely be granted. . . .  Excluding evidence as being more prejudicial than probative at the pretrial stage is an extreme measure that is rarely necessary, because no harm is done by admitting it at that stage."  *In re Paoli R. Yard PCB Litig.,* 916 F.2d 829, 859 (3d Cir. 1990); *see also Spain v. Gallegos,* 26 F.3d 439, 453 (3d Cir. 1994) (noting that the Third Circuit's "cautious approach to Rule 403 exclusions at the pretrial stage . . . .").  Moreover, the Third Circuit has characterized Rule 403 as a "trial-oriented rule" such that "[p]recipitous Rule 403 determinations, before the challenging party has had an opportunity to develop the record, are . . . unfair and improper."  *In re Paoli R. Yard PCB Litig.,* 916 F.2d at 859.

Accordingly, the principles which guide our consideration of motions *in limine* that seek the exclusion of evidence on Rule 402 relevance or Rule 403 undue prejudice grounds consistently urge that courts to exercise their broad discretion sparingly in this field, and avoid precipitous pre-trial rulings excluding evidence on these relevance and prejudice grounds.  It is against the backdrop of these guiding legal tenets that we consider the parties' motions *in limine,* noting

that these principles caution against wholesale efforts to resolve the balance of probative value and potential prejudice in the abstract and prior to trial.

These legal tenets, in turn, inform the parties regarding what they may expect from this court in terms of a ruling shaping and defining the proof prior to trial. Simply put, on this score, given the factors which caution against wholesale resolution of evidentiary issues in the abstract, the parties may expect: (1) that some matters can be resolved wholly in advance of trial; (2) that other evidentiary issues admit of only a partial resolution pre-trial; and (3) that other evidentiary matters must await the presentation of proof at trial.

With these cautions in mind, we turn to the 34 disputed evidentiary items identified by the parties in their competing motions *in limine*.

**B.   Defendant's Motion**

As we have noted, in its motion *in limine* the defendant seeks entry of an order prohibiting the plaintiff from eliciting testimony in 28 areas. We address these matters briefly below, combining some of the requests which are interrelated.

We begin by identifying areas of consensus, and subject matter areas where we are able to provide unequivocal and comprehensive guidance to the parties.

**1.   Matters Which Are Either Largely Undisputed or in Our View Are Subject to Definitive Pre-trial Rulings**

The following eight evidentiary matters are either largely undisputed by the parties or are amenable to complete resolution by the court prior to trial:

**A.   Use of Documentary or Demonstrative Exhibits During *Voir Dire* or Opening Statements**

The parties are in agreement that the plaintiffs will not show documentary or demonstrative exhibits to the jury during opening statements or *voir dire* without first showing the material to Cabot's counsel and the court, and the same will be required of Cabot's counsel.  (Doc. 633, No. 23.)  Therefore it is ordered that there will be no use of such items in *voir dire* or openings without the prior express approval of the court.

**B.   Evidence of the Plaintiffs' Prior Claims**

The parties agree that Cabot's request for an *in limine* ruling barring the plaintiffs from introducing evidence or testimony relating to their prior claims of fraud, breach of contract, or lost royalties, which were dismissed by the court, should be granted, (Doc. 633, No. 14.), and the court agrees that any such evidence would be irrelevant and inappropriate at trial.

**C.   Evidence of Cabot's Prior Settlement Offers to the Plaintiffs**

Cabot has moved for entry of an order prohibiting the plaintiffs from testifying about prior monetary settlement offers that Cabot made to the plaintiffs, and any discussions that the parties had regarding potential settlement.  (Doc. 633, No. 8.)  The plaintiffs have attested that they have no intention of introducing such evidence, and the court agrees that such evidence should be excluded at trial, both

pursuant to Rule 408 of the Federal Rules of Evidence and by the parties' own agreement.

### D.      Colloquies Between Counsel During Depositions

Perhaps anticipating an issue that is likely to be more imagined than real, Cabot also seeks an order prohibiting any mention or reference to any colloquy between counsel during depositions, objections, sidebars, or responses or objections made by Cabot's counsel during any depositions, including reference to any claim of privilege asserted by Cabot, and the refusal of any Cabot witness to answer questions to which objections were made.  (Doc. 633, No. 25.)

Plaintiffs assure Cabot and the court that they will not make any improper "generally-understood-to-be prohibited mention or reference to counsel colloquy, objections, responses, etc. during depositions," and suggest that since any such objections may be raised at trial outside the jury's presence and addressed promptly if concerns arise.  The court agrees and instructs the parties to follow this procedure at trial.

### E.      Reference to this Motion or Court Rulings

Cabot moves the court to preclude the plaintiffs from mentioning the defendant's motion *in limine* at trial, or this court's ruling in a manner that is intended to suggest to the jury that Cabot was seeking to prohibit the introduction of evidence.  (Doc. 633, No. 26.)  Plaintiffs "generally agree" that they will not

mention the motion or the court's ruling, and the court instructs the parties to follow this procedure at trial. Thus any matters relating to these rulings may be raised at trial outside the jury's presence and addressed promptly if concerns arise.

### F.   Evidence Relating to Natural Disasters

This case involves allegations of groundwater contamination by Cabot, but on occasion the plaintiffs have voiced broader, more generalized concerns that these drilling activities may lead to other natural disasters in the future. Since these unrealized fears seem legally, logically, factually, and topically remote from the claims in this case, Cabot moves to exclude evidence or testimony of alleged non-groundwater contamination risks, or damages from oil and gas production activities including, but not limited to, alleged air pollution, soil contamination, noise contamination, earthquakes or climate change. (Doc. 633, No. 17.) The plaintiffs agree that they will not introduce testimony regarding these natural hazards, and we agree that such testimony may not be elicited at the trial of this case.

### G.   Evidence of Cabot's Financial Condition

Cabot also requests entry of an order prohibiting the plaintiffs from mentioning or introducing evidence of the company's financial condition, including assets, income, profits, revenues or net worth, without the plaintiffs first making a showing that could support an award of punitive damages. (Doc. 633,

No. 24.)   The plaintiffs have responded that they intend to make a showing of outrageous conduct, and thus will be justified in offering evidence of Cabot's financial circumstances.   The parties are generally in agreement that such a showing must be made to support introduction of such evidence.   Thus, the parties seem to concede that this evidence may have conditional relevance when, and if, the issues of punitive damages becomes ripe for a jury's consideration.

Recognizing this conditional relevance, we view the admissibility of this evidence as a matter of timing, since:   "Before evidence of the financial condition or net worth of defendant . . . is admissible, this court must determine the legal sufficiency of plaintiff's claim for punitive damages, which must await trial." *Williams v. Betz Labs., Inc*., No. CIV. A. 93-426, 1996 WL 114815, at *3 (E.D. Pa. Mar. 14, 1996).   To facilitate this process we intend to address this issue in the following fashion:   Relying upon our broad discretion to bifurcate issues at trial, we intend to bifurcate the issue of punitive damages.   *See generally, Emerick v. U.S. Suzuki Motor Corp*., 750 F.2d 19 (3d Cir. 1984).   Thus, at trial, the parties will initially present evidence relating to liability and compensatory damages, evidence which may include proof both of negligence by the defendant and any allegedly willful conduct by Cabot.   Since the plaintiffs are "not entitled to submit the issue of punitive damages to the jury until they first established Suzuki's liability for compensatory damages," *Emerick v. U.S. Suzuki Motor Corp*., 750 F.2d 19, 22 (3d

Cir. 1984), once the jury has returned its liability and compensatory damages verdict, we will determine whether the case would be re-opened to allow the introduction of this evidence, which is relevant only to punitive damages.  If we conclude that the question of punitive damages was properly before the jury based upon their initial verdict, we would re-open the case for introduction of this proof, argument by counsel, further instructions by the court, and submission of the punitive damage question to the jury for its consideration.  *Emerick v. U.S. Suzuki Motor Corp., supra.*

## H.    Inquiry Into Witness Preparation with Counsel

Cabot also seeks a court ruling that would prevent plaintiffs' counsel from mentioning, or referring in any way, or inquiring of any witness about the extent of their preparation for trial with counsel.  Cabot has not provided any real argument in support of such a pre-trial ruling.  Plaintiffs, in turn, have represented that they will not intrude upon any matter covered by the attorney-client privilege, but may wish to inquire into the extent of witness preparation generally on cross examination.

On this score, "[t]he law appears to permit cross-examination regarding how a witness prepared for his or her testimony.  *See In re Cendant Corp. Securities Litigation*, 343 F.3d 658, 668 (3d Cir.2003) ('Nonetheless, we believe Wood may be asked whether his anticipated testimony was practiced or rehearsed.  But this

inquiry should be circumscribed.  As with all discovery matters, we leave much to the sound discretion of the District Court.'); *see also Geders v. United States*, 425 U.S. 80, 89-90, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) ('A prosecutor may cross-examine a defendant as to the extent of any 'coaching' during a recess, subject, of course, to the control of the court.').  The cases also suggest that this examination should be closely monitored by the trial court to prevent unfair prejudice, delay, confusion, and inquiry into privileged communications."  *Hynix Semiconductor Inc. v. Rambus Inc*., 2008 WL 350654, at *3 (N.D. Cal. Feb. 3, 2008).  Consistent with this permissive approach to cross examination regarding witness preparation, we will deny defendant's motion *in limine* on this particular matter, but will address these issues at trial as the need may arise.

## 2.   Disputed Evidentiary Matters Which May Be Addressed Prior to Trial

We further find that there are a series of related and contested evidentiary matters which may be resolved at least in part through pre-trial rulings.  These contested matters relate principally to three major issues:  (1) whether the plaintiffs are entitled to assert a statutory presumption of negligence due to the physical proximity between Cabot's drilling activities and the plaintiffs' wells; (2) the nature of recoverable damages under Pennsylvania law for property damage claims, and the scope of damages testimony at trial; and (3) the nature, extent and degree to which the protracted and multi-faceted history of this dispute may be

aired in this trial, and specifically the degree to which parties will be able to refer to settlements, consent decrees, Notices of Violations, or objective facts related to these other civil and administrative proceedings at trial.  We address these issues, in turn, below.

## A.   The Application of a Pennsylvania Statutory Presumption to this Case

One of the principal disputed evidentiary issues between the parties in this case relates to the application of a statutory presumption established by Pennsylvania law to this tort action between private parties.  The statute that was in effect at the time of the events giving rise to this lawsuit provided that "it shall be presumed that a well operator is responsible for the pollution of a water supply that is within 1,000 feet of the oil or gas well, where the pollution occurred within six months after the completion of drilling or alteration of such well."  58 Pa.S. § 601.208(c).  Pennsylvania has subsequently amended the Oil & Gas Act, 58 Pa. Cons. Stat. Ann. §§ 2301, et seq., and this statutory presumption is now codified at 58 Pa. Const. Stat. Ann. § 3218(c).

In enacting this amendment, the General Assembly also increased the radius of property protected by this presumption to 2,500 feet, and the time period was enlarged to 12 months for unconventional wells.  Thus, the General Assembly most recent pronouncement in this field broadened the presumption.

In its current form the presumption exists by virtue of a statute which is captioned "Protection of Water Supplies," 58 Pa.C.S. § 3218.  Under §3218(c): "Unless rebutted by a defense established in [the statute][2], it shall be presumed that a well operator is responsible for pollution of a water supply if: .... (i) the water supply is within 1,000 feet of an oil or gas well; and (ii) the pollution occurred within six months after completion of drilling or alteration of the oil or gas well." 58 Pa. C. S.  § 3218(c).  While §3218 directly addresses remedial actions which the state may compel drillers take on behalf of landowners to secure their water supplies, the statute also expressly acknowledge that landowners may have other tort remedies and provides that:  "Nothing in this section shall prevent a landowner or water purveyor claiming pollution or diminution of a water supply from seeking any other remedy at law or in equity."  58 Pa. C. S.  § 3218(f).  Notably, this statute–which creates a presumption that a well operator is responsible for pollution of a water supply if the water supply is within 1,000 feet of an oil or gas

---

[2]By statute: "To rebut the presumption established under subsection (c), a well operator must affirmatively prove any of the following: . . . (i) the pollution existed prior to the drilling or alteration activity as determined by a predrilling or prealteration survey; (ii) the landowner or water purveyor refused to allow the operator access to conduct a predrilling or prealteration survey; (iii) the water supply is not within 1,000 feet of the well; (iv) the pollution occurred more than six months after completion of drilling or alteration activities; and (v) the pollution occurred as the result of a cause other than the drilling or alteration activity."  58 Pa.C.S. § 3218 (d)

well and the pollution occurred within six months after completion of drilling and expressly acknowledges the right of landowners to pursue other civil remedies–does not in any way bar the application of this presumption to the other legal remedies which the legislature acknowledges are available to landowners.

While this statute has received scant attention from the state courts, this court has applied the presumption of causation established by §3218(c) to private tort actions, holding that plaintiffs may rely upon this presumption to prove causation in cases where their wells were allegedly affected by geographically and temporally proximate drilling activity.  *See e.g., Butts v. Sw. Energy Prod. Co.*, No. 3:12·CV·1330, 2014 WL 3953155, at *5 (M.D. Pa. Aug. 12, 2014) *reconsideration denied*, No. 3:12-CV-1330, 2014 WL 4626560 (M.D. Pa. Sept. 15, 2014); *Roth v. Cabot Oil & Gas Corp.*, 919 F. Supp. 2d 476, 487 (M.D. Pa. 2013)("Pennsylvania law presumes that 'a well operator is responsible for pollution of a water supply if ... (i) the water supply is within 1,000 feet of an oil or gas well; and (ii) the pollution occurred within six months after completion of drilling or alteration of the oil or gas well.' ")

In its motion *in limine* Cabot urges us to depart from the path forged by our peers, and hold that this statutory presumption is unavailable to individuals in private tort and nuisance claims, but only applies to administrative enforcement actions brought by the state.  Cabot supports this argument by inviting us to

examine what it views as a clear dichotomy created by Pennsylvania cases construing different presumptions crafted in other state statutes. Thus, Cabot notes that in *Centolanza v. Lehigh Valley Dairies, Inc.*, 430 Pa. Super. 463, 470, 635 A.2d 143, 146 (1993) *aff'd,* 540 Pa. 398, 658 A.2d 336 (1995), the Pennsylvania courts permitted private parties to rely upon a statutory presumption created by the Storage Tank and Spill Prevention Act, but did so only after finding that the statute itself specifically authorized private parties to bring actions under the statute, thus explicitly incorporating the statutory presumption into this statutory private cause of action. In contrast, Cabot argues that in *Fleck v. Timmons*, 374 Pa. Super. 417, 419, 543 A.2d 148, 149 (1988), the Pennsylvania courts declined to allow private parties to rely upon a presumption found in the Pennsylvania Solid Waste Management Act, reasoning that the provisions of the act spoke exclusively to agency enforcement actions and holding that the presumption created by the act only applied to agency enforcement proceedings. Having cast this legal dichotomy, Cabot invites us to abandon the path taken by other judges of this court and find that §3218(c)'s statutory presumption, like the presumption at issue in *Fleck,* is only available to the state in agency environmental enforcement proceedings.

We will decline this invitation. Unlike Cabot, we find that the law in this field is not defined by a simple dichotomy, but rather creates a continuum, a

continuum in which the legislature speaks with varying degrees of clarity regarding the ability of private parties to rely upon statutory presumptions.  To be sure, §3218 does not have the clarity of the presumption created by the Storage Tank and Spill Prevention Act, which created both a presumption and a statutory cause of action and then specifically authorized private parties to bring actions under the statute, explicitly extending the statutory presumption to this private cause of action.  *Centolanza v. Lehigh Valley Dairies, Inc*., 430 Pa. Super. 463, 470, 635 A.2d 143, 146 (1993) *aff'd*, 540 Pa. 398, 658 A.2d 336 (1995).  But §3218 speaks to individual rights and claims in ways which are much more direct and compelling than the presumption created by the Pennsylvania Solid Waste Management Act, which the court in *Fleck* found only applied to agency enforcement actions.  *Fleck v. Timmons*, 374 Pa. Super. 417, 419, 543 A.2d 148, 149 (1988).

On balance, we believe that the better view is that the presumption created by §3218(c) is available to private litigants in property damage tort cases.  We are persuaded that the statutory presumption applies to these tort actions for five reasons.

First, we begin with the premise that the legislature knew the law when it wrote this law.  At the time of the enactment of §3218, common law torts for damage to water and property due to hydro-carbon exploration activities had been part of the legal fabric of the Commonwealth for a century.  *See Rabe v.*

22

*Shoenberger Coal Co.,* 213 Pa. 252, 256, 62 A. 854, 855 (1906)(Damages resulting from coal extraction).    Thus, when the legislature enacted this statutory presumption it doubtless was aware that it was legislating in a field where there were longstanding and well-settled tort causes of action.

Further, the presumption crafted by the legislature in §3218(c) spoke to a fundamental tort concept, causation, and defined a set of circumstances in which causation, an essential element of any common law tort, could be found due to drilling activity which may have affected nearby water wells.    Therefore, this presumption speaks directly to an essential element of these common law torts, in a field where tort liability has long existed.

In addition, the entire text and structure of §3218 makes it clear that the statute was designed to be a broadly remedial measure aimed at protecting water quality for those who resided near drilling sites and relied upon well water.    It would be a curious thing for the legislature to create such a broadly remedial measure in a longstanding field of tort litigation but silently deny landowners access to one of these remedial measures, the presumption of causation created by §3218(c).    This broadly remedial construction of the statute is further bolstered by its legislative history, a history that is marked by prior action by the legislature to expand the geographic scope of the areas adjacent to gas wells that are embraced by this presumption.    This tendency towards express expansion of the geographic

scope of the law runs counter to Cabot's claim that the legislature was tacitly restricting the reach of the presumption, and confining that presumption to agency enforcement actions.

Moreover, we note that after creating this presumption relating to causation, an element of the longstanding torts recognized by Pennsylvania law, the statute also expressly acknowledged that landowners rely upon these other tort remedies, stating that:  "Nothing in this section shall prevent a landowner or water purveyor claiming pollution or diminution of a water supply from seeking any other remedy at law or in equity."  58 Pa. C. S.  § 3218(f).  Notably, nothing in this statutory text expressly barred the application of this presumption to these other longstanding tort remedies that are available to landowners.

Finally, we are guided to this conclusion by a recognition that the presumption of causation created by §3218(c) is an evidentiary rule grounded in the common sense notion that:  "[t]he temporal and physical proximity of the defendants' actions to the plaintiffs' harm, in addition to the lack of contemporaneous and alternative sources of the contamination, permit the reasonable inference that the defendants were responsible for that harm."  *Roth v. Cabot Oil & Gas Corp*., 919 F. Supp. 2d 476, 487 (M.D. Pa. 2013).  Given what this presumption does, it would be anomalous to find that only certain litigants may take advantage of this reasonable inference.  In short, if the legislature wished

to deny this reasonable inference to a whole class of aggrieved citizens, we believe that it would have been incumbent upon the state to act with far greater clarity. We are not prepared to infer a limitation on an evidentiary presumption created by the legislature, denying the benefits of that presumption to some litigants, without a much clearer expression of legislative intent.

Accordingly, the defendant's motion *in limine* will be denied in this regard. The plaintiff will be permitted at trial to attempt to present evidence which would support the presumption; the defense in turn may present proof to rebut the presumption. At the close of all the evidence, the court will determine whether there is sufficient evidence to submit the presumption to the jury.

> **B.**   **The Plaintiffs' Damages Evidence Must Be Moored to Recoverable Damages Available Under Pennsylvania Law**

With respect to the scope of recoverable damages, the sole remaining claims in this lawsuit are property damages and nuisance claims under Pennsylvania law. Recognizing this fact, Cabot seeks to prevent the plaintiffs from testifying about various physical ailments, symptoms, diseases, or conditions that they claim to have experienced and attribute to Cabot's drilling activities and alleged pollution of their water supply. Cabot correctly observes that claims for personal injury have already been dismissed, and the plaintiffs' own testimony about injuries they claim to have suffered are not only irrelevant, but they are speculative at best and could

be prejudicial.  For the same reason, Cabot urges the court disallow any testimony from any plaintiff claiming to have fears about potential personal injuries in the future that might result from consuming polluted water.  Cabot then seeks a pretrial ruling to limit the evidence that the plaintiffs may submit regarding costs that they might incur in connecting to a water supply, or in the costs they might bear in replacing potable water supplies.  The defendant also seeks to limit the Huberts from offering any testimony, for context, or even background, to the extent it suggests they are seeking recovery for diminution of value to property, since the Huberts live in a trailer on property that they do not own, something that Cabot notes reduces substantially the damages they may recover under Pennsylvania real property law.  (Doc. 633, Nos. 10-11 and 15-16.)  The plaintiffs respond that a jury is capable of giving this kind of evidence whatever weight it wishes, and that the evidence is potentially probative of the plaintiffs' alleged discomfort and inconvenience stemming from Cabot's drilling activities, which in turn is relevant to their nuisance claims.

In addressing these damages issues we do write upon a blank slate.  Quite the contrary, as a federal court exercising diversity jurisdiction in this case, we are obliged to apply the substantive law of Pennsylvania to this dispute.  *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d. Cir. 2000).  Here we are presented with a property damages tort claims by the plaintiffs which sound in negligence and

nuisance.   Further, throughout these proceedings, the plaintiffs have made it unmistakably clear that they regard the damage to their property as permanent and enduring in nature.

With the damages claims framed in this fashion, the law of Pennsylvania is clear regarding the scope of recoverable damages.   For the past century Pennsylvania courts have held that for property damage claims:  "when the injury is permanent, the measure of damages is the difference in market value before and after the injury, or the cost of removing the obstruction, whichever is the lower amount."   *Rabe v. Shoenberger Coal Co.,* 213 Pa. 252, 256, 62 A. 854, 855 (1906)(Damages resulting from coal extraction).   Given this clear measure of damages under state law, it has been held that it is error to instruct jurors on any alternate, or special, theories of damages when setting compensatory damages. *Oliver-Smith v. City of Philadelphia,* 962 A.2d 728, 730 (Pa. Commw. Ct. 2008). In short, settled Pennsylvania case law has pronounced for the past 100 years that: "In determining the proper measure of damages to injury to land,  . . . :  Assuming the land is reparable, the measure of damage is the lesser of:  (1) the cost to repair, or (2) the market value of the damaged property (before it suffered the damage, of course). *Kirkbride v. Lisbon Contractors*, 385 Pa.Super. 292, 560 A.2d 809 (1989).  If the land is not reparable, the measure of damage is the decline in market

value as a result of the harm. *Id*." *Christian v. Yanoviak*, 2008 PA Super 40, 945 A.2d 220, 226 (2008).

Confronted with this settled body of Pennsylvania law, for their part the plaintiffs argue that the time may have come to reconsider what they consider anachronistic or badly outdated legal holdings governing the damages that may be recovered under Pennsylvania law in cases of this type. Secondarily, the plaintiffs argue that they should be permitted to testify and to provide some information about costs that they have incurred or may incur, if for no other reason than to provide narrative and context for this case and the dispute with Cabot.

The court is not in a position to reframe or reshape Pennsylvania state law governing the allowable recovery of damages to real property. Nor may we substitute ideas regarding what the law should be for the immutable fact of what the law is. Thus, to the extent the plaintiffs are suggesting that this may be a proper function of this court's diversity jurisdiction in this action, the plaintiffs have offered nothing in the way of legal support for this proposition, and we must decline their invitation.

Yet, while the plaintiffs' damages proof must be moored to what Pennsylvania law deems to be the proper measure of damages in a property injury case, the diminution in the value of the property, this does not mean that the plaintiffs' are wholly precluded from speaking about the impact of these events

28

upon them in the use and enjoyment of the property.   The plaintiffs' surviving claims include nuisance claims.   With respect to these claims, Pennsylvania recognizes a claim for private nuisance liability, but only if the defendant's conduct "is a legal cause of an invasion of another's interest in the private use and enjoyment of land."   *Waschak v. Moffat*, 109 A.2d 310, 314 (Pa. 1954) (recognizing that Pennsylvania has adopted the Restatement (Second) of Torts § 822); *see also Kembel v. Schlegel*, 478 A.2d 11, 14-15 (Pa. 1984).   The defendant's invasion of the plaintiff's private use and enjoyment of land must be either "intentional and unreasonable" or "intentional or otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities."   Restatement (Second) of Torts § 822 (1977).   Further, in order for a plaintiff to prevail on a claim for private nuisance, the plaintiff must have suffered "significant harm, of a kind that would be suffered by a normal person in the community or by property in normal condition and used for a normal purpose."   *Kembel,* 478 A.2d at 14-15 (citing Restatement (Second) of Torts § 821F (1977)).   Commentary to the Restatement makes clear that a "significant harm" is a "harm of importance" and one that must cause a "real and appreciable interference with the plaintiff's use or enjoyment of his land." Restatement (Second) of Torts § 821F cmt. c.

Given the pending nuisance claim brought by the plaintiffs, the plaintiffs will be permitted to testify regarding how they have suffered "significant harm," in the use and enjoyment of their property, *Kembel,* 478 A.2d at 14-15 (citing Restatement (Second) of Torts § 821F (1977)); that is, a "harm of importance" and one that must cause a "real and appreciable interference with the plaintiff's use or enjoyment of his land."  Restatement (Second) of Torts § 821F cmt. c. Testimony on this score must be directly moored to the claims, and recoverable damages, provided for by Pennsylvania law.  Personal injury testimony, real or imagined, and emotional distress testimony which is unmoored to the plaintiffs' use and enjoyment of the property will not be permitted.  The court will then, upon request, be prepared to provide a limiting instruction, describing the scope of damages recoverable in this case, and the limited purpose for which the jury may consider any testimony concerning interference with the plaintiffs' use or enjoyment of this property.

**C.**   **The Nature, Extent and Degree to Which Parties Will be Able to Refer to Settlements, Consent Decrees, Notices of Violations, or Objective Facts Related to Other Civil and Administrative Proceedings at Trial**

Another closely contested evidentiary issue in this lawsuit relates to the extent to which the multi-faceted litigative and regulatory history of this case will be the subject of re-litigation in this lawsuit.  On this question, the parties have starkly different positions.  Noting that it resolved these other cases and

administrative proceedings, Cabot argues that reference to such settled matters is forbidden by Rule 408 of the Federal Rules of Evidence, which generally forbids reference to settlements or settlement discussions at trial. It appears that, in some respects, Cabot would have us apply this evidentiary rule in a transactional fashion, embracing not only various settlements, but also encompassing the underlying events which led to those settlements, or subsequent events which followed the settlements themselves.

The plaintiffs, in turn, have an far different view concerning how this past litigation should shape the trial. While acknowledging the existence of Rule 408, the plaintiffs would suggest that many matters occurring in litigation and administrative agency proceedings that were settled are properly admitted at trial. Thus, the plaintiffs would ask us to approve the presentation at trial of leaked agency records; Notices of Violation filed by agencies; off-the-record statements by agency personnel, and a host of other matters.

We choose a middle path. Our assessment of these issues begins with Rule 408 itself, which provides that:

> **(a) Prohibited Uses.** Evidence of the following is not admissible--on behalf of any party--either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> **(1)** furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim; and

**(2)** conduct or a statement made during compromise negotiations about the claim--except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

Fed. R. Evid., Rule 408.

As this court has observed: "Rule 408 embraces a strong public policy favoring settlement. Under this policy, federal courts frequently exclude evidence of settlements reached between a plaintiff and a former defendant or between a plaintiff and a non-defendant who is responsible for a portion of plaintiff's damages." *Trout v. Milton S. Hershey Med. Ctr.*, 572 F. Supp. 2d 591, 599 (M.D. Pa. 2008). Yet, the policy embodied in Rule 408, while strong, is not global, transactional or all-encompassing. Thus, where events which may tangentially touch upon the topic of settlement have an independent evidentiary relevance in a lawsuit, proof of those events is still permissible under the rule. *See Seasonwein v. First Montauk Sec. Corp.*, 324 F. App'x 160, 162 (3d Cir. 2009) (admitting evidence regarding a general release). Thus, Rule 408 would not prevent parties from introducing the underlying relevant facts in a case which later led to litigation simply because of later settlement efforts. *Hallmark v. Cohen & Slamowitz, LLP*, 283 F.R.D. 136, 140 (W.D.N.Y. 2012). Likewise, evidence of asset valuation arising out of transactions which took place following a settlement effort, are not

barred by Rule 408, if this valuation evidence is relevant at trial. *Noonan v. Harrington*, 740 F. Supp. 2d 970, 979 (C.D. Ill. 2010).

However, Rule 408's prohibition on the presentation of evidence relating to settlements extends both to private party settlements, and consent decrees with government agencies.  This fact has relevance in the instant case because Cabot entered into a Consent Order and Agreement with the Pennsylvania Department of Environmental Protection ("DEP") on November 4, 2009, (the "November 4, 2009 COSA") in order to settle alleged violations of Pennsylvania law in connection with the drilling of natural gas wells in Dimock and Springville Townships, Susquehanna Township, Pennsylvania (the "Affected Area").  (Doc. 635, Ex. A.) The COSA identifies certain Notices of Violation ("NOV") that the DEP issued to Cabot.  According to the terms of the COSA, it was made in settlement "[after full and complete negotiation of all matters set forth in this Consent Order and Agreement, and upon mutual exchange of the covenants contained herein," and "to avoid litigation," and no other person is "authorised]" "to use the Findings in this Consent Order and Agreement in any matter or proceeding." (*Id.*, pp. 10-11.)  As part of the COSA, Cabot agreed to undertake "corrective actions" with respect to households in the Affected Area, including the delivery of temporary water and offering whole-house potable water or gas migration devices to the households in

the Affected Area.  Cabot also agreed to pay a civil monetary penalty.  (*Id.*, pp. 11-14.)

The November 4, 2009, COSA was twice modified in April and July 2010, and was thereafter finally replaced in its entirety by the December 15, 2010 Consent Order and Settlement Agreement ("COSA").  (Doc. 635, Ex. F., COSA, p. 5 at ¶ 2.a   Although the COSA makes clear Cabot's disagreement with DEP's findings and determinations regarding the effect of Cabot's drilling activities on the drinking water in the Affected Area, Cabot ultimately agreed not to challenge the DEP's findings in matters between Cabot and the DEP.  (*Id.*, p. 5 at ¶ 2.a   By its very terms, it is clear that the COSA was entered into in order "[to avoid litigation, to resolve the items set forth in Paragraphs F, H and J, and as a complete and final settlement of any known claims, demands, stipulated penalties, and/or sanctions of any type that the [DEP] has made or could have made against Cabot . . . ."  (*Id.*, p. 4 at ¶ L.)   In terms of Cabot's obligations under the COSA, Cabot agreed to establish an escrow fund for property owners in the Affected Area; to continue supplying temporary water until it complied with certain requirements that were subsequently met; to notify property owners that Cabot would install a gas mitigation device upon request; and to pay a civil penalty.

The court has previously ruled that consent orders, like the COSA, are in effect settlement agreements and therefore not admissible at trial as evidence to prove liability.  *See* Doc. 510 at pp.37-39 ("Plaintiffs may not rely upon evidence

contained within the consent decrees that Cabot and the DEP entered into during
the course of certain investigations in order to establish evidence of negligence.");
Doc. 567; *see also* Fed. R. Evid. 408.   The defendant argues that because the
COSA was entered into as settlement of the claimed NOVs, they should be deemed
inadmissible, and should not be referred to at trial.   The defendant seeks entry of a
pretrial order to this effect because it contends that the plaintiffs have repeatedly
engaged in conduct during discovery and depositions that suggests they will
attempt to refer to the COSA or its earlier variations, or the NOVs, at trial.   In
support of its suspicion in this regard, Cabot has pointed to numerous instances
where the plaintiffs, through counsel, have indicated during depositions and other
discovery that they intend to rely upon information contained in the NOVs and the
consent orders to establish Cabot's liability.   That is precisely what the court
previously found was improper under the Federal Rules of Evidence, and we set
forth at length our prior analysis of this issue:

> We agree with the defendants that the plaintiffs may not rely upon
> evidence contained within the consent decrees that Cabot and the DEP
> entered into during the course of certain investigations in order to
> establish evidence of negligence.   Federal Rule of Evidence 408
> precludes the introduction of evidence of a party "furnishing .. . a
> valuable consideration in compromising or attempting to compromise
> a claim"   "conduct or statements made in compromise negotiations
> regarding the claim" when "offered to prove liability for, invalidity of,
> or amount of a claim that was disputed as to validity or amount, or to
> impeach through a prior inconsistent statement or contradiction . . . ."
> Fed. R. Evid. 408(a).   The policy behind the rule "is to encourage

freedom of discussion with regard to compromise," *Affiliated Manufacturers, Inc. v. Aluminum Company of America*, 56 F.3d 521, 526 (3d Cir. 1995), and "the promotion of settlement of disputes, which would be discouraged if offers of compromise were admitted." 2 McCormick on Evid. § 266 (6th ed.)

Courts generally have found that Rule 408 applies to consent decrees. *See, e.g., Wilson v. Paris*, No. 3:04-CV-1737, 2009 WL 151666, at *1 (M.D. Pa. Jan. 21, 2009); *Bowers v. Natal Collegiate Athletic Assen*, 563 F. Supp. 2d 508, 536 (D.N.J. 2008); *N.J. Turnpike Auth. v. PPG Indus., Inc.*, 16 F. Supp. 2d 460, 473 (D.N.J. 1998) (collecting cases). Rule 408 will permit the introduction of a settlement agreement or compromise related evidence, but only when it is offered for purposes not prohibited by subsection (a), such as "proving a witness's bias or prejudice; negating a contention of undue delay; and providing an effort to obstruct a criminal investigation or prosecution." Fed. R. Evid. 408(b). However, consent orders and related agreements will be deemed inadmissible when offered to provide liability, which is precisely what the plaintiffs seek to do by relying in part on this evidence to show breach. We agree with the defendants that it would be error to rely on evidence of the consent orders between Cabot and the DEP in order to find an issue of fact on negligence.

(Doc. 510, pp. 37-39.)

The court's view regarding the inadmissibility of this evidence remains unchanged.

This view, in turn, informs our consideration of a related issue; namely, whether the Notices of Violation which commenced the regulatory proceedings which were settled may be presented as independent evidence at trial. On this score, Cabot objects to the plaintiffs making any mention of the NOVs that the DEP issued to Cabot. In support of this request, Cabot argues that the NOVs are

merely allegations, are not actual evidence of a violation, are hearsay, and highly prejudicial.  The plaintiffs have represented that they intend to obtain authenticated copies of the NOVs from the DEP, and to subpoena at least one witness with firsthand knowledge who can testify at trial regarding their content.  The plaintiffs argue that whereas Cabot merely asserts without more that the NOVs are nothing more than inadmissible "charges", they represent factual findings by a state regulatory body responsible for the quality of drinking water in the Commonwealth, and under the public records exception to the rule against hearsay, are admissible pursuant to Rule 803(8)(A)(iii).  Fed. R. Evid. 803(8)(A)(iii).  The plaintiffs further argue that the NOVs, while not establishing liability, are nonetheless facts that provide some evidence of fault, and are in any event facts upon which their experts relied in formulating their opinions and thus should be permitted for at least that basis.

As a general matter courts have often been reluctant to admit agency accusations, notices or preliminary findings into evidence in separate litigation to which the agency is not a party.  This reluctance stems from several sources.  First, to the extent that these agency accusations and notices are mere allegations, they are not admissible to prove the underlying facts asserted.  *Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 506 (S.D.N.Y. 2012) *aff'd,* 766 F.3d 163 (2d Cir. 2014).  Further, such agency accusations, notices or preliminary findings are

fraught with a risk of confusion for jurors, since jurors may erroneously conclude that the agency determination is final or preclusive. *Seitzer v. City of Williamsport*, 920 F. Supp. 73, 76 (M.D. Pa. 1996). In addition, presentation of agency accusations, and notices of violation into evidence, would inevitably compel a rejoinder that those accusations were never substantiated and the matter was instead settled, drawing the parties into precisely the area where Rule 408 and the strong public policy favoring settlement forbids us from going–an inquiry into the terms and conditions of settled cases. Finally, we note that the Pennsylvania Environmental Hearing Board itself seems to only afford limited relevance to these NOVs, drawing a distinction between the NOV itself, which is not probative evidence, and the underlying facts recited in an NOV which may be relevant and admissible if presented by competent proof at trial. *Robert Hooper v. DEP,* 1996 WL 660628, at *8 n. 4 (EHB 1996).

This benchmark seems both appropriate, and consistent with case law construing Rule 408, which also forbids testimony regarding settlements, but allows presentation of evidence concerning other independent facts which may have a freestanding relevance to litigation at the discretion of the court. Guided by these basic principles we reach the following conclusions with respect to these aspects of the defendant's motion *in limine.*

First, no party or witness may refer to the settlement of other civil lawsuits during the trial of this case.  However, if relevant and probative of the claims made here, other persons residing nearby the plaintiffs may testify to factual occurrences on their property which were similar to the events allegedly experienced by plaintiffs and which took place following Cabot's drilling activity.  Any party proffering such proof shall provide an offer of proof outside the presence of the jury prior to calling witnesses, so the scope of testimony may be clearly defined.

Likewise, no party or witness may refer to any consent decree or notice of violation which resulted in a settlement.  However, if relevant and probative of the claims made here, the underlying facts may be presented by competent proof at trial.  Any party proffering such proof shall provide an offer of proof outside the presence of the jury prior to calling witnesses, so the scope of testimony may be clearly defined.  This ruling applies to fact witnesses and expert witnesses alike. Rule 703 of the Federal Rules of Evidence, which governs expert witness testimony,  provides that if the "facts or data" relied upon by an expert is otherwise inadmissible, like consent orders, then "the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."   Fed. R. Evid. 703. Therefore any party who wishes to proffer such proof through an expert must make an offer of proof which comports with the legal standards prescribed by Rule 703

prior to eliciting this testimony.  Otherwise expert witnesses may not discuss settlements, consent decrees or NOVs.

Furthermore, evidence concerning the United States Environmental Protection Agency ("EPA") having referenced that "reported violations" involving "documented discharges" to groundwater from Cabot wells, including the Gesford 3 and 9 wells at issue in this case, were caused by faulty cement jobs or well construction, or alleged "off-the-record" remarks by EPA officials will not be permitted at trial for the reasons previously noted by the court, and because such remarks in many instances constitute impermissible hearsay.  However, if relevant and probative of the claims made here, the underlying facts may be presented by competent proof at trial.  Any party proffering such proof shall provide an offer of proof outside the presence of the jury prior to calling witnesses, so the scope of testimony may be clearly defined.

As for evidence concerning the provision of water by Cabot to the plaintiffs, and offers by Cabot to install water treatment systems, while we recognize that this conduct may have taken place following settlement discussions, we find that this action has an independent evidentiary relevance relating to mitigation and calculation of damages.  Therefore we would permit brief testimony on these matters for this limited purpose only, subject upon request to an appropriate cautionary and limiting instruction.  Further, evidence relating to the market value

of property in the area purchased by Cabot and subsequently sold to third parties may also have an independent evidentiary relevance relating to mitigation and calculation of damages. Therefore we would permit brief testimony on these matters for this limited purpose only, subject upon request to an appropriate cautionary and limiting instruction.

While we have ruled in advance of trial on these two matters pertaining to damages, there is another related matter cited in the defendant's motion where we are not prepared to rule prior to trial that damages evidence may be admitted. As part of the COSA settlement it appears that Cabot created a $4.1 million escrow fund, and the plaintiffs may have received some $150,000 from that fund. In this case, which is a tort damages action, we believe that reference to these escrow fund payments would have grave potential to create a great deal of mutual confusion and  prejudice. Therefore our initial view is that no reference should be made to the total amount of this fund, nor should any party refer to the much smaller amounts withdrawn from that fund by the plaintiffs. We will, however, be prepared to address this issue with the parties at trial, if necessary.

### 3.   Defense *In Limine* Requests Deferred or Dealt With Elsewhere

Finally, there are a number of matters raised by the defendant in its motion *in limine* which we believe must be deferred or dealt with separately.

For example, the defendant requests a series of *in limine* rulings relating to the proposed testimony of Mr. Paul Rubin, a proffered defense expert witness in geology and hydro-geology.   There is pending a separate *Daubert* motion challenging the scientific basis for much of Mr. Rubin's testimony.   These specific evidentiary concerns relating to particular aspects of Mr. Rubin's proffered testimony will be dealt with separately by the court in our ruling upon this *Daubert* motion.

Likewise, the defendants have moved to exclude evidence of other alleged wrongs or acts by Cabot, including purported "whistleblower" testimony by Mr. Ely; testimony concerning an alleged "rush to drill," by Cabot; statements attributed to Cabot spokespersons; and other similar matters.   With respect to many of these matters determinations of relevance will likely be based in part upon Rule 404(b) of the Federal Rules of Evidence, which governs the admissibility of other acts evidence, and provides as follows:   "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.   It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." Fed. R. Evid. 404(b).   With respect to the admissibility of Rule 404(b) other act evidence:

> While . . . Rule 404(b) is "construed as a rule of inclusion rather than
> exclusion," *United States v. Scarfo,* 850 F.2d 1015, 1019 (3d
> Cir.1988) (internal quotation marks omitted), [the courts] have also
> cautioned that the . . . reasons for introducing prior bad acts evidence
> may be a combination of showing a "consequential fact as well as ...
> impugn [ing a party's] character." *United States v. Jemal,* 26 F.3d
> 1267, 1272 (3d Cir.1994) (quoting *United States v. Sampson,* 980
> F.2d 883, 886 (3d Cir.1992)). Therefore "when evidence of prior bad
> acts is offered, the proponent must clearly articulate how that evidence
> fits into a chain of logical inferences, no link of which can be the
> inference that the [party] has the propensity to commit the [act]
> charged." *United States v. Himelwright,* 42 F.3d 777, 782 (3d
> Cir.1994) (citing *Jemal,* 26 F.3d at 1272).

*United States v. Lindsay* 339 F. App'x 268, 272 (3d. Cir. 2009).

Given the highly fact-bound nature of the analysis called for by the rules of evidence, and mindful of the fact that "pretrial [rulings regarding evidentiary] exclusions should rarely be granted. . . . [e]xcluding evidence as being more prejudicial than probative at the pretrial stage is an extreme measure that is rarely necessary, because no harm is done by admitting it at that stage,*" In re Paoli R. Yard PCB Litig.*, 916 F.2d 829, 859 (3d Cir. 1990), we will defer on these evidentiary questions until they can be presented to us on a fully developed factual record.

While we will generally defer ruling upon these matters until trial, we note that one category of proof proffered by the plaintiffs may be contemporaneous public statements made by a Cabot representative. With respect to this class of evidence under Rule 801(d)(2)(c) of the Federal Rules of Evidence, such

statements may be admissible as a settled exception to the hearsay rule.   "Rule 801(d)(2)(c) specifically excludes from the definition of hearsay any statements used against a party which were made by another person authorized by the party to make a statement concerning the subject.   Fed.R.Evid. 801(d)(2)(C); *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1198 (3d Cir.1993)."   *United States v. Sokolow*, 91 F.3d 396, 402 (3d Cir. 1996).   Because this rule is premised on the notion that a party is bound by the admissions of its agents, "Rule 801(d)(2)(c) requires that the declarant be an agent of the party-opponent against whom the admission is offered.   *Kirk v. Raymark Indus., Inc.,* 61 F.3d 147, 164 (3d Cir.1995)*, cert. denied,* 516 U.S. 1145, 116 S.Ct. 1015, 134 L.Ed.2d 95 (1996)."   *United States v. Sokolow,* 91 F.3d 396, 402 (3d Cir. 1996).   Therefore in order to admit statements under Rule 801(d)(2)(c), the proponent of the statement must provide "independent proof of the existence of an agency relationship and its scope.   *See In re Japanese Elec. Prod. Antitrust Litig.,* 723 F.2d 238, 300 (3d Cir.1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)."   *United States v. Pelullo,* 964 F.2d 193, 200 (3d Cir. 1992).

Determinations of the application of Rule 801(d)(2)(c) to particular statements, however, is an exercise that cannot be done in a vacuum.   Rather this analysis must await trial.

C.     **Plaintiffs' Motion _in Limine_**

In their motion _in limine_, the plaintiffs seek a pre-trial ruling on several areas of potential trial evidence, but their motion and accompanying memorandum provide little in the way of specificity about the evidence that they seek to exclude, and provide an insufficient legal basis for the court to frame a pre-trial limitation even if one were shown to be warranted.  We explain briefly our consideration of these requests at this stage.  While the motion will be denied, the plaintiffs will not be precluded from seeking to lodge objections at trial if they believe there is a legitimate basis to oppose the introduction of evidence.

### 1.     The Number of Households With Water Treatment Systems or Bulk Water Deliveries

Plaintiffs' first request is not entirely clear.  It appears that plaintiffs are seeking entry of an order that would prevent any Cabot witness from testifying that there were more than 10 households in Dimock and Springville Townships that have had Cabot-supplied water treatment systems installed or bulk water delivered. Plaintiffs' offer little in support of this claim, other than to refer the court to large swaths of deposition testimony without any guidance as to what in these deposition transcripts supports such a request.  Plaintiffs do not indicate exactly what evidence they would have the court exclude.

Cabot opposes this request by arguing that it is vague and unspecific, and asserts that there is no witness testimony in the record that suggests there were not more than 10 households in Dimock and Springville that have received water treatment systems or bulk water deliveries from Cabot.

Upon consideration, the court finds insufficient basis to grant the plaintiffs' request.  Any objection to evidence regarding water treatment systems, their number, or their efficacy will be addressed if necessary at trial.

### 2. Evidence that the Water Treatment Systems Placed in Dimock and Springville Perform Consistently and Reliably

Next, plaintiffs request that the court rule that the defendant may not introduce any evidence to show that the water treatment systems installed in Dimock and Springville performed consistently and reliably.  Plaintiffs provide almost no argument in support of this request, other than to assert that the evidence would "mislead the jury and unfairly prejudice plaintiffs' ability to oppose Cabot's failure-to-mitigate defense in that defendant expert witnesses were unable to or chose not to provide pre-trial testimony that demonstrated, clarified and resolved this issue[.]"  As factual support for this assertion, plaintiffs refer the court to the entirety of Cabot expert, Brent Brelje's deposition transcript.

Cabot argues that plaintiffs' counsel failed to inquire into these very issues with Mr. Brelje, or to use the language "consistently and reliably".  Defendant also

notes that Mr. Brelje testified that the water treatment systems that were installed are effective to treat the constituents in the plaintiffs' water, and which plaintiffs' own expert, Mr. Rubin, claimed could not be effectively treated. (Doc. 638, Ex. 3, Deposition of Brent Brelje at 41:11-42:8; 81:24-82:10.)

Likewise, Cabot notes that another expert, Dr. James Pinta, opined in a report and during his deposition that analytical data he reviewed from the SLR-designed treatment systems in Dimock caused him to find that the systems are effective and efficient to treat, and are capable of treating, the compounds that the plaintiffs claim exist in their water. (Doc. 642, Ex. A, June 26, 2015 Supplemental Report of James Pinta, at pp. 21-23; Ex. B, Deposition of James Pinta, at 102:5-10; 102:18-103:21; 159:2-23.) Cabot argues that this evidence of the "efficient" and "effective" capabilities of the water treatment systems encompasses the "consistently" and "reliably" language that the plaintiffs now seek to exclude, and thus the request should be denied.

The court agrees that Cabot has shown that there is evidence in the record that may be relevant to the performance of the water treatment systems, including that these systems may be effective at treating constituents or compounds in the plaintiffs' water, and that the plaintiffs have failed to demonstrate that they are entitled to a pre-trial ruling absolutely excluding any such testimony at trial.

### 3.    Testimony Regarding Consumption of Treated Water

Next, the plaintiffs assert that Cabot should be prevented from eliciting testimony from any witness that would suggest that the members of the households that Cabot has identified as having water treatment systems provided by Cabot actually consume the treated water. The plaintiffs generally suggest that a ruling *in limine* on this issue is warranted because Cabot's witnesses failed to provide "pre-trial testimony that demonstrated, clarified and resolved this issue[.]" (Doc. 638, p. 2.) Plaintiffs also suggest that any such evidence offered at trial would confuse the jury – an assertion that they do not explain in their moving papers.

Cabot urges the court to deny this request as unsupported, baseless, and because it ignores deposition testimony in the record. Indeed, Cabot points the court to deposition testimony given by Loren A. Salsman, a non-party fact witness, who testified at a deposition that was initiated by the plaintiffs that he has an SLR-treatment system at his home and that he and his family consume the water and "[l]ove it." (Doc. 642, Ex. C, Deposition of Loren Salsman at 52:16-54:2; 61:11-18; 66:11-23.) In light of this evidence alone, and in the absence of any compelling reason to disallow such testimony, the court can perceive no basis to prevent the defendants from introducing testimony that residents who have had water treatment systems installed actually use the treated water.

48

### 4.   Preventing Brent Brelje From Testifying that the Opinions Contained in His Reports Were Made to "A Reasonable Degree of Scientific and Engineering Certainty"

Plaintiffs next claim that Brent Brelje should be prevented from testifying that the opinions set forth in his written reports were made to a "reasonable degree of scientific and engineering certainty."  Plaintiffs make this request but provide no authority to support it, and seem to overlook testimony from Mr. Brelje himself in which he attests that the opinions he set forth in his report were made to a reasonable degree of scientific certainty.  (Doc. 638, Ex. C, Deposition of Brent Brelje at 231:2-233:11; 38:15-39:3 (Q. . . . Is – are your opinions in [your report] to a reasonable degree of scientific certainty as you are testifying today?  A.  Yes.")  The court finds that the plaintiffs have not demonstrated that Mr. Brelje should be prohibited from confirming that his opinions were given to this degree of certainty, and the request to prevent him from doing so will be denied.

### 5.   Water Data Results

Plaintiffs also request that the court limit as "cumulative and redundant presentation of purported water data results obtained by Cabot or its vendors and agents, as it is anticipated that defendant will offer three or more witnesses who will cover this same material."  (Doc. 638, p. 3.)  Other than to speculate that the testimony offered at trial may become cumulative and redundant, the plaintiffs offer no support for this request.

As Cabot correctly underscores, the Ely and Hubert water test results are at the core of this litigation, and whether their water was and still is contaminated with methane or other substances, and whether Cabot was responsible for causing contamination in the first place, are central to the remaining claims.   Cabot represents that given the critical nature of this issue to the entire lawsuit, they have had multiple experts looking at data related to this subject.   Although Cabot represents that it does not intend to repeat the same evidence over and over again at trial, it suggests that it would be premature to determine this now, or to prescribe the manner in which Cabot would be permitted to present its case.

We agree.   There is no way for the court to determine at this time whether the evidence Cabot will seek to introduce will be cumulative or redundant, and thus no reasonable way for the court to grant the relief sought.   Furthermore, it is clear that this is an issue that is properly reserved for trial, when the plaintiffs may, if they believe warranted, interpose an objection that evidence offered is cumulative. The court can then make a determination within the context of trial as it unfolds, as is typically and routinely done.   *See, e.g., Trout v. Milton S. Hershey Med. Ctr.*, No. 1:07:07-CV-0431, 2008 WL 3978060, at *2 (M.D. Pa. Aug. 26, 2008) (denying motion *in limine* to exclude potentially cumulative testimony without prejudice to the defendants' right to object to cumulative testimony at trial); *see*

*also Sanchez v. Echo, Inc.*, CIV. 06-787, 2008 WL 2951339, at *2 (E.D. Pa. Jan. 9, 2008) (same).

### 6.    Limiting the Number of Lawyers at Trial

Finally, the plaintiffs move the court to limit the number of Cabot's lawyers who will be permitted to sit at counsel table at trial in order to prevent Cabot from "display[ing] . . . its phalanx of attorneys to make a 'might is right' showing to the jury."  (Doc. 638, p. 3.)  This motion will be denied, because it is not the proper subject of a motion *in limine*, but is instead something that the court has addressed with the parties during the pre-trial conference.

An appropriate order follows.