**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NOLEN SCOTT ELY, et al.,** | : | **Civil No. 3:09-CV-2284** |
| | : | |
| **Plaintiffs** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **CABOT OIL & GAS** | : | |
| **CORPORATION, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

The process of litigation often transforms, sharpens and defines disputes.  As a result, frequently the case that is actually presented at trial is very different than the case that the parties imagined when they began the litigation.  Therefore, litigation by its very nature presents the potential for either clarity or confusion.  Clarity in litigation comes from a candid recognition of how the law, the facts and the clash of ideas, re-defines the issues and claims in a case over time.  Confusion erupts when a party fails to see their case as it is, but instead persists in attempting to present that case as they wished it would be.

So it is here.

On March 10, 2016, following a nearly three-week trial that capped more than six years of litigation, an eight-person jury seated in Scranton, Pennsylvania found in favor of nine plaintiffs on claims that Cabot Oil & Gas Corporation's drilling activity at two gas wells in Susquehanna County, Pennsylvania was negligent and caused the plaintiffs' compensable nuisance injuries by interfering with and damaging the plaintiffs' access to water and their enjoyment of their property.   This claim, which was the sole claim submitted to the jury, differed significantly from the claims described six years earlier in the plaintiffs' complaint. It also varied materially from the claims that the plaintiffs led to jury to believe would be presented to them at the outset of this trial.   Further, although the evidence offered in support of the plaintiffs' sole remaining claims was limited, often substantially rebutted or discredited, and notably lacking with respect to damages, the jury found in the plaintiffs' favor and awarded them $4.24 million in the aggregate.

After the jury's verdict had been delivered and the panel was dismissed from the courtroom, Cabot advised the Court and the plaintiffs that it intended to renew its motion for judgment notwithstanding the jury's verdict, or alternatively seek a new trial.   Now pending before the Court is Cabot's motion seeking three alternative forms of relief from the jury's judgment in this case:   judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure; a new

trial pursuant to Rule 59 of the Federal Rules of Civil Procedure; or remittitur of the jury's damages award. (Doc. 756.) The parties have filed hundreds of pages in briefs in support of and opposition to Cabot's motion. (Docs. 762, 763, 765, 787, 788, 792, 797, 798.) With these voluminous submissions, the briefing on the motion is now concluded and Cabot's motion is ripe for adjudication.

For the reasons that follow, although the Court agrees with Cabot that the evidence presented in support of the plaintiffs' claims was spare, sometimes contradictory, frequently rebutted by other scientific expert testimony, and relied in some measure upon tenuous inferences, giving full deference to that verdict under the exacting standards prescribed by law, the Court does not agree that Cabot has demonstrated that it is entitled to have judgment entered in the company's favor. The legal standards for granting judgment in favor of the losing party are appropriately high and difficult to surmount, and in this case we find that that Cabot has not met that high standard, since the evidence may permit a narrow path for limited success by the plaintiffs, albeit on a claim framed in a manner that is very different from the claims argued by the plaintiffs before this jury.

However, the Court does agree with Cabot that the weaknesses in the plaintiffs' case and proof, coupled with serious and troubling irregularities in the testimony and presentation of the plaintiffs' case – including repeated and regrettable missteps by counsel in the jury's presence – combined so thoroughly to

undermine faith in the jury's verdict that it must be vacated and a new trial ordered.   Moreover, the jury's award of more than $4 million in damages for private nuisance bore no discernible relationship to the evidence, which was at best limited; and even were the Court to find that the jury's verdict of liability should stand, the Court can perceive no way in which the jury's damages award could withstand even passing scrutiny regardless of the applicable standard of review.

We do not take this step lightly, and we recognize the significance of voiding the judgment of a panel of jurors who sat through nearly three weeks of trial and reached a unanimous verdict.   Nevertheless, upon consideration of the trial record, and following reflection on the substantial and varied weaknesses in the plaintiffs' case together with the myriad examples of inappropriate conduct that repeatedly occurred in the jury's presence and may have colored the outcome of this case, the Court is constrained to find that a new trial is not only justified, but required.   Accordingly, Cabot's motion will be granted in part, the verdict will be set aside, and a new trial will be ordered.[1]

---

[1]  Before any trial is held, however, the Court will direct that the parties engage in meaningful settlement discussions with the assistance of another Magistrate Judge of this Court to determine whether a mutually agreeable, and sensible, resolution of the plaintiffs' remaining claims may be obtained without the need for a second trial, with the risks and costs that it necessarily will involve.  At this point, the litigative risks and the costs to all parties associated with trying the remaining claims are obvious.  Given the time, money, and effort that has been put into this litigation to date, the Court will require that the parties undertake an effort to determine whether settlement of the plaintiffs' remaining claims is possible.

## II.   **BACKGROUND**

This civil litigation commenced nearly eight years ago, when 44 plaintiffs and neighbors from Susquehanna County, Pennsylvania collectively sued Cabot Oil & Gas Corporation for injuries and property damage allegedly suffered as the result of the defendants' natural gas drilling operations in Dimock Township, a rural community situated in Susquehanna County.  Subsequently, a number of the plaintiffs reached settlement agreements with Cabot, eventually leaving only 9 plaintiffs who refused to reach a pre-trial resolution of their claims.  Those holdout plaintiffs include Nolen Scott Ely and his wife Monica L. Marta-Ely, individually and as parents to three minor children (the "Elys"); and Ray and Victoria Hubert, individually, and as parents of one minor child, as well as a child who since reached the age of majority, Angel Hubert (the "Huberts").[2]

As the number of plaintiffs in this lawsuit gradually reduced, so did the remaining plaintiffs' claims reduce in number and scope.

When the lawsuit was initiated, the Elys, Huberts and dozens of other Dimock plaintiffs launched a legal broadside on Cabot's expansive drilling activity in the northern tier of Pennsylvania, and in Susquehanna County in particular.  As part of this legal assault, the plaintiffs brought claims for breach of contract,

---

[2]  Nolen Ely is also the executor for the Estate of Kenneth R. Ely, which was one of the plaintiffs that brought multiple claims against the defendants.  Those claims were dismissed after the Court found the Estate had not adduced sufficient evidence to support them.

fraudulent inducement, private nuisance, negligence, negligence *per se*, claims for medical monitoring, and alleged violations of a variety of Pennsylvania environmental laws. The plaintiffs also endeavored to show that natural gas drilling represented an abnormally dangerous activity that should cause it to be subject to strict liability under Pennsylvania law – something that no court in Pennsylvania has ever found.

However fashioned or labeled, litigation in this action made clear that the primary thrust of the plaintiffs' claims was that the defendants' oil and gas drilling activities caused injury to the plaintiffs' access to safe water from the wells on the property where they live by polluting their well water. Although many other residents welcomed the industry's arrival and expansion, and the economic benefits that some realized as a result, this litigation represented the concerted push-back of others in the same community against the encroachment of the natural gas industry upon communities like Dimock, which claimed to have experienced unwelcome change to the local natural environment, erosion of the bucolic surroundings, and – most especially – the alleged impairment of the local drinking water as a result of the industry's expansion in the area.

Over the intervening years, this expansive legal strategy against Cabot and other natural gas concerns gradually winnowed and the remaining claims reduced in both number and scope. Dozens of the plaintiffs settled their claims, but the

Elys and Huberts pushed forward.   Following years of litigation, periodic enlargement of the discovery period to accommodate the Ely and Hubert plaintiffs as they were represented by a rotating cast of attorneys, as well as stints during which the plaintiffs were without counsel, Cabot moved for summary judgment against their remaining claims.

The undersigned prepared reports and recommendations with respect to the motions, recommending that the District Court grant the motions entirely with respect to the Estate's claims, and with respect to all of the Ely and Hubert family claims except for the claims of negligence and private nuisance.   In so doing, the Court recognized that the plaintiffs' surviving claims rested upon relatively limited evidence that was itself subject to vigorous dispute by the defendants. Nevertheless, the Court also found that viewing the evidence in the light most favorable to Elys and the Huberts, and granting all reasonable inferences in their favor, the negligence and nuisance claims had sufficient evidentiary support to go to trial.

After the district court adopted the reports and recommendations, the parties consented to proceed before the undersigned for the remainder of the litigation.   At this point, following the rulings that granted Cabot's motions for summary judgment in substantial part, the litigation became significantly more limited in its

scope, as the plaintiffs' claims had been pared back, and their theories of liability substantially curtailed.

Unfortunately, the plaintiffs proceeded to trial in late February 2016 as if their claims remained largely unaffected by these events or the court's rulings. The plaintiffs adopted a strategy which suggested they did not fully appreciate or acknowledge the significant limitations that had been imposed on their case against Cabot, and on the evidence that they could rely upon in front of a jury to prove their remaining claims. The plaintiffs' own failure to recognize the substantive change to their claims and the evidentiary limitations that would accordingly govern at trial was facilitated by a trial strategy which regrettably failed to abide the Court's orders and trial rulings regarding evidentiary matters and matters of basic civil practice. As a result, the manner in which this case was prosecuted had the effect of repeatedly inviting the jury to engage in unwarranted speculation that was plainly prejudicial to the defense. This constellation of serious problems thoroughly undermined the $4.24 million verdict that the jury ultimately rendered in favor of the plaintiffs. These grave concerns, which now combine to undermine confidence in this verdict and compel a new trial, were foreshadowed in pretrial proceedings.

On February 12, 2016, at a pretrial conference, the Court was presented with a startling issue that had arisen: despite having been preparing for this litigation

for many years, the plaintiffs had failed to provide or identify scores of documents that they now first proposed to introduce at trial. Cabot, reasonably, moved to exclude these undisclosed materials, and the Court was constrained to enter an Order excluding more than 300 of the plaintiffs' proposed trial exhibits resulting from counsel's "completely unexplained, and wildly kaleidoscopic" submission of "voluminous, contradictory, cryptic, confused and confusing" exhibit lists. (Doc. 685, pp. 1-2 and n.1.) Indeed, the Court was compelled to acknowledge that never in the undersigned's 36-years as a federal court litigator and judge had the Court "[ever] observed a wholesale discovery default of this scope and dimension" and it was thus something that constituted "an unprecedented event in our experience." (*Id.*) This ruling, which the plaintiffs' vigorously contested, was compelled by the plaintiffs' wholly unexplained production of thousands of pages of exhibits, and over 300 categories of exhibits, which had never previously been identified, and in some cases even produced, over the course of the entire litigation. Thus, the Court found itself confronted on the eve of trial by a profound tension between what the plaintiffs wished their case to be and what it was in fact. This tension was exemplified by the plaintiffs' interest in using countless previously undisclosed exhibits at a trial that was more than six years in the making and the defendant's interest in not being ambushed with a trial-by-surprise. This tension, and others substantially similar, would bedevil this case over its duration.

The plaintiffs' casual approach to identifying their exhibits in a "vague, ever-changing, and idiosyncratic form that continues to take still new shape even with trial approximately one week away" compelled the conclusion that "the plaintiffs' disregard of their obligation to produce discovery in a timely manner, and to timely and intelligibly identify trial exhibits in accordance with the Court's Local Rules and prior orders" required that the plaintiffs be limited to the 24 exhibits that they had identified in their pretrial memoranda. (*Id.*)

The Court includes reference to this tragic pretrial event because it offered a worrisome preview of what was to come once a jury was empaneled: a failure to reconcile the plaintiffs' case as they imagined it with the significantly changed legal and factual landscape of this litigation. The plaintiffs' case had been substantially, and appropriately, narrowed by the District Court's ruling on summary judgment. The plaintiffs' documentary evidence in support of these narrowed claims had been made narrower still through their own pretrial missteps and disregard of the Court's orders. The plaintiffs were thus faced with an especially narrow path to prove their remaining claims, and the plaintiffs were made explicitly aware of just how narrow that path was. Yet, the plaintiffs, their witnesses, and their counsel proved unable to stay within the narrow boundaries that had been set by legal rulings in this case – rulings that were compelled by the law, the evidence that had been adduced, and the plaintiff's own pretrial conduct.

The exclusion of the plaintiffs' proposed exhibits would be a harbinger of what would follow over the course of trial, with numerous instances in which the plaintiffs' witnesses were invited to stray from the confines of what they were permitted to discuss to offer passing commentary about other drilling activity in the area; to hint at other matters unrelated to the plaintiffs' claims that suggested Cabot engaged in prior misconduct; or to suggest to the jury that there were additional admissible factual issues that they were not permitted to discuss but were obviously relevant to the plaintiffs' claims. The aggregate effect of this repeated trespass into prohibited areas was compounded during a highly irregular closing argument, which ultimately created the impression for the jury that Cabot must have been responsible for all of the plaintiffs' alleged water problems – problems that began before the Gesford wells were drilled, a fact that we now know because the plaintiffs stipulated to it before trial.

This course of conduct is particularly regrettable because, as we discuss below, there was a narrow path the plaintiffs could have pursued to properly litigate some of their surviving claims. The existence of this path, which can be discerned from the evidence when that evidence is construed in a light most favorable to the plaintiffs, leads us to decline Cabot's invitation to find for the defendant as a matter of law. However, by eschewing this path, and instead steering an erratic course in contravention of the Court's rulings and admonitions

which led to confusion and prejudice, the plaintiffs have compelled us to grant the defendant's motion for new trial.  As explained below, the myriad problems that occurred at trial, both respect to the plaintiffs' proof and counsel's conduct, resulted in a verdict and damages award that is impossible to sustain.

## III.   <u>DISCUSSION</u>

### A.   **Motion for Judgment as a Matter of Law**

We begin by addressing Cabot's motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure.  Cabot has presented an exhaustive argument in support of this aspect of its motion that presents multiple arguments as to why it is entitled to have judgment entered in its favor regardless of the evidence presented.  With few exceptions, these were also arguments that Cabot made prior to trial, either in its motion for summary judgment, or in motions *in limine* that sought to exclude or limit certain testimony, particularly that of the plaintiff's hydrology expert, Paul Rubin.  Thus, in a number of particulars Cabot has essentially repeated and amplified those arguments again in its post-trial motion, which can reasonably be read as a motion seeking reconsideration of the Court's prior rulings masquerading as a motion for judgment as a matter of law.

The Court has studied Cabot's motion carefully, as it has done with all of the motions that the parties have filed over the past several years.  The Court has also

examined the trial record, and is intimately familiar with that record, which Cabot now urges the Court to discuss in great detail. The Court's consideration of that record does not, however, cause the Court to reconsider its prior rulings with respect to expert testimony; the right of the Huberts to prosecute a claim for private nuisance; or the narrow scope of the claims that were permitted to proceed to trial. The Court further is bound to consider these matters in accordance with the highly deferential standard of review that must be used after a jury has reached a verdict. Consideration of the testimony offered at trial in the context of this deferential standard of review causes the Court to find that although the jury's verdict must be set aside and a new trial ordered in this case, Cabot is not entitled to judgment in its favor on the very narrow claims that the Court previously found the plaintiffs were entitled to try before a jury.

Cabot's arguments fall predominately into two categories. First, Cabot argues that because the plaintiffs' stipulated as to the date on which Cabot first began drilling the Gesford wells, and because that date comes after the time that the plaintiffs represented that they began experiencing problems with their water, Cabot is necessarily entitled to judgment because any other result would be absurd, and lead to the conclusion that a cause did not precede the alleged effect.

Second, Cabot takes aim at the testimony of the plaintiffs' expert witnesses, Paul Rubin and Dr. Anthony Ingraffea, arguing that Rubin's testimony should have

been disallowed entirely and failed in any event to offer anything probative with respect to an underground pathway in which water flowed from the Gesford wells to the underground aquifers that fed the plaintiffs' water wells. Cabot also argues that Dr. Ingraffea's testimony was deeply flawed, relied upon a number of unreasonable and unsupported inferences, was highly prejudicial, and failed to connect with Rubin's testimony to allow a jury to find that Cabot was negligent in its drilling and cementing of the Gesford wells after they experienced faults. Cabot argues that Ingraffea's testimony was so flawed, and so thoroughly rebutted by Cabot's own experts, that it could not be used by a jury to infer that any failure in cementing the wells allowed gas to migrate into an aquifer that fed into the plaintiffs' water supply.[3]

### 1.    Standard of Review Under Rule 50

After a party has been fully heard on an issue during trial, Rule 50 of the Federal Rules of Civil Procedure allows a court to grant a motion for judgment as a

---

[3] Cabot also revisits an argument it previously made, and which the Court previously ruled upon, by arguing that the Hubert family should be precluded from bringing a claim for private nuisance because they do not hold a legally protectable interest in their home and its water supply because they merely live on property owned by the Elys, and do not hold any legally recognized tenancy in that land. The Court rejected that argument earlier, and found that Pennsylvania law would permit the Huberts, who have maintained a home on the property for decades, to maintain a nuisance claim. Cabot essentially amplifies its earlier argument, and is seeking reconsideration of that ruling. The Court stands by its previous treatment of this issue, which was adopted by the District Court, and declines to reconsider it here. Cabot has preserved this issue if it wishes to seek further review by the Third Circuit, if warranted, following a new trial.

matter of law, or a new trial, if the court finds "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]" Fed. R. Civ. P. 50(a).  Where a party has made a Rule 50 motion before the matter is submitted to the jury, and where that motion has been denied, the party may renew the motion following trial, as Cabot has done here.  Fed. R. Civ. P. 50(b). When presented with such a motion, the court may either let the verdict stand, order a new trial, or direct entry of judgment as a matter of law in favor on the moving party. *Id.*

Although available under the Rules, "judgment as a matter of law should be granted sparingly." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 373 (3d Cir. 2016) (quoting *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002)); *see also Bender v. Norfolk S. Corp.*, 31 F. Supp. 3d 659, 664 (M.D. Pa. 2014) ("Judgment as a matter of law should be used sparingly and may be granted only if, 'as a matter of law, the record is critically deficient in that minimum quantity of evidence from which a jury might reasonably afford relief.'") (quoting *Whelan v. Teledyne Metalworking Prods.*, 226 F. App'x 141, 145 (3d Cir. 2007) (quoting *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001)).

Thus, as the Third Circuit explained in *Avaya*, a motion for judgment as a matter of law brought pursuant to Rule 50 should be granted only if, "viewing the

evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Avaya*, 838 F.3d at 373 (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)). In considering the evidence in the light most favorable to the nonmoving party, the court must also give the nonmoving party "the benefit of all reasonable inferences, even though contrary inferences might reasonably be drawn." *In re Lemington Home for the Aged*, 777 F.3d 620 626 (3d Cir. 2015) (citing *Dudley v. S. Jersey Metal, Inc.*, 555 F.2d 96, 101 (3d Cir. 1977)). Additionally, a court must not make credibility determinations or weigh the evidence when considering the motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). Instead, "the court should review the record as a whole, [and] it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* At the same time, the court may grant the motion "if upon review of the record, it can be said as a matter of law that the verdict is not supported by legally sufficient evidence." *Borrell v. Bloomsburg Univ.*, No. 3:12-CV-2123, 2016 WL 4988061, at *2 (M.D. Pa. Sept. 19, 2016) (citing *Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685, 691-92 (3d Cir. 1993)). "The question is not whether there is literally no evidence supporting the non-moving party, but whether there is evidence upon which the jury could properly find for the non-moving party." *Id.* at *2.

### 2.      The Effect of the Stipulation on the Plaintiffs' Claims

Cabot first argues that no reasonable jury could have found for the plaintiffs because the plaintiffs have admitted that problems with their water began before the date that all parties agree Cabot began drilling the two Gesford wells in late September 2008.  (Doc. 696, ¶22; N.T. 2/24 56:14-57:6.)  The plaintiffs repeatedly attempted at trial to distance themselves from this agreement once it became apparent that the September 2008 drilling or "spud" date came after the plaintiffs had made reports of trouble with their water, as the problem this presented for their claims was obvious.  Although the plaintiffs were offered on multiple occasions the opportunity to challenge the effect of the stipulation appropriately outside the presence of the jury, they declined to do so.  Instead, they seemingly shifted their focus to offer new and different theories regarding Cabot's alleged activities near the drill sites that preceded the actual spud date, and Mr. Ely in particular testified that the drilling occurred in June or July, 2008 – something that was simply inconsistent with the plaintiffs' stipulation, which the Court ultimately found to be binding for purposes of trial.  (N.T. 2/29 49:1-7, 213:19-23.)

Since the plaintiffs rested their case-in-chief, Cabot has maintained that the defense was entitled to judgment in its favor because the plaintiffs' own admissions establish irrefutably that Cabot's Gesford wells could not have been the cause of the plaintiffs' alleged water problems because the plaintiffs admitted that

those problems existed *before* Cabot ever broke ground on either well.   Cabot argues that the plaintiffs' case crumbles on the very issue of causation, since at trial the plaintiffs were boxed in by the stipulation.   According to Cabot, this represented game, set and match in this case since the plaintiffs' case defied the basic science of cause-and-effect.   Cabot has now argued, once again, that the plaintiffs' admissions in this regard foreclose their entire case.

The evidence unquestionably showed that the plaintiffs had begun experiencing some problems with their water before the spud date for the Gesford wells.   Mr. Ely prepared a handwritten document in 2009 noting the problems began in the summer of 2008, (Cabot Ex. 96), and Mr. Ely testified at trial that problems began in August 2008.  (N.T. 2/23 126:20-127:13, 191:15-192:2, 210:21-212:10.)   On cross-examination, Mr. Ely emphasized that his family "began noticing issues with our water in August of 2008."  (N.T. 2/23 212:3-10.)   A day after giving this testimony, Mr. Ely reaffirmed it, noting that there was nothing about his prior testimony that he wanted to change.  (N.T. 2/24 24:14-17.)   Mrs. Ely testified similarly.  (N.T. 2/24 78:14-19.)

For his part, Ray Hubert testified that he began noticing problems with his own well in July 2008.   (N.T. 2/24 171:12-20, 210:23-211:3.)   Mrs. Hubert testified that problems began in August 2008.  (N.T. 2/25 27:10-23.)   Hope Hubert testified similarly that problems began during the summer of 2008.  (N.T. 3/3 30:5-

11, 37:17-21.)   Angel Hubert hedged somewhat in her own testimony, but on cross-examination agreed that changes to the family water began in the summer. (N.T. 3/3 64:18-66.)

The Court recognized that the plaintiffs' own testimony, coupled with the binding stipulation regarding the actual date of drilling, presented a significant problem for the plaintiffs' case.   Nevertheless, the Court cautiously permitted the case to proceed, and ultimately go to the jury, in part because there was some evidence which tended to show that the plaintiffs' problems with their water worsened and continued into 2009, and the plaintiffs' experts and third-party witnesses all offered testimony that combined to provide some basis for the jury to consider whether Cabot's drilling activity contributed to the alleged contamination of the plaintiffs' water.   In making this judgment we were mindful of the fact that parties may pursue negligence claims even in setting where there may be a number of factors contributing to the injury suffered, provided the plaintiffs show that the defendant's negligence was a proximate cause of their injury.

There was some evidence of this type presented at trial.   Mr. Ely testified that problems became considerably worse after the drilling began.   (N.T. 2/24 47:16-19.)   Testimony regarding ongoing and worsening problems was, to some degree, corroborated by the testimony of Michael O'Donnell, an agent with the Pennsylvania Department of Environmental Protection.   Mr. O'Donnell testified

that the plaintiffs communicated with him in January 2009 regarding concerns over their water and he became engaged in an investigation into the issue on behalf of DEP.[4]   (N.T. 3/2 76:21-77:7.)   Mr. O'Donnell personally observed that the Ely water was "strongly effervescent."   (N.T. 3/2 78:22.)   Mr. O'Donnell testified that "strong effervescence [is] an indication to us in the work I do that there's – there may be methane present."   (N.T. 3/2 79:7-9.)   Mr. O'Donnell confirmed that there was, in fact, methane present in the plaintiffs' water.   (N.T. 3/2 79:8-9.)   He testified that upon observation of the Huberts' water, it too was effervescent, though less so than the Elys'.   (N.T. 3/2 79:13-14.)

Mr. O'Donnell testified that he detected free methane in the Huberts' water well pit, which was a particular concern.   (N.T. 3/2 83:22-25.)   Mr. O'Donnell testified that he visited the Gesford well pad and personally observed bubbling in the Gesford 3 well cellar after January 2009, something that is an indication of gas escaping from the well bore.   (N.T. 3/2 84:14-85:15.)   Although he was prevented from testifying regarding regulatory investigations specifically, Mr. O'Donnell testified that he estimated that he took sampling from the Ely well on six to twelve separate occasions after this time.   (N.T. 3/2 87:8-9.)   He also testified that at this point the Hubert well had been taken offline because of concerns regarding high methane levels and, therefore, could not be sampled, but that air sampling was

[4]  Mr. O'Donnell's testimony regarding the DEP's investigation was limited by pretrial rulings excluding evidence of administrative actions and settlements.

performed on multiple occasions.  (N.T. 3/2 87:11-17.)  In response to questions from the Court, Mr. O'Donnell testified that the last time he observed the Ely or Hubert wells was in "late 2010" during which he sampled their water supplies and determined that the levels of dissolved methane present was "similar to the dissolved methane in some of the earlier samples that we collected."  (N.T. 3/2 94:1-20.)  Based on his recollection, Mr. O'Donnell testified that the methane levels in the plaintiffs' water wells were between 20 and 30 milligrams per liter, more than seven to eight times that the DEP considered to be safe; later, Mr. O'Donnell stated that the methane levels in the Ely water reached 64 milligrams per liter.  (N.T. 3/2 96:14-16.)

The jury also heard limited testimony from two of the plaintiffs' neighbors, Erik Roos and Victoria Switzer, over Cabot's objection.  These witnesses offered some testimony that was relevant to the jury's consideration of temporality and causation, or the likelihood that Cabot's drilling activity at the nearby wells contributed to the problems with the plaintiffs' water that persisted over a long period of time.

These witnesses, who resided in close proximity to the plaintiffs' homes, testified that they experienced detrimental changes in their water quality after Cabot commenced its drilling operations nearby.  For his part, Mr. Roos testified that the water coming from his faucet was "spurting more, more often, after they

21

started drilling [in his area]."   (3/1 N.T. 231:17-19.)   He testified that a Cabot representative contacted him and that a vent was placed on his well pipe in order to deal with "a lot of extra methane."   (3/1 N.T. 233:3-234:3.)   He testified that methane continues to be monitored, and that he and his wife still do not consume the water from their well because methane levels remain too high.   (3/1 N.T. 237:23-238:8.)   For her part, Ms. Switzer testified to the extent of drilling operations in the area throughout 2008, and testified that late that year she experienced, for the first time, having black water coming out of her taps.   (N.T. 3/2 40:19-22.)   Acknowledging Cabot's assertions that this testimony from the neighbors was erroneously admitted, the Court disagreed at trial and permitted this limited testimony that was relevant to the jury's assessment of the likelihood that Cabot's drilling activity impacted the plaintiffs' wells.

### 3. Though Limited and Problematic, the Plaintiffs' Expert Testimony Provided Some Additional Basis for the Jury to Evaluate the Plaintiffs' Claims

In addition to the fact witness testimony, the jury heard testimony from the plaintiffs' experts, Paul Rubin and Anthony Ingraffea, which also added to the information the jury had to consider whether Cabot's drilling impacted the plaintiffs' water supplies, and whether its conduct was negligent.   Indeed, the plaintiffs largely relied on the testimony from these experts to establish that Cabot's drilling and cementing of the wells was negligent, that the subsurface

structure of earth in this area was highly fractured, and that Cabot's drilling activity permitted methane to flow into underground aquifers that wound up polluting the plaintiffs' water wells. This testimony was, in the Court's estimation, riddled with problems and limitations, but it nonetheless did add to the tapestry of evidence that the jury could consider in evaluating the plaintiffs' claims, and may have provided some additional basis for the jury to reach inferences regarding the impact of drilling in late 2008 and into 2009.

The first of these expert witnesses was the plaintiffs' hydrology expert, Paul Rubin. Prior to trial, Cabot filed a *Daubert* motion seeking to have Rubin excluded as an expert. On February 1, 2016, the Court held a hearing during which Mr. Rubin testified over several hours. Following that hearing, and following consideration of the parties' substantial briefs submitted in opposition to, and in support of, his proposed expert testimony, the Court issued a 39-page decision that excluded much of Mr. Rubin's proposed testimony because of a lack of testing and actual data to support many of his conclusions. However, the Court found that he would be permitted to testify with respect to the fracturing that he had observed in the Dimock area, and that he was competent to testify in general terms about the way in which subsurface water migrates, and regarding contaminants that he found in the Elys' water in 2011. (Doc. 696.)

The Court recognizes that Cabot believes that Mr. Rubin's testimony should have been disallowed entirely, but that issue was previously ruled on, and narrow parameters were accordingly set for Mr. Rubin to testify in a limited scope regarding the geological features that existed in the area of the plaintiffs' homes and the Gesford wells that were marked by fractures, fissures and joints through which he testified that water could flow.   During trial, Mr. Rubin offered such testimony, and while he did not – and could not – testify as to a single pathway through which subsurface water traveled to the plaintiffs' wells, he did testify as to potential pathways for subsurface migration in the relevant geographic area based upon his own observations and understanding of geology in the area.   He also offered very limited testimony regarding the results of water testing that he performed in 2011.

Cabot subjected Rubin to lengthy cross-examination, and endeavored to show, repeatedly, that his conclusions were little more than speculation. Nevertheless, Rubin did testify that he had observed geological characteristics such as faults at a quarry located approximately one-half mile from the plaintiffs' water wells.  (N.T. 2/25 148:11-12, 158:3-5.)  He admitted that he had not identified a single joint, set, fault or other pathway through which chemicals or other substances traveled from the Gesford wells to the plaintiffs' water supplies.  (N.T. 2/25 166:16-24.)  Instead, Rubin was able only to testify that in this particular area

of Dimock, there were numerous potential pathways that could facilitate subsurface movement, and he concluded based upon his professional experience and observation that these same characteristics that he observed at the quarry would have been in place on the plaintiffs' property and the Gesford well pads.

Cabot argues forcefully that Rubin's testimony was simply rank speculation, since he did not perform any particular measurements or other examination of the plaintiffs' property that would have allowed him to conclude that the fractures and faults that he observed at the quarry actually extended to the Gesford pads or the plaintiffs' wells, or that underground pathways fed the plaintiffs' aquifers. Hence, Cabot argues that Rubin's testimony was vague, imprecise, speculative and un-scientific, and ultimately had the pernicious effect of inviting the jury to speculate impermissibly that gas or other constituents migrated from the Gesford wells to the plaintiffs' water, even though Rubin had offered no testimony that could support this conclusion.

As before, the Court continues to find that Rubin's testimony was permissible within the narrow confines that had been set by the Court's *Daubert* ruling, and the Court finds that this testimony had some limited probative value with respect to the plaintiffs' claims. Cabot has failed to persuade the Court that Rubin should have been prohibited from testifying simply because he was unable to identify a single pathway through which water and other substances could have

migrated to the wells; he testified in keeping with the limited scope of his examination of the area, and his understanding of what the faulting and fracturing in the area would mean with respect to potential subsurface migration. Despite Cabot's thorough critique of this witness' testimony, the Court finds that his testimony offered at least a minimal foundation from which a jury could make inferences, when this testimony was considered with that of the plaintiffs' fact witnesses and Dr. Ingraffea, who provided testimony regarding well bore integrity and testified about his opinion that Cabot's drilling activity and cementing of the Gesford wells was negligent.

The plaintiffs also relied on the testimony of Dr. Ingraffea, professor emeritus of engineering at Cornell University, to provide the jury with a basis to conclude the Cabot's drilling activity and the efforts the company later took to plug its wells was faulty. As it did with Rubin's testimony, Cabot argues that Dr. Ingraffea's testimony lacked an adequate foundation and was, in the end, little more than raw speculation on his part – in fact, Cabot also argues that Dr. Ingraffea offered testimony that was inappropriate, unduly speculative, or otherwise insufficient to permit a jury to infer that Cabot's drilling activity was more likely than not a contributing factor to the plaintiffs' contaminated water supplies. The Court agrees that Dr. Ingraffea's opinion testimony, which was not challenged pretrial through a *Daubert* motion, was problematic in some particulars because it

admittedly rested in some measure upon conclusions that had a limited empirical basis for support.  (N.T. 2/29 216:6-14, 218:1-7, 219:2-6) (explaining his theory that the plaintiffs' water was impacted by "gas that was coming from activities initiated on the 3S well by going through the 1,500 foot gas show" and then traveling over to the Gesford 3/9DD well bore, and somehow migrating up that well bore.)  Dr. Ingraffea also conceded that he had no direct proof of this theory of gas migration.  In fact, at one juncture, Dr. Ingraffea agreed with Cabot's counsel that his opinion could be referred to as speculative.  (N.T. 2/29 227:2-4, 230:14-21.)  This admission is nearly fatal to this expert testimony, particularly when coupled with Rubin's limited opinion, and has spurred Cabot to argue that his testimony as an expert was inappropriate and should be disregarded as the expert himself admitted to speculation.

Nevertheless, when considered against the other evidence in the case, and the very limited nature of the plaintiffs' remaining claims, and giving his testimony regarding the loss of well bore integrity every benefit of the doubt, the Court cautiously concludes that Dr. Ingraffea, to some minimum degree, did testify regarding problems with the defendants' drilling and cementing of the wells that may have had some relevance to the plaintiffs' case.  Therefore, the Court is unwilling to find that the problems with his testimony, to the extent they occurred, require that the Court enter judgment in Cabot's favor as a matter of law.

However, as will be discussed later, the weakness in his testimony contributes substantially to the Court's finding that a new trial is necessary because the verdict was contrary to the great weight of the evidence that was presented.

### 4.  Judgment as a Matter of Law is Not Warranted

In summary, the Court finds that the plaintiffs' evidence offered in support of their narrow claims was extremely limited.  Nevertheless, the Court finds that aggregating the testimony from the plaintiffs themselves, the testimony of their expert witnesses in spite of its shortcomings, and the testimony of third-party witnesses including Mr. O'Donnell and the plaintiffs' neighbors Erik Roos and Victoria Switzer, may provide sufficient evidence that could have permitted a reasonable jury to find by a preponderance of the evidence that Cabot's activity had been negligent and that it contributed to the plaintiffs' interference with the use of their water and enjoyment of their property.  When considering this evidence against the strict standards that govern motions for judgment as a matter of law under Rule 50, the Court does not find that Cabot has demonstrated that it is entitled to have judgment entered in its favor as a matter of law.

However, we also find manifest weaknesses in this evidence, and observe that this evidence even when it is construed in a light most favorable to the plaintiffs supports a basis of liability which is starkly at odds with the claims pursued by the plaintiffs at trial.  The material weaknesses and variances in this

proof, when it is coupled with the manifold instances of improper conduct at trial, and repeated testimony and argument by counsel that was prejudicial to Cabot, require a new trial. The Court further finds that the evidence at trial was bereft of any information that could have allowed the jury to calculate a multi-million dollar award, thus providing further reason why the jury's verdict as to both liability and damages must be vacated, and a new trial ordered.

### B.     Motion for a New Trial Pursuant to Rule 59

### 1.     Standard of Review

Federal Rule of Civil Procedure 59(a) provides, in relevant part:

> A new trial may be granted as to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

Fed. R. Civ. P. 59(a). The decision to grant or deny a new trial is committed to the sound discretion of the trial court and, unlike the standard used for determining judgment as a matter of law under Rule 50, the court need not view the evidence in the light most favorable to the verdict winner. *See Allied Chem. Corp. v. Daiflon*, *Inc.*, 449 U.S. 33, 36 (1980); *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (citing *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282 (3d Cir. 1993)); *see also* 9A Wright & Miller, Federal Practice and Procedure § 2531

(2d ed. 1994) ("On a motion for new trial the court may consider the credibility of witnesses and the weight of the evidence.").

Common reasons given for granting a new trial include "(1) the jury's verdict is against the clear weight of the evidence, and a new trial must granted to prevent a miscarriage of justice; (2) newly-discovered evidence exists that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent." *Amgen Inc. v. Sanofi*, -- F. Supp. 3d -- , 2017 WL 27253, at *3 (D. Del. Jan. 3, 2017) (citing *Zarow-Smith v. N.J. Transit Rail Operations*, 953 F. Supp. 581, 584-85 (D.N.J. 1997)).  Recently, another court in the Middle District of Pennsylvania observed that courts have granted new trials where, *inter alia*, the verdict was against the weight of the evidence, the size of the verdict was against the weight of the evidence, and where counsel engaged in improper conduct that had a prejudicial effect on the jury.  *See Borrell v. Bloomsburg Univ.*, -- F. Supp. 3d --, 2016 WL 4988061, at *3 (M.D. Pa. Sept. 19, 2016); *see also Todd v. Luzerne Cnty. Children & Youth Servs.*, No. 04-2637, 2011 WL 841429, at *2 (M.D. Pa. Mar. 8, 2011).  A new trial may also be warranted where there has been a "showing that the jury verdict resulted from passion or prejudice." *Evans v. Port Authority of New York and New Jersey*, 273 F.3d 346, 352 (3d Cir. 2001).

In considering a motion for a new trial, a court should proceed with caution and remain "mindful that it should not simply substitute its own judgment of the facts and the credibility of the witnesses for those of the jury.  Rather, the court should grant a new trial 'only when the great weight of the evidence cuts against the verdict and a miscarriage of justice would result if the verdict were to stand.'"  *Id.* (quoting *Leonard*, 834 F.3d at 386); *see also Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006); *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352-53 (3d Cir. 1991).   "[W]here the evidence is in conflict, and subject to two or more interpretations, the trial judge should be more reluctant to grant a new trial."  *Klein v. Hollings*, 992 F.2d 1285, 1295 (3d Cir. 1993) (citation omitted).   "This limit upon the district court's power to grant a new trial seeks to ensure that a district court does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury."  *Delli Santi v. CNA Ins. Cos.*, 88 F.3d 192, 201 (3d Cir. 1996) (quoting *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 211 (3d Cir. 1992)).   Accordingly, the Third Circuit has instructed that "a District Court reviewing a jury verdict has an 'obligation . . . to uphold the jury's award if there exists a reasonable basis to do so."  *Evans*, 273 F.3d at 351-52 (quoting *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989)).

## 2.      The Verdict Was Against the Weight of the Evidence

As an initial matter, despite the plaintiffs' persistent efforts to distance themselves from or disavow their binding stipulation, the evidence demonstrated convincingly that the plaintiffs' problems with their water were witnessed by all of them before Cabot had begun drilling the first of the Gesford wells.  The plaintiffs all acknowledged that they experienced problems with the water in their wells at least a month before Cabot started to drill on the Gesford pads.  This manifest problem of "cause and effect" was never adequately explained by the plaintiffs, who time and again either evaded this issue, attempted to impeach their own stipulation, or endeavored to provide some alternative explanation for their own prior representations.  Eventually, however, the plaintiffs' case was confined and hobbled by their own statements and testimony which showed that some of the very problems that they claim Cabot caused by its drilling activity occurred before Cabot broke ground on either well.  While the plaintiffs provided some scant evidence that could suggest that problems with their water worsened after drilling began in earnest, but this evidence was extraordinarily limited and vague.  In any event, even if the plaintiffs arguably provided this limited testimony that could have caused one to infer that the drilling activity worsened the plaintiffs' water contamination they did not proceed on this theory at trial, and thus created profound confusion regarding the nature of their claims.

Moreover, this evidence was overwhelmed by other testimony and evidence. Given the scientific nature of the plaintiffs' claims, the plaintiffs necessarily relied upon expert testimony to explain how the defendants were negligent in their drilling operations, and how that negligence could have caused contaminants to flow beneath the earth's surface to the plaintiffs' nearby water wells. Yet, the plaintiffs' expert witnesses offered opinion testimony that came perilously close speculation and at best were inferences that had weak factual support.

And even if there were a minimum quantity of evidence that could have allowed the jury to reach its finding regarding Cabot's negligence, and a causal relationship between that negligence and the alleged contamination of the plaintiffs' water, the plaintiffs provided essentially no testimony or other evidence that could have allowed a jury to make a rational calculation of damages that they sustained. In short, on the issues of causation and damages the plaintiffs' presentation left the jury largely at sea, invited appeals to sympathy and speculation, and provided us with few principled ways to explain or justify a damages award of $4.24 million for the nuisance and interference with the plaintiffs' use and enjoyment of their property.

### a.   Cause and Effect

In 2009, Nolen Ely wrote a note that was potentially devastating to the claims that remain in this case. In that note, Mr. Ely indicated that problems with

his family's well water were noticeable in the summer of 2008.  (Cabot Ex. 96.)

At trial he testified repeatedly that these problems began in August 2008.  (N.T.

2/23  126:20-127:13, 191:15-191:2, 210:21-212:10.)   On cross-examination, Mr.

Ely explained that "what we've been trying to convey" is that he and the other

plaintiffs "began noticing issues with our water in August 2008."   (N.T. 2/23

212:3-10.)  As the Court noted previously, each of the adult plaintiffs in this case

testified at trial that their water began experiencing problems that summer, and in

any event prior to September 25, 2008 – the date that the plaintiffs' agreed is the

date on which Cabot started to drill the two wells that are claimed to have caused

damage to the plaintiffs' property.  Moreover, Dr. Ingraffea testified that the gas

that impacted the plaintiffs' water wells came from a depth of 1500' – something

that did not happen until November 12 or 13, 2008, during the drilling of the

Gesford 3S well.  (N.T. 3/1 40:25-41:12.)  Paul Rubin's spare testimony regarding

the faults and fracturing in the region that allowed gas to flow into aquifers that

contaminated the plaintiffs' wells made clear that he believed the cause of the

alleged changes in the plaintiffs' water came from the drilling of the wells.  (N.T.

2/29 49:1-7, 213:19-23.)

Although the Court construed the evidence in the light most beneficial to the

plaintiffs, and concluded that there might have been some testimony that could

have allowed a jury to infer that the drilling activity was a contributory factor

which exacerbated the already recognized issues, given that the uncontradicted evidence showed that the initial impact to the plaintiffs' water begin before the alleged cause, it is hard to explain from the evidence at trial how Cabot's drilling – even if negligent – could be deemed the sole or exclusive cause of the plaintiffs nuisance and interfered with their use and enjoyment of property.   In sum the problems with the proof in this case are extensive, and were compounded by the manner in which this proof was presented.   The Court focuses on some of the most glaring of these problems to explain further why a new trial is necessary based upon the weight of the evidence alone.

### b.    Weakness in Rubin's Testimony

Even before trial, when the Court substantially curtailed the scope of Mr. Rubin's testimony in its *Daubert* opinion, the Court noted the inescapable conclusion that "much of Mr. Rubin's proffered testimony is long on conjecture and speculation and short on testing and analysis."  (Doc. 696, p. 38.)  In so ruling, the Court found that Rubin "has insufficient basis to render an opinion regarding the actual migration of groundwater from Cabot's wells to the plaintiffs' aquifers" and, therefore, precluded him from testifying at trial about "the existence of any specific pathways between Cabot's wells and the plaintiffs' water supplies for the simple reason that he did not do any testing that could confirm such a subsurface connection." (*Id.*, p. 36.)  At trial, Rubin conceded on cross that he had not done

any testing or other analysis that could have permitted him to opine to a reasonable degree of scientific certainty that there was a specific joint, set, fault or fracture through which any chemical or substance could travel to the plaintiffs' two wells. (N.T. 2/25 166:16-24.)  Instead, Rubin could only say he made some observations of geological faulting by visiting a quarry more than half a mile from the plaintiffs' wells.  (N.T. 2/25 148:11-12, 158:3-5.)   Rubin admitted that he did not know exactly which way the faults traveled, and his speculative opinion that the faults could have extended to the plaintiffs' property was weakened by the fact that he had never personally seen a fault extend more than 2,000 feet, and because he did not ever examine the geology on the plaintiffs' property.  (N.T. 2/25 182:12-15, 153:8-9, 171:5-13.)   Lastly, Rubin never performed any testing of the Huberts' water, which causes his opinion to be especially limited with respect to their claims.   (N.T. 2/25 131:7-9, 131:19-132:1, 169:3-24, 172:24-173:8.)   Any probative value of Mr. Rubin's testimony was limited – both by his own admission and by the limitations that had been placed on his area of expertise – to general observations regarding the geological features in the area that may be relevant to underground migration of water.

The limited, general and highly inferential testimony offered by Mr. Rubin was sharply contrasted with that offered by Dr. Tarek Saba, who opined based upon substantial scientific testimony that no pathway from a single source

36

impacting the plaintiffs' wells, and because the Ely and Hubert wells were not in communication with one another based upon information gleaned from chemical analysis of those wells. (N.T. 3/3 202:21-203:16, 203:23-204:18.) Thus, in contrast to Rubin's acknowledgment that he had not identified any one pathway between the Gesford pad and the wells, Dr. Saba testified without contradiction that no pathway even existed. (N.T. 3/3 204:16-18.)

The stark contrast between the testimony of these experts on this single issue – let alone Dr. Saba's extensive testimony regarding the chemical composition of the plaintiffs' water wells, and the geological features that could have impacted water flow to those wells, severely undermines the Court's confidence in this proof as support for the conclusion reached by the jury.

### c. Weakness in Ingraffea's Testimony

Dr. Ingraffea's opinion, though less limited in scope than Rubin's, also suffered from some glaring weaknesses, chief among them that some aspects of it were simply speculative – and Dr. Ingraffea admitted as much. Dr. Ingraffea's theory of how the plaintiffs' water wells were impacted was that gas was coming from activities initiated on the 3S well by it going through the 1,500 foot gas show – then moving over to the Gesford 3/9DD well bore, and somehow migrating up that well bore before entering an aquifer that took it to the plaintiffs' wells. This theory is difficult enough to believe on its own, but especially so when considered

against evidence which strongly suggested these water wells were not fed by a single source, and were not even connected to one another. (N.T. 2/29 216:6-14, 218:1-7, 219:2-6.) Dr. Ingraffea conceded that this multi-part theory was based substantially upon speculation, and that he had no proof to support it. (N.T. 2/29 227:2-4, 230:14-21.)

Dr. Ingraffea's testimony was also glaringly limited with respect to causation because he was not qualified to testify about hydrology or hydrogeology, and he acknowledged that it would take an expert in these fields to explain the flow of gas into a water supply:

> I can explain why a defective well might cause previously ensconced hydrocarbon fluids to be available for flow in an underground aquifer. It is the hydrologist's job to then determine whether underground flow of that aquifer in space and time could explain how these now liberated fluids could get into the water supply at the point of the water wells. That's the picture. It takes team work to do this.

(N.T. 2/29 57:3-11.) In other words, Dr. Ingraffea's testimony relied upon the testimony of another expert – presumably Paul Rubin – to connect his theory of negligence to the alleged contamination of the plaintiffs' wells. As noted, however, the evidence on this score was badly deficient, and thus further renders Dr. Ingraffea's testimony to be of marginal value. There was simply an analytical gap between the opinions offered by these experts that the plaintiffs never fully connected at trial. Instead, the plaintiff's theory of their case left the jury to

speculate regarding a possible connection between allegedly negligent drilling activity at the Gesford pads, the resultant flow of hydrocarbons through the earth as a result of that drilling into unidentified underground pathways, and the delivery of those hydrocarbons along those pathways as contaminants to the plaintiffs' water supplies.

### d.   Lack of Evidence that the Plaintiffs' Water Was Contaminated by the Gesford Wells

Setting aside the problems that afflicted the plaintiffs' own proof of negligence and causation, Cabot presented uncontradicted evidence that undermined the plaintiffs' very theory of liability in this case, and demonstrated that no pathway existed between the plaintiffs' wells – and that the chemical makeup of these wells were distinct from one another.   The plaintiffs had no explanation for this scientific evidence, which undermined their suggestion that Cabot's drilling at the Gesford site was the sole source of the contamination experienced at both of the plaintiffs' wells..

Dr. Saba testified, without contradiction by any other witness, that there were material differences in the chemical makeup and constituents in the plaintiffs' water wells.  (N.T. 3/3 203:17-204:18; N.T. 3/4 129:17-23, 176:22-25; Cabot Trial Ex. 237 (demonstrative).)   As Dr. Saba explained, the differences in chemical composition means, scientifically, "there is no pathway from a single source." (N.T. 3/4 176:14-21.)  Dr. Saba testified that if methane had, in fact, migrated from

39

the Gesford wells to the plaintiffs' water supplies, the isotopic makeup of the methane in each water supply would have been consistent. (N.T. 3/4 168:6-9.) Dr. Saba testified that they were not, and the plaintiffs had no answer in response.[5] Although the plaintiffs did provide evidence showing that their water was similarly turbid and cloudy, and they had methane in their water at levels that the DEP for some time considered to be dangerous, the record does not sufficiently demonstrate that Cabot's drilling at the Gesford wells – even if done negligently – was the source of any contamination.

> ### e.      Cabot's Evidence Regarding a Lack of Causation and Negligence was Substantial

Dr. Saba testified at length regarding his detailed testing of the gases found in the plaintiffs' water wells and concluded to a reasonable degree of scientific certainty that it did not match the gas at the 1500' level that Dr. Ingraffea stated was impacting the plaintiffs' water supply.   (N.T. 3/3 133:12-135:17, 137:6-141:16, 142:4-143:2, 212:3-217:5, N.T. 3/4 168:10-169:8.)  The plaintiffs offered essentially no rejoinder to this scientific testimony that discredited the plaintiffs' experts' own theory regarding causation.

Other evidence showed that outcrops existing on the plaintiffs' property were high in both iron and manganese, and Dr. Saba explained why the water there

---

[5] As noted, Mr. Rubin did no testing of the Hubert well at all, and thus would have been incapable of offering any meaningful testimony to rebut Dr. Saba on this score.

contained high levels of each of these elements.  (N.T. 3/3 152:2-153:1, 161:5-162:23.)  Dr. Saba also explained to the jury that water in this part of Pennsylvania has historically contained high levels of methane, iron, sulfur and other constituents, which further explained their presence in the plaintiffs' water.  (N.T. 3/3 163:23-169:11, 171:7-174:19, 186:11-22.)   Cabot presented evidence from local residents who testified that water in the area had long been bubbly and had a distinctive odor going back decades, (N.T. 3/7 34:14-35:16), and evidence showed that Mr. Ely himself had been able to light his water on fire even before gas drilling operations commenced in the area, (N.T. 3/3 170:14-171:6).

Dr. Saba also testified that the constituents found in the plaintiffs' water supplies are within background limits, with the exception of the results that Rubin had identified, which Dr. Saba criticized for not having been stabilized prior to sampling, hence making them unreliable outliers.  (N.T. 3/3 205:13-206:23.)  Indeed, Dr. Saba noted that Mr. Ely had found that gas was present in his water well at levels exceeding 28 milligrams per liter before Cabot broke ground on either of the Gesford wells.  (N.T. 3/3 206:24-209:25.)

In contrast to the extremely limited testing done by Mr. Rubin, Dr. Saba's research of historical data and testing of the plaintiffs' two distinct wells led him to opine to a reasonable degree of scientific certainty that "plaintiffs' water wells contain certain naturally occurring compounds" that are "consistent with

41

background, ground water condition" and therefore that the wells "are not impacted by gas operations." (N.T. 3/3 145:10-146:1.) Although the jury was not compelled to credit all of Dr. Saba's testimony, when considered against the paucity of evidence that the plaintiffs offered to prove their claims regarding contamination, which was itself based largely on irregular testing and conjecture, the Court is constrained to find that to the extent that it reflects a finding that Cabot was the sole source of any injury to the plaintiffs the jury's verdict was against the weight of the evidence.

Likewise, Cabot presented substantial testimony in response to Dr. Ingraffea's admittedly speculative opinion regarding the manner in which Cabot's drilling activities were negligent and permitted the migration of hydrocarbons in a way that later reached the plaintiffs' wells – something Dr. Saba testified did not happen. Dr. L. Brun Hilbert testified that (1) "no materials, liquid, fluid or gas escaped from the well bores and caused any contamination to the plaintiffs' water wells," (2) [t]he wells did not leak into the subsurface environment, nor are they leaking into the subsurface environment now," and (3) when the wells were plugged, they were plugged according to the best industry practices . . . and in accordance with the required regulations of Pennsylvania." (N.T. 3/7 92:22-93:5.) In reaching his conclusions, Dr. Hilbert testified that he had relied upon his review of well histories, morning reports, invoices, sketches, and other documents that

42

exist in the well files, whereas Dr. Ingraffea testified that his admittedly speculative opinion was drawn from the well histories alone. (*Compare* N.T. 3/7 87:7-88:23 with N.T. 3/1 91:7-12.)   As in the marked contrast between the hydrogeological testimony offered by Mr. Rubin and Dr. Saba, there was a substantial contrast in the testimony offered by Drs. Hilbert and Ingraffea, and particularly on the depth of information that each expert relied upon in offering their respective opinions.   As with the evidence on causation, the plaintiff's evidence regarding Cabot's allegedly negligent drilling activity was weak and lacked rigor in comparison with that offered by Dr. Hilbert in response.

> **2.     Missteps and Irregularity in the Presentation at Trial and Closing Argument Were So Extensive and Prejudicial as to Compel a New Trial**

While we have found that the jury's verdict was against the weight of the evidence, we note that the missteps of plaintiffs' counsel, which occurred on multiple occasions throughout the trial and in the presence of the jury, and particularly during closing argument, risked stoking juror prejudice and confusion and, in our view materially contributed to the jury's confusion.  Therefore, this trial conduct regrettably provides further reasons why a new trial in this case is required.

Earlier in this memorandum, the Court noted that this case was initially brought by 44 plaintiffs asserting multiple legal claims against Cabot, alleging a

variety of legal theories in a broadside attack on Cabot's oil and gas drilling activities. This action was, over the course of litigation and rulings by the Court, and as the result of settlement agreements, narrowed substantially on the eve of trial to consist only of the Elys' claims of negligence and nuisance, and the Huberts' claims of nuisance. The litigation thus became much more focused, and required that the plaintiffs approach the remaining claims in a similarly focused manner. Despite our repeated admonitions, sadly this did not happen.

Instead, on the eve of trial the plaintiffs endeavored to augment their exhibit list from the 24 that were originally identified to 351 – many of which had never even been produced in the litigation. The plaintiffs' efforts in this regard, which were unsuccessful, foreshadowed that they were unwilling to accept the way in which their claims had been pared back throughout this litigation, and more troublingly hinted at an unwillingness to confine their evidence and approach to trial that focused exclusively on these remaining claims.

The Court recognizes the difficulty that the plaintiffs faced in presenting a case that had been so narrowed, particularly given the broader litigative and administrative context from which the case came to trial. The testimony that could permissibly have been elicited from witnesses, and later made the subject of argument, was itself strictly limited by the Court's *in limine* rulings, particularly with respect to prior settlement agreements or DEP action. These limitations were

44

compelled by the rules of evidence.   Yet, plaintiffs' counsel on a number of occasions failed to abide by these express limitations.   Instead, what can fairly be described as a scattered and inattentive approach to these rulings signaled a kind of myopia on the plaintiffs' part regarding the limited issues that remained to be tried, and the kinds of proof that they could present to a jury in support of those claims. This inability to reconcile the case as they imagined it to be with the actual case as borne out by the law and facts also likely contributed to repeated missteps during trial with respect to the plaintiffs' presentation of their case, and in counsel's summation in front of the jury.

During trial, the plaintiffs, their witnesses and counsel continually strayed into forbidden territory by repeatedly hinting at evidence that had been excluded from the jury's consideration, or by resorting to unorthodox questioning and argument from counsel at all stages of the case.   This inappropriate conduct marred the trial from opening to close, and impelled the Court repeatedly to conduct sidebars with the parties – 40 in total, lasting more than three and a half hours, often at the request of Cabot's counsel – and, unfortunately, to admonish and reprimand plaintiffs' counsel in the jury's presence even during closing argument.[6]

---

[6] The Court emphasized for counsel, and was constrained to emphasize in front of the jury on more than one occasion, that it sought to conduct these types of discussions at sidebar and outside the jury's hearing.  Unfortunately, this was not possible at times during the trial, and at closing, and the Court was compelled to admonish counsel when her questioning or argument contravened the Court's

This intervention by the Court was forced even after counsel had specifically been put on notice that her summation at closing was inviting speculation, was improperly vouching for witness credibility, was implying the existence of settlement agreements that had been excluded from evidence, and was making mention of legal rulings made by the Court, including to suggest – wrongly – that the Court had made a *prima facie* finding of negligence in the case.[7]   (N.T. 3/9 38:17-49:11.) In reviewing the record, the Court is left with the firm impression that this conduct was inappropriate and likely influenced the jury's verdict.  Hence, a new trial is warranted.

---

explicit instructions.  (N.T. 3/8 37:24-40:5 (during examination of Hilbert); N.T. 3/9 88:22-89:5 (closing argument).)

[7] The Court identified these problems for plaintiffs' during a sidebar following her closing argument, and prior to Cabot's closing and the plaintiff's rebuttal.  In fact, after the Court took the pains to identify for counsel these four areas where she had improperly tread, and where she was to go no further, the Court informed her that the improper closing "could undermine any verdict that [the plaintiffs'] receive."  (N.T. 3/9 38:17-20.)  Unfortunately, the message did not get through, and during the plaintiffs' rebuttal argument she almost immediately began referring to methane, toxicological matters and EPA testing that were no longer a part of the case.  The Court was constrained to interrupt counsel once again to advise her and the jury that "this is not about toxic chemicals.  That is something that all of the parties have told this jury.  This case is about alleged interference with the use and enjoyment of property.  That is the only claim before this jury and that is the only claim in this case.  And Ms. Lewis's remarks, which regrettably go to an area that is not in the case, must be disregarded by the jury."  (N.T. 3/9 89:5-10.)  Plaintiffs' counsel's failure to stay within the narrow bounds of the case and the Court's rulings risked confusing the jury and making it appear that they were not hearing the full story, something that was plainly to Cabot's detriment, and was compounded by counsel's insinuation at other times earlier in the case that Cabot had destroyed evidence, something that the Court had to strike from the record.  (N.T. 3/1 215:1-216:25.)

Where, as here, the moving party objected to asserted inappropriate conduct by counsel at trial and later argues that the conduct warrants a new trial, a court must determine (1) whether counsel's conduct was improper and (2) whether it was reasonably probable that the improper conduct influenced the jury's verdict. *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 207 (3d Cir. 1992); *Blanche Rd. Corp. v. Bensalem Twp.*, 57 F.3d 253, 264 (3d Cir. 1995) (abrogated on other grounds by *United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392 (3d Cir. 2003)); *Greate Bay Hotel & Casino v. Tose*, 34 F.3d 1227, 1236 (3d Cir. 1994); *see also Young v. Pleasant Valley Sch. Dist.*, No. 3:07-CV-00854, 2012 WL 1827194, at *27 (M.D. Pa. May 18, 2012) (granting new trial due to counsel's prejudicial conduct at trial), aff'd 601 F. App'x 132, 136 (3d Cir. 2015).

Cases where new trials have been granted based on counsel's errors typically involve challenged conduct that was pervasive at trial. *See, e.g., Blanche Rd.*, 57 F.3d at 264 (affirming grant of a new trial where "counsel for Plaintiffs pursued a pattern of misconduct from opening statement through final argument" and where "the record [was] replete with examples of counsel misconduct that might have influenced the jury"); *Fineman*, 980 F.2d at 206-07 (affirming new trial based on pervasive misconduct); *cf. Draper v. Airco Inc.*, 580 F.2d 91, 96-97 (3d Cir. 1978) (reversing district court's decision against granting a new trial, noting "Where . . .

a closing address to the jury contains such numerous and serious violations of so many rules of proper argument as occurred here, we must conclude that it is more reasonably probable that the verdict was influenced by the prejudicial misstatements.").

Guided by these standards, the Court turns to the record of the trial in order to provide an overview of some of the missteps of counsel that lead the Court to find that this inappropriate conduct, including questioning and argument, likely influenced the jury's verdict and now compels that a new trial be ordered.

We begin at the trial's end, during the plaintiffs' closing argument, shortly before the jury was to retire to deliberate, since that argument encapsulates so much of what was ultimately prejudicial to Cabot. First, rather than to summarize the facts in evidence, counsel persisted in referring to matters that not only were not in evidence, but were specifically excluded from evidence by the Court's pretrial *in limine* rulings, particularly with respect to out-of-court settlements and administrative proceedings involving the DEP. For example, counsel improperly referred to the DEP's investigation into Dimock water issues, and later consent agreement with Cabot – both of which were excluded from trial in this case – in her closing argument, indicating on multiple instances that Cabot had been required to provide water to the plaintiffs and had not done so out of "charity" but instead because of a "requirement" imposed by the DEP. (N.T. 3/9 25:9-26:12.)

48

Perhaps owing to her familiarity with factual issues that were outside the bounds of this case, counsel would frequently refer to matters that had never been presented in front of the jury, thereby inviting speculation about facts not in evidence.   This happened regularly.   (N.T. 3/9 44:11-45:5) (testifying about a subcontractor's investigation into spills and leaks around the Gesford pads); N.T. 3/9 39:1-5 (referring to a still photo of "bubbling" offered for demonstrative purposes only, inviting speculation into facts not in evidence); N.T. 3/9 31:11-13 (commenting on an alleged drop in natural gas prices, not in evidence); N.T. 3/9 29:21-30:2 (informing the jury that the majority of Cabot's wells were drilled in Susquehanna County, inviting speculation).   This routine pattern of referring to matters outside of evidence, and especially about matters that were absolutely prohibited from being introduced into the case, was prejudicial.   See *Fineman*, 980 F.2d at 207-11 (attorney misconduct warranted new trial where counsel referred to "extrinsic evidence"); *Blanche Rd.*, 57 F.3d at 264 (holding new trial warranted where counsel referred to documents that had not been introduced).

Counsel's tendency to diverge from the record that had actually been made was especially problematic because it caused Cabot to object not only throughout trial but also during closing argument.   By forcing Cabot into the dilemma of choosing between an objection to improper testimony, or foregoing an objection, and allowing the introduction of excluded evidence, plaintiff's persistent refusal to

follow our orders and instructions created a wholly misleading impression for the jury. It suggested to the jury to speculate that they were not receiving the whole story and that evidence was being improperly withheld from them. Whether intentional or inadvertent, the impression created by this course of action was both wrong and unfairly prejudicial. In fact, this would be an issue that arose specifically during closing as well. Counsel said on multiple occasions that she would not "go beyond that," or offering a statement regarding constituents in the plaintiffs' water before saying "but I won't go into that," or hinting that the plaintiffs were being pressured to settle their cases but that she was "not saying how, I'm not getting into any details. I'm not implying anything, other than it has –" before this commentary was cut off by the Court. (N.T. 3/9 26:18-27:12; N.T. 3/9 40:1-6; N.T. 3/9 22-36:13.)

In addition to arguing about matters not in evidence and those that had been specifically excluded from the case, and implying that Cabot or the Court were preventing the jury from hearing all of the relevant evidence, plaintiffs' counsel also took the unfortunate step of vouching for her witness' credibility. In the context of the numerous irregularities in this case, this was also error, and further compels us to set aside the verdict.

It is a cardinal rule under the Pennsylvania Rules of Professional Conduct that "[a] lawyer shall not . . . when appearing before a tribunal, assert the lawyer's

personal opinion as to the justness of a cause, as to the credibility of a witness, [or] as to the culpability of a civil litigant." Pa. R. Prof. Conduct 3.4. Aside from the basic matter of conduct, the Third Circuit has held on several occasions that counsel's vouching for client testimony at trial may be a factor that warrants a new trial. *See, e.g., Blanche Rd.*, 57 F.3d at 264 (new trial warranted on several grounds, including fact that counsel commented that his client had testified "honestly" on cross-examination); *Draper*, 580 F.2d at 95 (ordering a new trial in case where counsel had attested for the "justness of his client's cause"); *see also Fineman*, 980 F.2d at 206-07.

In this case, counsel told the jury that her clients had testified honestly and vouched for the justness of their cause in ways that went past that permissible during a closing. For example, counsel told the jury, "I purport to you, as you look at them, and again, this is about demeanor, they were telling the truth." (N.T. 3/9 34:4-8.) She advised the jury that "the only credible, truthful, entirely truthful testimony that has been presented here in this courtroom has been from the witnesses put on the stand during the plaintiffs' case." (N.T. 3/9 33:5-10.) Regarding the plaintiffs' neighbors who testified, counsel told the jury, "Those two folks testified I believe in a highly credible fashion." (N.T. 3/9 34:1-35:3.) About Dr. Ingraffea, the jury was told that he was an "obviously honest man . . . . Dr. Ingraffea was so honest . . . ." (N.T. 3/9 37:16-38:3.) Regarding Erik Roos and

Victoria Switzer, they were held out as "impeccable witnesses, truth-telling witnesses, people who are in obvious distress." (N.T. 3/9 42:7-43:4.) The Court recognizes that it is the advocate's art to argue before a jury in order to persuade them regarding the credibility of particular witnesses, but this vouching was excessive, particularly during a closing that was riddled with other problems.

During the closing, plaintiffs' counsel also erred by suggesting to the jury that the Court had made certain legal rulings or findings with respect to Cabot's negligence, risking the jury being led to believe that the Court had already in some manner found for the plaintiffs:

> Before I was able to stand here before you today I had to make – we, plaintiffs, I speak for them – had to make a prima – what's called a prima facie showing of enough evidence to allow me to speak to you. That's legalese, I have a right to be here with my plaintiffs to ask for your consideration of their situation and hopefully a unanimous verdict that will allow them to put to rest something that has been going on way to loo long. And that is the difficulties of filing a lawsuit and standing behind a lawsuit for six years. Under great odds, great difficulty. So, there is a predicate for the plaintiffs being here, a legal predicate.

(N.T. 3/9 21:25-22:11.) The Court specifically addressed this matter with counsel prior to the defendant's closing, noting it was one of several irregularities with her argument that risked placing in jeopardy any verdict her clients might receive, and instructing her to refrain from further similar comments on rebuttal.

During the questioning of witnesses, counsel also improperly referred to matters that were excluded from trial on the basis of *in limine* rulings, thus further risking confusing the jury, and creating the impression that they were not being told all the facts, and that Cabot had something to hide.  This occurred when questioning Cabot employees like Philip Stalnaker whether there were reasons "other than a business decision" why Cabot would decide to plug the Gesford wells, something that risked getting into matters that had been covered by *in limine* rulings, including Cabot's out-of-court COSA with the DEP, something the Court at the time told counsel "creat[ed] an unfair implication that there is something else at play that I have excluded from evidence, and that would be, I think, an unfair implication to leave with the jury."  (N.T. 3/1 179:2-182:7.)  Yet this happened on numerous occasions, to Cabot's prejudice.  For example, in an argumentative exchange with Dr. Hilbert, plaintiffs' counsel asked him whether he would acknowledge that the "DEP is not in concurrence with your opinions in this case? You do accept that?"  (N.T. 3/7 197:9-202:25.)  This, too, led to a sidebar where the Court expressed its concern that counsel was again tiptoeing around the issue of matters that had been excluded by pretrial rulings.  After hearing from counsel, the Court made clear that her questioning was problematic:  "I do think that certainly your question regarding DEP disagreeing with his findings – it seems to go directly into the area that I thought I had precluded as a matter of law after

53

briefing and argument by the parties.  I do think if you're going to trot into those areas again you need to come up to sidebar first.  We have done this repeatedly throughout these proceedings, and it is not fair to this jury.  And it is not the way to proceed."  (*Id.*)  This came towards the end of trial, after numerous other similar issues had arisen with testimony from the plaintiffs' witnesses, which seemed to invite speculation regarding matters that were excluded from trial, including the administrative proceedings.[8]  This trespass into areas that had been excluded risked confusing the jury, was prejudicial to Cabot, and undermines confidence in the jury's verdict.

Regardless of whether counsel's conduct was willful or unintentional each of these episodes was inappropriate and plainly prejudicial. Taken together the aggregate prejudicial impact of counsel's missteps, in combination with the manifest weakness of the evidence, lead us to conclude that a new trial is required. *Fineman*, 980 F.2d at 207.  The Court appreciates that plaintiffs' counsel has characterized some of these instances as "innocent misstep[s] or "unintentional

---

[8]  Notably, the Court raised this issue at the outset of the case, and flatly instructed counsel for both sides that the case would not involve relitgation of prior administrative proceedings:  "Cases inspire great passions, and this case is no exception.  But those great passions must be bound, confined and bridled by the rulings of this Court.  And so I commend that advice and that observation to everyone as we commence what I expect to be a well-tried and hard-fought trial, that all parties must abide by the prior rulings of this Court, in particular with respect to matters such as references to administrative actions that may or may not have been taken, settlement of other litigation that had been pending.  Such matters I've ruled upon are not part of this case."  (N.T. 2/23 9:2-11.)

'slips'" that were brought out by the complexity of trial.  (Pl. Opp. At p. 6, 119

n.25, 122, 124, 129, 134, 151.)  However, some of the "missteps" happened with

such frequency, even after counsel had specifically been admonished, that they

compel us to the conclude that plaintiffs' counsel fell into precisely the snare of

their own making which we urged them to avoid by indulging in conduct which:

"could undermine any verdict that [the plaintiffs'] receive."  (N.T. 3/9 38:17-20.)

Sadly, our warnings were not heeded, and the seeds sown by this trial

conduct now bear a bitter fruit for the plaintiffs.  Therefore, the Court finds that

although counsel may have been seeking to deliver zealous advocacy on behalf of

clients she has known for years regarding a matter that holds deep meaning for her

personally, the aggregation of the instances of inappropriate conduct throughout

the trial cannot be allowed to stand where the Court finds it very likely that they

influenced the jury's verdict in this case.

### 3. There Was Insufficient Evidence to Support the Jury's Award of over $4 million in Damages for Private Nuisance Claims

As the Court has frequently noted throughout this opinion, one theme

running through this case continued at trial:  it became narrower.  Thus, at the

conclusion of the plaintiff's case-in-chief, the Court was constrained to grant

Cabot's motion for entry of judgment in its favor with respect to the Elys'

negligence claims, finding that the plaintiffs lacked evidence to support this claim.

This left the Elys and Huberts with claims that Cabot's drilling activities interfered with their access to water and created a private nuisance.  This further reduction in the scope of the plaintiffs' claims was apparently not fully appreciated by the jury, which after finding in favor of the plaintiffs' on the remaining nuisance claim, awarded damages of $4.24 million, which bore no relationship to the facts of the case, the plaintiffs' own testimony, or the Court's instructions on the law.

The Court has already concluded that the jury's verdict must be set aside, and a new trial ordered, because the verdict of liability was against the weight of the evidence, and because of counsel's misconduct throughout trial.  In addition, the Court finds that the jury's award of damages must be set aside because it is impossible to justify such an extraordinarily high amount based on the limited evidence that was offered in support of any damages award at all; it was by any measure excessive.  Although the jury heard evidence regarding mental and emotional distress claimed by the plaintiffs, and some general testimony regarding the costs of hauling water from an off-site location, neither of these categories provided a basis for the jury to award any amount of damages for nuisance alone. (N.T. 3/9 105:25-106:2.)  Instead, the jury was to award damages, if any, for the plaintiffs' inconvenience in the disruption of their water consumption and day-to-day activities on their property.

The plaintiffs offered limited evidence regarding their water conservation activities, including, among other privations:  limitations on showering, (*see, e.g.*, N.T. 2/24 207:15-19); resorting to doing laundry at a Laundromat   (see, e.g., N.T. 2/25 50:10-12, 207:15-22); reusing bath water (see, e.g., N.T. 2/24 92:24-93:1); and monthly checks of water tank supply (see, e.g., N.T. 3/3 33:19-25, 34:25-35:24); and in Ray Hubert's case, bathing in a pond on the property.  Although some of these matters were doubtless inconvenient, the evidence also reveals that many of these actions were likely unnecessary since the condition of the plaintiffs' water had improved over time and the plaintiffs has been offered, and refused, mitigation systems.

Given the profoundly mixed, equivocal and limited nature of this damages evidence, there simply is no reasoned and informed way to comprehend how these examples of inconvenience justified an award of the size handed down by the jury. Although a jury generally has broad discretion to consider damages, its award must still be grounded in a reasonable assessment of the evidence, and the jury may not abandon analysis for sympathy.  *See, e.g., Gumbs v. Pueblo Intern., Inc.*, 823 F.2d 768, 773 (3d Cir. 1987) ("A jury has very broad discretion in measuring damages; nevertheless, a jury may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket.  There must be a rational relationship between the specific injury sustained and the amount

57

awarded."). Given the paucity of proof of damages, and the potential for confusion created by the plaintiffs' presentation at trial, in addition to finding that the verdict of liability was against the weight of the evidence, and was likely affected by plaintiffs' counsel's improper conduct, we conclude the jury's award of damages also lacks sufficient basis and must be set aside.

## IV.   __CONCLUSION__

For all of the foregoing reasons, an Order will be entered granting Cabot's motion in part, vacating the jury's verdict in favor of the plaintiffs in its entirety, and ordering that a new trial be held if the parties are unable to reach a mutual settlement of the plaintiffs' remaining claims.

*/s/  Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated:  March 31, 2017